

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR OBSTRUCTION
### OF CONGRESS AND FALSE STATEMENTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| v. | * | SECTION: |
| DAVID RAINEY | * | VIOLATIONS: 18 U.S.C. § 1001 |
| | | 18 U.S.C. § 1505 |

**FELONY**

**12-291**

**SECT. N MAG. 3**

* * *

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

<u>Background</u>

1.      Defendant DAVID RAINEY was Vice President of Exploration for the Gulf of

Mexico for a subsidiary of BP plc, a multinational energy corporation headquartered in London,

England ("BP").

2.      On or about April 20, 2010, a blowout of natural gas, oil, and mud occurred

onboard the *Deepwater Horizon*, a drilling rig BP had leased and used to perform drilling work

on the Macondo well in the Gulf of Mexico.  The gas from the blowout ignited and quickly

caused explosions that killed 11 men onboard.  Over the next three months, millions of barrels of

oil gushed into the Gulf of Mexico from the well.

Fee USA
Process
X Dktd
CtRmDep
Doc. No.

3.     After the blowout, defendant RAINEY served on behalf of BP as Deputy Incident Commander at Unified Command, headquartered in Robert, Louisiana, in the Eastern District of Louisiana.  Unified Command consisted of representatives from the U.S. government as well as BP and Transocean Ltd., the designated "responsible parties" for purposes of responding to the spill. Led by the United States Coast Guard, Unified Command coordinated the oil spill response. Defendant RAINEY was BP's second highest-ranking representative at Unified Command.

Early Flow-Rate Estimates

4.     The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties.

5.     On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that the well was flowing at a rate of approximately 1,000 barrels of oil per day ("BOPD").

6.     On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD. The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times.  As a result of this NOAA estimate, on or about April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD.

2

<u>Defendant RAINEY's Estimates</u>

7.     After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimates, defendant RAINEY, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil floating on the surface of a water body, known as "mass balance" estimates.  Defendant RAINEY's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method.

8.     Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BP had employees who were trained in generating such estimates, defendant RAINEY performed and caused to be performed his own daily estimates purportedly using the ASTM and Bonn methods.

9.     Defendant RAINEY's Bonn estimates resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD.  Defendant RAINEY withheld his Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress.

10.    Defendant RAINEY's "ASTM" estimates did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD.  In effect, defendant RAINEY conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate. Defendant RAINEY labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method.

11.     As described below, defendant RAINEY, along with other BP executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP information suggesting the flow rate was considerably higher.

<u>BP's Actual Estimates</u>

12.     In its engineering response to the Macondo oil spill, BP did not rely internally on defendant RAINEY's contrived and inaccurate flow-rate numbers.  Instead, BP had numerous expert teams assessing the flow rate using sophisticated methodologies that focused on the conditions at the seafloor where the oil and natural gas were gushing out.  Defendant RAINEY knew that these teams were generating flow-rate estimates much higher than defendant RAINEY's purported "best guess" of between 5,000 and 6,000 BOPD.

13.     For example, on or about April 22, 2010, defendant RAINEY received an estimate of "various release scenarios" from subsurface engineers of BP that estimated potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

14.     Also, on or about May 11, 2010, a team of BP engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck").  Defendant RAINEY received a copy of the Engineer 1 Slide Deck no later than May 17, 2010.

<u>BP's Public Estimate Questioned</u>

15.     On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the Macondo well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP had recently released.

16.     On or about May 14, 2010, BP publicly rejected the university professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of defendant RAINEY's Bonn estimates and other internal BP engineering estimates, including the work of Engineer 1 described above.

17.     On or about May 14, 2010, Engineer 1 sent an email to two of BP's executives, including BP's then-Chief Executive Officer for Exploration and Production, expressing concern over BP's continued public embrace of the 5,000 BOPD number.  The email stated:

> I just read an article on CNN (May 14, 2010 1 p.m.) stating that a researcher .
> . . believes that the Macondo well is leaking up to 70,000 BOPD and that BP
> stands by a 5,000 BOPD figure.  With the data and knowledge we currently
> have available, we cannot definitively state the oil rate from this well.  We
> should be very cautious standing behind a 5,000 BOPD figure as our
> modeling shows that this well could be making anything up to ~ 100,000
> BOPD depending on a number of unknown variables, such as: flow path
> either through the annulus behind the production casing or through the
> production casing float shoe, the height of reservoir exposed, if drill pipe
> suspended in the BOP and sealed by VBR rams, reservoir skin damage,
> choking effects and etcetera.  We can make the case for 5,000 bopd only
> based on certain assumptions and in the absence of other information, such as
> a well test.

(emphasis added).

18.     Engineer 1's email caused concern within BP because it contradicted BP's public position regarding flow rate.  On or about May 17, 2010, defendant RAINEY received a copy of the Engineer 1 email and was directed to prepare an internal memorandum to address Engineer 1's concerns.

## The Rainey Memo

19.     On or about May 17, 2010, defendant RAINEY prepared a memorandum purporting to summarize the efforts that had been undertaken within Unified Command to estimate flow rate

(the "Rainey Memo"). The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

a.  Defendant RAINEY omitted his own Bonn estimates, which were significantly higher than 5,000 BOPD.

b.  Defendant RAINEY falsely labeled the estimates he included in the memorandum as "ASTM" calculations.

c.  Defendant RAINEY omitted that the estimates he included in the memorandum were premised on data and other inputs he knew were inaccurate.

d.  Defendant RAINEY omitted other documents relating to flow-rate estimates that contradicted his 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP engineer ("Engineer 2") of the university professor's work that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate assessment of the flow rate based on the same video footage of the spill.

e.  Defendant RAINEY falsely stated that his estimates ranging from 5,000 to 6,000 BOPD "played an important part in Unified Command's decision [on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per day." In fact, as defendant RAINEY well knew, he had not yet provided his purported "ASTM" estimates to Unified Command by the time that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

### The Flow Rate Technical Group

20.     On or about May 19, 2010, as a result of the growing concern that BP was understating the amount of oil spilling from the Macondo well, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government experts, to determine the flow rate.  Later, following independent analysis, the FRTG announced on or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been approximately 62,000 BOPD – over twelve times BP's public estimate of 5,000 BOPD – and had been approximately 53,000 BOPD at the time the well was shut in on or about July 15, 2010.  The FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during the course of the spill.

### The Congressional Inquiry and Investigation

21.     The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress.  The Subcommittee had oversight authority over matters including the regulation of energy, drinking water and soil and water contamination.  The Subcommittee's oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation.  The Subcommittee was a "Committee" for purposes of Title 18, United States Code, Section 1505.

22.     Following the *Deepwater Horizon* blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well.  Congress's inquiry and investigation included, among other things, requests for information from BP.

23.     On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant RAINEY falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate.  Defendant RAINEY further stated to Congress that, while BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at that time.  During the May 4 briefing, Defendant RAINEY did not disclose any information that contradicted his purported "best guess" of 5,000 BOPD, including his own Bonn estimates and other BP internal information of which he was aware indicating that the actual flow – not a hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed – was likely much higher than 5,000 BOPD.

24.     On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing it of understating the amount of oil leaking from the well.  The letter noted that BP had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day."  The letter further stated that Congress was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster."  The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available."  Among other things, the Subcommittee requested:

        a.     "What is the BP method and scientific basis for the estimate of 5,000 barrels per day?  Was this estimate based solely on surface monitoring of the size of the spill?"

b.  "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

c.  "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

25.    On or about May 21, 2010, defendant RAINEY began working on a response to the May 14 Congressional request.  Defendant RAINEY was the primary source of flow-rate information for BP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate.  During the preparation of the BP Response, defendant RAINEY continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low."  Aware of this and other information contradicting the 5,000 BOPD estimate, defendant RAINEY withheld such information from other BP employees and from BP in-house and outside lawyers with whom he was working on the BP Response.  Defendant RAINEY also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response.

26.    On or about May 24, 2010, BP submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant RAINEY.  As a result of defendant RAINEY's actions in withholding information and also providing false and misleading information, the BP Response made false and misleading

statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation.  For example:

a.  The BP Response omitted all of defendant RAINEY's Bonn estimates, which contained estimates of the oil spill up to 92,000 BOPD.

b.  The BP Response omitted key parts of Engineer 1's work, which defendant RAINEY possessed, including flow-rate estimates up to 82,000 BOPD.

c.  The BP Response omitted Engineer 1's email expressing concern about BP's public defense of the 5,000 BOPD estimate.

d.  The BP Response falsely labeled defendant RAINEY's estimates as having been calculated using the "ASTM" method, when, in fact, the estimates did not conform to that method.

e.  The BP Response omitted that defendant RAINEY's purported "ASTM" estimates were premised on data and other inputs defendant RAINEY knew were inaccurate.

f.  The BP Response omitted that defendant RAINEY had manipulated his purported "ASTM" estimates to arrive near 5,000 BOPD.

g.  The BP Response omitted Engineer 2's conclusion, which defendant RAINEY possessed, that a proper assessment of the video footage relied upon by the university professor resulted in an estimate of 15,000 BOPD – three times higher than the 5,000 BOPD estimate contained in the BP Response that defendant RAINEY asserted was the best estimate.

h.  The BP Response omitted the Subsurface Team Estimates, which defendant RAINEY possessed, which ranged from 64,000 to 146,000 BOPD.

i.  The BP Response falsely stated that defendant RAINEY's purported "ASTM" estimates played an important part in Unified Command's decision to raise its early estimate from 1,000 to 5,000 BOPD.

j.  The BP Response omitted data defendant RAINEY received on or about May 22, 2010, that the amount of oil actually being collected via the RITT confirmed that the flow rate was in excess of 5,000 BOPD.

k.  The BP Response omitted a May 23, 2010 email from the head of the FRTG to defendant RAINEY and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

## COUNT ONE
### (Obstruction of Congress)

27.     The allegations contained in Paragraphs 1 through 26 above are realleged and incorporated as if fully set forth herein.

28.     Between on or about May 4, 2010 and on or about May 24, 2010, both dates being approximate and inclusive, in Robert, Louisiana, in the Eastern District of Louisiana and elsewhere, defendant

### DAVID RAINEY,

did corruptly endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives, to wit: the Subcommittee on Energy and Environment of the Committee on Energy and Commerce.

All in violation of Title 18, United States Code, Section 1505.

## COUNT TWO

### (False Statements)

29.     The allegations contained in Paragraphs 1 through 26 above are realleged and incorporated as if fully set forth herein.

30.     On or about April 8, 2011, in New Orleans, Louisiana, in the Eastern District of Louisiana and elsewhere, defendant

### DAVID RAINEY,

in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, namely: during the course of an interview by federal law enforcement agents conducting an official investigation, defendant RAINEY falsely stated that he had calculated a

12

flow-rate estimate for the Macondo well to be approximately 5,000 BOPD before seeing NOAA's

flow-rate estimate of 5,000 BOPD, when, in truth and in fact, as defendant RAINEY well knew, he

had prepared his own purported flow-rate estimates only after seeing NOAA's 5,000 BOPD flow-

rate estimate.

All in violation of Title 18, United States Code, Section 1001(a)(2).

_____ : A TRUE BILL
FOREPERSON


**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF LOUISIANA**

_____
JIM LETTEN [8517]
United States Attorney
RICHARD R. PICKENS, II [22593]
Assistant United States Attorney

**ASSISTANT ATTORNEY GENERAL**
**CRIMINAL DIVISION**

_____
LANNY A. BREUER [Member of DC Bar]
Assistant Attorney General
JOHN D. BURETTA [Member of NY Bar]
Director, Deepwater Horizon Task Force
DEREK A. COHEN [Member of NY Bar]
Deputy Director, Deepwater Horizon Task Force
AVI GESSER [Member of NY Bar]
Deputy Director, Deepwater Horizon Task Force
EDWARD KANG [Member of NY Bar]
Trial Attorney, Deepwater Horizon Task Force


New Orleans, Louisiana
November 14, 2012

FORM OBD-34

No._____

UNITED STATES DISTRICT COURT

Eastern ___ District of ___ Louisiana

___ Criminal ___ Division

THE UNITED STATES OF AMERICA

vs.

DAVID RAINEY

INDICTMENT

INDICTMENT FOR
OBSTRUCTION OF CONGRESS
AND FALSE STATEMENTS

VIOLATIONS: 18 USC § 1001
18 USC § 1505

A true bill.

_____
Foreperson

Filed in open court this _____ day, of
_____ A.D. 2012.

_____
Clerk

Bail, $ _____

RICHARD R. PICKENS, II
Assistant United States Attorney