# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30770

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

                              Plaintiff-Appellant

v.

DAVID RAINEY,

                              Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, GARZA, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Distilled, this appeal raises a pure question of statutory interpretation. Congress criminalizes obstructing "the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress." 18 U.S.C. § 1505. The defendant contends, and the district court agreed, that he cannot be prosecuted under § 1505 for obstructing a congressional-subcommittee investigation because a congressional subcommittee is not "any committee of either House." We interpret the statutory class of "any committee of either House," however, to include congressional subcommittees. We VACATE accordingly.

No. 13-30770

I.

This criminal prosecution stems from BP plc's ("BP") response to the explosion on the *Deepwater Horizon* drilling rig on April 20, 2010. The defendant is David Rainey, BP's former Vice President of Exploration for the Gulf of Mexico.[1]

A.

Following the explosion, the United States Coast Guard coordinated the spill response by forming a "Unified Command" and installing Rainey as Deputy Incident Commander. Flow-rate estimates, stated in barrels of oil flowing from the well per day ("BOPD"), acted as the primary metric for gauging the spill's severity and therefore were integral to tailoring response efforts. Initially, the Unified Command estimated a flow-rate of 1,000 BOPD, but the National Oceanic and Atmospheric Administration ("NOAA") suggested that the flow rate was in fact 5,000 BOPD. The NOAA accompanied its flow-rate estimate with a number of qualifiers, including that its methodologies were "highly unreliable," that its estimate was accurate "to only an order of magnitude," and that the actual flow rate could potentially exceed 5,000 BOPD by ten times. Acknowledging the NOAA estimate, the Unified Command raised its public estimate to 5,000 BOPD.

The NOAA estimate also inspired Rainey independently to research and conduct his own flow-rate estimates. Rainey surfed the internet for "mass-balance" estimates, which is a method to conduct oil-spill estimates based on observing oil floating on the water's surface. Rainey discovered two generally accepted mass-balancing techniques: the American Society for Testing and Materials ("ASTM") method and the European ("Bonn") method. Rainey's Bonn

---

[1] The facts in this section are stated as alleged in the original indictment.

No. 13-30770

estimates were significantly higher than 5,000 BOPD, reaching upwards of 92,000 BOPD. As alleged in the indictment, Rainey's ASTM estimates did not conform to ASTM standards and were "manipulated to consistently arrive at or near a 'best guess' of between 5,000 and 6,000 BOPD." Aware of competing estimates, Rainey and other BP executives nevertheless maintained that 5,000 BOPD was the "best guess estimate." Internally, by contrast, BP relied on expert teams using sophisticated methodologies that focused on the conditions at the seafloor. Subsurface engineers at BP sent Rainey their estimates, which estimated that flow rates ranged from 64,000 to 146,000 BOPD. Rainey also knew that other BP engineers estimated a range of 14,000 to 82,000 BOPD.

Conflict between BP's engineers and Rainey notwithstanding, BP stood by its 5,000 BOPD estimate and publically rejected a professor's estimate that the flow rate was approximately 70,000 BOPD. Privately, it is alleged, a BP engineering supervisor sent an email to executives explaining that "[w]e should be very cautious standing behind a 5,000 BOPD figure as our modeling shows that this well could be making anything up to ~100,000 BOPD depending on a number of unknown variables." Rainey received this email, and it fell to him to draft a memorandum defending BP's allegiance to the 5,000 BOPD estimate. The "Rainey Memorandum," as it is referred to in the indictment, selectively omitted evidence calling into question BP's 5,000 BOPD estimate and made material misrepresentations. Among other things, the Rainey Memorandum omitted Rainey's own Bonn estimates and represented that Rainey's own ASTM estimates were central to the Unified Command's decision to raise its estimate to 5,000 BOPD even though Rainey had not provided his ASTM estimates to the Unified Command in advance of the decision to raise the estimate. BP's estimate became harder to sustain, however, and the Unified Command created the "Flow Rate Technical Group," which consisted of independent and government experts. The Flow Rate

3

Technical Group estimated that the flow rate after the blowout was approximately 62,000 BOPD and was 53,000 BOPD at the time the well was shut.

Enter the House Subcommittee on Energy and Environment (the "Subcommittee"), which was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress. The Subcommittee investigated the blowout and spill, and requested information from BP. In response to a Congressional request for briefing, Rainey informed the Subcommittee that 5,000 BOPD was the most accurate estimate. He explained that the "worst case" scenario was 60,000 BOPD, but that this scenario was not possible in part because it assumed removal of the blowout preventer from the wellhead. Rainey did not disclose his own Bonn estimates and other BP internal estimates indicating that the flow rate was higher than 5,000 BOPD.

Subsequently, the Subcommittee Chairman sent BP a letter accusing it of understating the flow rate and requested that BP respond to fifteen questions relating to its flow-rate calculations. Among other requests, the Subcommittee requested that BP explain what methodology supported its 5,000 BOPD estimate, that BP produce all of its documents that relate to its flow-rate estimates, and that BP provide its current estimate of the flow rate and its methodology supporting that estimate. Rainey was the primary source of flow-rate information for BP's response to the Subcommittee. Rainey was aware that everyone within the Flow Rate Technical Group agreed that 5,000 BOPD was too low, but he did not disclose this disagreement to BP's lawyers and other BP employees. Indeed, BP's response omitted key information which would have undercut its 5,000 BOPD estimate. The response did not include, among other things, Rainey's Bonn estimates that ranged up to 92,000 BOPD, key parts of the supervising engineer's estimates ranging up to 82,000 BOPD,

No. 13-30770

the supervising engineer's email indicating concern with BP's 5,000 BOPD estimate, and the subsurface engineers' estimates ranging up to 146,000 BOPD. BP's response also appended Rainey's prior memorandum defending the 5,000 BOPD estimate.

### B.

A federal grand jury indicted Rainey for one count of obstructing Congress in violation of 18 U.S.C. § 1505, and one count of making false statements in violation of 18 U.S.C. § 1001. Rainey moved to dismiss the obstruction count (count one) on four separate grounds. First, Rainey argued that § 1505 applies only to a duly authorized inquiry or investigation by a committee and that the Subcommittee Chairman was acting in his individual capacity rather than on behalf of a duly authorized committee investigation when he sent the relevant questionnaire to BP. Second, Rainey argued that the indictment failed properly to allege that he knew of the pending congressional investigation, which is an essential element of § 1505. Third, Rainey argued that § 1505 does not apply to the obstruction of subcommittee investigations. Fourth, Rainey argued that § 1505 was unconstitutionally vague.

On May 20, 2013, the district court dismissed the obstruction count on two alternative grounds. First, the district court determined that § 1505 did not apply to subcommittee investigations and, second, the district court ruled that the indictment did not allege that Rainey knew of the Subcommittee's investigation. On June 19, 2013, the Government moved the district court to reconsider its ruling. That same day a federal grand jury returned a superseding indictment. The district court subsequently denied reconsideration on June 21, 2013, and on July 19, 2013, the Government filed its notice of appeal.

No. 13-30770

## II.

Three issues postpone our discussion of § 1505, as neither party thinks we should decide this appeal. Rainey moves to dismiss the Government's interlocutory appeal as untimely and, alternatively, as moot. The Government, for its part, requests that we hold the appeal in abeyance pending the district court's ruling on the superseding indictment. We deny all three motions.

### A.

In a criminal case, an affirmative appeal by the Government "shall be taken within thirty days after the decision, judgment or order has been rendered." 18 U.S.C. § 3731. The district court dismissed count one on May 20, 2013, but on the thirtieth day after the dismissal, the Government moved the district court to reconsider its ruling. The Government filed its notice of appeal within thirty days after the district court denied its motion to reconsider, but sixty days after the initial dismissal. Rainey argues that the Government's notice of appeal was outside of the thirty-day window provided by § 3731 and therefore is untimely.

Deflating Rainey's argument is the Supreme Court's decision in *United States v. Healy*, which held that "a timely petition for rehearing by the Government filed within the permissible time for appeal renders the judgment not final for purposes of appeal until the court disposes of the petition." 376 U.S. 75, 77–78 (1964). By validating the exact sequence in this case, *Healy* explained that its holding was "consistent with a traditional and virtually unquestioned practice." *Id.* at 79. The Supreme Court has repeatedly reaffirmed *Healy*. *See United States v. Ibarra*, 502 U.S. 1, 6–8 (1991) (per curiam); *United States v. Dieter*, 429 U.S. 6, 7–9 (1976) (per curiam). Our circuit has followed *Healy* without pause. *See, e.g., United States v. Greenwood*, 974 F.2d 1449, 1466–67 (5th Cir. 1992).

6

Rainey counters that *Bowles v. Russell* overrules *Healy* and its progeny. 551 U.S. 205 (2007). In *Bowles*, the Supreme Court held that a district court could not extend a party's time for filing an appeal beyond the statutorily prescribed period. *Id.* at 206. The Court reasoned that "[l]ike the initial 30–day period for filing a notice of appeal, the limit on how long a district court may reopen that period is set forth in a statute." *Id.* at 213. The filing period is a jurisdictional limit, the Court continued, and "this Court has no authority to create equitable exceptions to jurisdictional requirements." *Id.* at 214.

There is a certain friction between *Healy*'s atextual recognition that a motion to reconsider renders a judgment not final and *Bowles*'s elimination of judge-made exceptions to statutory filing periods, but we must read these cases favoring reconciliation, especially when *Bowles* does not mention *Healy* or any of the cases Rainey contends are now overruled. *See, e.g., In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012) ("[W]e exercise restraint when determining whether a Supreme Court decision has produced an intervening change in the law."). The Supreme Court instructs that if "a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (internal quotation marks omitted). *Healy* directly controls and also may be distinguished from *Bowles* because it does not extend the statutory prescribed filing period, but delineates when the thirty-day period begins to run. Under *Healy*, the Government continues to be bound by the thirty-day requirement, but the judgment becomes final, and the clock begins to run, only after the disposition of a timely filed motion to reconsider. Therefore, and consistent with our sister circuits' continuing application of *Healy* after *Bowles*, we hold that the Government's appeal is timely. *See United States v. Cook*, 599 F.3d 1208, 1212–

No. 13-30770

13 (10th Cir. 2010); *United States v. Henderson*, 536 F.3d 776, 778–79 & n.2 (7th Cir. 2009).

## B.

The same day that the Government moved the district court to reconsider the dismissal of count one, a federal grand jury returned a superseding indictment. The superseding indictment purports to correct defects identified by the district court and appealed to us, including that Rainey obstructed a committee of the House rather than a subcommittee. Rainey contends that the return of a superseding indictment moots the Government's appeal of the original indictment. We have recognized, however, that "two indictments may be outstanding at the same time for the same offense if jeopardy has not attached to the first indictment." *United States v. Stricklin*, 591 F.2d 1112, 1116 & n.1 (5th Cir. 1979). More exactly,

> [t]he filing of the second superseding indictment, upon which the Government apparently intends to try defendant, does not moot this appeal because the first superseding indictment is presently still pending and because the conspiracy counts in the first and second superseding indictments are identical so that any decision here would control the disposition of a motion directed at the subsequent indictment.

*United States v. Lee*, 622 F.2d 787, 789 (5th Cir. 1980).

Rainey insists that the superseding indictment proceeds on a different ground than the original indictment, and therefore the outcome of this appeal cannot have any future impact. But in *Stricklin*, a superseding indictment did not render the appeal moot; indeed, we considered "both indictments for purposes of this review." *Stricklin*, 591 F.2d at 1116 n.1. The Government in *Stricklin* "indicated that it may attempt to proceed on a combination of the two indictments because the superceding [sic] indictment deals only with a portion of the original indictment's charges." *Id.* Equally here, the Government represents that "if the district court's order were reversed, [it] could proceed on

8

No. 13-30770

a theory that Section 1505 prohibits obstruction of inquiries by both full committees and subcommittees by, for example, seeking to once again supersede the indictment to include this theory." Because Rainey has not demonstrated that "the issues presented are no longer live," we apply our controlling precedent in *Stricklin* and deny his motion to dismiss. *AT&T Commc'ns of Sw., Inc. v. City of Austin*, 235 F.3d 241, 243 (5th Cir. 2000).[2]

## C.

The Government next asks us to invoke our discretion to hold this appeal in abeyance pending the district court's resolution of Rainey's motion to dismiss the superseding indictment. The Government represents that if the superseding indictment survives dismissal, it would dismiss this appeal. Because resolution of this appeal will clarify the proceedings below and because the superseding indictment might too be dismissed, we deny the Government's motion. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

## III.

Section 1505 is entitled "[o]bstruction of proceedings before departments, agencies, and committees." The statute punishes criminally whoever obstructs "the due and proper exercise of the power of inquiry under which any inquiry

---

[2] Rainey's reliance on *United States v. Scott*, 884 F.2d 1163 (9th Cir. 1989) is misplaced. In *Scott*, the Ninth Circuit acknowledged that "when an indictment is dismissed and replaced with an information charging offenses different than those contained in the indictment, any challenge to the legal sufficiency of the indictment becomes moot," reasoning that "[w]ere we to overturn the indictment in such a case, it would have no effect on the defendant's conviction under the superseding information." *Id.* at 1164. The Ninth Circuit went on to explain, however, that "[c]onversely, when it is within our power, in deciding the appeal from the first indictment, to affect the resolution of the government's case against the defendant under the second, the appeal from the first indictment is not moot." *Id.* at 1165 (citing *Lee*, 622 F.2d at 789).

No. 13-30770

or investigation is being had by either House, or any committee of either House or any joint committee of the Congress." 18 U.S.C. § 1505. Because the district court found § 1505 ambiguous—tolerating competing interpretations of "any committee of either House"—it invoked the rule of lenity to dismiss count one. Our *de novo* interpretation[3] reads § 1505 differently because, under its plain meaning, a congressional subcommittee is "any committee of either House." § 1505. Section 1505 is not boundless, but it is not ambiguous, either. *See, e.g., Loughrin v. United States*, No. 13-316, 2014 WL 2807180, at *4 (U.S. June 23, 2014) (noting that "[Loughrin's] proposed inquiry would thus function as an extra-textual limit on the clause's compass" because "imposing that requirement would prevent [18 U.S.C.] § 1344(2) from applying to a host of cases falling within its clear terms").

### A.

"Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States*, 522 U.S. 52, 57 (1997). We determine whether a statute is plain or ambiguous by "reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The text is plain and determinative, and all tools of statutory construction favor reading § 1505 to include congressional subcommittees.

### 1.

Section 1505 leaves "committee" undefined. The district court recognized that given its ordinary, plain meaning, the statutory language "any committee of either House" encompasses congressional subcommittees. Dictionary definitions of "committee" have remained markedly similar dating

---

[3] *United States v. Gore*, 636 F.3d 728, 730 (5th Cir. 2011).

back to § 1505's enactment in 1940. A committee was defined then as "[a] body of persons appointed or elected to consider, investigate, or take action upon, and usually to report concerning, some matter or business, as by a court, legislative body, or a number of persons." WEBSTER'S NEW INTERNATIONAL DICTIONARY 449 (1924); WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 539 (1934) (same). A "subcommittee," in turn, has also been consistently defined during § 1505's operation as "[a]n under committee; a part or division of a committee." WEBSTER'S NEW INTERNATIONAL DICTIONARY 2066 (1924); *see also* WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 2058 (1934) (same). Simply put, the House Subcommittee on Energy and Environment is one type of committee (an under committee) of the House and therefore is covered by the statutory language "any committee of either House." § 1505. Moreover, § 1505 modifies "committee" with "*any*." § 1505 (emphasis added). If Congress intended "committee" as a term of art, which under Rainey's proposed interpretation excludes other committee types, "a committee of either House" would perfectly define the class intended. The modifier "any," by contrast, suggests inclusion rather than exclusion. *See also* § 1505 (identifying "any joint committee" as protected).

Rainey contends that this plain reading should give way to a "technical" reading because this statute operates in the "congressional context." Rainey's argument faces an uphill battle because "[i]t is long settled that words in statutes should be given their ordinary, popular meaning unless Congress *clearly meant* the words in some more technical sense." *United States v. Nat'l Broiler Mktg. Ass'n*, 550 F.2d 1380, 1386 (5th Cir. 1977) (emphasis added); *see also United States v. Hubbard*, 480 F.3d 341, 348 (5th Cir. 2007) ("The question is whether there is sufficient indication that Congress indicated something other than the generic definitions of the terms it used."). The fixed default rule of plain meaning is especially appropriate in the criminal context, where the

No. 13-30770

statute's primary audience is not the legislators it protects but the would-be obstructors attempting to discern their potential exposure. *See, e.g., Holloway v. United States*, 526 U.S. 1, 6 (1999) ("Justice White reminded us that the language of the statutes that Congress enacts provides the most reliable evidence of its intent." (internal quotation marks omitted)). Rainey's view, however, is that "committee" does not mean committee in the ordinary sense, but means "a group of legislators, formally created by and reporting to the House(s) on particular matters, in accordance with the Rules of the House(s)." Because a subcommittee reports to the committee of which it is a part and not the entire House, Rainey argues a congressional subcommittee is not a "committee" for the purposes of § 1505.

Rainey's method of interpretation is atextual. Instead of relying on the statutory text to demonstrate that Congress intended a technical meaning of "committee" to supplant the plain meaning, Rainey primarily relies on "the congressional context" of the statute. Put another way, nothing in the statute itself reflects congressional intention to import a technical meaning to the phrase "any committee." Section 1505 does not prohibit obstructing any committee that "*reports to* either House," the definition Rainey suggests, but instead protects "any committee *of* either House." § 1505 (emphasis added). To this end, Rainey relies on House regulations defining a "committee," but he does not explain why the phrase "of either House" cross-references Congress's internal regulations into § 1505. Instead, "of either House" does not connote a technical term of art, it gives a limitation on the type of committee covered. Contrary to Rainey's argument that a plain meaning renders "of either House" superfluous, without the qualifier, § 1505 would apply to any committee

anywhere.[4] Accordingly, Rainey identifies no textual evidence indicating that Congress intended that its own technical understanding of the word "committee" overrides the text's plain meaning. *See Hubbard*, 480 F.3d at 348. For this reason alone, Rainey's argument fails.

The statute is clear, but even so, nothing in the legislative history calls our plain reading into question. *See United States v. Ridgeway*, 489 F.3d 732, 734 (5th Cir. 2007) ("The statute must be read as a whole, and only if the language is unclear do we turn to statutory history."). Rainey concedes that "failure to amend a statute should not be given undue weight," yet the bulk of his discussion of § 1505's history is divining meaning from revisions Congress could have made but did not. Accordingly, we do not give "undue weight" to congressional inaction, especially when courts uniformly interpret similar language in other statutes to include subcommittees. *See* Part III.A.2.

Rainey also attempts to draw congressional intent from the Act of June 18, 1940 Pub. L. No. 76–641, 54 Stat. 462, 467, which provided salaries for committee employees and listed, among other positions, "four clerk-stenographers, at the annual rate of $1,800 each, one for each subcommittee of the Committee on Appropriation . . . ." This appropriation for specific subcommittee employees implies little about § 1505's plain meaning. If anything, the Act undercuts Rainey's argument because the quoted section of the Act is entitled "Committee Employees," which demonstrates that Congress considered subcommittee employees to be "committee" employees. *Id.*

Rainey further cites the Economic Cooperation Act of 1948, ch. 169, § 124(c), 62 Stat. 137, 156, as evidence that the 80th Congress "not only knew how to, but did, use the term 'subcommittee' when it intended to include that

---

[4] Rainey also argues that a plain reading of the word "committee" renders "or any joint committee" superfluous. But a joint committee is not a committee "of either House," it is a committee of both Houses, and therefore a distinct class of committees.

No. 13-30770

type of entity." This legislation, however, "established a joint congressional committee to be known as the Joint Committee on Foreign Economic Cooperation (*hereinafter referred to as the committee*)." *Id.* (emphasis added). The Act further provides that "[t]he committee, or any duly authorized subcommittee thereof, is authorized to hold such hearings . . . ." *Id.* The material difference between this legislation and § 1505 is that the Act expressly defines the term "the committee" to replace the name of one particular committee for use throughout the statute. *Id.* The Act therefore provides an illustrative contrast; unlike the undefined phrase "any committee" in § 1505, Congress narrowed and defined the term "committee" to refer to a specific committee in the Act.[5] Thus, legislative history provides no barrier, controlling or persuasive, to our plain reading of § 1505.

2.

Our interpretation is consistent with the existence of § 1505 prosecutions for the obstruction of subcommittees, *see, e.g., United States v. Weissman*, 195 F.3d 96, 98 (2d Cir. 1999); *United States v. Lavelle*, 751 F.2d 1266, 1270 & n.3 (D.C. Cir. 1985), *abrogated on other grounds*, *Huddleston v. United States*, 485 U.S. 681 (1988); *United States v. North*, 708 F. Supp. 372, 374 & n.2 (D.D.C. 1988), and is further consistent with courts' uniform interpretation of the congressional contempt statute, 2 U.S.C. § 192, which contains § 1505's same crucial phrase, to cover subcommittees. Section 192 provides:

---

[5] That "committee" is undefined in § 1505 further distinguishes *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008). In *Ramos*, we recognized that the operative statutory phrase, "official proceeding," was defined by statute:

> The definition of "official proceeding" as used throughout § 1512 is found in § 1515(a)(1). The relevant definition for our purposes lies in § 1515(a)(1)(C), which, after referring to proceedings before federal judges, the grand jury and Congress, states that an "official proceeding" means "a proceeding before a Federal Government agency which is authorized by law."

*Id.*

No. 13-30770

> Every person who having been summoned as a witness by the
> authority of either House of Congress to give testimony or to
> produce papers upon any matter under inquiry before either
> House, or any joint committee established by a joint or concurrent
> resolution of the two Houses of Congress, or *any committee of either
> House of Congress*, willfully makes default, or who, having
> appeared, refuses to answer any question pertinent to the question
> under inquiry, shall be deemed guilty of a misdemeanor,
> punishable by a fine of not more than $1,000 nor less than $100
> and imprisonment in a common jail for not less than one month
> nor more than twelve months.

§ 192 (emphasis added).

The D.C. Circuit dismissed a narrow reading of "any committee of either House of Congress" in § 192. Attempting to negate a conviction under § 192, the defendant urged that "Congress did not intend to make it a crime to refuse to answer questions of a subcommittee." *Barenblatt v. United States*, 240 F.2d 875, 878 (D.C. Cir.), *vacated on other grounds*, 354 U.S. 930 (1957). The Court flatly disagreed:

> We disagree. Nothing has been shown which reflects that Congress
> has indicated such belief. We can only construe the statute in the
> light of the obvious purpose for its enactment. That purpose was
> to discourage the impairment of the vital investigative function of
> Congress. The function Congress sought to protect is as often
> committed to subcommittees as it is to full committees of Congress,
> as indeed it must be.

*Id.* (internal citations omitted). "Construing the statute in a manner consistent with its obvious purpose," the Court concluded, "we hold that Congress intended the word 'committee' in its generic sense, which would include subcommittees." *Id.* Consistent with *Barenblatt*, the Second Circuit subsequently recognized that "[s]ection 192 applies to subcommittees as well as to committees of Congress." *United States v. Seeger*, 303 F.2d 478, 482–84 & n.8 (2d Cir. 1962). The Supreme Court confirmed these circuit-court interpretations, acknowledging that § 192 applies to subcommittees

15

unflinchingly: "We do not question the authority of the Committee appropriately to delegate functions to a subcommittee of its members, nor do we doubt the availability of s 192 for punishment of contempt before such a subcommittee in proper cases." *Gojack v. United States*, 384 U.S. 702, 713 (1966).

Section 1505's focal phrase is also contained in 2 U.S.C. § 191. Section 191 provides:

> The President of the Senate, the Speaker of the House of Representatives, or a chairman of any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or of a committee of the whole, *or of any committee of either House of Congress*, is empowered to administer oaths to witnesses in any case under their examination.

*Id.* (emphasis added). The Second Circuit recognized: "In *United States v. Debrow*, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92, the Supreme Court sustained the sufficiency of an indictment for perjury based upon an oath taken *before a subcommittee* of the Senate the authority for which was a general statute, 2 U.S.C.A. 191 . . . .'" *United States v. Lester*, 248 F.2d 329, 330 (2d Cir. 1957) (emphasis added).

Rainey dismisses these authorities as articulating "dicta" and criticizes *Barenblatt* for "contraven[ing] . . . the fundamental rules of statutory construction." No party argues that these authorities are controlling, and Rainey's disagreements do not undermine their persuasive force. Moreover, Rainey makes no attempt to justify interpreting the language in § 1505 differently from the same language in § 191 and § 192 beyond the truism that they are different statutes.

3.

Federal obstruction statutes, we have recognized, are "drafted with an eye to the variety of corrupt methods by which the proper administration of

No. 13-30770

justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Griffin*, 589 F.2d 200, 206 (5th Cir. 1979) (internal quotation marks omitted) (interpreting § 1503). Our strictly textual interpretation is therefore further reinforced by our recognition that § 1505 and the analogous 18 U.S.C. § 1503 "have been given a broad and all-inclusive meaning." *United States v. Reeves*, 752 F.2d 995, 999 (5th Cir. 1985) (internal quotation marks omitted). "[T]his does not mean the statutes are to be given a sweep beyond the meaning of their language. Criminal statutes are to be strictly construed," *id.*, but our plain reading of § 1505 is consistent with "the well-established rule that the omnibus clauses of federal obstruction statutes should be broadly construed." *United States v. Mitchell*, 877 F.2d 294, 298 (4th Cir. 1989); *Rice v. United States*, 356 F.2d 709, 714–15 (8th Cir. 1966) (interpreting § 1505 and noting that "[t]he Court is not unmindful of the doctrine that a criminal statute should be strictly construed. There is, however, a corollary to that principle, namely, that even a criminal statute should not be interpreted so narrowly as to defeat the purpose and intent of the legislative body that enacted it." (internal quotation marks omitted)); *see also Loughrin*, 2014 WL 2807180, at *4 ("And indeed, imposing that requirement would prevent § 1344(2) from applying to a host of cases falling within its clear terms."). In sum, our construction of § 1505 coincides with the statute's purpose to deter and punish obstructions of congressional inquiries.

Notwithstanding these authorities, Rainey rejects any consideration of purpose as an impermissible tool of statutory construction of criminal statutes. To be clear, a statute's purpose may not override its plain language, but the Supreme Court has recognized that, even in a criminal case, a statute's purpose may be a "consideration [that] strongly support[s]" a textual interpretation:

17

No. 13-30770

[T]he statute as a whole reflects an intent to authorize federal prosecutions as a significant deterrent to a type of criminal activity that was a matter of national concern. Because that purpose is better served by construing the statute to cover both the conditional and the unconditional species of wrongful intent, the entire statute is consistent with a normal interpretation of the specific language that Congress chose.

*Holloway*, 526 U.S. at 9. Equally here, although unnecessary to our textual conclusion, the statute as a whole reflects an intent to deter obstruction of congressional investigations—a purpose consistent with interpreting subcommittee investigations as covered. *See United States v. Cisneros*, 26 F. Supp. 2d 24, 38–39 (D.D.C. 1998) ("The statutory purpose of § 1505 is to prevent any endeavor, whether successful or not, which is made for the purpose of corruptly influencing, obstructing or impeding an agency proceeding or congressional inquiry." (internal quotation marks omitted)).

4.

In light of the above analysis, and because "we do not believe that there remains a grievous ambiguity or uncertainty in the statutory provision before us," and do not need to "simply guess what the statute means," we conclude that the district court erroneously invoked the rule of lenity. *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal quotation marks omitted); *see also id.* ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' such that the Court must simply 'guess as to what Congress intended.'" (internal citations omitted)); *United States v. Pruett*, 681 F.3d 232, 240 n.4 (5th Cir. 2012) (per curiam) ("We find no 'grievous ambiguity' in the 'access' requirement sufficient to apply the rule of lenity.").

Rainey urges that the "grievous ambiguity" and "no more than a guess" language is "plainly . . . not intended to be taken literally," notwithstanding

18

No. 13-30770

the previously mentioned authorities and the Supreme Court's recent reiteration of the standard in *Maracich v. Spears*:

> In this framework, there is no work for the rule of lenity to do. This Court has held that "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."

133 S. Ct. 2191, 2209 (2013) (quoting *Barber*, 560 U.S. at 488–89)). Nonetheless, even under the articulation of the rule of lenity most favorable to Rainey, we find that § 1505's "text, structure, and history . . . establish that the Government's position is unambiguously correct." *United States v. Granderson*, 511 U.S. 39, 54 (1994).

5.

Nor does our conclusion leave § 1505 without boundaries. A successful prosecution under § 1505 must arise from the obstruction of "the *due and proper exercise of the power of inquiry* under which any inquiry or investigation is being had." § 1505 (emphasis added). The Fourth Circuit has analyzed this separate limitation on government prosecutions under § 1505:

> The question of whether a given congressional investigation is a "due and proper exercise of the power of inquiry" for purposes of § 1505 can not be answered by a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances. If it is apparent that the investigation is a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview, it should be protected by § 1505. While formal authorization is certainly a factor that weighs heavily in this determination, its presence or absence is not dispositive. To give § 1505 the protective force it was intended, corrupt endeavors to influence congressional investigations must be proscribed even when they occur prior to formal committee authorization.

No. 13-30770

*Mitchell*, 877 F.2d at 300–01.[6] With this discernment in mind, we observe that unauthorized frolics by a House entity might lose protection regardless of its committee status because there would be no "due and proper exercise of the power of inquiry" to obstruct. § 1505. Indeed, Rainey invoked this statutory restraint below in a motion to dismiss count one, but the district court denied this motion without prejudice. In sum, § 1505 is powerful, but not without internal restraints. *See Loughrin*, 2014 WL 2807180, at *7 ("But in claiming that we must therefore recognize an invisible element, Loughrin fails to take account of a significant *textual* limitation on § 1344(2)'s reach.").

## IV.

As an alternative ground for dismissing count one, the district court held that the Government failed properly to allege an essential element of § 1505 prosecutions, specifically, that Rainey knew of the pending congressional investigation that he allegedly obstructed. The Government agrees that it must prove that Rainey knew of the congressional proceeding that he is charged with obstructing. We review the sufficiency of the indictment *de novo*. *United States v. Pratt*, 728 F.3d 463, 477 (5th Cir. 2013). "To pass constitutional muster, an indictment must "allege[] every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *Id.*

The district court held that "implication of facts supporting an essential element of the crime charged does not pass muster under the Fifth

---

[6] One court has even deemed this a jurisdictional limitation: "Section 1505 contains a jurisdictional element. The obstruction must occur during the due and proper exercise by Congress of its power of inquiry." *United States v. North*, 708 F. Supp. 385, 386 (D.D.C. 1988); *see also Cisneros*, 26 F. Supp. 2d at 38 ("To charge an offense under § 1505 for obstruction of justice, an indictment must allege the defendant obstructed a congressional inquiry or government proceeding that was a 'due and proper' administration of the law.").

No. 13-30770

Amendment," but our cases have clarified that "[w]e are not concerned with whether the indictment could have been better framed, or whether it invokes a particular 'ritual of words,'" and that "an exact recitation of an element of the charged crime is not required, provided the indictment as a whole 'fairly imports' the element." *United States v. Harms*, 442 F.3d 367, 372 (5th Cir. 2006). The district court relied heavily on *Walker v. United States*, 342 F.2d 22, 26–27 (5th Cir. 1965), for the proposition that an element may not be implied in an indictment. In *United States v. Romero*, however, we explained:

> In *Walker*, the indictment was unclear, if not misleading, as to the object of the fraudulent activity. Count II of the indictment here was clear and complete, and permits of no misapprehension as to the elements of the offense charged. It is this, not the use of some talismanic phrase, that *Walker* requires.

495 F.2d 1356, 1359 (5th Cir. 1974). Subsequent cases have embraced *Romero*'s and *Harms*'s less formalistic analysis of indictments, recognizing that "[t]he validity of an indictment is governed by practical, not technical considerations." *United States v. Ramos*, 537 F.3d 439, 459 (5th Cir. 2008); *see, e.g., United States v. Franco,* 632 F.3d 880, 884 (5th Cir. 2011) (per curiam) ("Generally, an indictment that closely tracks the language under which it is brought is sufficient to give a defendant notice of the crimes with which he is charged."); *United States v. Henry*, 288 F.3d 657, 662 (5th Cir. 2002) ("While it is true that the allegations may not necessarily encompass a finding of knowledge, we have determined that a knowledge requirement may be inferred."); *United States v. Wilson*, 884 F.2d 174, 179 (5th Cir. 1989) ( "[T]he law does not compel a ritual of words, and a recitation of the exact scienter ('knowing') is not required where the pleading fairly imports knowledge." (internal quotation marks omitted); *United States v. Arteaga-Limones*, 529 F.2d 1183, 1199 (5th Cir. 1976) ("But the elements need not be alleged in terms, and a pleading is good if it fairly imports knowledge or intent."); *United States*

21

No. 13-30770

*v. Lester*, 541 F.2d 499, 501–02 (5th Cir. 1976) ("The indictment, for all practical purposes, traced the exact language of the statute. . . . The term convert implies, by its very legal nature, some kind of willful purpose and wrongful intent in the taking of property that does not belong to the converter." (internal citations omitted)).

This indictment does not "exact[ly] recit[e]" that Rainey knew a congressional investigation was pending, but "the indictment as a whole 'fairly imports' the element." *Harms*, 442 F.3d at 372. The indictment tracks the language of the statute and additionally provides the following factual allegations that "permit[] of no misapprehension as to the elements of the offense charged." *Romero*, 495 F.2d at 1395.

- "Following the *Deepwater Horizon* blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well. Congress's inquiry and investigation included, among other things, requests for information from BP."

- "On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant RAINEY falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate."

- "On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing it of understating the amount of oil leaking from the well. . . . The letter further stated that Congress was concerned that an 'underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster. The Subcommittee requested answers to fifteen questions relating to flow rate . . . .'"

- "On or about May 21, 2010, defendant RAINEY began working on a response to the May 14 Congressional request. . . . Defendant RAINEY also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response."

22

No. 13-30770

- "On or about May 24, 2010, BP submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant RAINEY."

That Rainey knew of the pending congressional investigation is imported by these allegations; he spoke with members of the Subcommittee and personally manufactured BP's response to the congressional requests. As a whole, these allegations "fairly import" the knowledge element. *See Harms*, 442 F.3d at 372. We decline to require the technical use of "some talismanic phrase" in light of the allegations importing that Rainey knew of the investigation. *Romero*, 495 F.2d at 1359.

## V.

Section 1505 criminalizes the "[o]bstruction of proceedings before departments, agencies, and committees." Because the indictment adequately alleges that Rainey obstructed an investigation by a "committee of either House," § 1505, and also that Rainey knew of the investigation, we VACATE and REMAND for proceedings consistent with this opinion.