FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2014 SEP 19  PM 3:22

WILLIAM W. BLEVINS
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

# FELONY

### SECOND SUPERSEDING INDICTMENT FOR
### OBSTRUCTION OF CONGRESS AND FALSE STATEMENT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 12-291 |
| v. | * | SECTION: "N" (3) |
| DAVID RAINEY | * | VIOLATIONS: 18 U.S.C. § 1001(a)(2) |
| | | 18 U.S.C. § 1505 |
| | | 18 U.S.C. §§ 2(a), 2(b) |

\*     \*     \*

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this Second Superseding Indictment:

<u>Background</u>

1.     Defendant DAVID RAINEY was Vice President of Exploration for the Gulf of Mexico for a subsidiary of BP plc ("BP"), a multinational energy corporation headquartered in London, England.

2.     On or about April 20, 2010, a blowout of natural gas, oil, and mud occurred onboard the *Deepwater Horizon*, a drilling rig that BP had leased and had used to perform drilling work on the Macondo well in the Gulf of Mexico.  Over the next three months, oil discharged from the Macondo well into the Gulf of Mexico.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

3.      Unified Command was headquartered in Robert, Louisiana, in the Eastern District of Louisiana, and consisted of representatives from the United States government as well as from BP and Transocean Ltd., the designated "responsible parties" for purposes of responding to the oil spill. Led by the United States Coast Guard, Unified Command coordinated the oil spill response.  After the blowout, defendant RAINEY served on behalf of BP as Deputy Incident Commander at Unified Command.  Defendant RAINEY was BP's second highest-ranking representative at Unified Command.

<u>Early Flow Rate Estimates</u>

4.      The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and was also relevant to potential civil and criminal litigation, including the calculation of possible penalties.

5.      On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that oil was flowing from the Macondo well into the Gulf of Mexico at a rate of approximately 1,000 barrels of oil per day ("BOPD").

6.      On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") finalized a document containing a flow rate estimate of 5,000 BOPD based on two methodologies: surface oil volume (also known as "mass balance") and velocity of the plume.  The NOAA scientist cautioned that the mass balance methodologies used to prepare the estimate, which were based in part on a very preliminary assessment of oil that had started to reach the surface of the Gulf of Mexico, were "highly unreliable" and that the resulting estimate was accurate "to only an order of magnitude."  The plume velocity methodology relied upon several assumptions, and the NOAA scientist cautioned that "[i]f any of them are changed, the answer

2

could be significantly different."  On or about April 28, 2010, as a result of the NOAA estimate,
Unified Command raised its public estimate to 5,000 BOPD.

### Defendant RAINEY's Flow Rate Estimates

7.       After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimates,
defendant RAINEY, an executive who had no prior experience in spill estimation, searched the
Internet for information about how to conduct oil-spill-volume estimates based on observations of
oil floating on the surface of a body of water, known as "mass balance" estimates.  Defendant
RAINEY's Internet search led him to a website where he found a Wikipedia entry describing some
generally accepted mass balance methodologies, including the American Society for Testing and
Materials ("ASTM") method and the European "Bonn" method.

8.       Between on or about April 26, 2010 and on or about April 30, 2010, despite having
no experience performing mass balance estimates and despite knowing that BP had employees who
were trained in making such estimates, defendant RAINEY performed and caused to be performed
his own daily estimates purportedly using the ASTM and Bonn methods.

9.       Defendant RAINEY's Bonn estimates resulted in "best guess" estimates
significantly more than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD.

10.      Defendant RAINEY's estimates labeled as "ASTM" did not conform to ASTM
standards.  Defendant RAINEY's "ASTM" estimates were manipulated to consistently arrive at or
near a "best guess" of between 5,000 and 6,000 BOPD.  In effect, defendant RAINEY conducted
his "ASTM" estimates in a manner designed to reverse engineer results consistent with NOAA's
preliminary and heavily-qualified 5,000 BOPD estimate.

<u>BP's Flow Rate Estimates</u>

11.     In its engineering response to the Macondo well oil spill, BP relied on flow rate
expert teams that were assessing the flow rate using sophisticated methodologies that focused on
the conditions at the seafloor, where the oil and natural gas were flowing.  Defendant RAINEY
knew that these teams were generating flow rate estimates much higher than defendant RAINEY's
purported "best guess" estimate of between 5,000 and 6,000 BOPD.

12.     For example, on or about April 22, 2010, defendant RAINEY received a document
containing "various release scenarios" from subsurface engineers of BP that estimated potential
flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

13.     Also, on or about May 11, 2010, a team of BP engineers working under the direction
of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged
from 14,000 to 82,000 BOPD, depending on potential flow paths and other known and unknown
variables (the "Engineer 1 Slide Deck").  Defendant RAINEY received a copy of the Engineer 1
Slide Deck on or before May 17, 2010.

<u>BP's Public Defense of the 5,000 BOPD Estimate Is Questioned</u>

14.     On or about May 13, 2010, a university professor with expertise in fluid mechanics
measurement publicly estimated that, based on a review of video footage of the leak that BP had
recently released, oil was flowing from the Macondo well at a rate of approximately 70,000 BOPD.

15.     On or about May 14, 2010, BP publicly rejected the university professor's flow rate
estimate and continued to publicly defend the 5,000 BOPD estimate as the "best" estimate, even
though 70,000 BOPD was within the range of defendant RAINEY's Bonn estimates and other
internal BP engineering estimates, including the work led by Engineer 1.

4

16.     On or about May 15, 2010, Engineer 1 sent an email to two BP executives, including BP's then-Chief Executive Officer for Exploration and Production, and expressed concern about BP continuing to publicly stand behind the 5,000 BOPD estimate. The email stated:

> I just read an article on CNN (May 14, 2010 1 p.m.) stating that a researcher . . . believes that the Macondo well is leaking up to 70,000 BOPD and that BP stands by a 5,000 BOPD figure. With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well. We should be very cautious standing behind a 5,000 BOPD figure as our modeling shows that this well could be making anything up to ~ 100,000 BOPD depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

(emphasis added).

17.     Engineer 1's email caused concern within BP because it contradicted BP's public position regarding the flow rate. On or about May 16, 2010, defendant RAINEY received a copy of Engineer 1's email and was directed to prepare an internal memorandum, described below in paragraph 19, to address Engineer 1's concerns.

18.     Another BP engineer ("Engineer 2") also prepared a critique of the university professor's work that used different assumptions than those used by the professor. Engineer 2 concluded that 15,000 BOPD, and not 5,000 BOPD, was an appropriate flow rate assessment based on the same video footage examined by the professor.

The Rainey Memo

19.     On or about May 17, 2010, defendant RAINEY prepared a memorandum, which included several attachments, purporting to summarize the efforts that had been undertaken within

5

Unified Command to estimate flow rate (the "Rainey Memo").  The Rainey Memo, which sought to justify a flow rate estimate of 5,000 BOPD, was false and misleading in numerous respects, namely:

a.  Defendant RAINEY omitted his own Bonn estimates, which were significantly higher than 5,000 BOPD.

b.  Defendant RAINEY falsely labeled the estimates he included in the memorandum as "ASTM" estimates.

c.  Defendant RAINEY omitted that he had manipulated his purported "ASTM" estimates to achieve a flow rate estimate near 5,000 BOPD.

d.  Defendant RAINEY omitted that the estimates he included in the memorandum were premised on data and other inputs that he knew or should have known were inaccurate, namely the amount of oil collected, the amount of oil that reached the surface, the amount of oil dispersed, and the chemical dispersant ratios.

e.  The estimates by defendant RAINEY that were included in the memorandum contained errors regarding the cover factor, the size of the spill, and the number of days that oil had been flowing into the Gulf of Mexico.

f.  Defendant RAINEY omitted the Subsurface Team Estimates, which defendant RAINEY possessed and which ranged from 64,000 to 146,000 BOPD.

g.  Defendant RAINEY omitted key parts of the work led by Engineer 1, which defendant RAINEY possessed, including flow rate estimates of up to 82,000 BOPD.

h.   Defendant RAINEY omitted a critique of the university professor's work written by Engineer 2 that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate flow rate assessment based on the same video footage examined by the professor.

i.   Defendant RAINEY falsely stated that his estimates, which he stated ranged from 1,000 to 14,000 BOPD, had been made "within Unified Command," and "played an important part in Unified Command's decision [on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per day." In fact, as defendant RAINEY well knew, he conducted his estimates on his own, and his estimates had not yet been disclosed to Unified Command prior to the time Unified Command raised its flow rate estimate to 5,000 BOPD.

j.   Defendant RAINEY falsely stated that the "Best guess was between 5,000 and 6,000 barrels per day."

### The Flow Rate Technical Group

20.   On or about May 19, 2010, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), which was made up of independent and government experts, to determine the flow rate.   Prior to and after the May 19, 2010 announcement, defendant RAINEY was BP's liaison to the FRTG on flow rate issues, and he coordinated BP's responses to requests from the FRTG for information and data.   Despite his role as liaison to the FRTG on flow rate issues, defendant RAINEY never disclosed to the FRTG his Bonn estimates, the Subsurface Team Estimates, the Engineer 1 Slide Deck, Engineer 1's May 15, 2010 email, or Engineer 2's critique of the university professor's work.

### The Congressional Inquiry and Investigation

21.     The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce (the "Committee") of the House of Representatives of the United States Congress.  The Subcommittee was created on or about January 14, 2009 pursuant to the authority provided by Rule 8(a) of the Rules of the House Committee on Energy and Commerce (the "Committee Rules").  The Subcommittee had a Chairman ("the Chairman of the Subcommittee") and a Ranking Member.  Rule 1(b) of the Committee Rules provided that "[e]ach subcommittee of the Committee is part of the Committee and is subject to the authority and direction of the Committee and to its rules so far as applicable."

22.     At or around the time of the creation of the Subcommittee, the Committee delegated to the Subcommittee oversight and investigative authority over matters including national energy policy, fossil energy, and energy regulation.  The Subcommittee's jurisdiction and authority also included the power to analyze the effectiveness of existing laws, programs, and government activities affecting such matters, and to evaluate the need to propose new or additional legislation. Rule 8(b) of the Committee Rules authorized the Subcommittee "to meet, hold hearings, receive testimony, mark up legislation, and report to the Committee on all matters referred to it."  Pursuant to the Rules of the United States House of Representatives, the Subcommittee was authorized "to conduct at any time such investigations and studies as it consider[ed] necessary or appropriate in the exercise of responsibilities" under the Rules of the House of Representatives.  Under both the Rules of the House of Representatives and the Committee Rules, the Chairman of the Subcommittee was authorized to begin an inquiry and investigation of any matter within the jurisdiction of the Subcommittee.

23.     On or before April 30, 2010, following the *Deepwater Horizon* blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the

amount of oil flowing from the Macondo well, which was within the jurisdiction and authority of the Subcommittee. This Congressional inquiry and investigation included, among other things, requests for information from BP.

24.     On or before May 1, 2010, the Subcommittee requested that BP attend a briefing on May 4, 2010, to provide information to members of the Subcommittee and their staff concerning, among other things, the amount of oil flowing from the Macondo well, and the current efforts to stop and contain the oil leak.

25.     On or about May 1, 2010, defendant RAINEY received an email providing him with details of the date and time of the May 4, 2010 briefing. The email also informed defendant RAINEY that the purpose of the meeting was to "[b]rief Congressional Members of the House Energy & Commerce Subcmte on Energy & Environment."

26.     On or about May 3, 2010, defendant RAINEY revised "talking points" for use at the May 4, 2010 briefing for the Committee. The talking points acknowledged that members of the Subcommittee, including the Chairman of the Subcommittee, would attend the May 4, 2010 briefing.

27.     On or about May 4, 2010, the Subcommittee held the briefing discussed above. It was attended by members and staff of the Subcommittee, including the Chairman of the Subcommittee. Defendant RAINEY represented BP at the briefing. During the May 4, 2010 briefing, defendant RAINEY falsely informed the members and staff that 5,000 BOPD was the most accurate flow rate estimate. Defendant RAINEY further stated that although BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, this worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which at the time was still in place. During the May 4, 2010 briefing, defendant RAINEY did not disclose

his own Bonn estimates or other BP internal information he had indicating the flow rate estimates were much higher than the figures he was providing at the briefing.

28.     On or about May 14, 2010, the Subcommittee sent a letter to BP accusing BP of understating the flow rate (the "May 14 Congressional Request"). The May 14 Congressional Request was sent on the letterhead of the Committee and was signed by the Chairman of the Subcommittee as "Chairman[,] Subcommittee on Energy and Environment[,] Committee on Energy and Commerce." The May 14 Congressional Request was copied to the Ranking Member of the Subcommittee.

29.     The May 14 Congressional Request noted that despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day," BP had recently "reaffirmed the 5,000 barrels per day estimate." The May 14 Congressional Request further stated that the Subcommittee was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster." The Subcommittee requested answers to 15 questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available." Among other things, the Subcommittee asked or requested:

a.      "What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on surface monitoring of the size of the spill?"

b.      "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

      c.     "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

30.     On or about May 21, 2010, defendant RAINEY received the May 14 Congressional Request and thereafter began working on a response to the request. Defendant RAINEY was the primary source of flow rate information for BP's eventual written response to the Committee, which was submitted on or about May 24, 2010 (the "May 24 BP Congressional Response"). During the preparation of the May 24 BP Congressional Response, defendant Rainey continued to receive information, in addition to the materials described above in paragraphs 12 and 13 that he already possessed, that contradicted a "best" flow rate estimate of 5,000 BOPD. This additional information comprised the following: that the amount of oil being collected via a riser insertion tube tool ("RITT") confirmed that the flow rate was in excess of 5,000 BOPD, information regarding the flow velocity, information regarding oil not reaching the surface of the water, and a May 23, 2010 email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low." Aware of this information contradicting the 5,000 BOPD estimate, defendant RAINEY withheld such information from other BP employees and from BP in-house and outside lawyers with whom he was working on the May 24 BP Congressional Response. Defendant RAINEY also prepared false and misleading statements in the letter, contained in the introductory paragraphs, and in responses to questions 4, 6, and 13, of the May 14 Congressional Request by referencing and attaching his false and misleading Rainey Memo, which defendant RAINEY provided to individuals working on the May 24 BP Congressional Response.

31.     On or about May 24, 2010, BP submitted to the Subcommittee the May 24 BP Congressional Response, which included a copy of the false and misleading Rainey Memo and its

11

attachments, which were selected by defendant RAINEY.  The May 24 BP Congressional Response was addressed to the Chairman of the Subcommittee, and was copied to the Ranking Member of the Subcommittee.

32.     As a result of defendant RAINEY's actions withholding information and providing false and misleading information, the May 24 BP Congressional Response contained false and misleading statements, and omitted information, and therefore impeded the due and proper exercise of the power of inquiry under which the Subcommittee was carrying out its inquiry and investigation, in the following respects, in addition to those identified with respect to the Rainey Memo:

    a.     The May 24 BP Congressional Response omitted all of defendant RAINEY's Bonn estimates, which were significantly higher than 5,000 BOPD.

    b.     The May 24 BP Congressional Response falsely labeled defendant RAINEY's estimates as having been calculated using "ASTM" standards, when, in fact, the estimates did not conform to ASTM standards.

    c.     The May 24 BP Congressional Response omitted that defendant RAINEY had manipulated his purported "ASTM" estimates to achieve a flow rate estimate near 5,000 BOPD.

    d.     The May 24 BP Congressional Response omitted that defendant RAINEY's purported "ASTM" estimates were premised on data and other inputs defendant RAINEY knew were inaccurate, namely the amount of oil collected, amount of oil that reached the surface, the amount of oil dispersed, and the chemical dispersant ratios.

e.    The May 24 BP Congressional Response omitted that defendant RAINEY's estimates contained errors regarding the cover factor, the size of the spill, and the number of days that oil had been flowing into the Gulf of Mexico.

f.    The May 24 BP Congressional Response omitted the Subsurface Team Estimates, which defendant RAINEY possessed and which ranged from 64,000 to 146,000 BOPD.

g.    The May 24 BP Congressional Response omitted key parts of the work led by Engineer 1, which defendant RAINEY possessed, including flow rate estimates of up to 82,000 BOPD.

h.    The May 24 BP Congressional Response omitted Engineer 2's conclusion, which defendant RAINEY possessed, that a proper assessment of the video footage relied upon by the university professor resulted in a flow rate estimate of 15,000 BOPD – three times more than the 5,000 BOPD estimate contained in the May 24 BP Congressional Response that defendant RAINEY asserted was the best estimate.

i.    The May 24 BP Congressional Response falsely referenced the Rainey Memo as the basis for Unified Command's flow rate estimates, by stating that "[t]he primary methods which Unified Command has used to estimate the amount of oil flowing from the well are summarized below and in the attached [Rainey Memo]."

j.    The May 24 BP Congressional Response created the false and misleading impression that the "best scientific guess [was] roughly 5,000 barrels per day," because that statement was based on the Rainey Memo specifically.

k.  The May 24 BP Congressional Response, in response to a question regarding BP's current flow rate estimate, falsely stated that "the most scientifically-informed judgment suggest[s] a best guess of roughly 5,000 barrels per day."

l.  The May 24 BP Congressional Response falsely stated that "[s]ubsequent estimates of flow rate have been carried out within Unified Command and have yielded consistent results."

m.  The May 24 BP Congressional Response omitted Engineer 1's email expressing concern about BP continuing to publicly stand behind a 5,000 BOPD estimate.

n.  The May 24 BP Congressional Response omitted data that defendant RAINEY received on or about May 22, 2010, indicating that the amount of oil being collected by the RITT confirmed that the flow rate was more than 5,000 BOPD.

o.  The May 24 BP Congressional Response omitted a May 23, 2010 email sent from the chairperson of the FRTG to defendant RAINEY and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

14

## COUNT ONE
### (Obstruction of Congress)

33.     The allegations contained in Paragraphs 1 through 32 above are realleged and incorporated as if fully set forth herein.

34.     Between on or about May 4, 2010 and on or about May 24, 2010, both dates being approximate and inclusive, in Robert, Louisiana, in the Eastern District of Louisiana and elsewhere, defendant

### DAVID RAINEY,

did himself, and did aid and abet and cause others to, corruptly endeavor to influence, obstruct, and impede, the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives, to wit: the Subcommittee on Energy and Environment of the United States House of Representatives' Committee on Energy and Commerce.

All in violation of Title 18, United States Code, Sections 1505, 2(a), 2(b).

## COUNT TWO
### (False Statement)

35.     The allegations contained in Paragraphs 1 through 32 above are realleged and incorporated as if fully set forth herein.

36.     On or about April 6, 2011, in New Orleans, Louisiana, in the Eastern District of Louisiana and elsewhere, defendant

### DAVID RAINEY,

in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, namely: during the course of an interview by federal law enforcement agents

conducting an official investigation, defendant RAINEY falsely stated that he had calculated a flow rate estimate for the Macondo well to be approximately 5,000 BOPD before he had seen NOAA's 5,000 BOPD flow rate number, when, in truth and in fact, as defendant RAINEY well knew, he had already seen NOAA's 5,000 BOPD flow rate number when he calculated a flow rate estimate for the Macondo well to be approximately 5,000 BOPD.

All in violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL
_____
FOREPERSON

_____
WILLIAM C. PERICAK
Director, Deepwater Horizon Task Force

LEO TSAO
ROHAN A. VIRGINKAR
ROBERT ZINK
Trial Attorneys, Deepwater Horizon Task Force

New Orleans, Louisiana
September 19, 2014

16

FORM OBD-34

No. _12-291_ "N"_ (3)_

UNITED STATES DISTRICT COURT

Eastern ___ District of ___ Louisiana

Criminal ___ Division

THE UNITED STATES OF AMERICA

vs.

DAVID RAINEY

SECOND SUPERSEDING INDICTMENT FOR
OBSTRUCTION OF CONGRESS AND FALSE
STATEMENT

VIOLATIONS: 18 U.S.C. §§ 1001(a)(2), 1505 and 2(a),
2(b)

A true bill.

_____
Foreperson

Filed in open court this _____

_____ day of

_____ A.D. 2014.

_____
Clerk

Bail, $ _____

_____
LEO R. TSAO
Department of Justice, Trial Attorney
Deepwater Horizon Task Force