1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3      ****************************************************************

4      UNITED STATES OF AMERICA

5                                    CRIMINAL ACTION NO. 12-291 "N"
       VERSUS                        NEW ORLEANS, LOUISIANA
6                                    TUESDAY, JUNE 2, 2015, 8:30 A.M.

7      DAVID RAINEY

8      ****************************************************************

9                      **DAY 2   MORNING SESSION**
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10         HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                    UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

13

14     FOR THE UNITED STATES:     U.S. DEPARTMENT OF JUSTICE
                                  BY:  LEO R. TSAO, ESQ.
15                                     ROBERT A. ZINK, ESQ.
                                  400 POYDRAS STREET, SUITE 1000
16                                NEW ORLEANS, LOUISIANA 70130

17

18     FOR DAVID RAINEY:          JONES WALKER
                                  BY:  MICHAEL W. MAGNER, ESQ.
19                                201 ST. CHARLES AVENUE, SUITE 5100
                                  NEW ORLEANS, LOUISIANA 70170
20

21
                                  STEPTOE & JOHNSON
22                                BY:  REID H. WEINGARTEN, ESQ.
                                  BRIAN M. HEBERLIG, ESQ.
23                                     SCOTT ARMSTRONG, ESQ.
                                       REBECCA S. LIU, ESQ.
24                                     JESSICA L. URBAN, ESQ.
                                  1330 CONNECTICUT AVENUE, N.W.
25                                WASHINGTON, DC 20036

                         **OFFICIAL TRANSCRIPT**

1    APPEARANCES CONTINUED:

2

3    OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                                 CERTIFIED REALTIME REPORTER
4                                REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM HB406
5                                NEW ORLEANS, LA   70130
                                 (504) 589-7779
6                                Cathy_Pepper@laed.uscourts.gov

7

8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        **OFFICIAL TRANSCRIPT**

1                              **I N D E X**

2

3    EXAMINATIONS                                        PAGE

4

5    **OPENING STATEMENTS  MR. TSAO**......................... 303

6    **OPENING STATEMENTS MR. HEBERLIG**..................... 311

7    **ABRAHAM "AVI" GESSER**................................ 326

8    DIRECT EXAMINATION BY MR. ZINK........................ 326

9    CROSS-EXAMINATION BY MR. WEINGARTEN................... 353

10   REDIRECT EXAMINATION BY MR. ZINK..................... 393

11   **JEFFREY BOLAS**........................................ 398

12   VOIR DIRE EXAMINATION BY MR. TSAO.................... 399

13   TRAVERSE EXAMINATION BY MR. MAGNER................... 406

14   FURTHER VOIR DIRE EXAMINATION BY MR. TSAO........... 410

15   **LUNCHEON RECESS**...................................... 413

16

17

18

19

20

21

22

23

24

25

                         **OFFICIAL TRANSCRIPT**

1                **P-R-O-C-E-E-D-I-N-G-S**

2                  TUESDAY, JUNE 2, 2015

3              M O R N I N G   S E S S I O N

4                (COURT CALLED TO ORDER)

5

6

08:35:38  7          THE DEPUTY CLERK:  All rise.

08:35:51  8          (WHEREUPON, at 8:35 a.m. the jury panel enters the

08:36:25  9    courtroom.)

08:36:25 10          THE COURT:  Good morning.  You all may be seated.  A

08:36:27 11    couple of housekeeping things.  First of all, I would ask you

08:36:30 12    all again -- I realize we're at the very outset of the trial,

08:36:34 13    so I'm going to be saying this and reminding you of your

08:36:37 14    obligation not to read anything or view anything or listen to

08:36:40 15    anything or research anything about this trial.

08:36:44 16          I hope you've been able to comply with my Order

08:36:48 17    since last night when you left the building, and, of course

08:36:51 18    I'll continually remind you of that during the lunch hour and

08:36:54 19    as we conclude today.

08:36:55 20          Through the good work of the attorneys yesterday

08:36:58 21    evening, I have news for you about the expected length of the

08:37:03 22    trial.  We do not expect the trial now to go beyond, at the

08:37:10 23    latest, early next week, and there is at least a reasonable

08:37:15 24    chance that we could finish the trial by the end of this week.

08:37:18 25          So we are going to work toward that end.  Again,

                        **OFFICIAL TRANSCRIPT**

08:37:22  1    I cannot give you a definitive time.  All I can tell you is
08:37:26  2    that through the efforts of counsel to try to streamline things
08:37:29  3    and give you a presentation that they think is commensurate
08:37:35  4    with the charge, so that you can deliberate, that we have been
08:37:39  5    able to reduce the expected time of the trial.
08:37:46  6            Now, we're going to pick up where we left off
08:37:48  7    yesterday.  As I explained, the first part of the trial will be
08:37:51  8    the opening statements of counsel.  And we're going to get to
08:37:53  9    that right now.
08:37:57 10            We do have one other housekeeping matter, is that
08:38:00 11    I need to read to you the indictment in the case and also
08:38:03 12    explain to you the charge that -- the elements of the crime
08:38:09 13    that has been charged here.  So I'm going to begin by reading
08:38:13 14    to you the indictment in full.
08:38:16 15            United States District Court, Eastern District of
08:38:18 16    Louisiana, second superseding indictment for a false statement.
08:38:24 17    United States v. David Rainey, Criminal Action 12-291,
08:38:27 18    Section "N", Magistrate Division 3, violation 18 United States
08:38:33 19    Code, § 1001, Subsection (A)(2).
08:38:36 20            The Grand Jury charges that at all times relevant
08:38:39 21    to this indictment:
08:38:40 22            Background.
08:38:41 23            1.  Defendant David Rainey was a Vice President
08:38:44 24    of Exploration for the Gulf of Mexico for a subsidiary of
08:38:48 25    BP plc, or BP, a multinational energy corporation headquartered

**OFFICIAL TRANSCRIPT**

08:38:56  1    in London, England.

08:38:58  2          2.   On or about April 20, 2010, a blowout of

08:39:01  3    natural gas, oil and mud occurred onboard the

08:39:04  4    *Deepwater Horizon*, a drilling rig that BP had leased and had

08:39:07  5    used to perform drilling work on the Macondo well in the

08:39:12  6    Gulf of Mexico.  Over the next three months, oil discharged

08:39:15  7    from the Macondo well into the Gulf of Mexico.

08:39:18  8          3.   Unified Command was headquartered in Robert,

08:39:22  9    Louisiana in the Eastern District of Louisiana and consisted of

08:39:27 10    representatives from the United States Government, as well as

08:39:29 11    from BP and Transocean, Limited, the designated "responsible

08:39:34 12    parties" for purposes of responding to the Oil Spill Trust.

08:39:40 13    Led by the United States Coast Guard, Unified Command

08:39:43 14    coordinated the oil spill response.  After the blowout,

08:39:47 15    defendant Rainey served on behalf of BP as Deputy Incident

08:39:52 16    Commander at Unified Command.  Defendant Rainey was BP's second

08:39:58 17    highest -- ranking representative at Unified Command.

08:40:00 18                    Early Flow Rate Estimates.

08:40:03 19          4.   The amount of oil leaking from the

08:40:05 20    Macondo well was directly relevant to various efforts to stop

08:40:09 21    the leak and was also relevant to potential civil and criminal

08:40:12 22    litigation, including the calculation of possible penalties.

08:40:17 23          5.   On or about April 24, 2010, very soon after

08:40:22 24    it was determined that the Macondo well was leaking oil and

08:40:25 25    natural gas, Unified Command, with BP's input, issued a

08:40:29  1   preliminary public estimate that oil was flowing from the

08:40:32  2   Macondo well into the Gulf of Mexico at the rate of

08:40:35  3   approximately 1,000 barrels of oil per day, or BOPD.

08:40:40  4          6.  On or about April 26, 2010, a scientist at

08:40:46  5   the National Oceanic and Atmospheric Administration, or NOAA,

08:40:49  6   finalized a document containing a flow rate estimate of

08:40:55  7   5,000 barrels of oil per day, or BOPD, based on two

08:40:58  8   methodologies:  Surface oil volume, also known as mass balance,

08:41:03  9   and velocity of the plume.  The NOAA scientist cautioned that

08:41:09 10   the mass balance methodologies used to prepare the estimate,

08:41:12 11   which were based in part on a very preliminary assessment of

08:41:16 12   oil that had started to reach the surface of the Gulf of Mexico

08:41:19 13   were "highly unreliable," and that the resulting estimate was

08:41:24 14   accurate "to only an order of magnitude."

08:41:28 15          The Plume Velocity methodology relied upon

08:41:34 16   several assumptions, and the NOAA scientist cautioned "if any

08:41:37 17   of them are changed, the answer could be significantly

08:41:40 18   different."

08:41:40 19          On or about April 28, 2010, as a result of the

08:41:45 20   NOAA estimate, Unified Command raised its public estimate to

08:41:53 21   5,000 barrels of oil per day, or BOPD.

08:41:55 22          Defendant Rainey's Flow Rate Estimates.

08:41:58 23          7.  After learning of NOAA's preliminary and

08:42:01 24   heavily qualified 5,000 BOPD estimate, David Rainey, an

08:42:06 25   executive who had no prior experience in spill estimation,

**OFFICIAL TRANSCRIPT**

08:42:10  1    searched the Internet for information about how to conduct

08:42:12  2    oil spill volume estimates based on observations of oil

08:42:17  3    floating on the surface of a body of water, known as mass

08:42:20  4    balance estimates.  Defendant Rainey's Internet search led him

08:42:24  5    to a website where he found a Wikipedia entry describing some

08:42:28  6    generally accepted mass balance methodologies, including the

08:42:32  7    American Society for Testing and Materials, or ASTM, method and

08:42:37  8    the European Bonn method.  B-O-N-N.

08:42:41  9        8.  Between on or about April 26, 2010, and on or

08:42:45 10    about April 30, 2010, despite having no experience performing

08:42:49 11    mass balance estimates, and despite knowing that BP had

08:42:52 12    employees who were trained in making such estimates, defendant

08:42:57 13    Rainey performed and caused to be performed his own daily

08:43:01 14    estimates purportedly using the ASTM and Bonn methods.

08:43:07 15        9.  Defendant Rainey's Bonn estimates resulted in

08:43:09 16    "best guess" estimates significantly more than 5,000 BOPD and

08:43:13 17    high-end estimates of up to 92,000 BOPD.

08:43:18 18        10.  Defendant Rainey's estimates labeled as ASTM

08:43:22 19    did not conform to ASTM standards.  Defendant Rainey's ASTM

08:43:27 20    estimates were manipulated to consistently arrive at or near a

08:43:32 21    "best guess" of between 5,000 and 6,000 BOPD.  In effect,

08:43:37 22    defendant Rainey conducted his ASTM estimates in a manner

08:43:40 23    designed to reverse-engineer results consistent with NOAA's

08:43:45 24    preliminary and heavily qualified 5,000 BOPD estimate.

08:43:52 25        The count alleged in this case -- this is all

**OFFICIAL TRANSCRIPT**

08:44:01  1   part of the indictment.  This is all part of the allegations --

08:44:03  2   is a false statement.  The allegations contained in paragraphs

08:44:08  3   1 through 10 which I've just read to you are realleged and

08:44:11  4   incorporated as if fully set forth herein.

08:44:15  5              On or about April 6, 2011, in New Orleans,

08:44:18  6   Louisiana, in the Eastern District of Louisiana and elsewhere,

08:44:22  7   defendant, David Rainey, in a matter within the jurisdiction of

08:44:26  8   the executive branch of the Government of the United States did

08:44:28  9   knowingly and willfully make materially false, fictitious, and

08:44:33 10   fraudulent statements and representations, namely:  during the

08:44:36 11   course of an interview by federal law enforcement agents

08:44:39 12   conducting an official investigation, defendant Rainey falsely

08:44:44 13   stated that he had calculated a flow rate estimate for the

08:44:46 14   Macondo well to be approximately 5,000 BOPD before he had seen

08:44:52 15   NOAA's 5,000 BOPD flow rate number, when, in truth and in fact,

08:44:57 16   as defendant Rainey well knew, he had already seen NOAA's

08:45:01 17   5,000 BOPD flow rate number when he calculated a flow rate

08:45:06 18   estimate for the Macondo well to be approximately 5,000 BOPD

08:45:11 19   all in violation of Title 18, United States Code, § 1001(A)(2).

08:45:17 20   This indictment is signed by a grand jury foreperson and by the

08:45:24 21   U.S. Attorney.

08:45:25 22              It's dated September 19th of 2014.

08:45:30 23              As I explained to you yesterday, an indictment is

08:45:33 24   only an allegation.  It is a means by which the government puts

08:45:37 25   the defendant on notice of what the defendant is accused of.

**OFFICIAL TRANSCRIPT**

08:45:40 1          The indictment itself which I have just read to
08:45:45 2 you is not evidence and it shall not be considered by you to be
08:45:48 3 evidence.  The defendant has pled not guilty and that,
08:45:52 4 therefore, raises issues of fact to be tried by a jury.
08:45:57 5          The indictment returned by the grand jury, as I
08:46:03 6 said, is a formal document which the Government uses to
08:46:04 7 commence its charges against the defendant, and by which it
08:46:08 8 brings its case to court.
08:46:10 9          The indictment is to serve no other trial purpose
08:46:13 10 whatsoever.  The indictment serves only to inform the defendant
08:46:18 11 of the crime with which he is charged.  It is not evidence, as
08:46:21 12 I've just said.  It affords no inference of guilt.  The
08:46:25 13 government has the burden of proof to establish beyond a
08:46:29 14 reasonable doubt each element of the crime.
08:46:33 15          Now, let's talk about the crime that's charged
08:46:34 16 here is 18 United States Code § 1001.  That section makes it a
08:46:40 17 crime for anyone to knowingly and willfully make a false or
08:46:45 18 fraudulent statement in any manner within the jurisdiction of
08:46:49 19 the executive, legislative or judicial branch of the government
08:46:52 20 of the United States.
08:46:53 21          For you to find the defendant guilty of this
08:46:55 22 crime, you must be convinced that the Government has proven
08:46:59 23 each of the following elements beyond a reasonable doubt:
08:47:04 24          First, that defendant made a false statement to
08:47:06 25 federal law enforcement agents regarding a matter within its

**OFFICIAL TRANSCRIPT**

08:47:10  1    jurisdiction.

08:47:10  2         Second, that the defendant made the statement

08:47:13  3    intentionally, knowing that it was false.

08:47:17  4         Third, that the statement was material.  The

08:47:20  5    false, fictitious or fraudulent statement or entry was

08:47:24  6    material.

08:47:24  7         And, fourth, that the defendant made the false

08:47:27  8    statement for the purpose of misleading the federal law

08:47:31  9    enforcement agent.

08:47:33 10         Those are the elements and what the government

08:47:34 11    must prove beyond a reasonable doubt with regard to § 1001.

08:47:38 12         All right.  I will also read to you a limiting

08:47:43 13    instruction just to be clear, and I will read this probably

08:47:48 14    several times during the trial.  This is a statement that has

08:47:51 15    been prepared by counsel.  Both sides have agreed upon this

08:47:55 16    statement as a limiting instruction.

08:47:58 17         The allegations against Mr. Rainey relate

08:48:02 18    exclusively to communications concerning the estimation of

08:48:06 19    flow rates after the oil spill began.  He is not alleged to

08:48:10 20    have any responsibility for the events leading up to the

08:48:16 21    *Deepwater Horizon* explosion and blowout, the explosion itself,

08:48:19 22    the velocity or volume of the oil spill, or the fact that oil

08:48:24 23    was discharged into the Gulf of Mexico.

08:48:26 24         Okay.  I'm going to read that to you again

08:48:30 25    periodically during the trial.  It's important that you keep

**OFFICIAL TRANSCRIPT**

08:48:32 1    that in mind.

08:48:34 2              Now, Counsel, with regard to exhibits, do we wish

08:48:37 3    to put exhibits in at this time?

08:48:42 4         MR. ZINK:  Yes, Your Honor, at this time, the

08:48:42 5    Government would move the following 16 exhibits into evidence.

08:48:46 6         THE COURT:  All right.  It's 1 through 16 you've got

08:48:49 7    numbered?

08:48:51 8         MR. WEINGARTEN:  There are various Government exhibit

08:48:52 9    numbers.

08:48:52 10        THE COURT:  Let's just put the numbers in.  Give us the

08:48:54 11   numbers, we'll get those in.  This will sound just like numbers

08:48:58 12   to you right now, but these will be exhibits that you will see.

08:49:03 13   It will save us some time if we can get them into evidence

08:49:04 14   right now, and then we'll refer to them as we go.

08:49:05 15        MR. ZINK:  Yes, Your Honor, it's the following

08:49:06 16   Government exhibit numbers:  23, 24, 25, 27, 29, 98, 141,

08:49:24 17   155.03, 155.13, 155.18, 155.33, 155.55, 158, 159, 168,

08:49:45 18   Government Exhibit 225.

08:49:48 19        THE COURT:  All right.  And, Counsel, is there any

08:49:49 20   objection to these exhibits coming into evidence at this point?

08:49:54 21        MR. HEBERLIG:  Subject to our prior discussion,

08:49:56 22   Your Honor, no.

08:49:57 23        THE COURT:  The Court will then order that those

08:49:58 24   exhibits which have been enumerated by Mr. Zink be admitted

08:50:02 25   into evidence.

**OFFICIAL TRANSCRIPT**

08:50:03   1          Please make certain -- I think you've already

08:50:06   2   supplied and I have copies up here, and make certain that the

08:50:09   3   courtroom deputy has copies of those as we go.

08:50:11   4          Let me also point out to the jury that the

08:50:14   5   exhibits or potential exhibits in this matter have been

08:50:18   6   prenumbered.  So although we're going to refer to them as

08:50:21   7   numbers, you'll become familiar with them as you view them

08:50:24   8   during the course of the trial.

08:50:25   9          There may be some numbers that we pass over

08:50:29  10   because there are things that are not pertinent, so, in other

08:50:32  11   words, it's not going to be one through consecutive.  There may

08:50:36  12   be exhibits that have been prenumbered and there may be some

08:50:38  13   numbers that are not assigned an exhibit at this point.  But

08:50:41  14   you need not be concerned with that, as long as we, of course,

08:50:44  15   get to see the exhibits in connection with the testimony during

08:50:48  16   the course of the trial.

08:50:48  17          All right.  Each side has been afforded by the

08:50:53  18   Court 25 minutes to address you on opening statements.  I

08:50:58  19   understand the Government will go first.

08:51:00  20          Mr. Zink, you have 25 minutes, and then we will

08:51:05  21   hear from Mr. Heberlig.  I have my trusty timer here.  In the

08:51:09  22   event that anyone approaches the 24-minute mark, I will so

08:51:13  23   signify that you have one minute remaining.  As I always say,

08:51:16  24   you do not get penalized if you do not use the entirety of your

08:51:19  25   time.

**OFFICIAL TRANSCRIPT**

08:51:20  1                    All right, Mr. Zink, if you would like to assume

08:51:22  2    the podium, I think we can go ahead and begin.

08:51:24  3            MR. ZINK:  I believe Mr. Tsao will be providing opening

08:51:26  4    statement.

08:51:34  5                         OPENING STATEMENTS

08:51:37  6            MR. TSAO:  May I begin, Your Honor?

08:51:39  7            THE COURT:  Please do.

08:51:41  8            MR. TSAO:  May it please the Court, ladies and

08:51:43  9    gentlemen of the jury.  On April 20, 2010, the

08:51:46  10   *Deepwater Horizon* drilling rig exploded in the Gulf of Mexico.

08:51:52  11   Two days later, it sank to the bottom of the Gulf.  Oil began

08:51:57  12   flowing out of the well into the surrounding waters, and almost

08:52:01  13   immediately, the question that everyone was asking was how much

08:52:05  14   oil was flowing out of that well.

08:52:09  15                   What was the flow rate?  That question was

08:52:15  16   critical because how big of a problem BP had on its hands

08:52:19  17   depended upon how much oil was coming out of that well.  And as

08:52:23  18   you will learn, in June of 2010, a federal criminal

08:52:26  19   investigation into the BP oil spill was launched, and one of

08:52:30  20   the things that the federal criminal investigation focused on

08:52:34  21   was whether any crimes had been committed in connection with

08:52:36  22   statements about the flow rates of oil from BP's well.

08:52:40  23                   And as you will learn, as part of the criminal

08:52:45  24   investigation, federal agents from the FBI and from the EPA's

08:52:51  25   Criminal Investigative Division interviewed the defendant,

                               **OFFICIAL TRANSCRIPT**

08:52:56 1   Mr. Rainey, in April of 2011.  And they asked the defendant
08:53:01 2   about certain flow rates that he had calculated on his own.
08:53:06 3   They wanted to know whether or not his flow rate estimates were
08:53:10 4   independent or whether his flow rate estimates had been
08:53:15 5   generated to back into a number that Mr. Rainey wanted to
08:53:19 6   reach.  And as the evidence will show in this case, during that
08:53:24 7   interview, the defendant lied.
08:53:28 8           He lied to federal agents from the EPA and the
08:53:34 9   FBI to cover up the fact that his flow rate work, the work that
08:53:37 10  he had done and created, was not independent.  He lied to cover
08:53:40 11  up the fact that the flow rate work that he had done was
08:53:43 12  generated to reach a specific result.  And that, ladies and
08:53:51 13  gentlemen of the jury, lying to federal agents, is a crime.
08:53:58 14          As the evidence will show and as the government
08:54:01 15  will prove beyond a reasonable doubt in the case, the defendant
08:54:03 16  is guilty of that crime.
08:54:05 17          Good morning.  Once again, my name is Leo Tsao.
08:54:10 18  I am a prosecutor from the United States Department of Justice.
08:54:15 19  I want to introduce the people sitting at our table here.  This
08:54:18 20  is Mr. Robert Zink, he's a prosecutor from the Department of
08:54:22 21  Justice as well.  Sitting with us at the table is Special Agent
08:54:27 22  Amy Adair.  She's the lead case agent from the EPA's criminal
08:54:41 23  investigative division.  EPA, of course, is the Environmental
08:54:41 24  Protection Agency.  At the back table is Ms. Katie Loughnane
08:54:41 25  and Ms. Ellen Chapin, and they are both paralegals at the

**OFFICIAL TRANSCRIPT**

08:54:44 1    Department of Justice.  And, together, we represent the
08:54:46 2    United States of America in this matter.
08:54:48 3            Before I get into the evidence, let me talk to
08:54:51 4    you just very briefly about the charge in this case.  As the
08:54:53 5    judge said, David Rainey has been charged with making a false
08:54:57 6    statement to federal agents, and specifically he is charged
08:55:01 7    with lying to the FBI and the EPA during his interview with
08:55:06 8    those agents.
08:55:06 9            Now, to understand this charge, it's going to be
08:55:09 10   important for you to understand the events that led up to the
08:55:12 11   lie.  So let me start with that background and walk through the
08:55:16 12   evidence that you will hear.
08:55:18 13           As I said to you before, this case begins with
08:55:21 14   the sinking of the *Deepwater Horizon* oil rig.  And the well
08:55:25 15   that the *Deepwater Horizon* was drilling was called the
08:55:28 16   Macondo well.  And the question was:  How much oil was flowing
08:55:33 17   from that well?  What was the flow rate of oil?  And as the
08:55:40 18   evidence will show, in the early days of the spill, the
08:55:42 19   official flow rate estimate was 1,000 barrels of oil per day.
08:55:48 20           Shortly after that number was issued, there was
08:55:52 21   doubt, serious doubt about the accuracy of that number.  You
08:55:58 22   will learn that early in the day on April 26, 2010, a scientist
08:56:02 23   at a federal agency called the National Oceanic and Atmospheric
08:56:07 24   Administration, or NOAA, calculated, prepared a one-page
08:56:12 25   document containing a flow rate estimate of 5,000 barrels of

**OFFICIAL TRANSCRIPT**

08:56:18 1   oil per day.  And you will see that document during this trial.

08:56:20 2   And what you will see is that that NOAA estimate was not meant

08:56:24 3   to be a serious estimate of the actual flow rate of oil.

08:56:27 4   Rather, you will learn that NOAA's 5,000 barrels-per-day

08:56:30 5   estimate was designed to get people off of that 1,000

08:56:34 6   barrels-of-oil-per-day estimate.  It was designed to be just

08:56:37 7   high enough to raise the level of urgency for the response of

08:56:43 8   the still, but not so much as to cause panic.  Again, you will

08:56:48 9   learn that this NOAA estimate was not a serious estimate of the

08:56:53 10  actual flow rate.

08:56:54 11        And you will learn that the evidence -- I'm

08:56:56 12  sorry, you will learn that the 5,000 barrels-per-day estimate

08:57:00 13  by NOAA was a big development for people within BP, including

08:57:04 14  Mr. Rainey.  In fact, you'll learn that just a few hours after

08:57:07 15  that NOAA estimate was released, a BP employee named

08:57:12 16  Keith Seilhan sent a text message to Mr. Rainey to his phone

08:57:18 17  with the news of NOAA's 5,000 barrels-per-day estimate.

08:57:24 18        After he got that estimate, David Rainey replied,

08:57:28 19  "Great.  Thank you."  As you will learn, the government

08:57:32 20  recovered those text messages, and we will show them to you

08:57:36 21  here in court.

08:57:36 22        You will see that David Rainey exchanged these

08:57:40 23  and other text messages with Mr. Seilhan about 3:20, 3:22 p.m.

08:57:46 24  on April 26, 2010.  And I ask you to pay close attention to the

08:57:52 25  dates and times of these text messages because the timing is

**OFFICIAL TRANSCRIPT**

08:57:55  1   critical in this case.  It's critical because only hours after

08:58:01  2   Mr. Rainey received these text messages, learning about NOAA's

08:58:06  3   5,000 barrels-per-day number, he started to create his own flow

08:58:15  4   rate estimate to show a basis for the 5,000 barrel-per-day

08:58:18  5   number to make it look like a serious flow rate number.

08:58:21  6           And as the evidence will show and as you will

08:58:25  7   see, there was only one problem, Mr. Rainey didn't really know

08:58:29  8   how to carry out these calculations.  You see, Mr. Rainey, at

08:58:34  9   the time of the response, he was a senior BP executive who had

08:58:39 10   been with the company for 31 years.  He was a geologist.  He

08:58:44 11   had no training or experience carrying out these types of

08:58:48 12   flow rate calculations.  He had never done it before.

08:58:51 13           So what did he do?  As you will see from the

08:58:57 14   evidence, the defendant turned to the Internet.  He started

08:59:00 15   using Google and visited sites like Wikipedia and answers.com

08:59:06 16   to learn how to calculate flow rates.  And only a few hours

08:59:11 17   after starting his Internet research, the defendant calculated

08:59:16 18   his first flow rate estimate.

08:59:19 19           As you will see and you will learn, the defendant

08:59:24 20   initially tried out two different methods for calculating

08:59:27 21   flow rate, neither of which got him to 5,000.  But finally on

08:59:30 22   April 27th, a little less than 24 hours after he received that

08:59:36 23   text message from Mr. Seilhan letting him know about NOAA's

08:59:40 24   number, the defendant landed on a third flow rate method, one

08:59:45 25   that Mr. Rainey had invented himself that allowed him to back

**OFFICIAL TRANSCRIPT**

08:59:49 1  into a 5,000, approximately barrel per day best-guess estimate,
08:59:57 2  one that roughly matched NOAA's number.
09:00:00 3          And as you will learn, the defendant's 5,000
09:00:06 4  best-guess flow rate number was important because that number
09:00:08 5  had been submitted to the Coast Guard and to Congress.
09:00:14 6          Let's fast forward now to June of 2010, when the
09:00:19 7  criminal investigation into the *Deepwater Horizon* oil spill
09:00:22 8  began.  And as you will hear, the criminal investigation
09:00:25 9  focused on crimes related to statements about flow rate.  And
09:00:33 10 as part of that investigation, the EPA and the FBI learned that
09:00:37 11 the defendant's 5,000 best-guess flow rate estimates had been
09:00:42 12 provided to the Coast Guard and provided to Congress.  They
09:00:45 13 were out there in the public.
09:00:47 14         And they wanted to talk to defendant about his
09:00:50 15 flow rate work.  So in April 2011, as you will learn, Agent
09:00:58 16 Adair from the EPA and another agent from the FBI interviewed
09:01:01 17 the defendant right here in New Orleans, just a few blocks
09:01:06 18 away.  And he was asked about the independence of this 5,000
09:01:12 19 best-guess flow rate estimate.  And, specifically, he was asked
09:01:16 20 whether he had calculated this 5,000 barrel-per-day number
09:01:20 21 before he saw NOAA's number.
09:01:25 22         And as the evidence will show, the defendant
09:01:30 23 lied.  He told the EPA and the FBI agents who were conducting
09:01:35 24 their investigation that he got his 5,000 number before he saw
09:01:39 25 NOAA's number.  As the evidence will show, that statement

**OFFICIAL TRANSCRIPT**

09:01:45  1    simply was not true, and the defendant knew it.  The text
09:01:48  2    messages in this case, which I talked about before, could not
09:01:52  3    be more clear that the defendant learned about NOAA's 5,000
09:01:55  4    number first, and then only a day later did he reach his own
09:01:59  5    5,000 barrel-per-day estimate.
09:02:01  6            And why did he lie?  Because as you will learn,
09:02:05  7    he wanted to cover up the fact that he had backed into his
09:02:09  8    5,000 barrels-per-day number.  He wanted to cover up the fact
09:02:12  9    that he started his analysis with the result already in mind.
09:02:16 10            As you will understand from the evidence and
09:02:19 11    learn, if he had calculated his 5,000 number before he saw
09:02:24 12    NOAA's number, then it would have been independent.  But as the
09:02:29 13    evidence will show, that's not what happened in this case.  It
09:02:32 14    was a lie.
09:02:33 15            The government in this case will prove its case
09:02:37 16    to you primarily through documents and witnesses.  And I want
09:02:40 17    to just talk to you -- introduce to you some of the documents
09:02:42 18    and some of the witnesses that you will hear in this courtroom.
09:02:45 19            With respect to documents, you will see the text
09:02:49 20    message records and the timing and the substance of those text
09:02:52 21    messages.  You will also see Mr. Rainey's phone records.  You
09:02:57 22    will also see the defendant's flow rate calculations contained
09:03:01 23    in spreadsheets that the defendant himself prepared.
09:03:05 24            You will also see when the defendant calculated
09:03:09 25    the estimates in those spreadsheets, and specifically that the

OFFICIAL TRANSCRIPT

09:03:13  1    defendant calculated his 5,000 estimate after he saw NOAA's

09:03:17  2    number.

09:03:18  3            With respect to witnesses, you will hear from a

09:03:20  4    federal agent and the federal prosecutor, both of whom attended

09:03:25  5    Mr. Rainey's April 2011 interview, and will testify about what

09:03:28  6    Mr. Rainey was asked and what Mr. Rainey said.

09:03:30  7            You will hear from an expert in computer

09:03:34  8    forensics, who will testify about Mr. Rainey's computer, his

09:03:38  9    e-mails, and his Internet browsing history.  You will hear from

09:03:43 10    an employee from NOAA, who will testify about NOAA's initial

09:03:48 11    5,000 barrels-per-day estimate.

09:03:51 12            Finally, you will hear David Rainey's own words

09:03:54 13    because, in a separate case, David Rainey gave sworn testimony

09:04:00 14    in a deposition.  And that -- some of that testimony will be

09:04:03 15    played in this courtroom, and you will hear through the

09:04:07 16    defendant's own words his explanations, his justifications and

09:04:11 17    his admissions.  And that's a summary of the evidence that you

09:04:18 18    will hear from the Government in this case.

09:04:20 19            Now, at the end of the trial, after you've heard

09:04:24 20    all of the evidence this case, Mr. Zink is going to have an

09:04:26 21    opportunity to speak with you again.  And at that time, we will

09:04:32 22    ask you to return a verdict, the only verdict that is

09:04:36 23    consistent with the evidence in this case, the only verdict

09:04:39 24    that is supported by the evidence in this case, a verdict of

09:04:45 25    guilty on the count in the indictment.

**OFFICIAL TRANSCRIPT**

09:04:54 1              THE COURT:  Thank you, Mr. Tsao.

09:04:58 2                  Mr. Herberlig, if you will assume the podium.

09:05:02 3                          OPENING STATEMENTS

09:05:07 4              MR. HEBERLIG:  May I proceed, Your Honor?

09:05:19 5              THE COURT:  Yes.

09:05:20 6              MR. HEBERLIG:  Good morning, ladies and gentlemen.

09:05:23 7     David Rainey is a fundamentally honest man.  He is a man of

09:05:27 8     deep personal integrity, a man of his word.

09:05:33 9                  There is no question in this case that the

09:05:36 10    *Deepwater Horizon* accident was a horrible tragedy.  After the

09:05:41 11    incident, many men and women, including Dave Rainey, worked

09:05:46 12    tirelessly to try to make things right.  It was an extremely

09:05:51 13    demanding situation, and Dave Rainey was right in the middle of

09:05:54 14    it as BP's Deputy Incident Commander within the

09:05:59 15    Unified Command.  He did his best to meet the challenging

09:06:03 16    demands of responding to the oil spill.

09:06:04 17                  What he didn't do in the middle of that crisis

09:06:08 18    was defraud or mislead anyone.  He didn't cheat on any flow

09:06:15 19    rate estimate.  At all times, in all of his responsibilities,

09:06:18 20    he acted in complete good faith.

09:06:21 21                  When he was interviewed by the FBI a year later,

09:06:25 22    he didn't lie about anything.  He had no reason to lie.  He had

09:06:30 23    nothing to hide.  They are never going to be able to prove

09:06:36 24    criminal intent to you, and the burden is on them.

09:06:40 25                  Let me back up for a minute.  I'm Brian

**OFFICIAL TRANSCRIPT**

09:06:45  1   Herberlig.  Together with Reid Weingarten and Michael Magner, I
09:06:48  2   have the distinct privilege of representing Dave Rainey in this
09:06:51  3   matter.
09:06:53  4          Dave was born and raised in Belfast, Northern
09:06:56  5   Ireland.  He received his undergraduate degree and a Ph.D. in
09:07:00  6   geology in Scotland.  While in school, he met his wife Janet.
09:07:05  7   Together they have two children, Kirstie and Ian.
09:07:09  8          After graduation, Dave went to work as a
09:07:12  9   geologist for BP.  He rose up the ranks and he eventually
09:07:17 10   settled in Houston, where BP's headquarters are located.  David
09:07:21 11   has lived in Houston since the early 1990s, and he became a
09:07:25 12   United States citizen in 2004.
09:07:27 13          By 2010, Dave held the position of Vice President
09:07:33 14   of Exploration for the Gulf of Mexico.  That was the number-two
09:07:36 15   exploration job within BP.  Dave knew about as much as you
09:07:41 16   could know about deepwater exploration for oil and BP's history
09:07:46 17   in the Gulf of Mexico.
09:07:46 18          I'm going to talk about Dave's role in the
09:07:51 19   aftermath of the *Deepwater Horizon* incident in just a minute,
09:07:54 20   but let's make clear what this case is about.  This trial
09:07:58 21   involves a very narrow charge.  It relates to two short
09:08:04 22   statements made by Dave during an all-day interview with the
09:08:08 23   FBI almost a year after the *Deepwater Horizon* incident.
09:08:12 24          Dave is not charged with any crimes related to
09:08:15 25   the cause of the explosion.  He's not charged with any crimes

**OFFICIAL TRANSCRIPT**

09:08:20  1    related to his work responding to the oil spill and the

09:08:24  2    aftermath of this incident.  The only criminal charge that you

09:08:28  3    are considering in this case relates to what Dave said during

09:08:31  4    that FBI interview almost a year later.

09:08:34  5              Now, to be sure, Dave's actions during the

09:08:39  6    response are relevant.  They provide context to you for what he

09:08:43  7    said in the interview.  Dave's good faith during the oil spill

09:08:47  8    response will show you he didn't lie.  He had nothing to lie

09:08:51  9    about.

09:08:52 10              Let's talk about that interview.  It took place

09:08:57 11    on April 6, 2011, here in New Orleans.  The interview lasted a

09:09:02 12    full day.  There was no recording.  There was no transcript of

09:09:07 13    the interview.  The FBI is going to try to reconstruct what

09:09:11 14    happened that day from notes and a memo that summarized what

09:09:16 15    Dave said during the interview.  Their memo is 33 single-spaced

09:09:21 16    pages.  They covered the waterfront with Dave that day, and he

09:09:25 17    answered their questions honestly.

09:09:28 18              They claim now that two brief statements made by

09:09:33 19    Dave during that interview were false.  They relate to the

09:09:36 20    timing of when Dave received a flow rate estimate prepared by

09:09:40 21    NOAA in relation to his own flow rate estimation work.

09:09:46 22              You will hear among the many, many things that

09:09:49 23    Dave handled during the oil spill response, he prepared a few

09:09:54 24    early estimates of the flow rate, estimates of how much oil was

09:09:57 25    spilling into the Gulf of Mexico.

**OFFICIAL TRANSCRIPT**

09:09:59   1          Around the same time, a NOAA scientist Bill Lehr
09:10:03   2   prepared his own flow rate testimony.  Lehr concluded that the
09:10:10   3   flow rate was roughly 5,000 barrels a day.  Not a serious
09:10:13   4   estimate?  This was a senior government scientist working for
09:10:16   5   the federal government, who provided his estimate to the senior
09:10:20   6   person in the Unified Command, who announced it to the public.
09:10:24   7   Not a serious estimate?  I think not.
09:10:27   8          The prosecutors say that Dave lied by telling the
09:10:31   9   FBI he had conducted his own flow rate estimate before he had
09:10:35  10   seen the results of that NOAA work.  You're going to have to
09:10:39  11   ask yourself a question in this trial.  Why?  Why would Dave
09:10:43  12   lie in his FBI interview about when he had seen that NOAA
09:10:46  13   number?  They need some reason to prove why Dave acted with
09:10:51  14   criminal intent.  It only makes sense if Dave was cheating, if
09:10:58  15   Dave reverse-engineered his own work, as they say, and he
09:11:01  16   wanted to hide when he had seen the NOAA estimate.
09:11:05  17          But that won't be the evidence in this case.  You
09:11:07  18   will be convinced that Dave worked in good faith.  His
09:11:12  19   estimates were legitimate and honest.  And if there is no
09:11:15  20   reverse engineering, if there is no cheating, if they can't
09:11:19  21   prove that to you, their case crumbles.
09:11:22  22          If Dave prepared his flow rate estimates in good
09:11:26  23   faith, as you will be convinced beyond any doubt by the
09:11:29  24   evidence in this trial, then he had absolutely no reason
09:11:32  25   whatsoever to lie about when he had received that NOAA number.

**OFFICIAL TRANSCRIPT**

09:11:36  1          So here is how I'm going to proceed today.  I
09:11:39  2  want to walk you through some of the work that Dave did in the
09:11:42  3  aftermath of the *Deepwater Horizon*, the flow rate estimates
09:11:44  4  that are at issue in this trial, and then I'll come back to
09:11:47  5  what he said during that FBI interview a year later.  And you
09:11:51  6  will see from the evidence that he didn't lie.  He didn't have
09:11:54  7  any reason to lie.
09:11:56  8          So let's get right to the incident.  On the
09:11:58  9  evening of April 20, 2010, Dave was at home in Houston about to
09:12:03 10  get into bed when he received a phone call from a colleague who
09:12:06 11  was in a life boat in the Gulf of Mexico who told him there had
09:12:10 12  been an explosion on the *Deepwater Horizon*, and the rig was on
09:12:12 13  fire.
09:12:14 14          Dave got up immediately and went in to the
09:12:16 15  office.  For the next two months, Dave abandoned his regular
09:12:20 16  job responsibilities and worked full time responding to the
09:12:24 17  oil spill.
09:12:26 18          During the response, he was part of the
09:12:28 19  Unified Command you heard the Government talk about.  That was
09:12:32 20  an organization led by the Coast Guard.  It had other federal
09:12:34 21  and state agencies and it had representatives from BP.  It was
09:12:39 22  led by a Coast Guard admiral, Mary Landry.  BP's senior
09:12:45 23  representative was Doug Suttles, and Dave was one of his
09:12:48 24  deputies.  They worked out of a facility in Robert, Louisiana.
09:12:54 25          It was a very intense environment.  Oil was

OFFICIAL TRANSCRIPT

09:12:57 1    flowing into the Gulf of Mexico, and everything done within the
09:13:02 2    Unified Command had a great sense of urgency.  There really was
09:13:04 3    no typical day.  It was one crisis to the next.  And Dave
09:13:07 4    worked around the clock on a whole variety of issues in the
09:13:12 5    Unified Command.
09:13:13 6              The prosecutors are going to try to make it
09:13:16 7    appear as if flow rate dominated the discussion within
09:13:18 8    Unified Command.  But the reality is that flow rate was but a
09:13:22 9    minor issue.  It had nowhere near the significance that they
09:13:25 10   will attempt to place upon it in hindsight in this trial.
09:13:29 11             But let's talk about flow rate.  Flow rate will
09:13:32 12   be a central issue in this trial, even though it wasn't a
09:13:35 13   remotely central issue for the Unified Command.
09:13:37 14             Dave did prepare some early estimates of
09:13:39 15   flow rate.  At the time, coming up with a precise estimate of
09:13:43 16   what was coming out of that well was not possible.  There was
09:13:46 17   no meter down at the seabed, no way to directly measure what
09:13:51 18   was happening.  Yet, despite all those uncertainties, the
09:13:55 19   Unified Command decided to issue to the public a flow rate
09:13:58 20   estimate.
09:13:59 21             And you will hear that on April 24th, Admiral
09:14:03 22   Mary Landry announce has had the flow rate estimate was 1,000
09:14:09 23   barrels per day.  Dave played no role in that initial estimate
09:14:12 24   whatsoever.  But within a few days, there was a growing concern
09:14:15 25   within the Unified Command, a sense that flow rate might be

**OFFICIAL TRANSCRIPT**

09:14:18  1  higher.

09:14:20  2          The press, the politicians, were clamoring for

09:14:23  3  more information about flow rate.  And faced with that

09:14:26  4  pressure, Admiral Landry pushed for a new public flow rate

09:14:30  5  estimate.  This was truly a fool's errand.  A request to

09:14:36  6  calculate the unknown.

09:14:38  7          Frankly, it was not a task that BP or the

09:14:41  8  government scientists within the Unified Command were eager to

09:14:45  9  take on.  BP was putting every resource it had on solving this

09:14:49 10  problem and stopping the flow of the oil.  That wasn't going to

09:14:54 11  change until the oil stopped flowing, no matter what was coming

09:14:57 12  out.

09:14:57 13          Flow rate would eventually become known after

09:15:01 14  more conditions about the well were discovered.  In those early

09:15:04 15  days, the consensus was there was just no point in calculating

09:15:07 16  flow rate.  It was too uncertain.

09:15:10 17          But BP was part of the Unified Command, and it

09:15:14 18  was cooperating with the federal government, so it agreed to

09:15:18 19  help.  Admiral Landry made this request of Doug Suttles, and

09:15:22 20  Doug turned to Dave for assistance.

09:15:25 21          The prosecutors want you to believe that Dave was

09:15:27 22  not qualified to handle this task, that he had no experience.

09:15:33 23  We profoundly disagree.  Dave was an accomplished Ph.D.

09:15:37 24  scientist.  He was a highly skilled, experienced executive.

09:15:42 25  And within the Unified Command, he had already assumed

**OFFICIAL TRANSCRIPT**

09:15:45  1    responsibility for handling the tough science issues they were
09:15:49  2    facing, and he knew the Gulf of Mexico better than anyone.  It
09:15:54  3    made complete sense for Suttles to turn to Dave for this task.
09:15:57  4            Now, Dave's estimates were not perfect.  They,
09:16:01  5    frankly, could not be.  There wasn't enough information
09:16:06  6    available to make any kind of definitive estimate.  And the
09:16:09  7    science was highly imprecise, a fact that Dave made well known
09:16:14  8    to everyone with whom he dealt on flow rate.
09:16:18  9            You will be convinced, despite the uncertainties
09:16:21 10    involved, that Dave's flow rate estimates were honest and
09:16:26 11    legitimate.  He didn't cheat.  He didn't cook up a phony
09:16:30 12    estimate, and he certainly did not reverse-engineer to match
09:16:36 13    someone else's number.
09:16:37 14            Dave's good faith is critical context to that FBI
09:16:45 15    interview.  He had absolutely nothing to hide when he was
09:16:47 16    interviewed with the FBI.  He told the FBI the truth.
09:16:51 17            Let's talk for a minute about how he got to those
09:16:54 18    early flow rate estimates.  Dave estimated the volume of oil
09:17:03 19    that was floating on the surface of the Gulf of Mexico.  The
09:17:05 20    benefit of that type of methodology is that you didn't need to
09:17:09 21    know anything about what was happening in the well below the
09:17:12 22    surface, the unknown that no one could know.  You needed a map
09:17:15 23    of what was apparent on the surface, it didn't require
09:17:19 24    guesswork about that damaged well.
09:17:22 25            You'll hear Dave started his work on the morning

**OFFICIAL TRANSCRIPT**

09:17:24  1   of April 26th.  One of the first thing things he did was try to

09:17:29  2   gather the data he would need to run these estimates, and he

09:17:32  3   got that from a Coast Guard form known as the ICS-209.  This

09:17:40  4   was third-party data, not anything that David Rainey made up.

09:17:43  5         He also consulted with NOAA's senior scientist

09:17:47  6   within the Unified Command, a man named Charlie Henry.  Dave

09:17:52  7   and Charlie, you will hear, brainstormed on that morning of the

09:17:56  8   26th about some of the data inputs that would be needed for

09:18:00  9   these flow rate estimates, and at 2:00 p.m., Dave had Charlie

09:18:04 10   sign off on the inputs that he was going to use in his

09:18:08 11   flow rate calculations.

09:18:10 12         Dave wanted to get it right.  He went to NOAA's

09:18:13 13   top scientist within the Unified Command.  He wasn't hiding

09:18:18 14   anything.  He worked in good faith.

09:18:21 15         After Dave nailed down the inputs, he conducted

09:18:27 16   computer research.  He spent a CBL amount of time researching

09:18:33 17   the best protocols available to estimate the volume of oil on

09:18:36 18   the surface.  And he found three established protocols,

09:18:40 19   including the European standard, which was known as the Bonn

09:18:46 20   agreement, and the American standard, known as the ASTM.

09:18:48 21         You heard the prosecutor try to belittle Dave's

09:18:53 22   estimates as somehow based on information from Wikipedia.

09:18:56 23   Let's put that one to rest right now.  You're going to see the

09:19:00 24   exact searches that Dave conducted on the Internet.  It is true

09:19:04 25   some of his initial search hits took to him a page from

09:19:08 1    Wikipedia.  But what's also true is that site and others took

09:19:13 2    him to the established protocols, and those were what he used

09:19:18 3    to conduct his estimates.

09:19:20 4         The suggestion that his research is in some way

09:19:24 5    diminished because he had to get through Wikipedia to get

09:19:29 6    there, it doesn't hold up.  Think about it.  Let's say you ran

09:19:34 7    an Internet search for a passage from be Bible that you were

09:19:39 8    familiar with, but you couldn't remember the cite, and it took

09:19:42 9    you to Wikipedia, and it told you the chapter and verse.  And

09:19:46 10   you went to the Bible and you learned the information before

09:19:49 11   from the Bible.  Is your research belittled or demeaned in some

09:19:53 12   way because you got to the Bible through Wikipedia?  Come on.

09:19:56 13   That's what they want you to believe here.

09:19:58 14        After brainstorming with these various protocols,

09:20:02 15   it was apparent that the Bonn agreement produced much higher

09:20:08 16   numbers of flow than the ASTM.  Given everything he knew and

09:20:12 17   all of his experience, Dave thought that the ASTM results made

09:20:15 18   more sense in this situation, and that's where he was leaning.

09:20:19 19   But he didn't make these calls alone.  He sought confirmation,

09:20:24 20   and he did that in a couple of different ways.

09:20:28 21        First, on April 27th, at the direction of Charlie

09:20:33 22   Henry from NOAA, Dave contacted a different NOAA scientist

09:20:39 23   named Bill Lehr, who is held out as an expert in this area.

09:20:43 24        With his numbers in hand, Dave had a nine-minute

09:20:46 25   telephone conversation with Bill Lehr the afternoon of the

**OFFICIAL TRANSCRIPT**

09:20:50 1 27th.  Dave wasn't hiding.  He wasn't working in some back

09:20:55 2 room.  He consulted with the Government's experts.  And Lehr

09:20:59 3 told him the whole methodology was highly uncertain, but the

09:21:06 4 Bonn agreement was particularly bad.

09:21:07 5 　　　　Later that day, Dave got an e-mail in which Lehr

09:21:11 6 said using Bonn for spill estimation is a bad idea.  The

09:21:17 7 conversation confirmed Dave's initial leanings that the ASTM

09:21:21 8 results made more sense.  But he didn't stop there.  Dave had a

09:21:25 9 conversation with his boss, Doug Suttles.  He openly walked

09:21:30 10 Suttles through his research and his results.  And Suttles

09:21:35 11 agreed that the Bonn results, those higher numbers didn't make

09:21:39 12 sense, based on what they knew, and that the ASTM results

09:21:42 13 seemed more reasonable under the circumstances.

09:21:45 14 　　　　Another piece of confirmation took place that

09:21:51 15 same afternoon on April 27th, 4:30 in the afternoon.  There was

09:21:55 16 a conference call between the personnel and the Unified Command

09:22:01 17 in Robert, Louisiana and other senior management for BP working

09:22:05 18 back in Houston on stopping the flow of oil.  Suttles and

09:22:09 19 Rainey participated in Robert, and a whole group of senior

09:22:13 20 executives were on the phone in Houston.

09:22:15 21 　　　　Dave briefed the group on that call about his

09:22:19 22 flow rate estimates.  He discussed the ASTM and the Bonn.  He

09:22:26 23 openly explained that the Bonn pushed higher numbers, and he

09:22:29 24 gave them the full range of his work under both standards.  He

09:22:33 25 didn't conceal anything.  He was completely honest and

**OFFICIAL TRANSCRIPT**

09:22:37  1    transparent about his work.

09:22:38  2            After that 4:30 call, Dave moved on.  The

09:22:44  3    prosecutors want you to think that flow rate was the most

09:22:46  4    important issue within Unified Command and that it dominated

09:22:50  5    Dave's responsibilities.  The reality is far different.  Dave

09:22:56  6    began working on this project on the morning of April 26.  He

09:22:59  7    was done by the afternoon of April 27.  That was a 30-hour

09:23:05  8    period, and he didn't even work on it continuously during that

09:23:09  9    time.

09:23:10 10            Flow rate was just not that important an issue.

09:23:13 11    It was an issue pushed by the press and the politicians, not

09:23:18 12    the real scientists.  It was a fool's errand.

09:23:22 13            And that's the story with Dave's estimates.  The

09:23:29 14    bottom line is he did real work.  He tried to get it right.  He

09:23:34 15    acted in complete good faith.

09:23:36 16            And now let's fast forward, almost a year later

09:23:40 17    to that interview that took place on April 6, 2011.  That's

09:23:43 18    when Dave was interviewed by the FBI in connection with the

09:23:48 19    *Deepwater Horizon* incident.  From that all-day interview, they

09:23:53 20    are going to focus on two brief statements.  Statements that at

09:23:57 21    most filled 5 minutes of that 6- to 7-hour interview.  They say

09:24:04 22    Dave lied by saying he got the NOAA estimate before he had done

09:24:09 23    his own flow rate work.

09:24:11 24            So what were the questions posed to him at this

09:24:14 25    interview?  There certainly is no good record of it.  But the

09:24:18 1  thrust of the questioning on when Dave was -- was on when Dave

09:24:25 2  got the one-page NOAA estimate, the document prepared by this

09:24:32 3  scientist in Seattle, Bill Lehr.  They even pushed across the

09:24:34 4  table during the interview that one-page document when these

09:24:37 5  questions were posed to Dave.

09:24:38 6           Dave's best recollection is exactly what he told

09:24:42 7  the FBI during the interview, that he got that one-page NOAA

09:24:47 8  estimate sometime between April 26th and April 30th.  He said

09:24:53 9  he generally recalled receiving it and seeing that the number

09:24:57 10 fell within the range of estimates that he prepared, and that

09:25:00 11 gave him some comfort.  But he made clear he had no memory of

09:25:06 12 how or when he received it and that was truth.

09:25:09 13          Sometime after the interview, the FBI found a

09:25:15 14 text message that Dave got from a colleague on the afternoon of

09:25:18 15 April 26th that contained the NOAA number.  For some technical

09:25:24 16 reason, not caused by anything Dave did, that message wasn't

09:25:29 17 saved on his phone.  When he was interviewed, almost a year

09:25:33 18 later, Dave had no memory of the text message.  And the FBI

09:25:39 19 didn't ask him any questions about it because they didn't have

09:25:43 20 it.

09:25:45 21          But now because they found that piece of evidence

09:25:50 22 after the fact, the prosecutors are going to try to recreate

09:25:55 23 history.  They are going to suggest that a key focus of that

09:25:59 24 all-day interview was the timing of when Dave got the NOAA

09:26:04 25 number.  That is not the reality.

**OFFICIAL TRANSCRIPT**

09:26:07  1          These statements came up almost in passing.  The

09:26:11  2   FBI didn't probe or drill down on them in any respect during

09:26:15  3   the interview.  They asked a question or two about when Dave

09:26:20  4   got the one-page document, and he told him his best memory was

09:26:25  5   that he got it after he had done his own work.  That was the

09:26:28  6   truth, period.

09:26:28  7          The last thing I want to talk to you about today

09:26:33  8   is why?  What is the prosecution's theory for why Dave lied to

09:26:39  9   the FBI?  They want you to believe that he cooked up a phony

09:26:44 10   flow rate estimate and then lied to the FBI about it to cover

09:26:49 11   his tracks.

09:26:50 12          But think about what is missing from this

09:26:53 13   picture.  Not a single witness will testify in this trial that

09:26:56 14   he told Dave to commit any crime.  Not a single witness will

09:27:01 15   testify in this trial that he was in on it with Dave, that they

09:27:07 16   cooked up this scheme together to manipulate the flow rates.

09:27:10 17          So for this theory to be true, you would have to

09:27:13 18   conclude that Dave decided to do this entirely on his own.

09:27:18 19   That he took it upon himself to cheat and to lie.  And for

09:27:23 20   what?  What on earth did he supposedly get for throwing away

09:27:28 21   his career and life and committing this crime?  Nothing.  You

09:27:33 22   will hear no evidence in this trial that Dave profited in any

09:27:37 23   way from this so-called crime.

09:27:39 24          When you use your common sense, ladies and

09:27:43 25   gentlemen, as, of course, you are permitted to do as a juror,

**OFFICIAL TRANSCRIPT**

09:27:47 1  you will see that the prosecution's theory of this case makes

09:27:51 2  no sense whatsoever.  It is wrong.  They cannot prove that Dave

09:27:57 3  had any criminal intent when he talked to the FBI.

09:28:01 4          David Rainey is an honest man.  He is not a liar.

09:28:04 5  He is not a cheat.  And at the end of this trial, we will be

09:28:09 6  back before you to ask you to deliver the only just verdict in

09:28:12 7  this case, a verdict of not guilty that will send this man

09:28:16 8  home.

09:28:17 9          Thank you very much.

09:28:18 10         THE COURT:  Thank you, Mr. Heberlig.

09:28:22 11         Okay.  Let's go ahead and get our first witness.

09:28:25 12 As I explained yesterday, the government has the obligation and

09:28:29 13 the opportunity at the outset to begin calling witnesses and

09:28:34 14 introducing testimony in support of its case.  So we're going

09:28:39 15 to begin that process.  We'll try to take a break in about a

09:28:42 16 half hour or so, 45 minutes, but we want to go ahead and get

09:28:46 17 started with our first witness.

09:28:51 18         Mr. Zink or Mr. Tsao, who will that be?

09:28:54 19         MR. ZINK:  The United States calls Avi Gesser,

09:28:58 20 Your Honor.

09:28:58 21         THE COURT:  Can we call Mr. Gesser in?

09:29:01 22         Mr. Gesser, if you would come forward, sir.  When

09:29:08 23 you get behind this chair, please remain standing until you

09:29:11 24 take the oath, and then you may be seated.

09:29:20 25         THE DEPUTY CLERK:  Would you please raise your right

**OFFICIAL TRANSCRIPT**

1      hand.  Do you solemnly swear that the testimony you are about

2      to give will be the truth, the whole truth and nothing but the

3      truth, so help you God?

4              THE WITNESS:  I do.

5                        **ABRAHAM "AVI" GESSER**

6       was called as a witness and, after being first duly sworn by

7       the Clerk, was examined and testified on his oath as follows:

09:29:26  8              THE DEPUTY CLERK:  Thank you.  Please state and spell

09:29:27  9      your name for the record.

09:29:28  10              THE WITNESS:  My name is Avi Gesser.  A-V-I,

09:29:39  11      G-E-S-S-E-R.

09:29:42  12              MR. ZINK:  May I proceed, Your Honor?

09:29:42  13              THE COURT:  Yes.

09:29:44  14                        DIRECT EXAMINATION

09:29:45  15      BY MR. ZINK:

09:29:45  16      Q.    Sir, can you please introduce yourself to the members of

09:29:45  17      the jury?

09:29:50  18      A.    Hello, my name is -- Abraham Gesser is my official name

09:29:55  19      but I go by Avi, Avi Gesser.  I'm a former member of the

09:30:02  20      Justice Department, and now I'm a lawyer working in New York.

09:30:05  21      Q.    And, sir, are you currently employed?

09:30:07  22      A.    I am, yes.

09:30:08  23      Q.    Where are you employed?

09:30:09  24      A.    I work for a law firm in New York, Davis Polk is the name

09:30:14  25      of the firm.

                        **OFFICIAL TRANSCRIPT**

09:30:15 1    Q.    What type of law do you do presently?

09:30:17 2    A.    I'm in the litigation group, and I practice white color

09:30:20 3    criminal defense law.

09:30:21 4    Q.    What does that mean?

09:30:22 5    A.    It means I represent companies who are being investigated

09:30:29 6    by government bodies.

09:30:30 7    Q.    And what is your position at Davis Polk, at your law firm?

09:30:35 8    A.    I'm a partner.

09:30:36 9    Q.    What does that mean?

09:30:37 10   A.    It means that I am part of the management structure of the

09:30:42 11   firm and I'm a part owner of the firm.

09:30:44 12   Q.    And how long in total have you worked at Davis Polk, your

09:30:48 13   law firm?

09:30:49 14   A.    About 14 years.

09:30:52 15   Q.    Were you employed with the government for a period of

09:30:55 16   time, sir?

09:30:56 17   A.    Yes.  From 2010 to 2013, I worked for the Department of

09:31:02 18   Justice in the criminal division, as part of the

09:31:07 19   *Deepwater Horizon* Task Force.

09:31:08 20   Q.    And just very briefly, sir, what is the *Deepwater Horizon*

09:31:11 21   Task Force?

09:31:12 22   A.    It was a group of Justice Department lawyers and agents

09:31:19 23   from a number of agencies that were investigating potential

09:31:22 24   criminal conduct in connection with the Macondo oil spill in

09:31:27 25   the Gulf of Mexico.

**OFFICIAL TRANSCRIPT**

09:31:27  1    Q.    Mr. Gesser, what was your position on the

09:31:32  2    *Deepwater Horizon* Task Force?

09:31:34  3    A.    I was the deputy director.  I was one of two deputy

09:31:39  4    directors.  I was the deputy director in charge of operations.

09:31:41  5    Q.    What does that mean, the deputy director of operations?

09:31:44  6    A.    So I had two roles on the task force.  The first role I

09:31:48  7    had was I was -- for operations, I did the day-to-day

09:31:52  8    operations of the task force.  I was in charge of budget,

09:32:00  9    technology, hiring, getting us space, equipment, things like

09:32:06 10    that.  And then I also ran a portion of the investigation.

09:32:10 11    Q.    And what part of the investigation did you run, sir?

09:32:15 12    A.    I did what we refer to as the "post spill" investigations,

09:32:18 13    so we were looking at potential criminal conduct in connection

09:32:22 14    with activities that occurred after the spill took place.  It

09:32:27 15    was mostly related to the flow rate of the oil from the well.

09:32:30 16    Q.    And very, very briefly and generally for the members of

09:32:35 17    the jury, what is flow rate?

09:32:36 18    A.    So we refer -- we use the term *flow rate* to refer to the

09:32:39 19    amount of oil that was leaking from the Macondo Well from the

09:32:45 20    time that the blowout took place until the time that the well

09:32:51 21    was capped, so it was about a two or three-month period.

09:32:56 22    Q.    And how is the flow rate measured?

09:33:03 23    A.    The unit of measurement that was generally used is in

09:33:09 24    barrels of oil per day.  So it was how much oil was leaking

09:33:13 25    from the well in barrels of oil per day or BOPD or bpd.

**OFFICIAL TRANSCRIPT**

09:33:19 1    Q.    And what specifically was you and your team looking at

09:33:23 2    with respect to the flow rate issue?

09:33:24 3    A.    So the estimates of the flow rate -- there were a number

09:33:28 4    of them, and they increased over time -- and we were looking to

09:33:33 5    see whether some of the initial flow rates were too low and

09:33:38 6    whether the people who had been involved in generating those

09:33:42 7    flow rate estimates had done those estimates in good faith or

09:33:50 8    whether those estimates were deliberately made to be too low.

09:33:53 9    Q.    Sir, why was flow rate important to your investigation?

09:33:58 10   A.    So a number of parts of the response to the spill depended

09:34:06 11   on flow rate, so both the containment efforts and the cleanup

09:34:11 12   efforts were being driven by how much oil was coming out.  And

09:34:14 13   so to the extent that the flow rates had been underestimated or

09:34:21 14   deliberately understated, it affected -- our theory was that it

09:34:26 15   affected the response and that the response was in some ways

09:34:31 16   insufficient because it was based on a flow rate that was too

09:34:35 17   low.

09:34:35 18   Q.    Sir, in connection with your investigation, did you have

09:34:38 19   the occasion to interview senior executives at BP?

09:34:41 20   A.    We did, yes.

09:34:42 21   Q.    And how many approximately?

09:34:44 22   A.    Dozens.  I'm not sure exactly the number, but --

09:34:47 23   Q.    And is one of those executives, senior executives,

09:34:51 24   David Rainey?

09:34:51 25   A.    Yes.

**OFFICIAL TRANSCRIPT**

| 09:34:52 | 1 | Q. Is Mr. Rainey present in the courtroom here today? |

Q.    Is Mr. Rainey present in the courtroom here today?

A.    Maybe.  You were blocking him.  Yes.  He's right there.

Q.    Can you please identify him by reference to where he's sitting and what he's wearing, sir?

A.    He's sitting at the defense counsel table.

THE COURT:  He's standing.

THE WITNESS:  He's standing.  I see him.

EXAMINATION BY MR. ZINK:

Q.    Was a request made to interview Mr. Rainey?

A.    Yes.

Q.    Why?

A.    Mr. Rainey -- based on a review of documents that we had received from BP and representations that were made to us by BP's counsel and our review of the public record, including some documents that we had just located on the Internet, we were of the view that Mr. Rainey had been a key member of the group at BP who was doing flow rate estimates and that his flow rate estimates had been shared with the government.  And so we were trying to figure out how he had come to do his flow rate estimates, why he was doing them, what inputs he had, what assumptions he made, what information he had from the government about flow rates and then what he was sharing with the government.

Q.    In connection with your investigation, did you become aware that some of Mr. Rainey's flow rate work had been shared

**OFFICIAL TRANSCRIPT**

09:36:14  1    with various departments and agencies and branches of the

09:36:18  2    federal government?

09:36:20  3    A.    Yes.  Based on our view of the documents and

09:36:24  4    representations, again, that were made to us by BP counsel and

09:36:27  5    looking at some public documents, you know, we were of the view

09:36:31  6    that Mr. Rainey's flow rate estimates had been shared both with

09:36:35  7    the Unified Command structure that had been set up after the

09:36:39  8    spill, which included members of the government and principally

09:36:42  9    the Coast Guard, as well as that his estimates had been shared

09:36:45 10    with Congress.

09:36:47 11            MR. ZINK:  May I approach, Your Honor?

09:36:47 12            THE COURT:  Yes.

09:36:50 13    EXAMINATION BY MR. ZINK:

09:36:50 14    Q.    Mr. Gesser, I'm showing you what's been marked as

09:36:50 15    Government Exhibit 98 and Government Exhibit 141.  I'm going to

09:37:06 16    ask you a couple questions about those documents.

09:37:06 17            MR. ZINK:  Your Honor, permission to publish 98 on the

09:37:12 18    computer screen.

09:37:12 19            THE COURT:  Yes.  I think those two have already been

09:37:14 20    admitted, so you can go ahead and put those up.

09:37:18 21            Ladies and gentlemen of the jury, if you gently

09:37:19 22    pull on the bottom of those screens, they will come up a little

09:37:22 23    bit so you can see them a little bit better.  When you enter

09:37:24 24    and exit the jury box, just push them down.  Go ahead and give

09:37:28 25    them a little tug and it will pull up.  And then when you

09:37:32 1   leave, if you would, just press the bottom of it so that it

09:37:34 2   retracts and you don't get hung up on it when you're trying to

09:37:39 3   get out of the jury box.  You can also view it -- it will be on

09:37:40 4   the same screen, the exhibit, up on the big screen.

09:37:46 5   EXAMINATION BY MR. ZINK:

09:37:46 6   Q.   Mr. Gesser, on your computer screen, do you see Government

09:37:49 7   Exhibit 98?

09:37:49 8   A.   I do.

09:37:50 9   Q.   Ms. Chapin, can you please highlight the top portion of

09:37:54 10  the document, please?

09:37:54 11          And what is this document?

09:37:56 12  A.   This is an e-mail that was sent from Doug Suttles to

09:38:01 13  various members of the US Coast Guard, who were part of the

09:38:06 14  Unified Command structure, and so it's Admiral Landry,

09:38:11 15  Admiral Allen, James Watson and Admiral Neffenger.

09:38:18 16  Q.   Who did you understand Doug Suttles to be?

09:38:21 17  A.   Doug Suttles was -- at the time, I believe, he was the

09:38:23 18  chief operating officer of BP.  He was also the senior member

09:38:27 19  of -- the senior person at BP as part of the Unified Command

09:38:34 20  structure.  I think he was second in -- next to Admiral Landry,

09:38:37 21  he was second in charge at Unified Command.

09:38:39 22  Q.   Mr. Gesser, can you please read for the members of the

09:38:42 23  jury what the e-mail says?

09:38:43 24  A.   It says, "Admiral Allen and Admiral Landry, attached below

09:38:48 25  is our most recent work on flow rate estimation.  Don't

**OFFICIAL TRANSCRIPT**

09:38:51 1   hesitate to contact me if you would like to discuss.  Doug."

09:38:55 2   Q.   Based on the heading of the e-mail -- and we'll look at

09:38:59 3   the attachments in a second -- but does there appear to be

09:39:02 4   attachments included with this e-mail?

09:39:03 5   A.   Yes.  There appear to be two attachments.

09:39:05 6   Q.   Ms. Chapin, can you pull up the bottom thread of the

09:39:09 7   e-mail?

09:39:09 8        And can you read this for the members of the jury,

09:39:11 9   sir?

09:39:11 10  A.   Yes.  It's an e-mail from Mr. Rainey to Mr. Suttles.  And

09:39:16 11  it says, "Apologies, Doug.  Had to run for plane.  Initial info

09:39:23 12  was meeting 1:00 p.m. Wed" -- which I think is Wednesday -- "at

09:39:28 13  4:00 p.m. got word MTG" -- which I believe is meeting -- "was

09:39:32 14  9:00 a.m., exclamation point.  Dave."

09:39:36 15  Q.   Based on your review of the document, what did you

09:39:39 16  understand was being communicated and attached to this e-mail?

09:39:45 17  A.   Mr. Rainey had conducted some flow rate estimates.  He had

09:39:49 18  forwarded them to Mr. Suttles, who then forwarded them on to

09:39:53 19  members of the Coast Guard in their capacity at the

09:39:56 20  Unified Command structure.

09:39:57 21  Q.   Mr. Gesser, prior to coming into court, did you have an

09:40:02 22  opportunity to review Government Exhibit 98?

09:40:04 23  A.   I did.

09:40:05 24  Q.   Are there flow rate tables attached to Government

09:40:08 25  Exhibit 98?

**OFFICIAL TRANSCRIPT**

09:40:09 1   A.    There are.

09:40:10 2   Q.    I want to direct your attention to page 6 of Government

09:40:14 3   Exhibit 98.  And very generally, sir, what is the information

09:40:17 4   depicted on this document?

09:40:18 5   A.    These are flow rate estimates that were conducted by

09:40:26 6   Mr. Rainey.

09:40:26 7   Q.    I want to direct your attention to the column on the

09:40:31 8   left-hand side.

09:40:31 9         Ms. Chapin, can you please pull it up?

09:40:33 10        What is that?

09:40:37 11  A.    Mr. Rainey's estimates had a low --

09:40:42 12  Q.    Sir, I just -- what's the number?

09:40:43 13  A.    This is the -- 1,063.  That's in barrels -- here it's

09:40:51 14  barrels per day.  But it's what we were discussing earlier,

09:40:54 15  that's the unit of measurement for the amount leaking from the

09:40:58 16  well, barrel of oil per day.

09:41:00 17  Q.    Ms. Chapin, can you please pull up the column on the far

09:41:04 18  right-hand side?

09:41:04 19        And what's that?

09:41:06 20  A.    Here the estimate is 14,266 barrels of oil per day.

09:41:15 21  Q.    Is that the high estimate?

09:41:15 22  A.    For this particular group of estimates, yes.

09:41:18 23  Q.    Is there a best guess estimate right in the middle?

09:41:19 24  A.    Yes.

09:41:19 25  Q.    Ms. Chapin, can you please pull that up?

**OFFICIAL TRANSCRIPT**

09:41:22 1                    And, sir, what is that?

09:41:24 2      A.    Here the estimate is 5,758 barrels of oil per day.

09:41:30 3      Q.    Ms. Chapin, can you please pull up the date at the bottom

09:41:32 4      of the document?

09:41:33 5                    And can you make that out, Mr. Gesser?

09:41:34 6      A.    Yes.  There is a printed date of 5/17/2010, which is

09:41:38 7      May 17, 2010, but that's crossed out.  And then handwritten is

09:41:41 8      4/27/10, which is April 27, 2010.

09:41:45 9      Q.    Finally, Ms. Chapin, can you pull up the bottom left-hand

09:41:45 10     corner?

09:41:50 11                   Do you see what that says?

09:41:52 12     A.    Yes.  It says, "BP Confidential."

09:41:54 13     Q.    And we'll move quickly through the next three or four

09:41:58 14     tables.  But Ms. Chapin can we go to page 7?

09:42:02 15                   Mr. Gesser, what's depicted on this page, sir?

09:42:08 16     A.    This is another one of Mr. Rainey's flow rate estimates.

09:42:12 17     Q.    And direct your attention to bottom of the page.  Is there

09:42:14 18     a different date at the bottom?

09:42:16 19     A.    Yes.  Here the date is 4/28/2010.

09:42:19 20     Q.    And we'll move quickly along.

09:42:21 21                   Ms. Chapin, can you just pull up the different

09:42:25 22     estimates that appear?

09:42:25 23                   Can you read those for the members of the jury, sir?

09:42:30 24     A.    Yes.  On the left is the low estimate at 935 barrels of

09:42:39 25     oil per day.  In the middle is the best guess estimate of

                            **OFFICIAL TRANSCRIPT**

09:42:43 1  5,092 barrels of oil per day.  And on the right is the high

09:42:48 2  estimate, which is 12,550 barrels of oil per day.

09:42:52 3  Q.    Ms. Chapin, can we go to page 8?

09:42:54 4        Same idea, Mr. Gesser?

09:42:55 5  A.    Yes.  This is another estimate that Mr. Rainey conducted.

09:42:59 6  And here the --

09:43:01 7  Q.    Very briefly, sir, I want to direct your attention to the

09:43:03 8  date at the bottom.  What's the date?

09:43:06 9  A.    This date is also -- I'm sorry.  So this is -- the printed

09:43:10 10 date is 5/17/2010, but it's crossed out.  And in handwriting it

09:43:17 11 says 4/29, which is April 29, 2010.

09:43:21 12 Q.    So we've seen April 27th, April 28th and now April 29th,

09:43:21 13 correct?

09:43:26 14 A.    Correct.

09:43:26 15 Q.    I would like to direct your attention to the estimates

09:43:29 16 that appear.  And can you read for the members of the jury the

09:43:32 17 range.

09:43:33 18 A.    Yes.  The low estimate is 1,195 barrels of oil per day.

09:43:37 19 The best guess is 5,906 barrels of oil per day.  And the high

09:43:43 20 is 14,455 barrels of oil per day.

09:43:46 21 Q.    Finally, Mr. Gesser, I direct your attention to page 9.

09:43:52 22 And direct your attention to the date at the bottom of the

09:43:55 23 page, and what's that date, sir?

09:43:58 24 A.    This is 4/30 or April 30, 2010.

09:44:00 25 Q.    Ms. Chapin, can you please pull up the range of rates?

**OFFICIAL TRANSCRIPT**

09:44:04  1            And can you read those to the members of the jury,

09:44:07  2   sir?

09:44:08  3   A.    Yes.   The low estimate here is 920 barrels of oil per day.

09:44:12  4   The best guess is 5,226 barrels of oil per day.   And the high

09:44:18  5   is 12,089 barrels of oil per day.

09:44:21  6   Q.    Based on your review of this e-mail, who received these

09:44:24  7   estimates?

09:44:24  8   A.    These were estimates that were received both by the

09:44:29  9   Coast Guard, as part of Unified Command, and were also shared

09:44:33 10   with Congress.

09:44:34 11   Q.    Thank you, Ms. Chapin.

09:44:37 12            I would like to direct your attention now to an

09:44:40 13   exhibit in front of you.   It's Government Exhibit 141.

09:44:43 14            And, Ms. Chapin, can you please pull up 141, just the

09:44:48 15   top half of the front page?

09:44:49 16            Mr. Gesser, do you recognize this document, sir?

09:44:51 17   A.    I do.

09:44:52 18   Q.    And what is it?

09:44:52 19   A.    This is a letter that was written from BP and was sent to

09:45:01 20   the Chairman of the House Subcommittee on Energy and the

09:45:07 21   Environment.

09:45:07 22   Q.    And prior to coming into court, did you have a chance to

09:45:10 23   review this document as well, sir?

09:45:11 24   A.    I did.

09:45:12 25   Q.    And does it have the exact same tables that we just looked

**OFFICIAL TRANSCRIPT**

09:45:14 1   at in the other exhibit?

09:45:15 2   A.   It does.

09:45:16 3   Q.   So is it fair to say these estimates were communicated to

09:45:20 4   Congress as well?

09:45:20 5   A.   Yes.

09:45:21 6   Q.   Let's just take a look at them very briefly.

09:45:24 7        Ms. Chapin, can you pull up page 6?

09:45:26 8        Is that the estimate on the 27th, Mr. Gesser?

09:45:31 9   A.   Yes.  It's the same estimate that we just looked at in the

09:45:34 10  previous document.

09:45:34 11  Q.   Ms. Chapin, page 7.

09:45:39 12       Is this the 28th, sir?

09:45:42 13  A.   Yes.  These are all the same.

09:45:43 14  Q.   Page 8?

09:45:44 15  A.   Yes, the same.

09:45:45 16  Q.   29th?

09:45:45 17  A.   Yes.

09:45:46 18  Q.   Page 10 is the 30th, correct?

09:45:49 19  A.   Correct.

09:45:49 20  Q.   Thank you, Ms. Chapin.

09:45:58 21  A.   I'm sorry.  Could I get a glass of water?  Is that

09:46:02 22  possible?

09:46:03 23       THE COURT:  There should be some right there.

09:46:06 24       THE WITNESS:  Thank you.

09:46:20 25  EXAMINATION BY MR. ZINK:

**OFFICIAL TRANSCRIPT**

09:46:21  1    Q.   Mr. Gesser, what role, if any, did the communication of

09:46:22  2    these materials to the United States Congress and the

09:46:24  3    Coast Guard have on your investigation?

09:46:25  4    A.   They were a key part of our investigation.  As I indicated

09:46:29  5    earlier, the flow rates -- estimates increased over time.

09:46:35  6    These were sort of early in the time period.  And we were

09:46:39  7    looking to see whether these estimates that were shared with

09:46:43  8    the Unified Command and shared with Congress were -- first of

09:46:47  9    all, whether they were too low and then whether or not the

09:46:51 10    people at BP who were involved in making these estimates knew

09:46:56 11    they were too low at the time.

09:46:57 12    Q.   I want to direct your attention back to your investigation

09:46:59 13    and your interview of Mr. Rainey.  Did you request an interview

09:47:03 14    of him?

09:47:03 15    A.   Yes.

09:47:03 16    Q.   And did an interview eventually take place?

09:47:06 17    A.   It did.

09:47:07 18    Q.   Where was Mr. Rainey interviewed, sir?

09:47:09 19    A.   Here in New Orleans, just across the street at the offices

09:47:12 20    of the task force.

09:47:15 21    Q.   Mr. Gesser, before going into this interview, was there

09:47:19 22    some discussion between you and the members of the team, your

09:47:22 23    team, about what questions would be asked and the information

09:47:25 24    sought to be elicited?

09:47:26 25    A.    Yes.  We spent some time preparing and discussing what

**OFFICIAL TRANSCRIPT**

09:47:30 1    issues we wanted to focus on and what we were hoping to learn

09:47:34 2    from the interview.

09:47:35 3    Q.    And what was that?

09:47:38 4    A.    There were a number of things.  Principally we wanted to

09:47:42 5    understand --

09:47:42 6          MR. WEINGARTEN:  I want to object to the relevance of

09:47:45 7    the conversation.

09:47:45 8          MR. ZINK:  It goes to why certain questions were asked,

09:47:47 9    which, I believe, were issues in opening statements,

09:47:51 10   Your Honor.

09:47:51 11         THE COURT:  I think you have to lay a foundation for

09:47:53 12   this because I'm not quite sure either, the purpose of an

09:47:59 13   internal conversation between counsel on a prosecution team.

09:48:04 14   The point of the allegations in the indictment are what

09:48:09 15   Mr. Rainey said to them.  I'm not quite sure, unless you can

09:48:12 16   explain it further, the foundation of why we need to hear what

09:48:18 17   he talked about with other people on his team.

09:48:21 18         MR. ZINK:  I can simply ask about his understanding.

09:48:22 19   We don't have to get into the discussions.

09:48:24 20   EXAMINATION BY MR. ZINK:

09:48:25 21   Q.    Mr. Gesser, do you have an understanding about the

09:48:26 22   questions that would be asked during the course of the

09:48:28 23   interview?

09:48:29 24   A.    I did.

09:48:29 25   Q.    And what was your understanding, sir?

**OFFICIAL TRANSCRIPT**

09:48:32 1    A.   We were hoping to accomplish a number of things.  We

09:48:35 2    wanted to understand why Mr. Rainey was doing flow rate

09:48:40 3    estimates, how he learned to do them, what his inputs were,

09:48:47 4    when he received certain information from the government about

09:48:51 5    the flow rate estimates they were doing, and whether or not his

09:48:56 6    work was independent of what the government was doing or

09:48:59 7    whether he had seen some of the information that was -- the

09:49:03 8    government was working on when he was doing his flow rate

09:49:06 9    estimates.

09:49:06 10   Q.   Why did independence matter to you in connection with your

09:49:10 11   questions?

09:49:10 12   A.   So around the time that Mr. Rainey first was doing his

09:49:16 13   flow rate estimates, there was an estimate that was being done

09:49:18 14   by the National Oceanic and Atmospheric Administration, which

09:49:21 15   is NOAA, and the two -- those two estimates, the NOAA estimate

09:49:26 16   and Mr. Rainey's estimate, were around the same amount, which

09:49:32 17   we were interested to know whether those two estimates had been

09:49:35 18   arrived at independently or whether Mr. Rainey had seen the

09:49:41 19   NOAA estimate when he conducted his flow rate estimate.

09:49:46 20   Q.   Why would that matter to you?

09:49:49 21   A.   So we had spent time looking at Mr. Rainey's estimates.  I

09:49:52 22   had a hard time understanding how he had come to his estimates.

09:49:55 23   And if he had seen the NOAA estimate before he conducted his

09:50:03 24   estimate, at least in my view, it made it much more likely that

09:50:07 25   he had backed into his flow rate estimate, just to get to the

OFFICIAL TRANSCRIPT

09:50:11  1  same number that NOAA had got to.  So it was a very important
09:50:15  2  part of our interview.
09:50:17  3  Q.    Mr. Gesser, I want to focus your attention now on the
09:50:20  4  interview.  Do you recall what day it was, sir?
09:50:24  5  A.    Yeah.  It was April 6th, I believe, 2011.
09:50:28  6  Q.    And do you remember who was in attendance at the
09:50:32  7  interview?
09:50:33  8  A.    Yes.  So, I was in attendance.  My colleague, Derek Cohen,
09:50:38  9  who was the other deputy director of the task force, was in
09:50:42  10 attendance.  Agent Sonja Stone from the FBI was in attendance.
09:50:49  11 Agent Amy Adair from the Environmental Protection Agency was in
09:50:54  12 attendance.  And, obviously, Mr. Rainey was in attendance, and
09:50:57  13 he had with him two lawyers from the Steptoe firm.  And our
09:51:03  14 paralegal, Katie Loughnane joined sometime around the middle of
09:51:09  15 the interview.
09:51:09  16 Q.    Do you remember what room the interview took place in?
09:51:13  17 A.    Yes.  So the task force has this very nice big, spacious
09:51:18  18 conference room, and for whatever reason, that was being used
09:51:21  19 for something else, and so we were cramped in one of the side
09:51:27  20 smaller conference rooms.
09:51:28  21 Q.    During the course of the interview, were questions asked,
09:51:32  22 sir?
09:51:32  23 A.    Yes.
09:51:33  24 Q.    Who asked most of the questions?
09:51:34  25 A.    Mr. Cohen did the initial questioning, but once we got

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 09:51:39 | 1 | into the substance of the flow rate estimates and exchange |
| 09:51:46 | 2 | between the information that Mr. Rainey had provided to |
| 09:51:48 | 3 | Congress, I did almost all of the questioning after that. |
| 09:51:49 | 4 | Q.   Why is that? |
| 09:51:51 | 5 | A.   So I was the one who had reviewed Mr. Rainey's documents, |
| 09:51:56 | 6 | I had spent a lot of time looking at his calculations and |
| 09:52:00 | 7 | trying to figure them out, and I was just very familiar with |
| 09:52:04 | 8 | the flow rate in general, so it made sense for me to do the |
| 09:52:09 | 9 | questioning. |
| 09:52:09 | 10 | Q.   And did agents ask questions, substantive questions? |
| 09:52:12 | 11 | A.   No, they did not. |
| 09:52:13 | 12 | Q.   Why is that? |
| 09:52:19 | 13 | A.   Mr. Cohen, I think, instructed them not to.  I'm not sure |
| 09:52:22 | 14 | why. |
| 09:52:22 | 15 | Q.   And from the government's side of the house, were notes |
| 09:52:25 | 16 | taken? |
| 09:52:27 | 17 | A.   Yes. |
| 09:52:27 | 18 | Q.   And who took notes, sir? |
| 09:52:30 | 19 | A.   Agent Stone. |
| 09:52:30 | 20 | Q.   Do you know how she took notes? |
| 09:52:34 | 21 | A.   She had a laptop.  So she was typing as we were going. |
| 09:52:37 | 22 | Q.   Do you know if anybody else in the room took notes? |
| 09:52:41 | 23 | A.   I remember the lawyers for Mr. Rainey at times writing |
| 09:52:46 | 24 | things down.  I don't know if they were writing notes to |
| 09:52:49 | 25 | themselves or transcribing what was going on.  I didn't see |

**OFFICIAL TRANSCRIPT**

09:52:51  1    what they were writing.

09:52:52  2    Q.    Sir, during the course of the interview with Mr. Rainey,

09:52:55  3    did you personally ask him about his work calculating the

09:52:58  4    flow rate?

09:52:58  5    A.    I did.  We spent a fair bit of time talking about how he

09:53:04  6    learned to do the analysis and what his inputs were for the

09:53:11  7    analysis and how he had come to his estimates.

09:53:14  8    Q.    Did you eventually ask him questions about how he arrived

09:53:17  9    at his inputs for the calculations that subsequently went to

09:53:21 10    Congress and the Coast Guard?

09:53:22 11    A.    I did.

09:53:22 12    Q.    Did he provide a response?

09:53:28 13    A.    He did.  So some of the inputs that he had used to

09:53:31 14    generate his calculations came from a form which was called an

09:53:36 15    ICS-209, which is a Coast Guard form that's used to record

09:53:41 16    certain information about a spill.  And then some of the inputs

09:53:46 17    were assumptions that he had himself come up with based on his

09:53:51 18    research on how to do the flow rate estimates.

09:53:56 19            So we had pressed on that issue and trying to

09:54:00 20    understand why he was -- himself was creating his assumptions

09:54:04 21    and doing his work, when there were experts during this work.

09:54:04 22            So NOAA, who knows how to do these kinds of

09:54:15 23    calculations quite well, had their own set of assumptions.  So

09:54:18 24    we had asked, well, why were you struggling to come up with

09:54:21 25    these inputs on your own?  Mr. Rainey had no experience doing

09:54:26 1   this kind of work, and so we asked, why didn't you ask the

09:54:30 2   experts at NOAA to do this.

09:54:31 3   Q.   Mr. Gesser, what did Mr. Rainey say?

09:54:33 4   A.   He said he wasn't aware that they were doing these -- that

09:54:38 5   NOAA was doing these estimates, that he had done this on his

09:54:42 6   own, not knowing that that was being done.

09:54:44 7          He then said that he later learned that NOAA was

09:54:50 8   doing the estimates, and that he had received a one-page

09:54:56 9   estimate that NOAA had done after he had done the calculations

09:55:00 10  that we're talking about.

09:55:01 11  Q.   Did he talk about, in relation to this NOAA one-page

09:55:06 12  document, when he received that?

09:55:07 13  A.   Yes.  So I asked him, when did you learn that NOAA was

09:55:10 14  doing this flow rate estimates.  And he said that he had

09:55:12 15  received the NOAA -- what he referred to as the NOAA one-pager,

09:55:16 16  which was the document that showed the NOAA estimate, that he

09:55:20 17  had received it somewhere between April 26th and April 30th.

09:55:23 18  Q.   Mr. Gesser, was this answer satisfactory to you?

09:55:27 19          MR. WEINGARTEN:  Objection.

09:55:30 20  EXAMINATION BY MR. ZINK:

09:55:30 21  Q.   Was there a follow-up?

09:55:32 22  A.   Not at the time.

09:55:34 23          MR. ZINK:  I'm sorry, I didn't want to step over

09:55:37 24  Your Honor.

09:55:37 25          THE COURT:  That's alright.

**OFFICIAL TRANSCRIPT**

09:55:38 1    MR. ZINK:  I can rephrase.

09:55:38 2    THE COURT:  I wanted to hear more of the objection.

09:55:40 3    MR. WEINGARTEN:  Whether or not it was satisfactory,

09:55:40 4 that is not the issue.

09:55:44 5    THE COURT:  I'm going to overrule.  I'll overrule.

09:55:51 6 EXAMINATION BY MR. ZINK:

09:55:51 7 Q. Mr. Gesser, was the answer satisfactory to you, sir?

09:55:54 8 A. No, it wasn't.  That window -- I was trying to figure out

09:55:58 9 when Mr. -- by -- the question was, when did you receive the

09:56:04 10 NOAA one page -- I asked him when he learned of the NOAA

09:56:08 11 estimates, and he said that he had received the NOAA one-pager

09:56:12 12 sometime between April 26th and April 30th.

09:56:14 13    And that window of time was much too long to figure

09:56:17 14 out what we were trying to figure out, which is the timing of

09:56:19 15 when he did his estimates versus when he received the NOAA

09:56:24 16 estimate.  April 26th took -- takes you before the time that he

09:56:28 17 started doing his estimates, and April 30th takes you to after

09:56:31 18 the government announced their flow rate estimates.  So that

09:56:34 19 window of time didn't -- was too broad to answer the question

09:56:39 20 we were trying to ask.

09:56:40 21    And also, I remember it struck me at the time as

09:56:44 22 being surprisingly imprecise.  I remember thinking, considering

09:56:50 23 how important this was, he would have a sense of a narrower

09:56:53 24 timeframe.

09:56:53 25 Q. Did you make a mental note, sir?

              **OFFICIAL TRANSCRIPT**

09:56:56  1    A.   I did.  I figured we would circle back on it.  At that

09:57:00  2    time, these were -- this was one of the very first interviews

09:57:03  3    we did, and we were still learning a lot about what had gone

09:57:07  4    on, and so our practice was to try and get through the

09:57:12  5    narrative, the story that people were telling us, as much as

09:57:15  6    possible and not get bogged down in side details.

09:57:19  7         And so what we generally did at this point, and what

09:57:23  8    we were doing with Mr. Rainey, was trying to get through the

09:57:27  9    whole story once, and then we had a number of issues that had

09:57:29 10    come up during the interview that we would circle back to at

09:57:33 11    the end.

09:57:33 12    Q.   And how long did it take for you to circle back, sir?

09:57:37 13    A.   It was a long interview.  It must have taken two or three

09:57:43 14    hours for us to circle back to that issue.

09:57:45 15    Q.   When you did eventually circle back, what did you ask

09:57:49 16    Mr. Rainey on this topic?

09:57:50 17    A.   We were discussing -- Mr. Rainey later had told us that he

09:57:56 18    was having a discussion with NOAA, and so at that point, we

09:58:00 19    asked again, so if you were in discussions with NOAA, why did

09:58:07 20    you make the assumptions that you made, when you could have

09:58:12 21    just as easily got the inputs from NOAA, who were the experts

09:58:15 22    on this issue, and understood how to conduct the particular

09:58:21 23    input we were talking about, which was the thickness of oil.

09:58:24 24    And so I asked him why -- why didn't he just use the

09:58:26 25    thicknesses that NOAA used.

**OFFICIAL TRANSCRIPT**

09:58:28  1    Q.   And what did Mr. Rainey tell you?

09:58:30  2    A.   He said -- again, he said, I didn't realize that NOAA was

09:58:33  3    doing this -- these estimates at the time that he was

09:58:36  4    conducting the calculations that we were talking about, and

09:58:39  5    that he only he later received the one-page document from NOAA,

09:58:45  6    and that that estimate from NOAA had the 5,000 number, which

09:58:50  7    was the name number that Mr. Rainey arrived at, and so he said

09:58:53  8    that that gave him comfort that he had done the calculation

09:58:57  9    correctly.

09:58:57 10    Q.   Mr. Gesser, did this answer pique your interest, sir?

09:59:01 11    A.   Yes.  So that was the second time that Mr. Rainey had

09:59:03 12    referred to the NOAA one-pager.  And we were trying to get at

09:59:11 13    more the actual number.  So I asked him, okay, so you got

09:59:18 14    comfort from the NOAA number?  So I remember asking Mr. Rainey,

09:59:21 15    so you did your calculations that resulted in the -- in his

09:59:25 16    5,000 estimate before he saw the NOAA 5,000 number.

09:59:30 17    Q.   A what, if anything, did Mr. Rainey say?

09:59:33 18    A.   He said that's right, that he had done his calculations

09:59:35 19    that resulted in his 5,000 estimate before he saw the NOAA

09:59:39 20    5,000 number, and that he didn't see the NOAA 5,000 number

09:59:44 21    until after April 26th.

09:59:45 22    Q.   Mr. Gesser, why did you put your question to Mr. Rainey to

09:59:50 23    start with?

09:59:51 24    A.   Because, again, we were very much focused on the timing of

09:59:55 25    when he received the NOAA 5,000 number because we were trying

**OFFICIAL TRANSCRIPT**

10:00:00  1    to determine whether he had -- whether he could have been

10:00:06  2    backing into his 5,000 estimate because BP thought the --

10:00:13  3    NOAA's 5,000 estimate was low, and so they wanted to -- we were

10:00:19  4    investigating whether they were trying to reinforce that number

10:00:22  5    by coming up with their own estimate that matched that low

10:00:25  6    number.

10:00:25  7    Q.    Mr. Gesser, in fairness, it's been four years.  Is there

10:00:28  8    any doubt in your mind the question you asked in response

10:00:33  9    Mr. Rainey gave in relation to when he first learned of NOAA's

10:00:38 10    5,000 number?

10:00:39 11    A.    No.

10:00:39 12    Q.    How can you be so sure?

10:00:40 13    A.    That particular issue was very important to us, both going

10:00:44 14    into the interview and in the interview and after the

10:00:49 15    interview, and so on particular issue, I have a very clear

10:00:51 16    recollection.

10:00:52 17    Q.    Mr. Gesser, after the interview with Mr. Rainey, did you

10:00:54 18    and your team request an additional materials from BP?

10:00:56 19    A.    Yes.  Lots of materials.

10:00:58 20    Q.    As a general matter, what were those materials?

10:01:01 21    A.    For anybody who was involved in the post spill operations

10:01:06 22    of BP, we asked for all their documents relating to the

10:01:11 23    flow rate.  So that was electronic documents, e-mails,

10:01:16 24    spreadsheets, memos, attachments, as well as we were looking

10:01:23 25    for their phones, and so we asked for forensic images of their

10:01:28  1    phones, and we were looking -- there we were looking for text

10:01:31  2    messages.

10:01:31  3    Q.    Were you able to identify any text messages sent and

10:01:35  4    received by Mr. Rainey on April 26, 2010?

10:01:37  5    A.    Yes.  We later, after the interview, found text messages

10:01:45  6    in which Mr. Rainey was discussing the NOAA 5,000 estimate.

10:01:49  7    Q.    Who found these text messages?

10:01:51  8    A.    I did.

10:01:52  9         MR. ZINK:  The Court's indulgence.

10:02:07 10    BY MR. ZINK:

10:02:07 11    Q.    Was an individual subsequently retained and at least

10:02:08 12    utilized by the task force to analyze these forensic images?

10:02:12 13    A.    Yes.  Not subsequently.  It was part of the gathering of

10:02:15 14    the data.  Extracting cell phone text messages is complicated,

10:02:23 15    so we had an expert who was helping us do that.

10:02:25 16    Q.    Is that man's name Jeff Bolas?

10:02:25 17    A.    Yes.

10:02:25 18         MR. ZINK:  I'll pass the witness, Your Honor.

10:02:31 19         THE COURT:  Why don't we do this:  It's 5 after 10:00.

10:02:33 20    I promised you all that we would take a pit stop right about

10:02:37 21    now.  If you all can be ready at 10:20, which is 15 minutes,

10:02:41 22    we'll go ahead and take a break.

10:02:44 23              Mr. Gesser, if you could be on -- in that chair

10:02:46 24    at 10:20, we'll resume with your testimony.  Please do not

10:02:50 25    discuss your testimony with anyone during the break.

**OFFICIAL TRANSCRIPT**

10:02:53  1          Also, ladies and gentlemen of the jury, please do

10:02:55  2  not discuss anything about the case amongst yourself during the

10:02:59  3  15-minute break.  At 10:20, we will resume with

10:03:03  4  cross-examination of Mr. Gesser.

10:03:06  5          (WHEREUPON, at 10:03 a.m. the jury panel leaves the

10:14:10  6  courtroom.)

10:19:26  7          THE DEPUTY CLERK:  All rise.

10:19:46  8          (WHEREUPON, at 10:19 a.m. the jury panel enters the

10:19:46  9  courtroom.)

10:20:18 10          THE COURT:  All right.  You may be seated.  We are

10:20:20 11  about to begin the cross-examination of this witness.  Who is

10:20:24 12  going to be handling that?  Mr. Weingarten.  Okay.

10:20:28 13          Mr. Gesser, you're still under oath.

10:20:29 14          Mr. Weingarten, if you would approach the podium,

10:20:31 15  and you may begin.  Before you do that, let me explain to the

10:20:34 16  jury that we had three stipulations that were reached prior to

10:20:41 17  trial over the weeks leading up to the trial here today.  I'm

10:20:43 18  going to read them to you now.

10:20:45 19          A stipulation is simply a fact that the parties

10:20:49 20  of the attorneys in this case believe to be true and that do

10:20:53 21  not require any further proof.  So you are to accept these

10:20:56 22  statements as true statements.

10:20:58 23          The first one is that the original handwritten

10:21:02 24  notes -- by the way, I should tell you I'm going to read these

10:21:05 25  to you again at the end of the trial, in case they are not in

                              **OFFICIAL TRANSCRIPT**

10:21:08  1   context right now, but I will read them to you again at the end

10:21:12  2   of the trial, and you'll also receive them as part of your

10:21:15  3   deliberations.

10:21:15  4          The first one is that the original handwritten

10:21:17  5   notes contained in two notebooks marked as Government

10:21:22  6   Exhibits 150 L.1 and 150 L.2 were provided by David Rainey to

10:21:30  7   BP's attorneys on August 10th of 2010.

10:21:35  8          The second one is that Government Exhibit 159 is

10:21:42  9   a text message exchange between David Rainey and Keith Seilhan,

10:21:45 10   when David Rainey provided his Blackberry cell phone to BP's

10:21:50 11   attorneys on August 16th of 2010, these text messages were not

10:21:55 12   stored in his device due to technical issues not caused by

10:22:00 13   Mr. Rainey.

10:22:00 14          And let's see.  Also on July 16th of 2010,

10:22:19 15   David Rainey provided two folders to BP's attorneys, one folder

10:22:22 16   labeled "Mass Balance" and one folder labeled "FRTG."

10:22:31 17   Documents from these folders are marked as Government's

10:22:36 18   Exhibits 50 and 51, respectively.

10:22:40 19          Those are stipulations.  You have -- obviously

10:22:43 20   haven't seen some of these exhibits yet, but during the course

10:22:46 21   of the trial, I will go back and read these stipulations to you

10:22:50 22   again.

10:22:51 23          Mr. Weingarten, if you would like to begin

10:22:54 24   cross-examination of Mr. Gesser, you may do so.

10:22:57 25          MR. WEINGARTEN:  Thank you, Your Honor.

**OFFICIAL TRANSCRIPT**

CROSS-EXAMINATION

BY MR. WEINGARTEN:

Q.   I want to make sure you have the timing down.  Obviously, the explosion was April of 2010, correct?

A.   Correct.

Q.   At that time, were you working as a prosecutor for the Justice Department?

A.   I was not.

Q.   So you were assigned specifically to work on the *Deepwater Horizon* Task Force?

A.   I was not originally.

Q.   When did you start working on the Task Force?

A.   So the Task Force wasn't created until, I believe it was February or March of 2011.  Until that time, I was working on flow rate and issues but not in the context of the Task Force. I was part of the fraud section of the criminal division.

Q.   Make it simple.  You were a federal prosecutor working on the *Deepwater Horizon* issue from what time forward?

A.   From the day I arrived at the Justice Department, which was June 9th and 2010.

Q.   And I believe it was your testimony that Mr. Rainey was interviewed April 2011, correct?

A.   Correct.

Q.   So you had been working on the *Deepwater Horizon* matter for ten months, correct?

**OFFICIAL TRANSCRIPT**

10:24:15 1    A.    Among other things.

10:24:16 2    Q.    Did there come a time you were working on the

10:24:18 3    *Deepwater Horizon* case exclusively?

10:24:19 4    A.    Almost exclusively.  I always maintained -- I had a job in

10:24:24 5    Washington that I was supposed to be doing.  I wasn't doing

10:24:27 6    very well, and so it took up, I would say, 90 to 95 percent of

10:24:33 7    my time.

10:24:33 8    Q.    Okay.  And there certainly came a time that in the summer

10:24:39 9    of 2010, shortly after you started working, that BP started

10:24:43 10   producing documents to the Justice Department, correct?

10:24:46 11   A.    Yes.

10:24:47 12   Q.    And included in that production were documents authored by

10:24:51 13   Mr. Rainey, correct?

10:24:52 14   A.    Yes.

10:24:52 15   Q.    And included in that production was an entire mass balance

10:24:56 16   file that included all the charts and material that you

10:25:00 17   referred to in your direct examination, correct?

10:25:08 18   A.    I don't believe I knew that -- where they had come from at

10:25:13 19   that time.  We had seen some of the documents, I'm not sure all

10:25:18 20   the documents that were in the folder, before we interviewed

10:25:22 21   Mr. Rainey, but I can't be sure of that.

10:25:23 22   Q.    So are you are disputing that BP turned over the

10:25:27 23   mass balance file to the Justice Department in the summer of

10:25:29 24   2010?

10:25:32 25   A.    I'm not disputing that.  I just -- I don't know whether

**OFFICIAL TRANSCRIPT**

10:25:35  1    the documents that we received were everything that was in

10:25:39  2    those folders in the summer of 2010.

10:25:41  3    Q.    You interviewed Mr. Rainey in April of 2011, and it was a

10:25:49  4    full-day interview?

10:25:50  5    A.    Yes.

10:25:51  6    Q.    And I believe you testified that there were present for

10:25:57  7    the government, you, of course, Mr. Cohen, two prosecutors,

10:25:57  8    right?

10:26:02  9    A.    Right.

10:26:02 10    Q.    There were two federal agents, Agent Adair, who's sitting

10:26:06 11    at the table, and there was an FBI agent named Sonja Stone,

10:26:10 12    correct?

10:26:10 13    A.    Correct.

10:26:10 14    Q.    Was there also another prosecutor in attendance?

10:26:16 15    A.    I know that Justin Goodyear was on the Task Force working

10:26:20 16    on this.  I just don't recall whether he attended or not.

10:26:23 17    Q.    There is a document that is the formal record of the

10:26:30 18    interview for the government; is there not?

10:26:31 19    A.    Yes.

10:26:31 20    Q.    And that's called an FBI 302, correct?

10:26:34 21    A.    That's correct.

10:26:35 22    Q.    And, obviously, you've reviewed the FBI 302 in

10:26:39 23    anticipation of your testimony, correct?

10:26:41 24    A.    I have, yes.

10:26:41 25    Q.    And the FBI 302 is authored by FBI Agent Stone, correct?

10:26:48  1    A.   That's correct.

10:26:48  2    Q.   And the FBI 302 is 33 single-spaced typewritten pages,

10:26:48  3    correct?

10:26:56  4    A.   Yes.

10:26:58  5         MR. WEINGARTEN:  It's GX 168A, and I moved it into

10:27:03  6    evidence.  And I would like to present it to the witness just

10:27:04  7    for convenience sake, Your Honor.

10:27:07  8         MR. ZINK:  Judge, objection, hearsay.

10:27:09  9         THE COURT:  I'm sorry?

10:27:09 10         MR. ZINK:  I believe Mr. Weingarten is trying to move

10:27:11 11    the entire 302 in.

10:27:12 12         THE COURT:  Well, he wants to show it to the witness.

10:27:15 13    He asked to approach to show it to the witness, so let's hold

10:27:20 14    on to that.

10:27:23 15    EXAMINATION BY MR. WEINGARTEN:

10:27:23 16    Q.   So 168A, that's the FBI 302 of the interview of

10:27:28 17    Mr. Rainey, correct?

10:27:29 18    A.   Yes.

10:27:29 19    Q.   And that is the only government record of the interview,

10:27:29 20    correct?

10:27:39 21    A.   Yes.

10:27:39 22    Q.   You could have taped the interview, could you not?

10:27:45 23    A.   I don't know that.

10:27:45 24    Q.   Well, there is nothing prohibiting you from tape recording

10:27:48 25    the interview, correct?

**OFFICIAL TRANSCRIPT**

10:27:51  1   A.   I don't know if there was a Justice Department policy

10:27:53  2   against that.  This was not -- that -- the recording was

10:27:56  3   something that Mr. Cohen handled.  I did not -- I didn't get

10:28:00  4   involved in that.

10:28:01  5   Q.   Well, you were a federal prosecutor at the time, correct?

10:28:03  6   A.   I was a fairly new federal prosecutor at the time.

10:28:06  7   Q.   You had United States Department of Justice credentials in

10:28:09  8   your pocket, did you not?

10:28:10  9   A.   I don't know if I actually had them in my pocket, but I

10:28:14 10   understand the point, yes.

10:28:15 11   Q.   Did you interview Mr. Rainey, yes?

10:28:17 12   A.   Yes.

10:28:18 13   Q.   And did you tape record the interview?

10:28:20 14   A.   No.

10:28:20 15   Q.   Did you put a tape recorder between you and Mr. Rainey and

10:28:23 16   say, "Let's make sure we have a complete and accurate record of

10:28:27 17   this interview"?  Did you do that?

10:28:28 18   A.   I did not do that.

10:28:30 19   Q.   So, again, the only official record of the interview you

10:28:36 20   conducted with Mr. Rainey is this 33-page single-spaced 302

10:28:42 21   authored by the FBI, correct?

10:28:43 22   A.   That's correct.

10:28:44 23        MR. WEINGARTEN:  We move it into evidence, Your Honor.

10:28:46 24        THE COURT:  That's GX 168A.

10:28:49 25        MR. ZINK:  We object to hearsay, Your Honor.

**OFFICIAL TRANSCRIPT**

10:28:51 1          THE COURT:  Well, it's the record, it's the actual

10:28:54 2   record of what was said.  In fact, it is the only government

10:28:56 3   record, so I'm going to overrule the objection.

10:28:59 4          It's GX 168A is the exhibit.  That's how it's

10:29:03 5   identified?

10:29:04 6          MR. WEINGARTEN:  Yes.

10:29:04 7          THE COURT:  So ordered.

10:29:05 8   EXAMINATION BY MR. WEINGARTEN:

10:29:06 9   Q.    Now, Mr. Gesser, there were other ways that you could have

10:29:09 10  preserved actually what happened during that interview; isn't

10:29:12 11  that correct?

10:29:12 12  A.    As -- I honestly don't know as a matter of policy whether

10:29:21 13  there were other ways.  Certainly there were physically other

10:29:24 14  ways we could have done that.  We could have videotaped it.

10:29:27 15  Q.    Videotaped it, tape recorded it, correct?

10:29:28 16  A.    Those are all ways to record.

10:29:30 17  Q.    You could have invited a court reporter in.

10:29:32 18  A.    Again, I don't know as a matter of policy whether that was

10:29:35 19  something we could have done, but it wasn't done.

10:29:37 20  Q.    Did you ask Mr. Rainey to sign the document to attest to

10:29:43 21  its accuracy?

10:29:44 22  A.    No, we did not.  But, again, I don't think that was

10:29:49 23  department policy.

10:29:51 24  Q.    And did you ask Mr. Rainey to respond to written

10:29:54 25  questions?

**OFFICIAL TRANSCRIPT**

10:29:55  1   A.    No.  But again, I don't think that's the way this was

10:29:58  2   done.

10:29:58  3   Q.    Is it fair to say there were at least a half a dozen other

10:30:03  4   techniques available to the United States Department of Justice

10:30:06  5   for purposes of this interview that would have provided more

10:30:09  6   accuracy than the document that we have before us today?

10:30:13  7   A.    Again, yes, theoretically.  As a matter of policy, I don't

10:30:18  8   know.

10:30:18  9   Q.    Theoretically or in fact?

10:30:22 10   A.    Again, I don't know what avenues were available to us

10:30:27 11   because I didn't take care of that in terms of what --

10:30:29 12         THE COURT:  He's asking:  In fact, were there ways?

10:30:32 13   Not theoretically or not policy.  He's asking about fact.  That

10:30:37 14   was the question.  That was the word in the question.

10:30:40 15         THE WITNESS:  I understand.  I'm just saying to the

10:30:41 16   extent it was not -- it was against department policy, I don't

10:30:44 17   know.  Yes, but -- fine.  Yes, yes, there were other ways.

10:30:47 18         THE COURT:  Fact, yes or no?

10:30:49 19         THE WITNESS:  Yes.

10:30:51 20   EXAMINATION BY MR. WEINGARTEN:

10:30:51 21   Q.    Okay.  So there are a half a dozen feds in the room,

10:31:00 22   correct, two prosecutors -- and let's see if your third mate

10:31:03 23   was in attendance.  Let's look at the first paragraph and see

10:31:06 24   who was there.

10:31:09 25         Present during the interview, in addition to the

**OFFICIAL TRANSCRIPT**

10:31:11 1   undersigned agent -- I'm sorry.  First paragraph, why don't you

10:31:20 2   read it and tell us who was present.

10:31:28 3   A.   It says, Rainey's attorneys, Brian M. Heberlig and

10:31:33 4   David Matthew Fragale.

10:31:34 5   Q.   And what Task Force attorneys?

10:31:38 6   A.   Derek Cohen, who I mentioned was the other deputy director

10:31:42 7   of the *Deepwater Horizon* Task Force, myself, and Justin

10:31:46 8   Goodyear, and Environmental Protection Agency, EPA, Special

10:31:51 9   Agent Amy Adair and Katie Loughnane was present for part of the

10:31:54 10  interview.

10:31:54 11  Q.   And, of course, the FBI agent who drafted the document,

10:31:57 12  correct?

10:31:57 13  A.   Sonja Stone, yes.

10:31:58 14  Q.   So we have at various times in the room for the entire day

10:32:03 15  six members of the Federal Task Force team, fair?

10:32:08 16  A.   Correct.

10:32:08 17  Q.   Okay.  How many people of the six took notes?

10:32:14 18  A.   As far as I know, only Agent Stone took notes.

10:32:16 19  Q.   And why was that?

10:32:20 20  A.   Again, that was policy.

10:32:21 21  Q.   So you have six people in the room, and you have five

10:32:27 22  twiddling their thumbs while one takes notes during the Q & A?

10:32:31 23  A.   So I was asking questions, Mr. Cohen was asking questions.

10:32:35 24  We had other people in attendance.  We took breaks, and during

10:32:39 25  that time we discussed what other questions -- there was a lot

| | |
|---|---|
| 10:32:43 | 1 |
| 10:32:47 | 2 |
| 10:32:51 | 3 |
| 10:32:54 | 4 |
| 10:32:58 | 5 |
| 10:32:58 | 6 |
| 10:33:01 | 7 |
| 10:33:08 | 8 |
| 10:33:12 | 9 |
| 10:33:18 | 10 |
| 10:33:23 | 11 |
| 10:33:28 | 12 |
| 10:33:33 | 13 |
| 10:33:33 | 14 |
| 10:33:35 | 15 |
| 10:33:36 | 16 |
| 10:33:39 | 17 |
| 10:33:44 | 18 |
| 10:33:46 | 19 |
| 10:33:46 | 20 |
| 10:33:49 | 21 |
| 10:33:50 | 22 |
| 10:33:52 | 23 |
| 10:34:00 | 24 |
| 10:34:03 | 25 |

going on.  And so other people were there to be listening to give us suggestions of what to be asked and what we were missing or clarifying issues.

Q.   And then the agent is tasked to put together the document, correct?

A.   That was her sole task.

Q.   And does she pass around the document for review after she finishes it?

A.   I know I saw it when she was done, whether that was final or not -- she may have asked for spelling issues or things -- very minor issues.  But in terms of the substance, the -- it was the agent's report and the agent -- we didn't comment on substance.

Q.   This is a pretty important document, correct?

A.   It turned out to be, yes.

Q.   It's the only record in the United States government that the United States Department of Justice made of this interview of Mr. Rainey four years ago, correct?

A.   Correct.

Q.   And you reviewed it right after it was drafted, correct?

A.   Shortly thereafter, yes.

Q.   Did you find any errors in here?

A.   I don't remember finding any errors.  To the extent I found errors, we reviewed a number of -- it was always somebody's name spelled wrong or there was, you know, some

10:34:10  1   clerical errors.   Spelling mistakes.

10:34:12  2   Q.   Did you correct any errors in realtime, meaning back in

10:34:17  3   2011?

10:34:19  4   A.   I don't recall.  I might have corrected an error.  If it

10:34:22  5   was, again, it was a spelling mistake or somebody's name had

10:34:25  6   been incorrectly spelled.

10:34:26  7   Q.   I assume you reviewed the 302 right before testifying here

10:34:30  8   today?

10:34:30  9   A.   Not -- not all of it, but I took a look at it, yes.

10:34:33 10   Q.   You took a look at this document, correct?

10:34:35 11   A.   Correct.

10:34:36 12   Q.   Did you find any errors when you reviewed it this time?

10:34:39 13   A.   Not that I can remember.

10:34:39 14   Q.   Okay.  Why don't you turn to page 4 of the document.

10:34:58 15   A.   I'm there.

10:34:59 16   Q.   And why don't we read aloud from the third paragraph --

10:35:06 17   the second full paragraph, "Rainey could not remember the

10:35:11 18   details as to why they" -- excuse me.  One second.  I have the

10:35:19 19   wrong page.  Page 2.  Page 2.

10:35:19 20   A.   Okay.

10:35:27 21   Q.   This is the introductory part of the interview, correct?

10:35:30 22   A.   Yes.

10:35:30 23   Q.   And this is part that Mr. Cohen conducted?

10:35:32 24   A.   I believe so, yes.

10:35:33 25   Q.   Let's look at the first full page -- the first full

OFFICIAL TRANSCRIPT

10:35:39 1    sentence on the top of page 2, "He then moved to Anchorage to

10:35:42 2    explore the north central slope.  In 1991 Rainey moved to

10:35:46 3    Houston, Texas, as a Team Leader responsible for the western

10:35:49 4    half of deepwater.  Rainey has been working in Houston most of

10:35:53 5    the time working *Deepwater Horizon* and a variety of technical

10:35:56 6    and commercial roles."

10:35:58 7            Do you see that?

10:35:58 8    A.    Yes.

10:35:58 9    Q.    There is an obvious error in that sentence; isn't there?

10:36:06 10   A.    I don't know what you're referring to.

10:36:07 11   Q.    Well, you know enough about the case to know that Rainey,

10:36:11 12   when he was in Houston, was not -- from 1991 forward, was not

10:36:16 13   working most of the time on the *Deepwater Horizon*.  He was

10:36:18 14   working on deep water projects.  Correct?

10:36:27 15   A.    Well, again, it depends on what you mean by the

10:36:30 16   "*Deepwater Horizon*."  I mean, the *Deepwater Horizon* is a

10:36:31 17   drilling rig.

10:36:31 18   Q.    Yes.

10:36:32 19   A.    Right.  So the deep water was in the Gulf of Mexico for --

10:36:35 20   on various projects for a long time.  So whether he was working

10:36:40 21   on other *Deepwater Horizon* drilling projects or not -- if you

10:36:45 22   mean the blowout, yes.

10:36:46 23   Q.    You're not going to concede that this is an obvious error?

10:36:50 24   The *Deepwater Horizon* was brought -- was not a BP well -- a BP

10:36:54 25   facility, correct?

**OFFICIAL TRANSCRIPT**

10:36:54  1   A.    No.  But I believe the drilling rig was used -- it's a

10:36:57  2   Transocean drilling rig.  I believe it was used for other BP

10:37:01  3   projects.

10:37:01  4   Q.    And you're saying from 1991, Rainey testified to you that

10:37:06  5   most of the time he was working on the *Deepwater Horizon*

10:37:09  6   facility?

10:37:13  7   A.    To be honest, I haven't noticed it until just this moment.

10:37:18  8   I guess -- I guess --

10:37:20  9   Q.    It's an obvious error, is it not?

10:37:22 10   A.    I wouldn't describe it as an obvious error.  It appears to

10:37:25 11   be an error.  If you took out the word *Horizon*, it would

10:37:28 12   probably be more accurate.

10:37:29 13   Q.    And it's an error that nobody caught, on the team,

10:37:32 14   correct, because it exists today?

10:37:35 15   A.    It's an irrelevant error, but I'm not sure -- I'm not sure

10:37:38 16   that anybody -- I'm not sure anybody focused on this testimony

10:37:43 17   at all.

10:37:43 18   Q.    Let's take a look at -- so you didn't catch it, correct?

10:37:49 19   A.    To the extent it was to be caught, no.

10:37:51 20   Q.    Let's turn to page 10.  Just for context, let's take a

10:38:06 21   look at the second full paragraph of the page.

10:38:08 22         "Rainey was directed back to the document" -- and

10:38:12 23   there is a document -- and "Rainey was using the Mass Balance

10:38:15 24   analysis.  The information in this document was taken from the

10:38:18 25   209."

**OFFICIAL TRANSCRIPT**

10:38:18  1              That's the Coast Guard document that reflects values

10:38:23  2  relating to the spill, correct?

10:38:24  3  A.    Correct.

10:38:24  4  Q.    And there was some discussion by Mr. Rainey about that

10:38:29  5  form, correct?

10:38:30  6  A.    Yes.

10:38:30  7  Q.    Okay.  And just to the bottom of the paragraph.

10:38:33  8              "The numbers in this document were plugged in by

10:38:36  9  people in Houma."

10:38:37 10              And those are the Coast Guard people and other people

10:38:40 11  working in Houma, correct?

10:38:42 12  A.    Yes, including BP people.

10:38:43 13  Q.    Okay.  "They were putting in 1,000 barrels per day and

10:38:47 14  saying this is what you need to get back out.  They were

10:38:51 15  plugging in 1,000 barrels per day and then getting concerned

10:38:55 16  about what they were seeing on the top."

10:38:56 17              Do you see all of that?

10:38:57 18  A.    Yes.

10:38:57 19  Q.    And then it says, "Rainey was asked by the interviewer why

10:39:01 20  they did not take the observations on the surface and use those

10:39:04 21  numbers to calculate what is on the bottom.  There was a

10:39:07 22  reluctance to do that.  There was too much uncertainty."

10:39:11 23              Do you see that?

10:39:11 24  A.    Yes.

10:39:11 25  Q.    And is that accurate, sir?

**OFFICIAL TRANSCRIPT**

10:39:26  1    A.    Yeah.

10:39:26  2    Q.    Isn't it true that Rainey -- what Mr. Rainey said was he

10:39:31  3    went into the science room and asked the NOAA people, the

10:39:36  4    scientists in the science room, to help him get to a number,

10:39:42  5    and instead of presuming an amount, actually to see what was on

10:39:47  6    the surface and then see if they could get better numbers than

10:39:50  7    what were being reflected in the 209?  Isn't that what he said

10:39:54  8    to you?

10:39:54  9    A.    That's not quite what he said.

10:39:56 10    Q.    Isn't it true he said the trigger for his work and his

10:40:01 11    work on the Internet was a conversation in the science room

10:40:05 12    where he wanted help from the government scientists to look

10:40:09 13    what was on the surface so they wouldn't be guessing as to what

10:40:12 14    numbers to put in the 209?

10:40:15 15    A.    That's not what I -- I recall -- if I -- I recall him

10:40:19 16    saying that he was uncomfortable with the numbers and no one

10:40:25 17    was willing to do that calculation that you're just referring

10:40:28 18    to, so he rolled up his sleeves and he did it himself.

10:40:31 19    Q.    And the *no one* that he was referring to were the federal

10:40:35 20    scientists in the science room at Unified Command?

10:40:37 21    A.    It was everybody.  It was everybody.  Not just the --

10:40:40 22    no -- he said no one was willing to do this calculation and so

10:40:43 23    he had to roll up his sleeves and do it himself.

10:40:54 24    Q.    Let's turn to page 14.  Let's look at the -- one, two,

10:41:09 25    three, four, five -- sixth full paragraph.  It says, "Rainey

**OFFICIAL TRANSCRIPT**

10:41:10  1    did not believe anyone else was performing this analysis at the
10:41:13  2    time.  He later learned NOAA was doing this kind of analysis.
10:41:19  3    Rainey received a one-page note from someone at NOAA after he
10:41:22  4    started doing his own calculations.  He received the note
10:41:26  5    sometime after April 26th to 30th."
10:41:29  6              Do you see that?
10:41:30  7    A.    It says "sometime between," not after.
10:41:33  8    Q.    "...sometime between April 26th to 30th."  Correct?
10:41:36  9    A.    Correct.
10:41:36 10    Q.    That's the subject matter you testified about on direct,
10:41:36 11    correct?
10:41:40 12    A.    Correct.
10:41:40 13    Q.    Okay.  He also then says, "They were using two methods.
10:41:45 14    They used observation of the oil slick and how much oil was on
10:41:49 15    the water."
10:41:51 16              Do you see that?
10:41:51 17    A.    Yes.
10:41:52 18    Q.    And is that correct?  Is that what he said?
10:41:54 19    A.    Yes.
10:41:55 20    Q.    The two methods, observation of the oil slick and how much
10:42:01 21    oil was on the water?
10:42:06 22    A.    Yeah.
10:42:06 23    Q.    He's making reference to Lehr's note, is he not?
10:42:19 24    A.    He's making reference to the work that NOAA was doing.
10:42:24 25    Whether he's referring to the note itself or not, I don't think

OFFICIAL TRANSCRIPT

10:42:26 1    so.

10:42:26 2    Q.    He's talking about the one-page note.  That's the Lehr

10:42:30 3    report, correct?

10:42:33 4    A.    Yes.

10:42:33 5    Q.    And the two methods he talks about -- the two methods that

10:42:37 6    Lehr used were a surface estimation, correct?

10:42:40 7    A.    Correct.

10:42:40 8    Q.    And then he made assessment, how much oil was coming out

10:42:45 9    at the bottom, correct?

10:42:46 10   A.    Based on a video analysis, correct.

10:42:47 11   Q.    That's not what it says here because it's incorrect.  How

10:42:50 12   it was taken down is incorrect; isn't that true?

10:42:54 13   A.    (No response.)

10:42:57 14   Q.    Let's focus on that sentence.  "They were using two

10:42:59 15   methods."  He's talking about NOAA, correct?

10:43:01 16   A.    When he says *they*, I believe he's referring to NOAA,

10:43:09 17   correct.

10:43:09 18   Q.    Yes.  And the operative sentence here, "They used

10:43:12 19   observation of the oil slick and how much oil was on the

10:43:18 20   water."  Do you see that?

10:43:18 21   A.    Yes.

10:43:18 22   Q.    The two methods used by Lehr, observation of the oil

10:43:26 23   plume, one, and how much oil was on the water.  Lehr did two

10:43:29 24   different things.  What's described in here are identical;

10:43:33 25   isn't that true, sir?

**OFFICIAL TRANSCRIPT**

10:43:35  1   A.   They appear to be, although I don't know if that's because

10:43:38  2   that's what Mr. Rainey said and that was being transcribed or

10:43:43  3   whether what was being transcribed was incorrectly transcribed.

10:43:46  4   Q.   So if it was the former, if Mr. Rainey misdescribed what

10:43:54  5   Lehr had done, you certainly would have challenged him,

10:43:54  6   correct?

10:43:57  7   A.   No.

10:43:57  8   Q.   You wouldn't have?

10:43:59  9   A.   I know what Mr. Lehr did.  What -- Mr. Rainey's view of

10:44:04 10   what Mr. Lehr did based on the paper was not that --

10:44:09 11   Q.   It's true, is it not, is that what's described in this 302

10:44:11 12   is inaccurate as to what Mr. Lehr did?

10:44:13 13   A.   It may be accurate as to what Mr. Rainey said Mr. Lehr

10:44:20 14   did, but it appears to be inaccurate as to what Mr. Lehr

10:44:24 15   actually did.

10:44:24 16   Q.   Let's look at the bottom of the page on page 14.  It says,

10:44:28 17   "On April 27th, Rainey made a handwritten note for the 4:30

10:44:33 18   call with Lehr."

10:44:33 19        Do you see that?

10:44:35 20   A.   I do.

10:44:35 21   Q.   And that's actually an extremely important part of this

10:44:39 22   case; is it not?

10:44:42 23   A.   No, it is not.

10:44:43 24   Q.   It's not?

10:44:45 25   A.   No.

**OFFICIAL TRANSCRIPT**

10:44:45  1    Q.    Okay.  So the 4:30 call that Rainey made, you're saying is

10:44:49  2    not an important part of this case?

10:44:51  3    A.    Well, you described it as an *extremely important* part of

10:44:54  4    the case.

10:44:54  5    Q.    Well, take a way extremely.

10:44:55  6    A.    It's interesting.  Nothing turns on it.

10:44:59  7    Q.    So let's just talk about that for a second.  We'll see if

10:45:03  8    that's true.  4:30 on the 27th, Mr. Rainey reported to his

10:45:09  9    colleagues at BP, did he not?

10:45:11 10    A.    Yes.  I believe that was the call that he had with other

10:45:18 11    members of the BP team, correct.

10:45:22 12    Q.    And at that time --

10:45:25 13         MR. ZINK:  Objection.  We're well outside the scope

10:45:26 14    now.  And he's asking questions about which he has no personal

10:45:30 15    knowledge what actually happened at the time.  Not that big a

10:45:35 16    deal, but I don't know how much longer we're going to be doing

10:45:37 17    this.

10:45:37 18         THE COURT:  I'm going to let him pursue this a little

10:45:39 19    bit further, but I think we're getting into the area of maybe

10:45:41 20    some testimony from some other people.  I mean, you're

10:45:45 21    examining him off of a 302 written by another agent about now

10:45:49 22    events that -- well, he attended -- the witness attended the

10:45:53 23    meeting where Mr. Rainey was interviewed and purportedly said

10:45:57 24    these things, so I'm going to let you go ahead a little bit

10:46:00 25    further on it, but at some point I think we depart into some

**OFFICIAL TRANSCRIPT**

10:46:03  1    other witnesses' testimony.

10:46:04  2              I'll overrule it.

10:46:06  3         THE WITNESS:  I'm having a hard time -- when you're

10:46:08  4    talking about accuracy, accuracy based on what was said at the

10:46:11  5    interview versus accuracy what I know based on other things, so

10:46:14  6    that's --

10:46:15  7    EXAMINATION BY MR. WEINGARTEN:

10:46:16  8    Q.   Okay.  Let's explore that a little further.  You know, for

10:46:21  9    example, on this sentence that we're talking about on

10:46:23 10    April 27th, that Rainey spoke with his BP colleagues at 4:30,

10:46:28 11    not with Mr. Lehr, correct?

10:46:34 12    A.   I know that -- well, from the documents and the interview,

10:46:39 13    I know that Mr. Rainey spoke with both his colleagues and

10:46:43 14    Mr. Lehr on the 27th.

10:46:45 15    Q.   And you know that Lehr called -- because timing here is

10:46:48 16    extremely important -- as you testified on direct, was at

10:46:51 17    two o'clock in the afternoon and at 4:30 he reported to his

10:46:54 18    colleagues at BP in Houston, correct?

10:47:00 19    A.   I don't know whether -- there is time differences that

10:47:06 20    sort of -- they are talking in two different time zones, so

10:47:11 21    what's 4:30 where, and what was scheduled and what happened are

10:47:15 22    all things that were pretty complicated on this day.  And so I

10:47:20 23    just -- sitting here, I don't know whether that's accurate or

10:47:22 24    not.

10:47:22 25    Q.   So you're challenging my representation to you that

**OFFICIAL TRANSCRIPT**

10:47:25  1    Mr. Lehr and Mr. Rainey spoke at two o'clock on the 27th and

10:47:29  2    then Mr. Rainey spoke with his colleagues at BP at 4:30?

10:47:34  3    A.    Houston time.

10:47:35  4    Q.    Yes.

10:47:39  5    A.    I'm not challenging you.  That sounds right to me.

10:47:42  6    Q.    Then if that's true, this 302 contains incorrect

10:47:46  7    information, fair?

10:47:46  8    A.    No.  Again, the 302 was designed to record what Mr. Rainey

10:47:51  9    told us, not what was necessarily accurate at the time, and so

10:47:55 10    this may be accurate as to what Mr. Rainey had testified to.

10:47:58 11    Q.    All right.  I want to return to page 16.

10:48:09 12          Just a couple more, Your Honor.

10:48:17 13          Let's turn to the bottom paragraph where it says

10:48:20 14    *Suttles*.  And Doug Suttles, just to get us reoriented, was a BP

10:48:24 15    executive, correct?

10:48:25 16    A.    Correct.

10:48:25 17    Q.    And he was the Incident Commander for BP, correct?

10:48:31 18    A.    I believe that's right.

10:48:34 19    Q.    So he was above Mr. Rainey, correct?  Mr. Rainey reported

10:48:36 20    to him?

10:48:37 21    A.    I'm sorry, the Incident Commander for BP, I'm sorry, was

10:48:41 22    Keith Seilhan.  He was the Unified Commander for BP within the

10:48:47 23    Unified Command structure.

10:48:48 24    Q.    So Mr. Rainey reported to him?

10:48:49 25    A.    Both within Unified Command and at BP, he was Mr. Rainey's

**OFFICIAL TRANSCRIPT**

10:48:54  1    superior.

10:48:54  2    Q.    Now it says on page 16 that Suttles talked about Rainey's

10:49:00  3    hybrid with Lehr on the telephone.  Do you see that?

10:49:02  4    A.    Yes.

10:49:02  5    Q.    Now, you will concede that that is an obvious and

10:49:07  6    important error in the 302, correct?

10:49:13  7    A.    Again, yes.  That -- that didn't happen.  I don't know if

10:49:19  8    that didn't happen and Mr. Rainey's testimony wasn't to that

10:49:25  9    effect or Mr. Rainey misspoke in his interview and it got

10:49:31 10    recorded that way.  And so it's inaccurate in terms of the

10:49:35 11    substance, but not accurate in terms of the transcription.

10:49:38 12    Q.    Let's talk about that for a second.  You're saying that

10:49:41 13    there is a possibility that Mr. Rainey in his conversation told

10:49:45 14    you that his boss spoke with the NOAA scientists on the

10:49:48 15    telephone about the hybrid?

10:49:53 16    A.    It's possible that he misspoke and said that.

10:49:55 17    Q.    Well, you testified a couple of minutes ago that you had

10:49:58 18    this explicit memory of what Mr. Rainey said about this issue,

10:50:04 19    and now we're raising the possibility that Rainey told you that

10:50:08 20    his boss also had conversations with NOAA?

10:50:11 21    A.    Again, I think it's unlikely, but the -- things moved very

10:50:15 22    quickly in the interview, and it was something I took -- it

10:50:19 23    took a little while to get used to.  We may all know in the

10:50:22 24    room what someone meant.  Someone may have misspoke.  Everyone

10:50:25 25    in the room knows what they meant, and so you just keep going.

**OFFICIAL TRANSCRIPT**

10:50:29 1  And then you look back at the transcript, and you realize, oh,
10:50:32 2  you know, I wish I would have corrected it.
10:50:34 3  Q.   Why didn't you fix it if you reviewed it right after?
10:50:36 4  This is an obvious, relevant and important error that you
10:50:39 5  missed.
10:50:40 6  A.   I'm not sure I ever saw this before.  This is the 30-page
10:50:45 7  document.  I focused on the parts I focus on.  I spend a lot of
10:50:49 8  time on other areas.  I didn't look at this area.  So I'm
10:50:52 9  seeing this -- I'm focusing on this for the first time.  I'm
10:50:55 10 just telling you as the between those two options, I don't --
10:50:58 11 sitting here today, I don't know for sure which one it is, and
10:51:01 12 so it's hard for me to answer your questions.
10:51:03 13       I'm just looking at this.  This point -- this error
10:51:09 14 that you're referring to, I'm just seeing it for the first time
10:51:12 15 really.
10:51:12 16 Q.   You're seeing it for the first time even though you
10:51:14 17 reviewed the 302 after it was written and you reviewed it after
10:51:17 18 you testified here today?
10:51:18 19 A.   Not the whole thing.
10:51:19 20 Q.   And the other six people that participated in the
10:51:22 21 interview of Mr. Rainey, they had responsibilities, too,
10:51:24 22 correct?
10:51:27 23 A.   They had responsibilities, yes.
10:51:28 24 Q.   This is a pretty important document, isn't it?  Do you
10:51:31 25 think this is funny?

**OFFICIAL TRANSCRIPT**

10:51:33 1   A.    No.  I'm just saying it's hard for me to answer.  They

10:51:35 2   have responsibilities.  They have a responsibilities for a

10:51:36 3   whole bunch of things.  Are you asking me, do they have the

10:51:38 4   responsibility --

10:51:38 5   Q.   Do you think it's funny that this document contains

10:51:41 6   relevant, critical inaccurate information, and this is your

10:51:44 7   only record of the interview?

10:51:48 8   A.    I apologize.  What -- what I'm telling you is that, -- in

10:51:54 9   response to your question, did other people have

10:51:57 10  responsibility, I do not believe it was the responsibility of

10:52:00 11  the other members of the Task Force to read every single word

10:52:03 12  in this document and give their view as to whether it was an

10:52:06 13  accurate transcription.

10:52:06 14  Q.   Was it the responsibility of any one in the United States

10:52:10 15  government to make sure that this memo was accurate?

10:52:15 16  A.    That in the 30 -- I think -- the agent is responsible for

10:52:22 17  making it as accurate a transcription as possible.  We reviewed

10:52:26 18  it for clerical errors.  To the extent we saw any, we corrected

10:52:30 19  them.

10:52:30 20  Q.   Let's turn to page 24.  And let's look at the third full

10:52:45 21  paragraph.  "The interviewer mentioned the three flow rate

10:52:49 22  calculations created by Rainey on April 27th, April 28th, and

10:52:54 23  April 29th."

10:52:57 24        Now, you knew -- you know that that's incorrect, do

10:53:00 25  you not?

**OFFICIAL TRANSCRIPT**

10:53:09  1    A.    I do not know that is correct.

10:53:10  2    Q.    Who is the man named Parkin?

10:53:14  3    A.    Tony Parkin, I believe, is his name.

10:53:18  4    Q.    Yes.  You know, do you not, that Mr. Parkin was brought in

10:53:21  5    from Alyeska to do the last three flow rate estimates, that

10:53:26  6    Mr. Rainey only did one and Mr. Parkin did the last three?

10:53:29  7    A.    I don't think I knew that at this time.

10:53:35  8    Q.    Well, you know it now, right?

10:53:37  9    A.    I do know it now.

10:53:38 10    Q.    So this sentence that Mr. Rainey calculated created by

10:53:44 11    Mr. Rainey over the last three, that's incorrect, correct?

10:53:49 12    A.    Again, if I subsequently learn something --

10:53:52 13          THE COURT:  Is it correct or is it not correct, as we

10:53:54 14    sit here today?  Don't -- just answer the question.  The

10:54:02 15    question is correct, question mark.  Yes or no, and then you

10:54:05 16    can explain.  Is that a correct statement?

10:54:12 17          I can read it back to you.  Would you like me to

10:54:14 18    read it back to you, Mr. Gesser?

10:54:18 19          So the sentence that Mr. Rainey calculated

10:54:21 20    created by Mr. Rainey over the last three, that's incorrect?

10:54:26 21    Correct?  Is that a correct statement?

10:54:30 22    A.    I'm sorry.  I'm just struggling.  It's actually a very --

10:54:32 23    the question you're asking me is actually very complicated, and

10:54:35 24    I'm just trying to get you the right answer.

10:54:36 25          So it says the interviewer mentioned the three flow

**OFFICIAL TRANSCRIPT**

10:54:41 1    rate calculations created by Rainey on April 27, 28 and 29.

10:54:49 2    The methodology for all three of those were created by

10:54:55 3    Mr. Rainey, and Mr. Parkin was simply plugging in the numbers,

10:54:58 4    and so it's hard for me to answer.

10:55:04 5          To the extent that sentence is -- to the extent

10:55:09 6    you're to read that sentence as Mr. Rainey actually did the

10:55:12 7    calculations for all three days, that's inaccurate.  To the

10:55:14 8    extent that the calculations for those three days were the

10:55:18 9    methodology that Mr. Rainey created, that is accurate.

10:55:21 10   EXAMINATION BY MR. WEINGARTEN:

10:55:21 11   Q.   Let's just make sure we're clear on that.  I think you

10:55:25 12   testified on direct that part of the presentation that was made

10:55:29 13   to the Coast Guard and to Congress included the flow rate

10:55:34 14   estimations for the last three days, and you ascribed them or

10:55:38 15   attributed them to Mr. Rainey.

10:55:40 16         What's true, is it not, is that Mr. Parkin, a total

10:55:43 17   stranger to Mr. Rainey, was brought in from Alaska to do the

10:55:46 18   calculations the last three days?

10:55:48 19   A.   No, that's not accurate.  Mr. Parkin was not brought in

10:55:53 20   from Alaska to do the calculations.  He was brought in to do

10:55:56 21   something completely different.

10:55:58 22   Q.   Mr. Rainey's calculations?

10:56:00 23   A.   Mr. Rainey tasked him to input data for the calculations,

10:56:03 24   but he then provided them to Mr. Rainey, and Mr. Rainey is the

10:56:06 25   one who packaged them up, presented them.  Mr. Parkin was

10:56:09  1    performing a very clerical function.

10:56:12  2    Q.    Did Mr. Parkin know Mr. Rainey?

10:56:13  3    A.    Before he arrived?

10:56:15  4    Q.    Yes.

10:56:15  5    A.    I do not believe he did.

10:56:24  6    Q.    Let's just turn last to Page 30 and let's go to the second

10:56:36  7    to last full paragraph.  And we're talking about Mr. Lehr, and

10:56:43  8    the second to last -- or third to last sentence, "There were

10:56:48  9    certain ROVs that had higher resolutions.  ROVs were decimated

10:56:54 10    in the explosion."  Do you see that?

10:56:55 11    A.    Yes.

10:56:55 12    Q.    In fact, no ROVs were decimated in the explosion, were

10:57:01 13    they?

10:57:01 14    A.    I have no idea.

10:57:02 15    Q.    How long did you spend on the Task Force?

10:57:04 16    A.    Almost three years.

10:57:06 17    Q.    Okay.  And you don't know, sitting here today, whether or

10:57:10 18    not ROVs were decimated by the explosion?

10:57:14 19    A.    It was not part of anything I was looking at.

10:57:16 20    Q.    Did you ever see anything that supports the statement in

10:57:18 21    this 302 that that happened?

10:57:20 22    A.    I didn't see anything either way.  But what happened --

10:57:24 23    there was a whole other team that was in charge of what

10:57:26 24    happened at the explosion.  Until the rig -- until the rig sunk

10:57:30 25    and the oil started flowing from the rig was something that I

**OFFICIAL TRANSCRIPT**

10:57:35  1    had almost nothing to do with.

10:57:36  2    Q.   Okay.  So you don't know one way or another whether or not

10:57:40  3    these remotely operated vehicles were blown up during the

10:57:44  4    explosion, right?  You just don't know that?

10:57:46  5    A.   I do not know that.

10:57:47  6    Q.   Okay.  Now, let's go back and talk about what you actually

10:57:54  7    did talk to Mr. Rainey about.  Now, you testified on direct

10:58:00  8    that you asked him about his methodology, correct?

10:58:03  9    A.   Correct.

10:58:03 10    Q.   And he explained to you that he initially, through

10:58:06 11    Internet research, came upon a protocol called Metcalf Eddy.

10:58:12 12    Do you remember that?

10:58:12 13    A.   That's correct.

10:58:13 14    Q.   And he used that protocol.  And when we talk about

10:58:17 15    protocol, these protocols have different -- what we're talking

10:58:21 16    about is trying to estimate how much oil is on the surface,

10:58:26 17    correct?

10:58:26 18    A.   Correct.

10:58:28 19    Q.   And usually the way that happens is either a helicopter or

10:58:32 20    an airplane, and you look down at the spill and you make a

10:58:36 21    judgment as to the spread of the spill, fair?

10:58:39 22    A.   Correct.  How much square miles is covered by the spill

10:58:43 23    and then how much oil is deposited in that spill area.

10:58:49 24    Q.   Thank you.  And then in that area, you need to make

10:58:54 25    judgments about whether or not there is thick oil, dull oil,

10:59:00 1    thin oil, and there are various categories that are laid out in

10:59:06 2    the various protocols, correct?

10:59:07 3    A.    Correct.  The protocol is a correlation between what the

10:59:12 4    oil looks like and how thick it is.  And so there are a number

10:59:15 5    of different ways to say, okay, for dark oil, it's this thick,

10:59:20 6    for what they call sheen, which is light oil, it's this thick.

10:59:24 7    Q.    Okay, and Metcalf Eddy is one protocol, correct?

10:59:28 8    A.    Correct.

10:59:28 9    Q.    And Mr. Rainey made an estimate based upon the Metcalf

10:59:36 10   Eddy figures, correct?

10:59:36 11   A.    Correct.

10:59:36 12   Q.    And he got his surface area from spotters who had flown

10:59:40 13   over the site, correct?

10:59:44 14   A.    From maps that were drawn by spotters who had --

10:59:48 15   Q.    Okay.  And the maps also identified the colors of the

10:59:52 16   various parts of the spill, some being dark, some being dull,

10:59:57 17   some being sheen, am I correct on that?

11:00:03 18   A.    I'm struggling with the word "identified."  So they were

11:00:06 19   not photos.  They were not visual.  So the people who had

11:00:09 20   prepared the maps that Mr. Rainey used, they were sort of

11:00:13 21   cartoons, and what they had done is they had interpreted how --

11:00:18 22   what the oil looked like, and so then they ascribed certain

11:00:22 23   colors to the oil in the different places.

11:00:25 24   Q.    So Mr. Rainey is relying on them to give him the area,

11:00:31 25   correct?  Fair?

**OFFICIAL TRANSCRIPT**

11:00:34  1    A.    He's relying on -- yes, although there were times in which

11:00:39  2    he was challenging that.

11:00:39  3    Q.    Okay.  But wasn't in the airplane lane, right?

11:00:44  4    A.    He was not in the airplane.

11:00:45  5    Q.    He wasn't in the helicopter, right?

11:00:46  6    A.    He definitely was not in the helicopter.

11:00:48  7    Q.    So somebody else was providing him with the numbers of the

11:00:51  8    size?

11:00:51  9    A.    Correct.

11:00:51 10    Q.    And the people in the plane or the helicopter are also

11:00:55 11    describing the colors, correct?

11:00:56 12    A.    They are.

11:00:56 13    Q.    So what Mr. Rainey is doing, he's plugging in these

11:01:00 14    numbers in these different protocols, isn't that true?

11:01:03 15    A.    He's trying to do that, yes.

11:01:04 16    Q.    And one protocol is Metcalf Eddy, correct?

11:01:08 17    A.    Correct.

11:01:09 18    Q.    And Metcalf Eddy actually uses the numbers that the

11:01:13 19    Coast Guard uses?

11:01:17 20    A.    No.

11:01:18 21    Q.    You don't remember that?

11:01:19 22    A.    Metcalf Eddy uses numbers that the Coast Guard uses?

11:01:24 23    Certainly not that I'm aware of.  My understanding was that

11:01:27 24    Metcalf Eddy was used for wastewater and that that was not an

11:01:31 25    appropriate --

**OFFICIAL TRANSCRIPT**

Q.   We'll move along.  Mr. Rainey moved from Metcalf Eddy --
and the numbers he got from Metcalf Eddy were low, isn't that
true?

A.   They were relatively low to where he came out, correct.

     MR. ZINK:  Your Honor, we can keep on doing this,
that's fine, but this has nothing to do with the interview, the
direct examination that was said at the proffer and what he
heard and the words out of his mouth.  We're talking about what
Mr. Rainey did now, and Mr. Gesser clearly wasn't there at the
time.

     MR. WEINGARTEN:  What he explained to Mr. Gesser is
what I'm after.

     THE COURT:  It relates to statements -- it has to
relate to statements that were made at the interview.  And we
just looked at the document, 168A, I don't know if we're still
on that.

     MR. WEINGARTEN:  I am, absolutely am.

     THE COURT:  But it has to relate to statements that
were made in connection with the conversation that was
memorialized such as it was, in Exhibit 168A.

         So we can't examine this witness about something
Mr. Rainey did way back when, unless Mr. Rainey himself
described it at the meeting in 2011 and it's in the document.

EXAMINATION BY MR. WEINGARTEN:

Q.   Well, you anticipated my next question.  Mr. Rainey

**OFFICIAL TRANSCRIPT**

11:02:42 1    explained his involvement with Metcalf Eddy to you, did he not?

11:02:46 2    A.    Yes.

11:02:46 3    Q.    And then he moved on.  He wasn't satisfied with Metcalf

11:02:51 4    Eddy; he moved on to ASTM, did he not?

11:02:53 5    A.    Yes.  Yes.  He moved on.

11:02:57 6    Q.    And ASTM, do you remember what that stands for?

11:03:05 7    A.    American standards, something, something.

11:03:06 8    Q.    And they also have protocols within their four corners

11:03:12 9    telling what numbers you should use for different colors,

11:03:17 10   correct?

11:03:18 11   A.    Correct.  Although Mr. Rainey did not use those.

11:03:20 12   Q.    Well, is it not true that the opening numbers, the ASTM

11:03:25 13   numbers, are on the front page of the document, and he

11:03:28 14   explained this to you, and then there is a summary ASTM table

11:03:32 15   in the back of the document?

11:03:36 16   A.    That's incorrect.

11:03:36 17   Q.    That's incorrect?

11:03:37 18   A.    That's incorrect.

11:03:39 19   Q.    Are you sure about that?

11:03:39 20   A.    That's not what Mr. Rainey told us.

11:03:41 21   Q.    So it's -- am I factually correct, or what Mr. Rainey told

11:03:46 22   you?

11:03:46 23   A.    You're both factually incorrect, and it's not what

11:03:49 24   Mr. Rainey told me.

11:03:50 25   Q.    You're as sure about that as everything else you

**OFFICIAL TRANSCRIPT**

11:03:53 1   testified?

11:03:53 2   A.    Let me just answer your question.  So although the

11:03:55 3   document indicates that Mr. Rainey -- it purports to be an ASTM

11:04:00 4   calculation.  In fact, the thicknesses that were used were not

11:04:06 5   ASTM, and that Mr. Rainey had told us that he had created his

11:04:11 6   own hybrid between the ASTM and the Bonn analysis, and that the

11:04:16 7   documents that are labeled "ASTM" are actually Mr. Rainey's

11:04:20 8   hybrid calculation.

11:04:21 9   Q.    Okay.  So there is an ASTM formula, correct?

11:04:24 10  A.    Correct.

11:04:24 11  Q.    And you dispute that the ASTM protocol actually has two

11:04:29 12  tables?

11:04:30 13  A.    The protocol itself has two tables, correct.

11:04:33 14  Q.    So you're not challenging that?

11:04:34 15  A.    No, but that's not what you said.

11:04:36 16  Q.    Okay.  I did, but we'll move on.

11:04:38 17        He moved from ASTM to Bonn, did he not?

11:04:42 18  A.    Mr. Rainey, yes, later --

11:04:44 19  Q.    He explained that to you.  He laid it out all for you in

11:04:48 20  the day-long interview, correct?

11:04:49 21  A.    He laid out what he -- he had laid out what -- well, he

11:04:52 22  told us what he had done, yes.

11:04:54 23  Q.    And he explained to you this idea of hybrid, did he not?

11:04:59 24  A.    That he, on his own, created a hybrid, yes.

11:05:01 25  Q.    And he explained to you that he was uncomfortable with the

11:05:03 1    high numbers of Bonn, that he thought they were way out of

11:05:07 2    whack?  Did he not say that to you?

11:05:08 3    A.   He said that -- he said that, in his view, they were too

11:05:12 4    high, yes.

11:05:12 5    Q.   And he wanted to get to a range of numbers.  Did he not

11:05:16 6    say that?

11:05:16 7    A.   That -- I'm not sure he said exactly that, but --

11:05:24 8    Q.   Well, in every one of his estimations, he uses a range,

11:05:28 9    does he not?

11:05:29 10   A.   He did.

11:05:30 11   Q.   And he explained to you that he used a range because the

11:05:33 12   numbers in the estimation are so imprecise that you needed a

11:05:38 13   range to accurately reflect or to reflect best what was

11:05:42 14   actually there?  Fair?

11:05:47 15   A.   I don't remember him saying precisely that, but his

11:05:51 16   justification for creating his own methodology and using the

11:05:57 17   best -- the low best and high, what he told us was that he was

11:06:02 18   trying to get to a number that he thought was reasonable.

11:06:08 19   Q.   And the number he used or the number -- the end result of

11:06:14 20   his numbers was about a thousand for his low estimate, correct?

11:06:19 21   A.   Correct.

11:06:19 22   Q.   To 14,000 barrels per day as his high number, correct?

11:06:25 23   A.   Correct.

11:06:26 24   Q.   With 5700 his medium number, correct?

11:06:29 25   A.   Correct.  Which is why -- it was very similar to the NOAA

**OFFICIAL TRANSCRIPT**

11:06:33  1    number, which is why we thought he was backing into it.

11:06:36  2    Q.    Did the NOAA surface estimation have a barrels-per-day

11:06:42  3    figure?

11:06:42  4    A.    No.

11:06:42  5    Q.    It didn't?

11:06:43  6    A.    Well, it did as it was communicated to Mr. Rainey in the

11:06:49  7    text message, but the one-pager --

11:06:49  8    Q.    The document itself did not have one, did it?

11:06:52  9    A.    The document itself, you needed to then do -- so it had

11:06:54 10    barrels of oil, and then you needed to divide by days to get

11:06:58 11    barrels of oil per day, which is not a terribly complicated

11:07:02 12    calculation.

11:07:03 13    Q.    So the Lehr document that we're talking about had two

11:07:06 14    parts to it, correct?

11:07:06 15    A.    Yes.

11:07:07 16    Q.    And one, the surface estimation, similar to the work that

11:07:10 17    Mr. Rainey did, had a total number of barrels on the water,

11:07:12 18    correct?  That was its conclusion?

11:07:22 19    A.    It's both barrels on the water and I think barrels emitted

11:07:27 20    as well, but I would have to double check to make sure.  Is it

11:07:31 21    okay if I take a look?

11:07:33 22    Q.    I can move along.

11:07:34 23    A.    But whatever it was, to then get to the barrels of oil per

11:07:40 24    day was a fairly simple calculation.

11:07:42 25    Q.    Okay.  So there did come a time in your interview with

**OFFICIAL TRANSCRIPT**

11:07:46 1    Mr. Rainey when you slid the document, the Lehr memo, across

11:07:52 2    the table to him, right?

11:07:53 3    A.    Yes.  Whether it was part of a group of documents or

11:07:58 4    whether it was by itself, I'm not entirely sure, but yes.

11:08:01 5    Q.    And let's turn to page 14.

11:08:05 6    A.    Of?

11:08:05 7    Q.    Of the 302.

11:08:14 8    A.    I'm there.

11:08:14 9    Q.    You have that?

11:08:16 10   A.    Yes.

11:08:16 11   Q.    And I think you went through this on direct, and perhaps

11:08:20 12   with me already, but let's do it one within more.  "Rainey did

11:08:25 13   not believe anyone else was performing this analysis at the

11:08:29 14   time."  So this is what he said to you, correct?

11:08:30 15   A.    Correct.

11:08:30 16   Q.    "He later learned NOAA was doing this kind of analysis.

11:08:34 17   Rainey received a one-page note from someone at NOAA after he

11:08:38 18   started doing his own calculations.  He received the note

11:08:41 19   sometime between April 26th to 30th."  Do you see that?

11:08:44 20   A.    Yes.

11:08:45 21   Q.    So that's what he said to you.  He said he received it

11:08:48 22   sometime between the 26th and the 30th.  Fair?

11:08:50 23   A.    Correct.

11:08:50 24   Q.    And let's turn to page 24.  Second to the last paragraph,

11:09:08 25   "Rainey had a conversation with Lehr, but did not believe he

**OFFICIAL TRANSCRIPT**

11:09:12 1   sent Lehr the results."  Do you see that?

11:09:13 2   A.    Yes.

11:09:14 3   Q.    So he told you about a conversation he had with Bill Lehr

11:09:17 4   about his work, correct?

11:09:19 5   A.    Correct.

11:09:19 6   Q.    And Lehr was the scientist from NOAA, correct?

11:09:23 7   A.    Correct.

11:09:23 8   Q.    So he was telling you about a conversation he had with the

11:09:27 9   scientist from NOAA about his surface estimates, correct?

11:09:30 10  A.    Correct.

11:09:30 11  Q.    "He was not aware if NOAA used the Bonn method in their

11:09:36 12  analysis.  At some point, Rainey received the one page from

11:09:40 13  NOAA."

11:09:41 14          So that's what he said to you, at some point, he

11:09:43 15  received the one page from NOAA, correct?

11:09:45 16  A.    Yeah.  Although, in -- I remember in context, it was at

11:09:50 17  some point after -- in the room at the time, although he might

11:10:00 18  have said at some point, I interpreted that to mean, and I

11:10:03 19  think everyone there interpreted it to mean at some point after

11:10:05 20  he had done the calculations.

11:10:06 21  Q.    But, of course, the only official record we have of the

11:10:11 22  interview is this document I have in my right hand, correct?

11:10:15 23  A.    Yes.

11:10:15 24  Q.    And then Mr. Rainey said, "It had the same flow rate that

11:10:22 25  Rainey got."  Do you see that?

**OFFICIAL TRANSCRIPT**

11:10:23  1    A.    Yes.

11:10:23  2    Q.    Now, you have Lehr's memo right in front of you?

11:10:35  3    A.    I believe I do.

11:10:36  4    Q.    Okay.

11:10:36  5    A.    Do you want me to pull it up?

11:10:39  6    Q.    I may ask you to look at it.  I just want to make sure you

11:10:41  7    have it.

11:10:41  8    A.    I do.

11:10:42  9    Q.    So Mr. Rainey's best estimate that he finished with is in

11:10:48 10    the neighborhood of a thousand, low, correct?

11:10:51 11    A.    Yes.

11:10:53 12    Q.    14,000 high, correct?

11:10:55 13    A.    Yeah.

11:10:56 14    Q.    Best guess, 5700?

11:10:58 15    A.    Yes.

11:10:58 16    Q.    Is that the same as what Mr. Lehr got?

11:11:04 17    A.    Roughly the same.

11:11:05 18    Q.    Mr. Lehr didn't use a range, did he?

11:11:08 19    A.    We were only talking about the 5,000 number.

11:11:09 20    Q.    And you know that because of why?

11:11:12 21    A.    Because that's what we were talking about.  I was at the

11:11:14 22    interview.

11:11:14 23    Q.    And when you talk about Mr. Rainey's estimates, Mr. Rainey

11:11:18 24    included three numbers, a range.  Did you crawl in his head to

11:11:22 25    figure out what he was thinking at the time?

**OFFICIAL TRANSCRIPT**

11:11:24 1    A.   Mr. Rainey used the low and the high to get to the best

11:11:28 2    guess.  The estimate that Mr. Rainey shared with Congress, that

11:11:31 3    Mr. Rainey shared with Unified Command was the best guess, that

11:11:34 4    was the number.  There was a low and there was a high.  But --

11:11:36 5    Q.   Was there ever a document submitted by Mr. Rainey that did

11:11:40 6    not include a low, a best guess and a high?

11:11:55 7    A.   Yes.

11:11:55 8    Q.   What document was that?

11:11:56 9    A.   So, in the draft answers -- I don't know if I want to get

11:12:04 10   into this, but --

11:12:06 11        THE COURT:  The question was, what document was that?

11:12:09 12   So just identify the document.

11:12:11 13        THE WITNESS:  The draft letter that Mr. Rainey -- it

11:12:13 14   was a draft of a letter that Mr. Rainey preparing, helping BP

11:12:16 15   prepare in response to questions from Congress.

11:12:18 16   EXAMINATION BY MR. WEINGARTEN:

11:12:19 17   Q.   All right.  Let's consider the documents that were

11:12:21 18   submitted to the Coast Guard.  Did they have a low, a best

11:12:24 19   guess and a high?

11:12:25 20   A.   Yes.

11:12:27 21   Q.   And what about the documents to Congress?  Was there a

11:12:31 22   low, a medium or a best guess and a high?

11:12:36 23   A.   There were answers to questions that did not --

11:12:38 24   Q.   Can you answer that question?

11:12:39 25        THE COURT:  Let's stick with the question.

**OFFICIAL TRANSCRIPT**

11:12:40  1    A.    Yes.  Yes.  Yes.

11:12:42  2    EXAMINATION BY MR. WEINGARTEN:

11:12:47  3    Q.    And then there is a statement in this document that says,

11:12:52  4    "He did not see NOAA's number until after the 26th."  Do you

11:12:56  5    see that?

11:12:56  6    A.    Yes.

11:12:56  7    Q.    So in the very same document, the document that we have

11:13:00  8    been considering this morning, there is an inconsistency; is

11:13:00  9    there not?

11:13:09 10    A.    An internal inconsistency?

11:13:11 11    Q.    Well, we just read and a portion where Mr. Rainey says,

11:13:16 12    hey, my best memory, I got it between the 26th and the 30th,

11:13:18 13    and that's reported in here.  And then a couple of pages later,

11:13:21 14    on the very same subject, he says he did not see NOAA's number

11:13:26 15    until after the 26th, correct?

11:13:28 16    A.    That's correct.

11:13:28 17    Q.    All right.  So there is factual inconsistency in this very

11:13:32 18    document as to when he got the NOAA document as reported by

11:13:35 19    this document?  Fair or not?

11:13:37 20    A.    Well, he first gave a range, and then we were following up

11:13:41 21    to narrow the range.  So I don't know if it's an inconsistency.

11:13:45 22    It's a clarification on his point in response to a question.

11:13:48 23    Q.    All right.  So it's your testimony that you were

11:13:57 24    interested in this because you wanted to know whether or not

11:14:03 25    you reverse-engineered his number?

**OFFICIAL TRANSCRIPT**

11:14:06  1    A.    That's essentially right.

11:14:07  2    Q.    Where in the 33 pages of this document do you ask him

11:14:10  3    that?

11:14:10  4    A.    Ask him, did you reverse-engineer your number?

11:14:14  5    Q.    Yes.

11:14:15  6    A.    Nowhere.

11:14:15  7    Q.    And where in this document did you ask him if he backed

11:14:19  8    into Lehr's number?

11:14:21  9    A.    Nowhere.  But it's not -- it's not how these things went.

11:14:35 10    Q.    It's not how these things went.  You testified on direct

11:14:40 11    that your big concern here was that he backed into Lehr's

11:14:44 12    number or that he reverse-engineered, correct?

11:14:46 13    A.    Correct.  So we were gathering evidence to make that

11:14:49 14    determination.  Generally, in these, you do not ask people, did

11:14:53 15    you lie about flow rate.  The ultimate question is not

11:14:56 16    necessarily asked.

11:14:57 17    Q.    So the long and short of it, you didn't ask him those

11:14:59 18    questions?

11:15:01 19    A.    No.

11:15:01 20    Q.    Never in the 33 -- in the full day of interview, and it

11:15:05 21    doesn't appear anywhere in the 33 pages of this document, fair?

11:15:08 22    A.    I don't think we asked -- we interviewed dozens of

11:15:11 23    witnesses.  I don't think we asked anybody that.

11:15:12 24    Q.    And you certainly didn't ask Mr. Rainey?

11:15:14 25    A.    No.

**OFFICIAL TRANSCRIPT**

11:15:16  1          MR. WEINGARTEN:  Nothing further, Your Honor.

11:15:17  2          THE COURT:  Redirect.

11:15:20  3          MR. ZINK:  Yes, Your Honor.

11:15:21  4                    REDIRECT EXAMINATION

11:15:22  5     BY MR. ZINK:

11:15:22  6     Q.   Mr. Gesser, counsel asked you several questions about the

11:15:31  7     FBI Form 302, 168A.  Do you recall those questions generally?

11:15:36  8     A.   Yes.

11:15:36  9     Q.   And on direct examination, you were asked no questions

11:15:42 10     about 168A, correct?

11:15:44 11     A.   Correct.

11:15:44 12     Q.   And you testified about your recollection of the questions

11:15:47 13     asked and the answers given, correct?

11:15:48 14     A.   I did.

11:15:49 15     Q.   And what did Mr. Rainey say about when he learned of

11:15:58 16     NOAA's number?

11:15:58 17     A.   That he learned of NOAA's number after he had done his

11:16:01 18     calculations that resulted in his 5,000 estimate.

11:16:03 19     Q.   Any doubt about that, sir?

11:16:05 20     A.   No doubt.

11:16:06 21     Q.   I want to direct your attention to 24 of Government

11:16:10 22     Exhibit 168A.

11:16:13 23     A.   I'm there.

11:16:20 24          MR. ZINK:  Ms. Chapin, can you pull it up on the

11:16:22 25     television monitor.  Can you please highlight the paragraph

                          **OFFICIAL TRANSCRIPT**

11:16:30 1    second to the bottom.

11:16:30 2    EXAMINATION BY MR. ZINK:

11:16:34 3    Q.    And, Mr. Gesser, can you read for the members of the jury

11:16:39 4    the last two sentences of that paragraph.

11:16:42 5    A.    It says, "Rainey calculated his 5,000 BOPD," which is

11:16:48 6    barrels of oil per day, "number before he saw NOAA's number.

11:16:50 7    He did not see NOAA's number until after the 26th."

11:16:54 8    Q.    Now, Mr. Weingarten asked you several questions about the

11:16:58 9    FBI Form 302, right?

11:16:59 10   A.    Correct.

11:17:00 11   Q.    Did he ask you about that one?

11:17:01 12   A.    We talked -- we talked about it.  I don't know if he asked

11:17:06 13   me specifically.  He asked me about things that are covered

11:17:09 14   there, but --

11:17:10 15   Q.    And is that what was said by Mr. Rainey?

11:17:12 16   A.    That's what I remember Mr. Rainey saying, yes.

11:17:13 17   Q.    And that's the official document that Mr. Weingarten

11:17:16 18   referred to?

11:17:16 19   A.    Yes.

11:17:16 20   Q.    The official government record?

11:17:18 21   A.    Correct.

11:17:18 22   Q.    And the official the government record comports 100

11:17:23 23   percent with your recollection, doesn't it?

11:17:24 24   A.    It does.

11:17:24 25   Q.    I want to direct your attention to the last sentence.  And

**OFFICIAL TRANSCRIPT**

11:17:28  1    what does it say?

11:17:29  2    A.   The last sentence of that paragraph?

11:17:31  3    Q.   Yes, sir.

11:17:31  4    A.   It says, "He did not see NOAA's number until after the

11:17:35  5    26th."

11:17:35  6    Q.   What did you learn about that?

11:17:37  7    A.   I'm sorry?

11:17:39  8    Q.   What did you learn about that?

11:17:41  9    A.   When did I learn --

11:17:42 10    Q.   What did you learn about the accuracy of that statement?

11:17:45 11         MR. WEINGARTEN:  Objection.  Objection.

11:17:46 12         THE COURT:  Well, we covered this on direct.  It's

11:17:49 13    limited to cross, and he just --

11:17:51 14         MR. WEINGARTEN:  No, he's asking for what he did

11:17:53 15    afterwards.

11:17:53 16         MR. ZINK:  Mr. Weingarten spent 30 minutes asking about

11:17:56 17    what was said during the interview and what he learned

11:17:59 18    subsequently.  I'm just going to show him one document.

11:18:01 19         THE COURT:  Go ahead.  Overruled.

11:18:03 20         MR. ZINK:  I'm showing you what's been marked as

11:18:04 21    Government's Exhibit 230.

11:18:22 22         The Court's indulgence.  I'm sorry, Government 159.  My

11:18:30 23    apologies.

11:18:31 24              Can you please highlight the top portion of the

11:18:33 25    document.  I'm sorry, the entire portion.

                              **OFFICIAL TRANSCRIPT**

11:18:33 1   EXAMINATION BY MR. ZINK:

11:18:37 2   Q.    And, Mr. Gesser, can you please explain for the members of

11:18:42 3   the jury what the information in this document depicts?

11:18:44 4   A.    So we had our forensic electronic data vendor extract text

11:19:00 5   messages from a number of people's phones, and this looks like

11:19:02 6   an extract from one of the phones that we had imaged showing

11:19:08 7   the text messages on a particular date.

11:19:10 8   Q.    And the text messages, what's the date of those text

11:19:13 9   messages?

11:19:13 10  A.    It's April 26, 2010.

11:19:15 11  Q.    And is one of these numbers affiliated with Mr. Rainey?

11:19:18 12  A.    Yes.

11:19:21 13  Q.    And I want to direct your attention to --

11:19:26 14  A.    When you say number, it's a phone number.

11:19:27 15  Q.    One of the phone numbers?

11:19:28 16  A.    Yes, I believe that's Mr. Rainey's BlackBerry.

11:19:32 17  Q.    And does Mr. Rainey receive a message, "They have

11:19:35 18  published numbers of 10,000 bbl on water and a source of

11:19:40 19  roughly 5,000 BOPD.  It was drafted at noon PST.  That's why

11:19:45 20  they were in closed doors"?

11:19:47 21  A.    Yes, that's a text message that Mr. Rainey received

11:19:49 22  from --

11:19:49 23  Q.    The response says, "No"?

11:19:51 24  A.    That's -- Mr. Rainey's response says, "No."

11:19:53 25  Q.    And what is the response back from Mr. Rainey?

**OFFICIAL TRANSCRIPT**

11:19:54 1    A.    "I have the memo and will fax it to Rick."

11:19:57 2    Q.    And the response?

11:19:58 3    A.    "Great.  Thank you."

11:20:06 4         MR. ZINK:  The Court's indulgence.

11:20:09 5         THE COURT:  Ms. Chapin, can we please pull up on split

11:20:13 6    screen 159 on the left-hand side and Government Exhibit 168A,

11:20:18 7    page 14, second to last paragraph on the right-hand side.  I'm

11:20:24 8    sorry, page 24.  My apologies.

11:20:24 9    EXAMINATION BY MR. ZINK:

11:20:30 10   Q.    Mr. Gesser, when Mr. Rainey says he did not calculate

11:20:34 11   NOAA's number until after the 26th, based on the information

11:20:36 12   contained in the text message on the left-hand side of the

11:20:39 13   screen in evidence, is that true or false?

11:20:42 14        MR. WEINGARTEN:  Objection, Your Honor.

11:20:43 15        THE COURT:  I'm going to overrule.

11:20:44 16        THE WITNESS:  That last sentence, "He did not see

11:20:47 17   NOAA's number until after the 26th," is inaccurate in light of

11:20:54 18   the text message that he received on the 26th.

11:20:57 19        MR. ZINK:  Expand back out.

11:20:57 20   EXAMINATION BY MR. ZINK:

11:20:59 21   Q.    Direct your attention to date and time of those e-mails.

11:21:06 22        MR. ZINK:  And, Ms. Chapin, can you put them one on top

11:21:11 23   of the another and expand it out for the members of the jury.

11:21:13 24   EXAMINATION BY MR. ZINK:

11:21:13 25   Q.    Based on the date and time of those text messages, is

**OFFICIAL TRANSCRIPT**

11:21:19 1    Mr. Rainey's statement true or false?

11:21:20 2          MR. WEINGARTEN:  Objection.

11:21:21 3          THE COURT:  I'm going to sustain it.

11:21:23 4    EXAMINATION BY MR. ZINK:

11:21:24 5    Q.   Mr. Gesser, did Mr. Rainey receive NOAA's one-pager before

11:21:27 6    or after the 26th?

11:21:30 7          MR. WEINGARTEN:  Objection, again, Your Honor.

11:21:30 8          THE COURT:  I'm going to sustain as well.  I think the

11:21:32 9    jury can look at the exhibits.

11:21:34 10         MR. ZINK:  Nothing more, Your Honor.

11:21:35 11         THE COURT:  Thank you, sir, you can step down.  You are

11:21:37 12   ordered not to discuss your testimony with anyone during the

11:21:41 13   pendency of this trial.  And you are subject to recall, so

11:21:44 14   please do not stay in the courtroom during other testimony.

11:21:50 15              All right.  Who is next?

11:21:53 16         MR. TSAO:  Your Honor, the government calls

11:21:57 17   Mr. Jeffrey Bolas.

11:22:36 18         THE COURT:  Mr. Bolas, if you would come forward, sir.

11:22:39 19   When you get behind this chair, please remain standing until

11:22:39 20   you take the oath, and then you may be seated.

11:22:40 21         THE DEPUTY CLERK:  Would you please raise your right

22   hand.  Do you solemnly swear that the testimony which you are

23   about to give will be the truth, the whole truth and nothing

24   but the truth, so help you God?

25         THE WITNESS:  I do.

                          **OFFICIAL TRANSCRIPT**

1          **JEFFREY BOLAS**

2     was called as a witness and, after being first duly sworn by

3     the Clerk, was examined and testified on his oath as follows:

4            THE DEPUTY CLERK:  Please state and spell your name for

5     the record.

11:22:46  6            THE WITNESS:  Yes, I do.

11:22:46  7            THE DEPUTY CLERK:  Thank you, you may be seated.

11:22:47  8     Please state and spell your name for the record.

11:22:49  9            THE WITNESS:  Jeffrey Bolas, J-E-F-F-R-E-Y, B-O-L-A-S.

11:22:57 10                 VOIR DIRE EXAMINATION

11:22:57 11     BY MR. TSAO:

11:22:57 12     Q.    Good morning, Mr. Bolas.  Can you please start by telling

11:23:01 13     the jury where you work.

11:23:02 14     A.    Yes, I work at a consulting firm named Stroz Friedberg.

11:23:07 15     Q.    What is Stroz Friedberg?

11:23:09 16     A.    Stroz Friedberg is a digital risk management and digital

11:23:14 17     forensics consulting firm.  We assist in investigations, among

11:23:18 18     other things, that relate to digital evidence.

11:23:21 19     Q.    And what kind of -- what kind of other services does Stroz

11:23:28 20     Friedberg provide?

11:23:28 21     A.    We do a lot of things.  We assist companies if their

11:23:32 22     networks get hacked or if there is an intrusion or data breach.

11:23:35 23     We assist in the internal investigations if something may have

11:23:38 24     been stolen, such as intellectual property from a computer

11:23:41 25     network, and we also perform forensic analysis on various

                        **OFFICIAL TRANSCRIPT**

11:23:47  1    devices that may have electronic evidence or information stored

11:23:50  2    in them, such as computers, phones, servers, etcetera.

11:23:53  3    Q.   And just as a general matter, can you explain to the jury

11:23:57  4    what digital forensic analysis is?

11:23:59  5    A.   Sure.  Generally speaking, forensics is the application of

11:24:04  6    scientific principles against evidence of various sorts.  There

11:24:08  7    is a lot of different branches of forensics, and you've seen

11:24:13  8    many of them portrayed on TV in various crime shows.

11:24:16  9         Digital forensics specifically is the application of

11:24:19 10    those principles to information on anything that may store

11:24:23 11    digital information which, again, might be computers, phones,

11:24:27 12    servers or really any other storage medium where you might have

11:24:31 13    files or anything else that would be stored in a binary format.

11:24:34 14    Q.   If I can, I'm not going to call it Stroz Friedberg, I'm

11:24:38 15    just going to refer to it as Stroz, is that okay?

11:24:42 16    A.   Okay.

11:24:42 17    Q.   How long have you worked at Stroz?

11:24:45 18    A.   Since 2006, so a little more than nine years.

11:24:47 19    Q.   What positions are you held at Stroz?

11:24:49 20    A.   I started as a digital forensic examiner.

11:24:51 21    Q.   In 2006?

11:24:53 22    A.   Yes.  And in 2009, I became an assistant director for

11:25:01 23    digital forensics in our laboratory in New York City.  And then

11:25:04 24    in 2013, I became the director of the digital forensics

11:25:09 25    practice for the firm.

**OFFICIAL TRANSCRIPT**

11:25:09  1          THE COURT:  Are you are tendering him as an expert?

11:25:13  2          MR. TSAO:  I am, Your Honor.

11:25:13  3          THE COURT:  In what field?

11:25:15  4          MR. TSAO:  In the field of digital forensic analysis.

11:25:17  5          THE COURT:  Do we have a stipulation?

11:25:20  6          MR. WEINGARTEN:  No, Your Honor, I would like to

11:25:21  7  traverse.

11:25:22  8          THE COURT:  Continue, Mr. Tsao.

11:25:25  9          MR. TSAO:  Certainly, Your Honor.

11:25:25 10  EXAMINATION Y MR. TSAO:

11:25:26 11  Q.   How many people are in the digital forensics department at

11:25:28 12  Stroz?

11:25:28 13  A.   About 45 worldwide.

11:25:30 14  Q.   Can you please tell the jury about your education?

11:25:32 15  A.   Yes.  I hold a Bachelor's degree in computer science from

11:25:38 16  Williams College, and I have a Master's in fine arts from

11:25:43 17  Columbia University in film.

11:25:44 18  Q.   And do have you any certifications in the field of digital

11:25:49 19  forensic analysis?

11:25:49 20  A.   Yes.  I hold a professional certification called ENCE,

11:25:53 21  which stands for EnCase Certified Examiner, which is a

11:25:57 22  certification in my field regarding a particular tool that we

11:26:01 23  use for forensic analysis.

11:26:03 24  Q.   Can you tell the jury what sorts of training you've gone

11:26:08 25  through to get this EnCase certification?

                        **OFFICIAL TRANSCRIPT**

11:26:09  1    A.    Sure.  That certification requires taking a practical

11:26:14  2    examination of forensic material to establish your proficiency

11:26:18  3    in the tool, as well as a certain number of months that you've

11:26:24  4    been using it.  Those are the prerequisites for getting

11:26:27  5    certification.

11:26:27  6              In addition to that, we have ongoing training that we

11:26:30  7    attend as a form of continuing technical education so that we

11:26:35  8    can continue to be educated on technologies as they change and

11:26:41  9    evolve over time.

11:26:41 10    Q.    And, Mr. Bolas, so you ever conduct training yourself in

11:26:44 11    the field of digital forensic analysis?

11:26:47 12    A.    Yes.  I help coordinate all of the internal training that

11:26:50 13    our firm provides to our examiners.

11:26:52 14    Q.    Have you ever previously been certified as an expert in

11:26:55 15    court in the field of digital forensic analyses?

11:27:00 16    A.    Yes.  I have -- I have testified, if that's what you mean

11:27:02 17    by "certified."

11:27:04 18    Q.    Yes.  How many times have you testified as an expert

11:27:08 19    witness in this field?

11:27:08 20    A.    I testified once previously here in New Orleans in federal

11:27:13 21    criminal court.  I have testified in federal civil court in

11:27:19 22    Manhattan and Brooklyn in New York, and I have testified in

11:27:23 23    state courts in Texas and Colorado.

11:27:25 24    Q.    In your career, in this field, have you ever personally

11:27:30 25    conducted digital forensic analyses on electronic devices and

**OFFICIAL TRANSCRIPT**

11:27:35 1    media?

11:27:35 2    A.    Yes.  Yes.

11:27:36 3    Q.    Can you explain to the jury generally what sorts of things

11:27:38 4    you have done?

11:27:39 5    A.    I've looked at a lot of different kinds of evidence over

11:27:43 6    the years, many of which include hard drives from computers,

11:27:48 7    and mobile devices such as smartphones.

11:27:50 8    Q.    And with respect to phones and text messages in

11:27:56 9    particular, can you tell the jury what sorts of physical

11:28:00 10   forensic analyses activities that you perform?

11:28:02 11   A.    Yes.  In prior casework, I've looked at phones of various

11:28:05 12   makes and models in order to retrieve information from those

11:28:10 13   phones, such as text message information or to provide analyses

11:28:15 14   on whether text messages may have been deleted.

11:28:17 15   Q.    And over your career at Stroz, approximately how many

11:28:20 16   computers and cell phones and other electronic devices have you

11:28:25 17   conducted digital forensic analyses on?

11:28:28 18   A.    I don't have a good number, but certainly somewhere

11:28:31 19   between a hundred or 200 different cases over the years.

11:28:34 20   Q.    And have you also supervised the digital forensic analysis

11:28:37 21   of other devices that you didn't personally conduct?

11:28:40 22   A.    Yes.  I often supervise other members of our department in

11:28:44 23   their analysis.

11:28:44 24   Q.    In your experience, have you ever examined a computer or

11:28:49 25   computer hard drive to see what browsing, Internet browsing

**OFFICIAL TRANSCRIPT**

11:28:53 1   history is on the computer?

11:28:54 2   A.   Yes, I have.

11:28:54 3   Q.   Just briefly tell the jury what your experience is with

11:28:57 4   respect to that activity.

11:28:58 5   A.   That's a very commonly requested analysis for our clients

11:29:03 6   in which we are asked to look at a hard drive from a computer

11:29:07 7   and try to determine, to the fullest extent possible, what

11:29:12 8   activity an individual user of that computer might have

11:29:14 9   conducted when browsing the Internet looking at various web

11:29:18 10  sites and web pages.

11:29:19 11  Q.   Mr. Bolas, have you ever examined a computer to see -- to

11:29:23 12  look at digital files that may be contained on that computer's

11:29:27 13  hard drive?

11:29:27 14  A.   Yes.

11:29:28 15  Q.   Is that a common task --

11:29:30 16  A.   Absolutely.

11:29:30 17  Q.   -- in your field?

11:29:31 18  A.   Certainly.

11:29:31 19  Q.   And just, again, as a general matter, can you tell the

11:29:35 20  jury what sorts of activities you've done with respect to

11:29:38 21  looking for digital files on hard drives.

11:29:40 22  A.   Looking for files of interest on the particular hard drive

11:29:44 23  is, again, a very common request in the context of many

11:29:49 24  different kinds of analyses or reviews.

11:29:51 25            We will provide files of interest, find files that

**OFFICIAL TRANSCRIPT**

11:29:56  1   match certain search terms, or search a hard drive in order to

11:30:00  2   recover files that may have been deleted, or provide

11:30:03  3   information about the timing of the creation, modification or

11:30:08  4   e-mailing of various files.

11:30:09  5   Q.    Mr. Bolas, have you performed digital forensic analyses

11:30:15  6   with respect to electronic devices that are related to this

11:30:19  7   Rainey matter?

11:30:20  8   A.    Yes.

11:30:24  9        MR. TSAO:  Your Honor, at this point, the government

11:30:26 10   proffers Mr. Bolas as an expert in the field of digital

11:30:30 11   forensic analysis.

11:30:32 12        THE COURT:  Let me explain to the jury what we're going

11:30:34 13   to do here.  When an expert witness is called during a trial,

11:30:37 14   there is a two-part exercise.  The first part is to qualify the

11:30:41 15   expert as a witness in a given field, which in this case for

11:30:44 16   this witness is digital forensic analysis.

11:30:48 17            As part of that qualification process, opposing

11:30:52 18   counsel will do this -- other experts may be called during this

11:30:56 19   trial, it will operate the same way.  Opposing counsel will

11:30:59 20   have a chance to ask questions about the area of expertise, and

11:31:04 21   then counsel can redirect after that.

11:31:07 22            Once the Court determines whether or not to

11:31:10 23   accept a witness as an expert, if the Court accepts the witness

11:31:13 24   as an expert, then we will begin the witness' testimony about

11:31:16 25   this case.

**OFFICIAL TRANSCRIPT**

11:31:17  1          So the testimony that you've heard so far that

11:31:22  2   Mr. Tsao elicited from this witness pertains to his expertise,

11:31:25  3   but not about what he did in this case.

11:31:27  4          Mr. Magner at this point is going to ask

11:31:29  5   questions again about the area of expertise so that we can find

11:31:33  6   out whether or not the witness is to be accepted as an expert

11:31:38  7   and can testify for your consideration.

11:31:41  8          Mr. Magner, if you would like to begin.

11:31:42  9       MR. MAGNER:  Yes, Your Honor, just briefly.

11:31:42 10                   TRAVERSE EXAMINATION

11:31:44 11   BY MR. MAGNER:

11:31:44 12   Q.   How old are you, sir?

11:31:47 13   A.   I'm 39.

11:31:49 14   Q.   And you graduated from college in 1997, correct?

11:31:53 15   A.   That's correct.

11:31:53 16   Q.   And that was from Williams College in Williamsport (sic),

11:31:58 17   Massachusetts?

11:32:00 18   A.   Williamstown, Massachusetts.

11:32:00 19   Q.   Excuse me.  Your degree was a Bachelor of Arts degree in

11:32:05 20   computer science, correct?

11:32:06 21   A.   That's correct.

11:32:06 22   Q.   And while you were at Williams, you didn't take any

11:32:09 23   digital forensics classes, did you?

11:32:11 24   A.   That is correct.

11:32:12 25   Q.   They don't offer any?

                          **OFFICIAL TRANSCRIPT**

11:32:13 1    A.   That's correct.

11:32:14 2    Q.   It's a relatively small department at a liberal arts

11:32:18 3    college in the northeast, correct?

11:32:21 4    A.   I don't know that I would characterize the department as

11:32:23 5    small.   Computer science is a fairly popular field overall, but

11:32:27 6    it is a liberal arts school, and the education that I received

11:32:31 7    there were in general principles of computer science.

11:32:33 8    Q.   And then subsequently you went and received your MFA,

11:32:38 9    that's a Master's in fine arts, correct?

11:32:40 10   A.   Correct.

11:32:40 11   Q.   You went to film school?

11:32:42 12   A.   That's right.

11:32:42 13   Q.   That was in New York?

11:32:43 14   A.   Yes.

11:32:44 15   Q.   And then you graduated from film school in 2004, correct?

11:32:48 16   A.   Yes.

11:32:48 17   Q.   And then you went to work -- actually, before that, as I

11:32:55 18   understand it, you worked in connection with a collection of

11:32:58 19   historical documents for the New York Historical Society,

11:32:58 20   correct?

11:33:02 21   A.   I had a part-time job during graduate school, that's

11:33:04 22   right.

11:33:04 23   Q.   That was while you were in grad school?

11:33:06 24   A.   Yes.

11:33:06 25   Q.   And then right after that, you went to work at the

**OFFICIAL TRANSCRIPT**

11:33:10 1   U.S. Attorney's Office, correct?

11:33:11 2   A.   Yes.  That was the fall of 2004.

11:33:14 3   Q.   While you were there, you worked primarily with the

11:33:18 4   prosecutors and federal agents, right?

11:33:20 5   A.   That's correct.

11:33:21 6   Q.   And so you were on the government team investigating and

11:33:25 7   prosecuting subjects of their investigations, right?

11:33:28 8   A.   Yes, I was a technical paralegal, supporting the

11:33:31 9   government investigations in the Eastern District of New York.

11:33:34 10  Q.   So you were a paralegal of the U.S. Attorney's Office,

11:33:38 11  correct?

11:33:39 12  A.   Correct.

11:33:39 13  Q.   And then you went to work for Stroz?

11:33:41 14  A.   Correct.

11:33:42 15  Q.   And Stroz is a contractor?

11:33:45 16  A.   We're a private consulting film, yes, we have clients.

11:33:48 17  Q.   And Stroz is full of people who are either former

11:33:53 18  prosecutors or FBI agents or people who used to work in federal

11:33:57 19  prosecution agencies, right?

11:34:01 20  A.   Many of the engagement managers of our firm, yes, do have

11:34:05 21  backgrounds in various areas of law enforcement and law.

11:34:07 22  Q.   And the firm is managed by former prosecutors, former

11:34:12 23  federal agents and former law enforcement officers, right?

11:34:14 24  A.   Among others, yes.

11:34:15 25  Q.   I'm using your words from a prior testimony that you gave.

**OFFICIAL TRANSCRIPT**

11:34:17  1   A.   I don't know exactly what words I used in the testimony,
11:34:22  2   but everything you say is accurate.
11:34:23  3   Q.   And your work in this case, has your work be as a neutral,
11:34:33  4   objective expert, or have you been acting as essentially a
11:34:39  5   partisan on behalf of the government team?
11:34:41  6   A.   I wouldn't characterize anything I've done as partisan.
11:34:44  7   It is true that we have been working at the direction of the
11:34:47  8   government.  In other words, since our involvement in digital
11:34:51  9   forensics matters relating to BP since 2011, when we first got
11:34:56 10   involved, our work has been done in order to answer questions
11:35:00 11   put to us by the government.  But we have always been
11:35:06 12   understood to be advocates for the facts and not advocates for
11:35:10 13   any party.
11:35:11 14   Q.   And you have been well compensated for your work for the
11:35:15 15   government in this case, correct?
11:35:18 16   A.   I have a fair salary.  I am well compensated for the hard
11:35:22 17   work that I put in.
11:35:23 18   Q.   And your company -- in fact, you billed about 950 hours in
11:35:28 19   connection with this matter?  As well as -- I'll represent to
11:35:34 20   you that was what was represented to us.
11:35:35 21   A.   Well, when you say in relation to this matter, are you
11:35:39 22   speaking specifically with regards to Mr. Rainey?
11:35:40 23   Q.   Yes, sir.
11:35:40 24   A.   Okay.  Our firm has done a lot of work for the government
11:35:44 25   over the course of four years, but in a ballpark estimate, I

**OFFICIAL TRANSCRIPT**

11:35:48  1    would say that, yeah, maybe 900 hours was a rough estimate that

11:35:52  2    we calculated for the number of hours spent over the course of

11:35:57  3    four years related to Mr. Rainey.

11:35:57  4    Q.    Right.  And the government lawyers, if they told me that

11:36:00  5    it was 950 hours, you wouldn't quibble with that, would you?

11:36:04  6    A.    No.  I wouldn't quibble.  These are ballpark estimates.

11:36:08  7    Q.    And your company billed $400,000 for that work?

11:36:10  8    A.    Over the course of those four years, correct.  That is,

11:36:14  9    again, a ballpark estimate.

11:36:15 10    Q.    I did the calculations, and we can do it again, but that's

11:36:19 11    roughly about $421 an hour, correct?

11:36:21 12    A.    I haven't done that calculation.  I'll accept your

11:36:23 13    representation.

11:36:25 14          MR. MAGNER:  I have no further questions at this time.

11:36:27 15    And we do object.

11:36:29 16          THE COURT:  Mr. Tsao, would you like to question the

11:36:31 17    witness further about what Mr. Magner has asked about?

11:36:39 18          MR. TSAO:  Just a few things, Your Honor.

11:36:39 19                       VOIR DIRE EXAMINATION

11:36:39 20    BY MR. TSAO:

11:36:41 21    Q.    Mr. Bolas, with respect to your firm Stroz Friedberg, does

11:36:45 22    it provide services only to the government?

11:36:46 23    A.    No.  The majority of our clients are not government

11:36:48 24    clients at all.  They are private companies that need

11:36:52 25    assistance or private law firms.

                              **OFFICIAL TRANSCRIPT**

11:36:54  1   Q.   Up until this year, who actually retained Stroz Friedberg

11:37:01  2   to perform work for the government?

11:37:03  3   A.   We were retained by counsel for BP from the time that we

11:37:07  4   were first involved in this case, which was July of 2011, until

11:37:11  5   sometime in the middle of last year.  At that point, in the

11:37:14  6   middle of last year, we were then retained by the government.

11:37:17  7   Q.   Before you were retained directly by the government, who

11:37:19  8   was paying your bills, do you know?

11:37:20  9   A.   It was -- our bills went to counsel for BP, a law firm

11:37:25 10   called Wilmer Hale.  I understand that then they billed their

11:37:28 11   client, the company, BP.

11:37:29 12   Q.   And do you know at whose request it was that Stroz

11:37:35 13   Friedberg be hired?

11:37:35 14   A.   I believe, if my recollection serves, that at the outset

11:37:42 15   of our involvement in July of 2011, the company itself asked

11:37:45 16   for assistance because they wanted a separate party to be able

11:37:52 17   to answer questions that the government had about digital

11:37:57 18   forensic analysis.  And so that was a -- not a request

11:38:02 19   necessarily from the government; from all of the parties.

11:38:04 20   There was generally an understanding between the government

11:38:06 21   investigators and the company BP and their lawyers that we

11:38:11 22   would get involved in order to provide this service.  And there

11:38:14 23   was an agreement established at that time that we would do so.

11:38:19 24        MR. TSAO:  Your Honor, no further questions with

11:38:22 25   respect to the voir dire.

                        **OFFICIAL TRANSCRIPT**

11:38:22  1        THE COURT:  The Court is the going to accept Mr. Bolas

11:38:25  2   as an expert in the field of digital forensic analysis.  All of

11:38:29  3   the information that has been provided to you in his testimony

11:38:32  4   in response to the questions from Mr. Tsao and Mr. Magner may

11:38:37  5   be considered by you.

11:38:37  6             And you'll get an instruction at the end of the

11:38:40  7   trial that you are to afford all witnesses' testimony,

11:38:45  8   including expert witnesses, whatever weight you believe is

11:38:47  9   appropriate based upon all the information provided to you.

11:38:50 10             So the information regarding Mr. Bolas and the

11:38:54 11   questions that he's just answered are all part of your duty to

11:38:59 12   consider the weight of each witness, including Mr. Bolas, to

11:39:03 13   decide what weight you're going to give it, if any at all.

11:39:06 14             Mr. Tsao, we are -- it's almost quarter to noon.

11:39:12 15   This might be a good spot for a lunch break, rather than get

11:39:15 16   you started and have to shut down in a few minutes.

11:39:18 17        MR. TSAO:  Of course, Your Honor.

11:39:18 18        THE COURT:  Why don't we go ahead and take our lunch

11:39:20 19   break.  If you all can be back at, why don't we say 5 minutes

11:39:24 20   to 1.  That gives you a little over an hour.  If you could be

11:39:27 21   back in the jury room at 12:55, or 5 minutes to 1:00  we will

11:39:33 22   bring you in the courtroom and we will pick up one this

11:39:34 23   witness' testimony.

11:39:35 24             In the meantime, please do not discuss anything

11:39:38 25   about the case amongst yourselves or with anyone else, and if

OFFICIAL TRANSCRIPT

11:39:42  1    you are in the building or even anyplace else, and there is any

11:39:46  2    type of discussion about this trial or you see anyone who is

11:39:50  3    associated with this trial, please withdraw from any situation

11:39:55  4    where you might possibly hear anything about this trial.  Thank

11:40:00  5    you.

11:40:02  6              (WHEREUPON, at 11:40 a.m. the jury panel leaves the

11:40:45  7    courtroom.)

11:40:45  8              THE COURT:  All right.  Mr. Bolas, you're going to be

11:40:48  9    under oath when you resume.  If you can be here at 5 minutes to

11:40:51 10    12 in the same spot you are right now.  We will begin promptly.

11:40:56 11              Please do not discuss, and the Court orders you

11:40:58 12    not to discuss your testimony already given or anticipated

11:41:02 13    testimony with anyone pending the lunch hour.  Okay, you

11:41:07 14    understand that?

11:41:08 15              THE WITNESS:  I do.

11:41:10 16              THE COURT:  You're free to step down.

11:41:12 17              Counsel, can you all come up on for a second.  Not on

11:41:15 18    the record.

         19              (WHEREUPON, at 11:41 a.m., the proceedings were in

         20    luncheon recess.)

         21                              *    *    *

         22

         23

         24

         25

                              **OFFICIAL TRANSCRIPT**

1                        REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11

12                         _s/Cathy Pepper_____

13                         Cathy Pepper, CRR, RMR, CCR
                           Certified Realtime Reporter
14                         Registered Merit Reporter
                           Official Court Reporter
15                         United States District Court
                           Cathy_Pepper@laed.uscourts.gov
16

17

18

19

20

21

22

23

24

25

                            **OFFICIAL TRANSCRIPT**

**$**

$400,000 [1] - 410:7
$421 [1] - 410:11

**1**

1 [4] - 294:23, 298:3, 301:6, 412:20
1,000 [6] - 296:3, 305:19, 306:5, 316:22, 365:13, 365:15
1,063 [1] - 334:13
1,195 [1] - 336:18
10 [4] - 297:18, 298:3, 338:18, 364:20
10,000 [1] - 396:18
100 [1] - 394:22
1000 [1] - 290:15
1001 [3] - 294:19, 299:16, 300:11
1001(A)(2) [1] - 298:19
10:00 [1] - 350:19
10:03 [1] - 351:5
10:19 [1] - 351:8
10:20 [3] - 350:21, 350:24, 351:3
10th [1] - 352:7
11:40 [1] - 413:6
11:41 [1] - 413:19
12 [1] - 413:10
12,089 [1] - 337:5
12,550 [1] - 336:2
12-291 [2] - 290:5, 294:17
12:55 [1] - 412:21
1330 [1] - 290:24
14 [5] - 327:14, 366:24, 369:16, 387:5, 397:7
14,000 [2] - 385:22, 389:12
14,266 [1] - 334:20
14,455 [1] - 336:20
141 [4] - 301:16, 331:15, 337:13, 337:14
15 [1] - 350:21
15-minute [1] - 351:3
150 [2] - 352:6
155.03 [1] - 301:17
155.13 [1] - 301:17
155.18 [1] - 301:17
155.33 [1] - 301:17
155.55 [1] - 301:17
158 [1] - 301:17
159 [4] - 301:17,

352:8, 395:22, 397:6
16 [4] - 301:5, 301:6, 372:11, 373:2
168 [1] - 301:17
168A [10] - 356:5, 356:16, 357:24, 358:4, 382:15, 382:20, 393:7, 393:10, 393:22, 397:6
16th [2] - 352:11, 352:14
17 [1] - 335:7
18 [3] - 294:18, 298:19, 299:16
1990s [1] - 312:11
1991 [3] - 363:2, 363:12, 364:4
1997 [1] - 406:14
19th [1] - 298:22
1:00 [2] - 333:12, 412:21

**2**

2 [7] - 290:6, 290:9, 293:2, 295:2, 362:19, 363:1
20 [3] - 295:2, 303:9, 315:9
200 [1] - 403:19
20036 [1] - 290:25
2004 [3] - 312:12, 407:15, 408:2
2006 [2] - 400:18, 400:21
2009 [1] - 400:22
201 [1] - 290:19
2010 [28] - 295:2, 295:23, 296:4, 296:19, 297:9, 297:10, 303:9, 303:18, 305:22, 306:24, 308:6, 312:13, 315:9, 327:17, 335:7, 335:8, 336:11, 336:24, 350:4, 352:7, 352:11, 352:14, 353:4, 353:20, 354:9, 354:24, 355:2, 396:10
2011 [15] - 298:5, 304:1, 308:15, 310:5, 313:11, 322:17, 342:5, 353:14, 353:22, 355:3, 362:3,

382:23, 409:9, 411:4, 411:15
2013 [2] - 327:17, 400:24
2014 [1] - 298:22
2015 [2] - 290:6, 293:2
209 [3] - 364:25, 366:7, 366:14
225 [1] - 301:18
23 [1] - 301:16
230 [1] - 395:21
24 [7] - 295:23, 301:16, 302:22, 375:20, 387:24, 393:21, 397:8
24-minute [1] - 302:22
24th [1] - 316:21
25 [3] - 301:16, 302:18, 302:20
26 [7] - 296:4, 297:9, 305:22, 306:24, 322:6, 350:4, 396:10
26th [21] - 319:1, 319:8, 323:8, 323:15, 345:17, 346:12, 346:16, 348:21, 367:5, 367:8, 387:19, 387:22, 391:4, 391:12, 391:15, 394:7, 395:5, 397:11, 397:17, 397:18, 398:6
27 [4] - 301:16, 322:7, 335:8, 377:1
27th [12] - 307:22, 320:21, 321:1, 321:15, 336:12, 338:8, 369:17, 370:8, 371:10, 371:14, 372:1, 375:22
28 [2] - 296:19, 377:1
28th [3] - 336:12, 338:12, 375:22
29 [3] - 301:16, 336:11, 377:1
29th [3] - 336:12, 338:16, 375:23
2:00 [1] - 319:9

**3**

3 [2] - 294:18, 295:8
30 [5] - 297:10, 336:24, 375:16, 378:6, 395:16
30-hour [1] - 322:7
30-page [1] - 374:6

302 [18] - 355:20, 355:22, 355:25, 356:2, 356:11, 356:16, 357:20, 362:7, 369:11, 370:21, 372:6, 372:8, 373:6, 374:17, 378:21, 387:7, 393:7, 394:9
303 [1] - 292:5
30th [10] - 323:8, 338:18, 345:17, 346:12, 346:17, 367:5, 367:8, 387:19, 387:22, 391:12
31 [1] - 307:10
311 [1] - 292:6
326 [2] - 292:7, 292:8
33 [5] - 313:15, 356:2, 392:2, 392:20, 392:21
33-page [1] - 357:20
353 [1] - 292:9
39 [1] - 406:13
393 [1] - 292:10
398 [1] - 292:11
399 [1] - 292:12
3:20 [1] - 306:23
3:22 [1] - 306:23

**4**

4 [2] - 295:19, 362:14
4/27/10 [1] - 335:8
4/28/2010 [1] - 335:19
4/29 [1] - 336:11
4/30 [1] - 336:24
400 [1] - 290:15
406 [1] - 292:13
410 [1] - 292:14
413 [1] - 292:15
45 [2] - 325:16, 401:13
4:00 [1] - 333:13
4:30 [9] - 321:15, 322:2, 369:17, 370:1, 370:8, 371:10, 371:17, 371:21, 372:2

**5**

5 [6] - 295:23, 322:21, 350:19, 412:19, 412:21, 413:9
5,000 [45] - 296:7, 296:21, 296:24, 297:16, 297:21,

297:24, 298:14, 298:15, 298:17, 298:18, 305:25, 306:4, 306:12, 306:17, 307:3, 307:4, 307:21, 308:1, 308:3, 308:11, 308:18, 308:20, 308:24, 309:3, 309:5, 309:8, 309:11, 310:1, 310:11, 314:3, 348:6, 348:16, 348:19, 348:20, 348:25, 349:2, 349:3, 349:10, 350:6, 389:19, 393:18, 394:5, 396:19
5,092 [1] - 336:1
5,226 [1] - 337:4
5,758 [1] - 335:2
5,906 [1] - 336:19
5/17/2010 [2] - 335:6, 336:10
50 [1] - 352:18
500 [1] - 291:4
504 [1] - 291:5
51 [1] - 352:18
5100 [1] - 290:19
5700 [2] - 385:24, 389:14
589-7779 [1] - 291:5

**6**

6 [7] - 296:4, 298:5, 313:11, 322:17, 322:21, 334:2, 338:7
6,000 [1] - 297:21
6th [1] - 342:5

**7**

7 [3] - 296:23, 335:14, 338:11
7-hour [1] - 322:21
70130 [2] - 290:16, 291:5
70170 [1] - 290:19

**8**

8 [3] - 297:9, 336:3, 338:14
8:30 [1] - 290:6
8:35 [1] - 293:8

**9**

**9** [2] - 297:15, 336:21
**90** [1] - 354:6
**900** [1] - 410:1
**92,000** [1] - 297:17
**920** [1] - 337:3
**935** [1] - 335:24
**95** [1] - 354:6
**950** [2] - 409:18, 410:5
**98** [7] - 301:16,
  331:15, 331:17,
  332:7, 333:22,
  333:25, 334:3
**9:00** [1] - 333:14
**9th** [1] - 353:20

**A**

**A)(2)** [1] - 294:19
**a.m** [6] - 293:8,
  333:14, 351:5,
  351:8, 413:6, 413:19
**A.M** [1] - 290:6
**abandoned** [1] -
  315:15
**ability** [1] - 414:8
**able** [5] - 293:16,
  294:5, 311:23,
  350:3, 411:16
**above-entitled** [1] -
  414:9
**Abraham** [1] - 326:18
**ABRAHAM** [2] - 292:7,
  326:5
**absolutely** [4] -
  314:24, 318:15,
  382:17, 404:16
**accept** [4] - 351:21,
  405:23, 410:12,
  412:1
**accepted** [2] - 297:6,
  406:6
**accepts** [1] - 405:23
**accident** [1] - 311:10
**accomplish** [1] -
  341:1
**accomplished** [1] -
  317:23
**accuracy** [7] - 305:21,
  358:21, 359:6,
  371:4, 371:5, 395:10
**accurate** [15] - 296:14,
  357:16, 364:12,
  365:25, 369:13,
  371:23, 372:9,
  372:10, 373:11,
  375:13, 375:15,
375:17, 377:9,
  377:19, 409:2
**accurately** [1] -
  385:13
**accused** [1] - 298:25
**acted** [3] - 311:20,
  314:13, 322:15
**acting** [1] - 409:4
**Action** [1] - 294:17
**ACTION** [1] - 290:5
**actions** [1] - 313:5
**activities** [3] - 328:14,
  403:10, 404:20
**activity** [2] - 404:4,
  404:8
**actual** [4] - 306:3,
  306:10, 348:13,
  358:1
**Adair** [5] - 304:22,
  308:16, 342:11,
  355:10, 360:9
**addition** [2] - 359:25,
  402:6
**additional** [1] - 349:18
**address** [1] - 302:18
**Administration** [3] -
  296:5, 305:24,
  341:14
**admiral** [1] - 315:22
**Admiral** [9] - 316:21,
  317:4, 317:19,
  332:14, 332:15,
  332:20, 332:24
**admissions** [1] -
  310:17
**admitted** [2] - 301:24,
  331:20
**advocates** [2] -
  409:12
**affected** [2] - 329:14,
  329:15
**affiliated** [1] - 396:11
**afford** [1] - 412:7
**afforded** [1] - 302:17
**affords** [1] - 299:12
**aftermath** [3] - 312:19,
  313:2, 315:3
**afternoon** [6] -
  320:25, 321:15,
  322:7, 323:14,
  371:17
**afterwards** [1] -
  315:5
**agencies** [4] - 315:21,
  327:23, 331:1,
  408:19
**Agency** [3] - 304:24,
  342:11, 360:8
**agency** [1] - 305:23
**agent** [14] - 300:9,

304:22, 308:16,
  310:4, 342:10,
  342:11, 343:19,
  355:11, 360:1,
  360:11, 361:4,
  361:12, 370:21,
  375:16
**Agent** [6] - 304:21,
  308:15, 355:10,
  355:25, 360:9,
  360:18
**agent's** [1] - 361:12
**agents** [14] - 298:11,
  299:25, 303:24,
  304:8, 304:13,
  305:6, 305:8,
  308:23, 327:22,
  343:10, 355:10,
  408:4, 408:18,
  408:23
**ago** [2] - 361:18,
  373:17
**agreed** [3] - 300:15,
  317:18, 321:11
**agreement** [4] -
  319:20, 320:15,
  321:4, 411:23
**ahead** [9] - 303:2,
  325:11, 325:16,
  331:20, 331:24,
  350:22, 370:24,
  395:19, 412:18
**airplane** [3] - 379:20,
  381:3, 381:4
**Alaska** [2] - 377:17,
  377:20
**all-day** [3] - 312:22,
  322:19, 323:24
**allegation** [1] - 298:24
**allegations** [4] -
  298:1, 298:2,
  300:17, 340:14
**alleged** [2] - 297:25,
  300:19
**Allen** [2] - 332:15,
  332:24
**allowed** [1] - 307:25
**almost** [11] - 303:12,
  312:23, 313:4,
  322:16, 323:17,
  324:1, 343:3, 354:4,
  378:16, 379:1,
  412:14
**alone** [1] - 320:19
**aloud** [1] - 362:16
**alright** [1] - 345:25
**Alyeska** [1] - 376:5
**America** [1] - 305:2
**AMERICA** [1] - 290:4
**American** [3] - 297:7,

319:20, 383:7
**amount** [6] - 295:19,
  319:16, 328:19,
  334:15, 341:16,
  366:5
**Amy** [3] - 304:22,
  342:11, 360:9
**analyses** [7] - 402:15,
  402:25, 403:10,
  403:13, 403:17,
  404:24, 405:5
**analysis** [24] - 309:9,
  344:6, 344:7,
  364:24, 367:1,
  367:2, 368:10,
  384:6, 387:13,
  387:16, 388:12,
  399:25, 400:4,
  401:4, 401:19,
  401:23, 402:11,
  403:20, 403:23,
  404:5, 405:11,
  405:16, 411:18,
  412:2
**analyze** [1] - 350:12
**Anchorage** [1] - 363:1
**announce** [1] - 316:22
**announced** [2] -
  314:6, 346:18
**answer** [14] - 296:17,
  345:18, 346:7,
  346:19, 348:10,
  374:12, 375:1,
  376:14, 376:24,
  377:4, 384:2,
  390:24, 409:10,
  411:17
**answered** [2] -
  313:17, 412:11
**answers** [3] - 390:9,
  390:23, 393:13
**answers.com** [1] -
  307:15
**anticipated** [2] -
  382:25, 413:12
**anticipation** [1] -
  355:23
**anyplace** [1] - 413:1
**Apologies** [1] - 333:11
**apologies** [2] -
  395:23, 397:8
**apologize** [1] - 375:8
**apparent** [2] - 318:23,
  320:15
**appear** [7] - 316:7,
  333:3, 333:5,
  335:22, 336:16,
  369:1, 392:21
**APPEARANCES** [2] -
  290:12, 291:1

**application** [2] -
  400:5, 400:9
**approach** [3] - 331:11,
  351:14, 356:13
**approaches** [1] -
  302:22
**appropriate** [2] -
  381:25, 412:9
**April** [54] - 295:2,
  295:23, 296:4,
  296:19, 297:9,
  297:10, 298:5,
  303:9, 304:1,
  305:22, 306:24,
  307:22, 308:15,
  310:5, 313:11,
  315:9, 316:21,
  319:1, 320:21,
  321:15, 322:6,
  322:7, 322:17,
  323:8, 323:15,
  335:8, 336:11,
  336:12, 336:24,
  342:5, 345:17,
  346:12, 346:16,
  346:17, 348:21,
  350:4, 353:4,
  353:22, 355:3,
  367:5, 367:8,
  369:17, 371:10,
  375:22, 375:23,
  377:1, 387:19,
  396:10
**area** [9] - 320:23,
  370:19, 374:8,
  379:23, 379:24,
  380:12, 380:24,
  405:20, 406:5
**areas** [2] - 374:8,
  408:21
**ARMSTRONG** [1] -
  290:23
**arrive** [1] - 297:20
**arrived** [5] - 341:18,
  344:8, 348:7,
  353:19, 378:3
**Arts** [1] - 406:19
**arts** [4] - 401:16,
  407:2, 407:6, 407:9
**ascribed** [2] - 377:14,
  380:22
**assessment** [2] -
  296:11, 368:8
**assigned** [2] - 302:13,
  353:9
**assist** [3] - 399:17,
  399:21, 399:23
**assistance** [2] -
  317:20, 410:25,
  411:16

assistant [1] - 400:22
associated [1] - 413:3
assume [3] - 303:1, 311:2, 362:7
assumed [1] - 317:25
assumptions [6] - 296:16, 330:21, 344:17, 344:20, 344:23, 347:20
ASTM [23] - 297:7, 297:14, 297:18, 297:19, 297:22, 319:20, 320:16, 320:17, 321:7, 321:12, 321:22, 383:4, 383:6, 383:12, 383:14, 384:3, 384:5, 384:6, 384:7, 384:9, 384:11, 384:17
Atmospheric [2] - 296:5, 305:23, 341:14
attached [3] - 332:24, 333:16, 333:24
attachments [4] - 333:3, 333:4, 333:5, 349:24
attempt [1] - 316:10
attend [1] - 402:7
attendance [9] - 342:6, 342:8, 342:10, 342:12, 355:14, 359:23, 360:24
attended [4] - 310:4, 355:16, 370:22
attention [15] - 306:24, 334:2, 334:7, 335:17, 336:7, 336:15, 336:21, 336:22, 337:12, 339:12, 342:3, 393:21, 394:25, 396:13, 397:21
attest [1] - 358:20
Attorney [1] - 298:21
Attorney's [2] - 408:1, 408:10
attorneys [7] - 293:20, 351:20, 352:7, 352:11, 352:15, 360:3, 360:5
attributed [1] - 377:15
August [2] - 352:7, 352:11
authored [3] - 354:12, 355:25, 357:21
available [4] - 318:6,

319:17, 359:4, 359:10
AVENUE [2] - 290:19, 290:24
avenues [1] - 359:10
AVI [3] - 292:7, 326:5, 326:10
Avi [4] - 325:19, 326:10, 326:19
aware [4] - 330:25, 345:4, 381:23, 388:11

# B

B-O-L-A-S [1] - 399:9
B-O-N-N [1] - 297:8
Bachelor [1] - 406:19
Bachelor's [1] - 401:15
backed [4] - 309:7, 341:25, 392:7, 392:11
background [2] - 294:22, 305:11
backgrounds [1] - 408:21
backing [2] - 349:2, 386:1
bad [2] - 321:4, 321:6
Balance [2] - 352:16, 364:23
balance [7] - 296:8, 296:10, 297:4, 297:6, 297:11, 354:15, 354:23
ballpark [3] - 409:25, 410:6, 410:9
barrel [5] - 307:4, 308:1, 308:20, 309:5, 334:16
barrel-per-day [3] - 307:4, 308:20, 309:5
barrels [40] - 296:3, 296:7, 296:21, 305:19, 305:25, 306:4, 306:6, 306:12, 306:17, 307:3, 309:8, 310:11, 314:3, 316:23, 328:24, 328:25, 334:13, 334:14, 334:20, 335:2, 335:24, 336:1, 336:2, 336:18, 336:19, 336:20, 337:3, 337:4, 337:5, 365:13, 365:15,

385:22, 386:2, 386:10, 386:11, 386:17, 386:19, 386:23, 394:6
barrels-of-oil-per-day [1] - 306:6
barrels-per-day [7] - 306:4, 306:12, 306:17, 307:3, 309:8, 310:11, 386:2
based [20] - 296:7, 296:11, 297:2, 319:22, 321:12, 329:16, 330:12, 331:3, 333:2, 333:15, 337:6, 344:17, 368:10, 369:10, 371:4, 371:5, 380:9, 397:11, 397:25, 412:9
basis [1] - 307:4
bbl [1] - 396:18
became [3] - 312:11, 400:22, 400:24
become [2] - 302:7, 317:13, 330:24
bed [1] - 315:10
BEFORE [1] - 290:10
began [4] - 300:19, 303:11, 308:8, 322:6
begin [11] - 294:13, 303:2, 303:6, 325:13, 325:15, 351:11, 351:15, 352:23, 405:24, 406:8, 413:10
begins [1] - 305:13
behalf [2] - 295:15, 409:5
behind [2] - 325:23, 398:19
Belfast [1] - 312:4
belittle [1] - 319:21
belittled [1] - 320:11
below [2] - 318:21, 332:24
benefit [1] - 318:20
best [26] - 297:16, 297:21, 308:1, 308:4, 308:11, 308:19, 311:15, 319:17, 323:6, 324:4, 334:23, 335:25, 336:19, 337:4, 385:13, 385:17, 389:9, 389:14, 390:1, 390:3, 390:6, 390:18, 390:22,

391:12, 414:8
best-guess [4] - 308:1, 308:4, 308:11, 308:19
better [3] - 318:2, 331:23, 366:6
between [21] - 297:9, 297:21, 321:16, 323:8, 339:22, 340:13, 343:2, 345:17, 346:12, 352:9, 357:15, 367:7, 367:8, 374:10, 380:3, 384:6, 387:19, 387:22, 391:12, 403:19, 411:20
beyond [6] - 293:22, 299:13, 299:23, 300:11, 304:15, 314:23
Bible [4] - 320:7, 320:10, 320:11, 320:12
big [6] - 303:16, 306:13, 332:4, 342:17, 370:15, 392:11
Bill [5] - 314:1, 320:23, 320:25, 323:3, 388:3
billed [3] - 409:18, 410:7, 411:10
bills [2] - 411:8, 411:9
binary [1] - 400:13
bit [5] - 331:23, 344:5, 370:19, 370:24
Blackberry [2] - 352:10, 396:16
blocking [1] - 330:2
blocks [1] - 308:17
blown [1] - 379:3
blowout [5] - 295:2, 295:14, 300:21, 328:20, 363:22
boat [1] - 315:11
bodies [1] - 327:6
body [1] - 297:3
bogged [1] - 347:6
BOLAS [1] - 399:1
Bolas [14] - 350:16, 398:17, 398:18, 399:9, 399:12, 402:10, 404:11, 405:5, 405:10, 410:21, 412:1, 412:10, 412:12, 413:8
BOLAS.......................
................ [1] -

292:11
Bonn [14] - 297:8, 297:14, 297:15, 319:19, 320:15, 321:4, 321:6, 321:11, 321:22, 321:23, 384:6, 384:17, 385:1, 388:11
BOPD [15] - 296:3, 296:7, 296:21, 296:24, 297:16, 297:17, 297:21, 297:24, 298:14, 298:15, 298:17, 298:18, 328:25, 394:5, 396:19
born [1] - 312:4
boss [3] - 321:9, 373:14, 373:20
bottom [17] - 303:11, 322:14, 331:22, 332:1, 333:6, 335:3, 335:9, 335:17, 335:18, 336:8, 336:22, 365:7, 365:21, 368:9, 369:16, 372:13, 394:1
box [2] - 331:24, 332:3
BP [52] - 294:25, 295:4, 295:11, 295:15, 297:11, 303:16, 303:19, 306:13, 306:15, 307:9, 312:9, 312:15, 315:21, 317:7, 317:9, 317:17, 321:17, 329:19, 330:13, 330:17, 331:4, 332:18, 332:19, 335:12, 337:19, 339:10, 349:2, 349:18, 349:22, 354:9, 354:22, 363:24, 364:2, 365:12, 370:9, 370:11, 371:10, 371:18, 372:2, 372:14, 372:17, 372:21, 372:22, 372:25, 390:14, 409:9, 411:3, 411:9, 411:11, 411:21
BP's [11] - 295:16, 295:25, 303:22, 311:14, 312:10, 312:16, 315:22, 330:14, 352:7,

352:10, 352:15
**bpd** [1] - 328:25
**brainstormed** [1] - 319:7
**brainstorming** [1] - 320:14
**branch** [2] - 298:8, 299:19
**branches** [2] - 331:1, 400:7
**breach** [1] - 399:22
**break** [6] - 325:15, 350:22, 350:25, 351:3, 412:15, 412:19
**breaks** [1] - 360:24
**BRIAN** [1] - 290:22
**Brian** [2] - 311:25, 360:3
**brief** [2] - 313:18, 322:20
**briefed** [1] - 321:21
**briefly** [7] - 305:4, 327:20, 328:16, 336:7, 338:6, 404:3, 406:9
**bring** [1] - 412:22
**brings** [1] - 299:8
**broad** [1] - 346:19
**Brooklyn** [1] - 402:22
**brought** [5] - 363:24, 376:4, 377:17, 377:19, 377:20
**browsing** [4] - 310:9, 403:25, 404:9
**budget** [1] - 328:8
**building** [2] - 293:17, 413:1
**bunch** [1] - 375:3
**burden** [2] - 299:13, 311:24
**BY** [39] - 290:14, 290:18, 290:22, 291:7, 291:8, 292:8, 292:9, 292:10, 292:12, 292:13, 292:14, 326:15, 330:8, 331:13, 332:5, 338:25, 340:20, 345:20, 346:6, 350:10, 353:2, 356:15, 358:8, 359:20, 371:7, 377:10, 382:24, 390:16, 391:2, 393:5, 394:2, 396:1, 397:9, 397:20, 397:24, 398:4, 399:11, 406:11, 410:20

# C

**calculate** [4] - 307:16, 317:6, 365:21, 397:10
**calculated** [13] - 298:13, 298:17, 304:2, 305:24, 307:17, 308:20, 309:11, 309:24, 310:1, 376:10, 376:19, 394:5, 410:2
**calculating** [3] - 307:20, 317:15, 344:3
**calculation** [9] - 295:22, 348:8, 366:17, 366:22, 384:4, 384:8, 386:12, 386:24, 410:12
**calculations** [25] - 307:8, 307:12, 309:22, 319:11, 343:6, 344:9, 344:14, 344:23, 345:9, 348:4, 348:15, 348:18, 367:4, 375:22, 377:1, 377:7, 377:8, 377:18, 377:20, 377:22, 377:23, 387:18, 388:20, 393:18, 410:10
**CALLED** [1] - 293:4
**cannot** [2] - 294:1, 325:2
**capacity** [1] - 333:19
**capped** [1] - 328:21
**care** [1] - 359:11
**career** [3] - 324:21, 402:24, 403:15
**carry** [1] - 307:8
**carrying** [1] - 307:11
**cartoons** [1] - 380:21
**case** [41] - 294:11, 297:25, 299:8, 304:6, 304:15, 304:22, 305:4, 305:13, 307:1, 309:2, 309:13, 309:15, 310:13, 310:18, 310:20, 310:23, 310:24, 311:9, 312:20, 313:3, 314:17, 314:21, 325:1, 325:7, 325:14, 351:2, 351:20,

351:25, 354:3, 363:11, 369:22, 370:2, 370:4, 405:15, 405:25, 406:3, 409:3, 409:15, 411:4, 412:25
**cases** [1] - 403:19
**casework** [1] - 403:11
**catch** [1] - 364:18
**categories** [1] - 380:1
**Cathy** [2] - 414:3, 414:13
**CATHY** [1] - 291:3
**Cathy_Pepper@laed .uscourts.gov** [2] - 291:6, 414:15
**caught** [2] - 364:13, 364:19
**caused** [3] - 297:13, 323:16, 352:12
**cautioned** [2] - 296:9, 296:16
**CBL** [1] - 319:16
**CCR** [2] - 291:3, 414:13
**cell** [3] - 350:14, 352:10, 403:16
**central** [3] - 316:12, 316:13, 363:2
**certain** [10] - 302:1, 302:2, 304:2, 340:8, 341:4, 344:16, 378:9, 380:22, 402:3, 405:1
**certainly** [10] - 318:12, 322:25, 354:8, 358:13, 369:5, 381:23, 392:24, 401:9, 403:18, 404:18
**CERTIFICATE** [1] - 414:1
**certification** [5] - 401:20, 401:22, 401:25, 402:1, 402:5
**certifications** [1] - 401:18
**CERTIFIED** [1] - 291:3
**Certified** [4] - 401:21, 414:3, 414:4, 414:13
**certified** [2] - 402:14, 402:17
**certify** [1] - 414:7
**chair** [3] - 325:23, 350:23, 398:19
**Chairman** [1] - 337:20
**challenged** [1] - 369:5
**challenging** [5] - 311:15, 371:25,

372:5, 381:2, 384:14
**chance** [3] - 293:24, 337:22, 405:20
**change** [2] - 317:11, 402:8
**changed** [1] - 296:17
**Chapin** [20] - 304:25, 332:9, 333:6, 334:9, 334:17, 334:25, 335:3, 335:9, 335:14, 335:21, 336:3, 336:25, 337:11, 337:14, 338:7, 338:11, 338:20, 393:24, 397:5, 397:22
**chapter** [1] - 320:9
**characterize** [2] - 407:4, 409:6
**charge** [10] - 294:4, 294:12, 305:4, 305:9, 312:21, 313:2, 328:4, 328:8, 332:21, 378:23
**charged** [7] - 294:13, 299:11, 299:15, 305:5, 305:6, 312:24, 312:25
**charges** [2] - 294:20, 299:7
**CHARLES** [1] - 290:19
**Charlie** [4] - 319:6, 319:7, 319:9, 320:21
**charts** [1] - 354:16
**cheat** [4] - 311:18, 318:11, 324:19, 325:5
**cheating** [2] - 314:14, 314:20
**check** [1] - 386:20
**chief** [1] - 332:18
**children** [1] - 312:7
**circle** [5] - 347:1, 347:10, 347:12, 347:14, 347:15
**circumstances** [1] - 321:13
**cite** [1] - 320:8
**citizen** [1] - 312:12
**City** [1] - 400:23
**civil** [2] - 295:21, 402:21
**claim** [1] - 313:18
**clamoring** [1] - 317:2
**clarification** [1] - 391:22
**clarifying** [1] - 361:3
**classes** [1] - 406:23
**cleanup** [1] - 329:11
**clear** [6] - 300:13,

309:3, 312:20, 323:11, 349:15, 377:11
**clearly** [1] - 382:9
**clerical** [3] - 362:1, 375:18, 378:1
**Clerk** [2] - 326:7, 399:3
**CLERK** [7] - 293:7, 325:25, 326:8, 351:7, 398:21, 399:4, 399:7
**client** [1] - 411:11
**clients** [4] - 404:5, 408:16, 410:23, 410:24
**clock** [1] - 316:4
**close** [1] - 306:24
**closed** [1] - 396:20
**Coast** [19] - 295:13, 308:5, 308:12, 315:20, 315:22, 319:3, 331:9, 332:13, 333:19, 337:9, 339:3, 344:10, 344:15, 365:1, 365:10, 377:13, 381:19, 381:22, 390:18
**Code** [3] - 294:19, 298:19, 299:16
**Cohen** [8] - 342:8, 342:25, 343:13, 355:7, 357:3, 360:6, 360:23, 362:23
**colleague** [3] - 315:10, 323:14, 342:8
**colleagues** [5] - 370:9, 371:10, 371:13, 371:18, 372:2
**collection** [1] - 407:18
**College** [2] - 401:16, 406:16
**college** [2] - 406:14, 407:3
**color** [1] - 327:2
**Colorado** [1] - 402:23
**colors** [4] - 380:15, 380:23, 381:11, 383:9
**Columbia** [1] - 401:17
**column** [2] - 334:7, 334:17
**comfort** [3] - 323:11, 348:8, 348:14
**coming** [10] - 301:20, 303:17, 316:15, 316:16, 317:11,

329:12, 333:21, 337:22, 349:5, 368:8

**Command** [33] - 295:8, 295:13, 295:16, 295:17, 295:25, 296:20, 311:15, 314:6, 315:19, 316:2, 316:5, 316:8, 316:13, 316:19, 316:25, 317:8, 317:17, 317:25, 319:6, 319:13, 321:16, 322:4, 331:7, 332:14, 332:19, 332:21, 333:20, 337:9, 339:8, 366:20, 372:23, 372:25, 390:3

**Commander** [5] - 295:16, 311:14, 372:17, 372:21, 372:22

**commence** [1] - 299:7

**commensurate** [1] - 294:3

**comment** [1] - 361:12

**commercial** [1] - 363:6

**commit** [1] - 324:14

**committed** [1] - 303:21

**committing** [1] - 324:21

**common** [3] - 324:24, 404:15, 404:23

**commonly** [1] - 404:5

**communicated** [3] - 333:16, 338:3, 386:6

**communication** [1] - 339:1

**communications** [1] - 300:18

**companies** [3] - 327:5, 399:21, 410:24

**company** [6] - 307:10, 409:18, 410:7, 411:11, 411:15, 411:21

**compensated** [2] - 409:14, 409:16

**complete** [4] - 311:20, 318:3, 322:15, 357:16

**completely** [2] - 321:25, 377:21

**complicated** [4] - 350:14, 371:22,

376:23, 386:11

**comply** [1] - 293:16

**comports** [1] - 394:22

**computer** [16] - 310:7, 310:8, 319:16, 331:18, 332:6, 399:24, 401:15, 403:24, 403:25, 404:1, 404:6, 404:8, 404:11, 406:20, 407:5, 407:7

**COMPUTER** [1] - 291:8

**computer's** [1] - 404:12

**computers** [4] - 400:2, 400:11, 403:6, 403:16

**conceal** [1] - 321:25

**concede** [2] - 363:23, 373:5

**concern** [2] - 316:24, 392:11

**concerned** [2] - 302:14, 365:15

**concerning** [1] - 300:18

**conclude** [2] - 293:19, 324:18

**concluded** [1] - 314:2

**conclusion** [1] - 386:18

**conditions** [1] - 317:14

**conduct** [7] - 297:1, 320:3, 327:24, 328:13, 347:22, 402:10, 403:21

**conducted** [14] - 297:22, 314:9, 319:15, 319:24, 333:17, 334:5, 336:5, 341:19, 341:23, 357:20, 362:23, 402:25, 403:17, 404:9

**conducting** [3] - 298:12, 308:23, 348:4

**conference** [3] - 321:16, 342:18, 342:20

**Confidential** [1] - 335:12

**confirmation** [2] - 320:19, 321:14

**confirmed** [1] - 321:7

**conform** [1] - 297:19

**Congress** [13] - 308:5, 308:12, 331:10,

337:10, 338:4, 339:2, 339:8, 343:3, 344:10, 377:13, 390:2, 390:15, 390:21

**CONNECTICUT** [1] - 290:24

**connection** [11] - 302:15, 303:21, 322:18, 327:24, 328:13, 329:18, 330:24, 341:10, 382:19, 407:18, 409:19

**consecutive** [1] - 302:11

**consensus** [1] - 317:15

**consider** [2] - 390:17, 412:12

**consideration** [1] - 406:7

**considered** [2] - 299:2, 412:5

**considering** [3] - 313:3, 346:22, 391:8

**consisted** [1] - 295:9

**consistent** [2] - 297:23, 310:23

**consistently** [1] - 297:20

**consulted** [2] - 319:5, 321:2

**consulting** [3] - 399:14, 399:17, 408:16

**contact** [1] - 333:1

**contacted** [1] - 320:22

**contained** [6] - 298:2, 309:22, 323:15, 352:5, 397:12, 404:12

**containing** [2] - 296:6, 305:25

**containment** [1] - 329:11

**contains** [2] - 372:6, 375:5

**context** [7] - 313:6, 318:14, 352:1, 353:15, 364:20, 388:16, 404:23

**continually** [1] - 293:18

**continue** [2] - 401:8, 402:8

**CONTINUED** [1] - 291:1

**continuing** [1] - 402:7

**continuously** [1] -

322:8

**contractor** [1] - 408:15

**convenience** [1] - 356:7

**conversation** [11] - 320:25, 321:7, 321:9, 340:7, 340:13, 366:11, 373:13, 382:19, 387:25, 388:3, 388:8

**conversations** [1] - 373:20

**convinced** [4] - 299:22, 314:18, 314:23, 318:19

**cook** [1] - 318:11

**cooked** [2] - 324:9, 324:16

**cooperating** [1] - 317:18

**coordinate** [1] - 402:12

**coordinated** [1] - 295:14

**copies** [2] - 302:2, 302:3

**corner** [1] - 335:10

**corners** [1] - 383:8

**corporation** [1] - 294:25

**Correct** [2] - 355:13, 379:9

**correct** [153] - 336:13, 336:14, 338:18, 338:19, 353:4, 353:5, 353:22, 353:23, 353:25, 354:10, 354:13, 354:17, 355:12, 355:20, 355:21, 355:23, 355:25, 356:1, 356:3, 356:17, 356:20, 356:25, 357:5, 357:21, 357:22, 358:11, 358:15, 359:22, 360:12, 360:16, 361:5, 361:14, 361:18, 361:19, 361:20, 362:2, 362:10, 362:11, 362:21, 363:14, 363:25, 364:14, 364:18, 365:2, 365:3, 365:5, 365:11, 367:8, 367:9, 367:11, 367:12, 367:18, 368:3, 368:6, 368:7,

368:9, 368:10, 368:15, 368:17, 369:6, 370:11, 371:11, 371:18, 372:15, 372:16, 372:17, 372:19, 373:6, 374:22, 376:1, 376:11, 376:13, 376:15, 376:16, 376:21, 379:8, 379:13, 379:17, 379:18, 379:22, 380:2, 380:3, 380:7, 380:8, 380:10, 380:11, 380:13, 380:17, 380:25, 381:9, 381:11, 381:16, 381:17, 382:4, 383:10, 383:11, 383:21, 384:9, 384:10, 384:13, 384:20, 385:20, 385:21, 385:22, 385:23, 385:24, 385:25, 386:14, 386:18, 387:14, 387:15, 387:23, 388:4, 388:5, 388:6, 388:7, 388:9, 388:10, 388:15, 388:22, 389:10, 389:12, 391:15, 391:16, 392:12, 392:13, 393:10, 393:11, 393:13, 394:10, 394:21, 406:14, 406:15, 406:20, 406:21, 406:24, 407:1, 407:3, 407:9, 407:10, 407:15, 407:20, 408:1, 408:5, 408:11, 408:12, 408:14, 409:15, 410:8, 410:11, 414:7

**corrected** [3] - 362:4, 374:2, 375:18

**correctly** [1] - 348:9

**correlation** [1] - 380:3

**counsel** [13] - 294:2, 294:8, 300:15, 330:5, 330:14, 331:4, 340:13, 393:6, 405:18, 405:19, 405:21, 411:3, 411:9

**Counsel** [3] - 301:2, 301:19, 413:17

**count** [2] - 297:25, 310:25
**couple** [6] - 293:11, 320:20, 331:16, 372:12, 373:17, 391:13
**course** [18] - 293:17, 298:11, 302:8, 302:14, 302:16, 304:23, 324:25, 340:22, 342:21, 344:2, 352:20, 355:7, 360:11, 388:21, 409:25, 410:2, 410:8, 412:17
**court** [8] - 299:8, 306:21, 333:21, 337:22, 358:17, 402:15, 402:21
**Court** [13] - 294:15, 301:23, 302:18, 303:8, 405:22, 405:23, 412:1, 413:11, 414:4, 414:5, 414:6, 414:14, 414:15
**COURT** [56] - 290:1, 291:3, 293:4, 293:10, 301:6, 301:10, 301:19, 301:23, 303:7, 311:1, 311:5, 325:10, 325:21, 326:13, 330:6, 331:12, 331:19, 338:23, 340:11, 345:25, 346:2, 346:5, 350:19, 351:10, 356:9, 356:12, 357:24, 358:1, 358:7, 359:12, 359:18, 370:18, 376:13, 382:13, 382:18, 390:11, 390:25, 393:2, 395:12, 395:19, 397:5, 397:15, 398:3, 398:8, 398:11, 398:18, 401:1, 401:3, 401:5, 401:8, 405:12, 410:16, 412:1, 412:18, 413:8, 413:16
**Court's** [3] - 350:9, 395:22, 397:4
**courtroom** [10] - 293:9, 302:3, 309:18, 310:15, 330:1, 351:6, 351:9,

398:14, 412:22, 413:7
**courts** [1] - 402:23
**cover** [5] - 304:9, 304:10, 309:7, 309:8, 324:10
**covered** [4] - 313:16, 379:22, 394:13, 395:12
**cramped** [1] - 342:19
**crawl** [1] - 389:24
**create** [1] - 307:3
**created** [10] - 304:10, 353:13, 375:22, 376:10, 376:20, 377:1, 377:2, 377:9, 384:5, 384:24
**creating** [2] - 344:20, 385:16
**creation** [1] - 405:3
**credentials** [1] - 357:7
**crime** [12] - 294:12, 299:11, 299:14, 299:15, 299:17, 299:22, 304:13, 304:16, 324:14, 324:21, 324:23, 400:8
**crimes** [4] - 303:21, 308:9, 312:24, 312:25
**criminal** [17] - 295:21, 303:18, 303:20, 303:23, 304:22, 308:7, 308:8, 311:24, 313:2, 314:14, 325:3, 327:3, 327:18, 327:24, 328:13, 353:16, 402:21
**Criminal** [2] - 294:17, 303:25
**CRIMINAL** [1] - 290:5
**crisis** [2] - 311:17, 316:3
**critical** [5] - 303:16, 307:1, 318:14, 375:6
**cross** [4] - 351:4, 351:11, 352:24, 395:13
**CROSS** [2] - 292:9, 353:1
**cross-examination** [3] - 351:4, 351:11, 352:24
**CROSS-EXAMINATION** [2] - 292:9, 353:1
**crossed** [2] - 335:7, 336:10

**CRR** [2] - 291:3, 414:13
**crumbles** [1] - 314:21

# D

**daily** [1] - 297:13
**damaged** [1] - 318:24
**dark** [2] - 380:5, 380:16
**data** [7] - 319:2, 319:4, 319:8, 350:14, 377:23, 396:4, 399:22
**date** [14] - 335:3, 335:6, 335:18, 335:19, 336:8, 336:9, 336:10, 336:22, 336:23, 396:7, 396:8, 397:21, 397:25
**dated** [1] - 298:22
**dates** [1] - 306:25
**Dave** [68] - 311:11, 311:13, 312:2, 312:4, 312:8, 312:13, 312:15, 312:22, 312:24, 313:3, 313:15, 313:16, 313:19, 313:20, 313:23, 314:8, 314:11, 314:13, 314:14, 314:15, 314:18, 314:22, 315:2, 315:9, 315:14, 315:15, 315:23, 316:3, 316:14, 316:23, 317:20, 317:21, 317:23, 318:3, 318:7, 318:18, 318:25, 319:6, 319:9, 319:12, 319:15, 319:24, 320:17, 320:22, 320:24, 321:1, 321:5, 321:8, 321:21, 322:2, 322:5, 322:18, 322:22, 323:1, 323:5, 323:14, 323:16, 323:18, 323:24, 324:3, 324:8, 324:14, 324:15, 324:18, 324:22, 325:2, 333:14
**Dave's** [11] - 312:18, 313:5, 313:7, 318:4, 318:10, 318:14,

319:21, 321:7, 322:5, 322:13, 323:6
**DAVID** [2] - 290:7, 290:18
**David** [19] - 294:17, 294:23, 296:24, 298:7, 305:5, 306:18, 306:22, 310:12, 310:13, 311:7, 312:10, 319:4, 325:4, 329:24, 352:6, 352:9, 352:10, 352:15, 360:4
**Davis** [3] - 326:24, 327:7, 327:12
**DAY** [1] - 290:9
**day-long** [1] - 384:20
**day-to-day** [1] - 328:7
**days** [9] - 303:11, 305:18, 316:24, 317:15, 377:7, 377:8, 377:14, 377:18, 386:10
**DC** [1] - 290:25
**deal** [1] - 370:16
**dealt** [1] - 318:8
**decide** [1] - 412:13
**decided** [2] - 316:19, 324:18
**decimated** [3] - 378:9, 378:12, 378:18
**deep** [3] - 317:8, 363:14, 363:19
**Deepwater** [27] - 295:4, 300:21, 303:10, 305:14, 305:15, 308:7, 311:10, 312:19, 312:23, 315:3, 315:12, 322:19, 327:19, 327:20, 328:2, 353:10, 353:18, 353:24, 354:3, 360:7, 363:5, 363:13, 363:16, 363:21, 363:24, 364:5
**deepwater** [2] - 312:16, 363:4
**defendant** [37] - 294:23, 295:15, 295:16, 296:22, 297:12, 297:15, 297:18, 297:19, 297:22, 298:7, 298:12, 298:16, 298:25, 299:3, 299:7, 299:10, 299:21, 299:24,

300:2, 300:7, 303:25, 304:1, 304:7, 304:15, 307:14, 307:17, 307:19, 307:24, 308:14, 308:17, 308:22, 309:1, 309:3, 309:23, 309:24, 310:1
**Defendant** [1] - 297:4
**defendant's** [4] - 308:3, 308:11, 309:22, 310:16
**defense** [2] - 327:3, 330:5
**definitely** [1] - 381:6
**definitive** [2] - 294:1, 318:6
**defraud** [1] - 311:18
**degree** [4] - 312:5, 401:15, 406:19
**deleted** [2] - 403:14, 405:2
**deliberate** [1] - 294:4
**deliberately** [2] - 329:8, 329:14
**deliberations** [1] - 352:3
**deliver** [1] - 325:6
**demanding** [1] - 311:13
**demands** [1] - 311:16
**demeaned** [1] - 320:11
**depart** [1] - 370:25
**Department** [14] - 304:18, 304:20, 305:1, 326:20, 327:17, 327:22, 353:7, 353:19, 354:10, 354:23, 357:1, 357:7, 359:4, 361:17
**DEPARTMENT** [1] - 290:14
**department** [6] - 358:23, 359:16, 401:11, 403:22, 407:2, 407:4
**departments** [1] - 331:1
**depended** [2] - 303:17, 329:10
**depicted** [2] - 334:4, 335:15
**depicts** [1] - 396:3
**deposited** [1] - 379:23
**deposition** [1] - 310:14
**deputies** [1] - 315:24

**Deputy** [2] - 295:15, 311:14
**DEPUTY** [7] - 293:7, 325:25, 326:8, 351:7, 398:21, 399:4, 399:7
**deputy** [7] - 302:3, 328:3, 328:4, 328:5, 342:9, 360:6
**Derek** [2] - 342:8, 360:6
**describe** [1] - 364:10
**described** [4] - 368:24, 369:11, 370:3, 382:23
**describing** [2] - 297:5, 381:11
**designated** [1] - 295:11
**designed** [4] - 297:23, 306:5, 306:6, 372:8
**despite** [4] - 297:10, 297:11, 316:18, 318:9
**details** [2] - 347:6, 362:18
**determination** [1] - 392:14
**determine** [2] - 349:1, 404:7
**determined** [1] - 295:24
**determines** [1] - 405:22
**development** [1] - 306:13
**device** [1] - 352:12
**devices** [6] - 400:1, 402:25, 403:7, 403:16, 403:21, 405:6
**differences** [1] - 371:19
**different** [19] - 296:18, 307:20, 320:20, 320:22, 322:5, 335:18, 335:21, 368:24, 371:20, 377:21, 379:15, 380:5, 380:23, 381:14, 383:9, 400:7, 403:5, 403:19, 404:24
**digital** [26] - 399:16, 399:18, 400:4, 400:9, 400:11, 400:20, 400:23, 400:24, 401:4, 401:11, 401:18, 402:11, 402:15,

402:25, 403:17, 403:20, 404:12, 404:21, 405:5, 405:10, 405:16, 406:23, 409:8, 411:17, 412:2
**diminished** [1] - 320:5
**DIRE** [4] - 292:12, 292:14, 399:10, 410:19
**dire** [1] - 411:25
**DIRECT** [2] - 292:8, 326:14
**direct** [23] - 334:2, 334:7, 335:17, 336:7, 336:15, 336:21, 336:22, 337:12, 339:12, 354:17, 367:10, 371:16, 377:12, 379:7, 382:7, 387:11, 392:10, 393:9, 393:21, 394:25, 395:12, 396:13, 397:21
**directed** [1] - 364:22
**direction** [2] - 320:21, 409:7
**directly** [3] - 295:20, 316:17, 411:7
**director** [7] - 328:3, 328:4, 328:5, 342:9, 360:6, 400:22, 400:24
**directors** [1] - 328:4
**disagree** [1] - 317:23
**discharged** [2] - 295:6, 300:23
**discovered** [1] - 317:14
**discuss** [7] - 333:1, 350:25, 351:2, 398:12, 412:24, 413:11, 413:12
**discussed** [2] - 321:22, 360:25
**discussing** [4] - 334:14, 339:25, 347:17, 350:6
**discussion** [6] - 301:21, 316:7, 339:22, 347:18, 365:4, 413:2
**discussions** [2] - 340:19, 347:19
**dispute** [1] - 384:11
**disputing** [2] - 354:22, 354:25
**distinct** [1] - 312:2
**District** [8] - 294:15,

295:9, 298:6, 408:9, 414:6, 414:15
**DISTRICT** [3] - 290:1, 290:1, 290:10
**divide** [1] - 386:10
**division** [3] - 304:23, 327:18, 353:16
**Division** [2] - 294:18, 303:25
**document** [63] - 296:6, 299:6, 305:25, 306:1, 323:2, 323:4, 324:4, 332:10, 332:11, 333:15, 334:4, 335:4, 337:16, 337:23, 338:10, 345:12, 345:16, 348:5, 355:17, 358:20, 359:6, 360:11, 361:4, 361:7, 361:14, 362:10, 362:14, 364:22, 364:23, 364:24, 365:1, 365:8, 374:7, 374:24, 375:5, 375:12, 382:15, 382:23, 383:13, 383:15, 384:3, 386:8, 386:9, 386:13, 387:1, 388:22, 390:5, 390:8, 390:11, 390:12, 391:3, 391:7, 391:18, 391:19, 392:2, 392:7, 392:21, 394:17, 395:18, 395:25, 396:3
**documents** [22] - 309:16, 309:17, 309:19, 330:12, 330:15, 331:3, 331:5, 331:16, 343:5, 349:22, 349:23, 354:10, 354:12, 354:19, 354:20, 355:1, 371:12, 384:7, 387:3, 390:17, 390:21, 407:19
**Documents** [1] - 352:17
**dominated** [2] - 316:7, 322:4
**done** [31] - 304:10, 304:11, 307:12, 316:1, 322:7, 322:22, 324:5,

329:7, 341:13, 345:5, 345:6, 345:9, 348:8, 348:18, 358:14, 358:19, 359:2, 361:9, 369:5, 380:21, 384:22, 388:20, 393:17, 403:4, 404:20, 409:6, 409:10, 409:24, 410:12
**doors** [1] - 396:20
**double** [1] - 386:20
**doubt** [10] - 299:14, 299:23, 300:11, 304:15, 305:21, 314:23, 349:8, 393:19, 393:20
**Doug** [10] - 315:23, 317:19, 317:20, 321:9, 332:12, 332:16, 332:17, 333:1, 333:11, 372:14
**down** [12] - 316:17, 319:15, 324:2, 331:24, 343:24, 347:6, 353:3, 368:12, 379:20, 398:11, 412:16, 413:16
**dozen** [2] - 359:3, 359:21
**dozens** [2] - 329:22, 392:22
**draft** [3] - 390:9, 390:13, 390:14
**drafted** [3] - 360:11, 361:20, 396:19
**drawn** [1] - 380:14
**drill** [1] - 324:2
**drilling** [8] - 295:4, 295:5, 303:10, 305:15, 363:17, 363:21, 364:1, 364:2
**drive** [5] - 403:25, 404:6, 404:13, 404:22, 405:1
**driven** [1] - 329:12
**drives** [2] - 403:6, 404:21
**due** [1] - 352:12
**dull** [2] - 379:25, 380:16
**duly** [2] - 326:6, 399:2
**during** [41] - 293:18, 298:10, 300:14, 300:25, 302:8, 302:15, 304:6, 305:7, 306:1, 312:22, 313:3,

313:5, 313:7, 313:15, 313:19, 313:23, 315:5, 315:18, 322:8, 323:4, 323:7, 324:2, 340:22, 342:21, 344:2, 344:21, 347:10, 350:25, 351:2, 352:20, 358:10, 359:25, 360:22, 360:24, 379:3, 395:17, 398:12, 398:14, 405:13, 405:18, 407:21
**duty** [1] - 412:11

## E

**e-mail** [9] - 321:5, 332:12, 332:23, 333:2, 333:4, 333:7, 333:10, 333:16, 337:6
**e-mailing** [1] - 405:4
**e-mails** [3] - 310:9, 349:23, 397:21
**eager** [1] - 317:8
**early** [10] - 293:23, 295:18, 305:18, 305:22, 312:11, 313:24, 316:14, 317:14, 318:18, 339:6
**earth** [1] - 324:20
**easily** [1] - 347:21
**EASTERN** [1] - 290:1
**Eastern** [5] - 294:15, 295:9, 298:6, 408:9, 414:6
**Eddy** [11] - 379:11, 380:7, 380:10, 381:16, 381:18, 381:22, 381:24, 382:1, 382:2, 383:1, 383:4
**educated** [1] - 402:8
**education** [3] - 401:14, 402:7, 407:6
**effect** [2] - 297:21, 373:9
**efforts** [4] - 294:2, 295:20, 329:11, 329:12
**either** [4] - 340:12, 378:22, 379:19, 408:17
**electronic** [6] - 349:23, 396:4,

400:1, 402:25, 403:16, 405:6
**element** [1] - 299:14
**elements** [3] - 294:12, 299:23, 300:10
**elicited** [2] - 339:24, 406:2
**Ellen** [1] - 304:25
**elsewhere** [1] - 298:6
**emitted** [1] - 386:19
**employed** [3] - 326:21, 326:23, 327:15
**employee** [2] - 306:15, 310:10
**employees** [1] - 297:12
**EnCase** [2] - 401:21, 401:25
**ENCE** [1] - 401:20
**end** [10] - 293:24, 293:25, 297:17, 310:19, 325:5, 347:11, 351:25, 352:1, 385:19, 412:6
**energy** [1] - 294:25
**Energy** [1] - 337:20
**enforcement** [5] - 298:11, 299:25, 300:9, 408:21, 408:23
**engagement** [1] - 408:20
**ENGELHARDT** [1] - 290:10
**engineer** [3] - 297:23, 318:12, 392:4
**engineered** [3] - 314:15, 391:25, 392:12
**engineering** [1] - 314:20
**England** [1] - 295:1
**enter** [1] - 331:23
**enters** [2] - 293:8, 351:8
**entire** [4] - 354:15, 356:11, 360:14, 395:25
**entirely** [1] - 324:18, 387:4
**entirety** [1] - 302:24
**entitled** [1] - 414:9
**entry** [2] - 297:5, 300:5
**enumerated** [1] - 301:24
**environment** [1] - 315:25
**Environment** [1] -

337:21
**Environmental** [3] - 304:23, 342:11, 360:8
**EPA** [7] - 304:8, 304:23, 305:7, 308:10, 308:16, 308:23, 360:8
**EPA's** [2] - 303:24, 304:22
**equipment** [1] - 328:9
**errand** [2] - 317:5, 322:12
**error** [11] - 362:4, 363:9, 363:23, 364:9, 364:10, 364:11, 364:13, 364:15, 373:6, 374:4, 374:13
**errors** [7] - 361:22, 361:23, 361:24, 362:1, 362:2, 362:12, 375:18
**ESQ** [8] - 290:14, 290:15, 290:18, 290:22, 290:22, 290:23, 290:23, 290:24
**essentially** [2] - 392:1, 409:4
**establish** [1] - 299:13, 402:2
**established** [3] - 319:18, 320:2, 411:23
**estimate** [87] - 296:1, 296:6, 296:10, 296:13, 296:20, 296:24, 297:24, 298:13, 298:18, 305:19, 305:25, 306:2, 306:3, 306:5, 306:6, 306:9, 306:12, 306:15, 306:17, 306:18, 307:4, 307:18, 308:1, 308:19, 309:5, 310:1, 310:11, 311:19, 313:20, 314:4, 314:5, 314:7, 314:9, 314:16, 316:15, 316:20, 316:22, 316:23, 317:5, 318:6, 318:12, 319:17, 322:22, 323:2, 323:8, 324:10, 334:20, 334:21, 334:23, 335:2, 335:24,

335:25, 336:2, 336:5, 336:18, 337:3, 338:8, 338:9, 341:13, 341:15, 341:16, 341:19, 341:23, 341:24, 341:25, 345:9, 345:16, 346:16, 348:6, 348:16, 348:19, 349:2, 349:3, 349:5, 350:6, 379:16, 380:9, 385:20, 389:9, 390:2, 393:18, 409:25, 410:1, 410:9
**estimated** [1] - 318:18
**estimates** [76] - 297:2, 297:4, 297:11, 297:12, 297:14, 297:15, 297:16, 297:17, 297:18, 297:20, 297:22, 304:3, 304:4, 308:11, 309:25, 313:24, 314:19, 314:22, 315:3, 316:14, 318:4, 318:10, 318:18, 319:2, 319:9, 319:22, 320:3, 321:22, 322:13, 323:10, 329:3, 329:7, 329:8, 330:17, 330:18, 330:20, 331:6, 331:9, 333:17, 334:5, 334:11, 334:22, 335:16, 335:22, 336:15, 337:7, 337:8, 338:3, 339:5, 339:7, 339:10, 341:3, 341:5, 341:9, 341:13, 341:15, 341:17, 341:21, 341:22, 343:1, 344:7, 344:18, 345:5, 345:8, 345:14, 346:11, 346:15, 346:17, 346:18, 348:3, 376:5, 388:9, 389:23, 410:6
**Estimates** [2] - 295:18, 296:22
**estimation** [9] - 296:25, 300:18, 313:21, 321:6, 332:25, 368:6, 385:12, 386:2, 386:16

**estimations** [2] - 377:14, 385:8
**etcetera** [1] - 400:2
**European** [2] - 297:8, 319:19
**evening** [2] - 293:21, 315:9
**event** [1] - 302:22
**events** [3] - 300:20, 305:10, 370:22
**eventually** [5] - 312:9, 317:13, 339:16, 344:8, 347:15
**evidence** [36] - 299:2, 299:3, 299:11, 301:5, 301:13, 301:20, 301:25, 304:6, 304:14, 305:3, 305:12, 305:18, 306:11, 307:6, 307:14, 308:22, 308:25, 309:10, 309:13, 310:17, 310:20, 310:23, 310:24, 314:17, 314:24, 315:6, 323:21, 324:22, 356:6, 357:23, 392:13, 397:13, 399:18, 400:1, 400:6, 403:5
**evolve** [1] - 402:9
**exact** [2] - 319:24, 337:25
**exactly** [4] - 323:6, 329:22, 385:7, 409:1
**EXAMINATION** [34] - 292:8, 292:9, 292:10, 292:12, 292:13, 292:14, 326:14, 330:8, 331:13, 332:5, 338:25, 340:20, 345:20, 346:6, 353:1, 356:15, 358:8, 359:20, 371:7, 377:10, 382:24, 390:16, 391:2, 393:4, 394:2, 396:1, 397:9, 397:20, 397:24, 398:4, 399:10, 401:10, 406:10, 410:19
**examination** [7] - 351:4, 351:11, 352:24, 354:17, 382:7, 393:9, 402:2
**EXAMINATIONS** [1] - 292:3

**examine** [1] - 382:21
**examined** [4] - 326:7, 399:3, 403:24, 404:11
**Examiner** [1] - 401:21
**examiner** [1] - 400:20
**examiners** [1] - 402:13
**examining** [1] - 370:21
**example** [1] - 371:9
**exchange** [2] - 343:1, 352:9
**exchanged** [1] - 306:22
**exclamation** [1] - 333:14
**exclusively** [3] - 300:18, 354:3, 354:4
**excuse** [2] - 362:18, 406:19
**executive** [6] - 296:25, 298:8, 299:19, 307:9, 317:24, 372:15
**executives** [4] - 321:20, 329:19, 329:23
**exercise** [1] - 405:14
**exhibit** [7] - 301:8, 301:16, 302:13, 332:4, 337:13, 338:1, 358:4
**Exhibit** [13] - 301:18, 331:15, 332:7, 333:22, 333:25, 334:3, 337:13, 352:8, 382:20, 393:22, 395:21, 397:6
**Exhibits** [2] - 352:6, 352:18
**exhibits** [12] - 301:2, 301:3, 301:5, 301:12, 301:20, 301:24, 302:5, 302:12, 302:15, 352:20, 398:9
**exists** [1] - 364:14
**exit** [1] - 331:24
**expand** [2] - 397:19, 397:23
**expect** [1] - 293:22
**expected** [2] - 293:21, 294:5
**experience** [8] - 296:25, 297:10, 307:11, 317:22, 320:17, 344:25, 403:24, 404:3

**experienced** [1] - 317:24
**expert** [15] - 310:7, 320:23, 350:15, 401:1, 402:14, 402:18, 405:10, 405:13, 405:15, 405:23, 405:24, 406:6, 409:4, 412:2, 412:8
**expertise** [3] - 405:20, 406:2, 406:5
**experts** [5] - 321:2, 344:21, 345:2, 347:21, 405:18
**explain** [8] - 294:12, 340:16, 351:15, 376:16, 396:2, 400:3, 403:3, 405:12
**explained** [12] - 294:7, 298:23, 321:23, 325:12, 379:10, 382:11, 383:1, 383:14, 384:19, 384:23, 384:25, 385:11
**explanations** [1] - 310:16
**explicit** [1] - 373:18
**exploded** [1] - 303:10
**Exploration** [2] - 294:24, 312:14
**exploration** [2] - 312:15, 312:16
**explore** [2] - 363:2, 371:8
**explosion** [10] - 300:21, 312:25, 315:12, 353:4, 378:10, 378:12, 378:18, 378:24, 379:4
**extent** [9] - 329:13, 359:16, 361:23, 364:19, 375:18, 377:5, 377:8, 404:7
**extract** [2] - 396:4, 396:6
**extracting** [1] - 350:14
**extremely** [5] - 311:12, 369:21, 370:3, 370:5, 371:16

## F

**faced** [1] - 317:3
**facility** [3] - 315:24, 363:25, 364:6
**facing** [1] - 318:2

**fact** [19] - 298:15, 299:4, 300:22, 304:9, 304:11, 306:14, 309:7, 309:8, 318:7, 323:22, 351:19, 358:2, 359:9, 359:12, 359:13, 359:18, 378:12, 384:4, 409:18
**facts** [1] - 409:12
**factual** [1] - 391:17
**factually** [2] - 383:21, 383:23
**fair** [12] - 338:3, 344:5, 359:3, 360:15, 372:7, 379:21, 380:25, 385:14, 387:22, 391:19, 392:21, 409:16
**fairly** [3] - 357:6, 386:24, 407:5
**fairness** [1] - 349:7
**faith** [8] - 311:20, 313:7, 314:18, 314:23, 318:14, 319:14, 322:15, 329:7
**fall** [1] - 408:2
**false** [12] - 294:16, 298:2, 298:9, 299:17, 299:24, 300:3, 300:5, 300:7, 305:5, 313:19, 397:13, 398:1
**falsely** [1] - 298:12
**familiar** [3] - 302:7, 320:8, 343:7
**far** [4] - 322:5, 334:17, 360:18, 406:1
**fast** [2] - 308:6, 322:16
**fax** [1] - 397:1
**FBI** [37] - 303:24, 304:9, 305:7, 308:10, 308:16, 308:23, 311:21, 312:23, 313:4, 313:13, 314:9, 314:12, 315:5, 318:14, 318:16, 322:18, 323:7, 323:13, 323:18, 324:2, 324:9, 324:10, 325:3, 342:10, 355:11, 355:20, 355:22, 355:25, 356:2, 356:16, 357:21, 360:11, 393:7, 394:9, 408:18

**February** [1] - 353:14
**Federal** [1] - 360:15
**federal** [26] - 298:11, 299:25, 300:8, 303:18, 303:20, 304:24, 304:8, 304:13, 305:6, 305:23, 310:4, 314:5, 315:20, 317:18, 331:2, 353:17, 355:10, 357:5, 357:6, 366:19, 402:20, 402:21, 408:4, 408:18, 408:23
**feds** [1] - 359:21
**fell** [1] - 323:10
**few** [7] - 306:14, 307:16, 308:17, 313:23, 316:24, 410:18, 412:16
**fictitious** [2] - 298:9, 300:5
**field** [13] - 401:3, 401:4, 401:18, 401:22, 402:11, 402:15, 402:19, 402:24, 404:17, 405:10, 405:15, 407:5, 412:2
**figure** [7] - 330:19, 343:7, 346:8, 346:13, 346:14, 386:3, 389:25
**figured** [1] - 347:1
**figures** [1] - 380:10
**file** [2] - 354:16, 354:23
**files** [8] - 400:13, 404:12, 404:21, 404:22, 404:25, 405:2, 405:4
**filled** [1] - 322:21
**film** [4] - 401:17, 407:11, 407:15, 408:16
**final** [1] - 361:9
**finalized** [1] - 296:6
**finally** [4] - 307:21, 310:12, 335:9, 336:21
**fine** [4] - 359:17, 382:6, 401:16, 407:9
**finish** [1] - 293:24
**finished** [1] - 389:9
**finishes** [1] - 361:8
**fire** [1] - 315:13
**firm** [16] - 326:24, 326:25, 327:7, 327:11, 327:13,

342:13, 399:14, 399:17, 400:25, 402:13, 408:20, 408:22, 409:24, 410:21, 411:9
**firms** [1] - 410:25
**first** [30] - 293:11, 294:7, 299:24, 302:19, 307:18, 309:4, 319:1, 320:21, 325:11, 325:17, 326:6, 328:6, 339:8, 341:12, 347:2, 349:9, 351:23, 352:4, 359:23, 360:1, 362:25, 374:9, 374:14, 374:16, 391:20, 399:2, 405:14, 409:9, 411:4
**five** [2] - 360:21, 366:25
**fix** [1] - 374:3
**floating** [2] - 297:3, 318:19
**Flow** [2] - 295:18, 296:22
**flow** [110] - 296:6, 298:13, 298:15, 298:17, 300:19, 303:15, 303:22, 304:2, 304:3, 304:4, 304:9, 304:11, 305:17, 305:19, 305:25, 306:3, 306:10, 307:3, 307:5, 307:12, 307:16, 307:18, 307:21, 307:24, 308:4, 308:9, 308:11, 308:15, 308:19, 309:22, 311:18, 313:20, 313:21, 313:24, 314:2, 314:3, 314:9, 314:22, 315:3, 316:7, 316:8, 316:11, 316:15, 316:19, 316:22, 316:25, 317:3, 317:4, 317:10, 317:13, 317:16, 318:8, 318:10, 318:18, 319:9, 319:11, 320:16, 321:18, 321:22, 322:3, 322:10, 322:23, 324:10, 324:16, 328:15,

328:17, 328:18, 328:22, 329:2, 329:3, 329:5, 329:7, 329:9, 329:11, 329:13, 329:16, 330:17, 330:18, 330:20, 330:22, 330:25, 331:6, 332:25, 333:17, 333:24, 334:5, 335:16, 339:5, 341:2, 341:5, 341:8, 341:13, 341:19, 341:25, 343:1, 343:8, 344:4, 344:18, 345:14, 346:18, 349:23, 353:15, 375:21, 376:5, 376:25, 377:13, 388:24, 392:15
**flowing** [7] - 296:1, 303:12, 303:14, 305:16, 316:1, 317:11, 378:25
**flown** [1] - 380:12
**focus** [6] - 322:20, 323:23, 340:1, 342:3, 368:14, 374:7
**focused** [5] - 303:20, 308:9, 348:24, 364:16, 374:7
**focusing** [1] - 374:9
**folder** [3] - 352:15, 352:16, 354:20
**folders** [3] - 352:15, 352:17, 355:2
**follow** [1] - 345:21
**follow-up** [1] - 345:21
**following** [4] - 299:23, 301:5, 301:15, 391:20
**follows** [2] - 326:7, 399:3
**fool's** [2] - 317:5, 322:12
**FOR** [2] - 290:14, 290:18
**Force** [13] - 327:19, 327:21, 328:2, 353:10, 353:12, 353:13, 353:15, 355:15, 360:5, 360:7, 360:15, 375:11, 378:15
**force** [6] - 328:6, 328:8, 339:20, 342:9, 342:17, 350:12
**foregoing** [1] - 414:7

**forensic** [21] - 349:25, 350:12, 396:4, 399:25, 400:4, 400:20, 401:4, 401:19, 401:23, 402:2, 402:11, 402:15, 402:25, 403:10, 403:17, 403:20, 405:5, 405:11, 405:16, 411:18, 412:2
**forensics** [10] - 310:8, 399:17, 400:5, 400:7, 400:9, 400:23, 400:24, 401:11, 406:23, 409:9
**foreperson** [1] - 298:20
**Form** [2] - 393:7, 394:9
**form** [5] - 319:3, 344:14, 344:15, 365:5, 402:7
**formal** [2] - 299:6, 355:17
**format** [1] - 400:13
**former** [6] - 326:19, 369:4, 408:17, 408:22, 408:23
**formula** [1] - 384:9
**forth** [1] - 298:4
**forward** [6] - 308:6, 322:16, 325:22, 353:18, 363:12, 398:18
**forwarded** [2] - 333:18
**foundation** [2] - 340:11, 340:16
**four** [8] - 335:13, 349:7, 361:18, 366:25, 383:8, 409:25, 410:3, 410:8
**fourth** [1] - 300:7
**Fragale** [1] - 360:4
**frankly** [2] - 317:7, 318:5
**fraud** [1] - 353:16
**fraudulent** [3] - 298:10, 299:18, 300:5
**free** [1] - 413:16
**Friedberg** [8] - 399:14, 399:15, 399:16, 399:20, 400:14, 410:21, 411:1, 411:13
**front** [4] - 337:13, 337:15, 383:13, 389:2

**FRTG** [1] - 352:16
**full** [14] - 294:14, 313:12, 315:16, 321:24, 355:4, 362:17, 362:25, 364:21, 366:25, 375:20, 378:7, 392:20, 408:17
**full-day** [1] - 355:4
**fullest** [1] - 404:7
**fully** [1] - 298:7
**function** [1] - 378:1
**fundamentally** [1] - 311:7
**funny** [2] - 374:25, 375:5
**FURTHER** [1] - 292:14

## G

**G-E-S-S-E-R** [1] - 326:11
**gas** [2] - 295:3, 295:25
**gather** [1] - 319:2
**gathering** [2] - 350:13, 392:13
**general** [5] - 343:8, 349:20, 400:3, 404:19, 407:7
**generally** [11] - 297:6, 323:9, 328:16, 328:23, 334:3, 347:7, 392:14, 393:7, 400:5, 403:3, 411:20
**generate** [1] - 344:14
**generated** [2] - 304:5, 304:12
**generating** [1] - 329:6
**gentlemen** [6] - 303:9, 304:13, 311:6, 324:25, 331:21, 351:1
**gently** [1] - 331:21
**geologist** [2] - 307:10, 312:9
**geology** [1] - 312:6
**GESSER** [1] - 326:5
**Gesser** [41] - 325:19, 325:21, 325:22, 326:10, 326:18, 326:19, 328:1, 331:14, 332:6, 332:22, 333:21, 335:5, 335:15, 336:4, 336:21, 337:16, 338:8, 339:1, 339:21, 340:21, 342:3,

345:3, 345:18, 346:7, 348:10, 348:22, 349:7, 349:17, 350:23, 351:4, 351:13, 352:24, 358:9, 376:18, 382:9, 382:11, 393:6, 394:3, 396:2, 397:10, 398:5
**GESSER...................
.............** [1] - 292:7
**given** [4] - 320:16, 393:13, 405:15, 413:12
**glass** [1] - 338:21
**God** [2] - 326:3, 398:24
**Goodyear** [2] - 355:15, 360:8
**Google** [1] - 307:15
**Government** [23] - 295:10, 298:8, 299:6, 299:22, 301:5, 301:8, 301:16, 301:18, 302:19, 310:18, 315:19, 331:15, 332:6, 333:22, 333:24, 334:2, 337:13, 352:5, 352:8, 393:21, 395:22, 397:6
**government** [50] - 298:24, 299:13, 299:19, 300:10, 304:14, 306:19, 309:15, 314:4, 314:5, 317:8, 317:18, 325:12, 327:6, 327:15, 330:18, 330:22, 330:23, 331:2, 331:8, 341:4, 341:6, 341:8, 346:18, 355:7, 355:18, 356:19, 358:2, 361:16, 366:12, 375:15, 394:20, 394:22, 398:16, 405:9, 408:6, 408:9, 409:5, 409:8, 409:11, 409:15, 409:24, 410:4, 410:22, 410:23, 411:2, 411:6, 411:7, 411:17, 411:19, 411:20
**government's** [1] - 343:15

**Government's** [3] - 321:2, 352:17, 395:21
**grad** [1] - 407:23
**graduate** [1] - 407:21
**graduated** [2] - 406:14, 407:15
**graduation** [1] - 312:8
**Grand** [1] - 294:20
**grand** [2] - 298:20, 299:5
**great** [2] - 316:2, 397:3
**Great** [1] - 306:19
**group** [7] - 321:19, 321:21, 327:2, 327:22, 330:17, 334:22, 387:3
**growing** [1] - 316:24
**Guard** [19] - 295:13, 308:5, 308:12, 315:20, 315:22, 319:3, 331:9, 332:13, 333:19, 337:9, 339:3, 344:10, 344:15, 365:1, 365:10, 377:13, 381:19, 381:22, 390:18
**guess** [18] - 297:16, 297:21, 308:1, 308:4, 308:11, 308:19, 334:23, 335:25, 336:19, 337:4, 364:8, 389:14, 390:2, 390:3, 390:6, 390:19, 390:22
**guessing** [1] - 366:13
**guesswork** [1] - 318:24
**guilt** [1] - 299:12
**guilty** [5] - 299:3, 299:21, 304:16, 310:25, 325:7
**Gulf** [17] - 294:24, 295:6, 295:7, 296:2, 296:12, 300:23, 303:10, 303:11, 312:14, 312:17, 313:25, 315:11, 316:1, 318:2, 318:19, 327:25, 363:19
**GX** [2] - 356:5, 357:24, 358:4

## H

**hacked** [1] - 399:22
**Hale** [1] - 411:10
**half** [5] - 325:16, 337:15, 359:3, 359:21, 363:4
**hand** [10] - 320:24, 326:1, 334:8, 334:18, 335:9, 388:22, 397:6, 397:7, 397:12, 398:22
**handle** [1] - 317:22
**handled** [2] - 313:23, 357:3
**handling** [2] - 318:1, 351:12
**hands** [1] - 303:16
**handwriting** [1] - 336:10
**handwritten** [4] - 335:7, 351:23, 352:4, 369:17
**hard** [13] - 341:22, 371:3, 374:12, 375:1, 377:4, 403:6, 403:25, 404:6, 404:13, 404:21, 404:22, 405:1, 409:16
**HB406** [1] - 291:4
**head** [1] - 389:24
**heading** [1] - 333:2
**headquartered** [2] - 294:25, 295:8
**headquarters** [1] - 312:10
**hear** [18] - 302:21, 305:12, 308:8, 309:18, 310:3, 310:7, 310:9, 310:12, 310:15, 310:18, 313:22, 316:21, 318:25, 319:7, 324:22, 340:16, 346:2, 413:4
**HEARD** [1] - 290:10
**heard** [5] - 310:19, 315:19, 319:21, 382:8, 406:1
**hearsay** [2] - 356:8, 357:25
**heavily** [2] - 296:24, 297:24
**HEBERLIG** [4] - 290:22, 301:21, 311:4, 311:6
**Heberlig** [3] - 302:21,

325:10, 360:3
**HEBERLIG**................
..... [1] - 292:6
**held** [3] - 312:13,
320:23, 400:19
**helicopter** [4] -
379:19, 381:5,
381:6, 381:10
**hello** [1] - 326:18
**help** [6] - 317:19,
326:3, 366:4,
366:12, 398:24,
402:12
**helping** [2] - 350:15,
390:14
**Henry** [2] - 319:6,
320:22
**Herberlig** [2] - 311:2,
312:1
**hereby** [1] - 414:6
**herein** [1] - 298:4
**hesitate** [1] - 333:1
**hide** [3] - 311:23,
314:16, 318:15
**hiding** [2] - 319:13,
321:1
**high** [16] - 297:17,
306:7, 334:21,
336:1, 336:19,
337:4, 385:1, 385:4,
385:17, 385:22,
389:12, 390:1,
390:4, 390:6,
390:19, 390:22
**high-end** [1] - 297:17
**higher** [5] - 317:1,
320:15, 321:11,
321:23, 378:9
**highest** [1] - 295:17
**highlight** [3] - 332:9,
393:25, 395:24
**highly** [4] - 296:13,
317:24, 318:7, 321:3
**himself** [8] - 307:25,
309:23, 324:19,
344:17, 344:20,
366:18, 366:23,
382:22
**hindsight** [1] - 316:10
**hired** [1] - 411:13
**hiring** [1] - 328:9
**historical** [1] - 407:19
**Historical** [1] - 407:19
**history** [4] - 310:9,
312:16, 323:23,
404:1
**hits** [1] - 319:25
**hold** [4] - 320:6,
356:13, 401:15,
401:20

**home** [2] - 315:9,
325:8
**honest** [6] - 311:7,
314:19, 318:10,
321:25, 325:4, 364:7
**honestly** [2] - 313:17,
358:12
**Honor** [32] - 301:4,
301:15, 301:22,
303:6, 311:4,
325:20, 326:12,
331:11, 331:17,
340:10, 345:24,
350:18, 352:25,
356:7, 357:23,
357:25, 372:12,
382:5, 393:1, 393:3,
397:14, 398:7,
398:10, 398:16,
401:2, 401:6, 401:9,
405:9, 406:9,
410:18, 411:24,
412:17
**HONORABLE** [1] -
290:10
**hope** [1] - 293:16
**hoping** [2] - 340:1,
341:1
**Horizon** [28] - 295:4,
300:21, 303:10,
305:14, 305:15,
308:7, 311:10,
312:19, 312:23,
315:3, 315:12,
322:19, 327:19,
327:20, 328:2,
353:10, 353:18,
353:24, 354:3,
360:7, 363:5,
363:13, 363:16,
363:21, 363:24,
364:5, 364:11
**horrible** [1] - 311:10
**Houma** [2] - 365:9,
365:11
**hour** [5] - 293:18,
325:16, 410:11,
412:20, 413:13
**hours** [9] - 306:14,
307:1, 307:16,
307:22, 347:14,
409:18, 410:1,
410:2, 410:7
**house** [1] - 343:15
**House** [1] - 337:20
**housekeeping** [2] -
293:11, 294:10
**Houston** [10] - 312:10,
312:11, 315:9,
321:18, 321:20,

363:3, 363:4,
363:12, 371:18,
372:3
**hundred** [1] - 403:19
**hung** [1] - 332:2
**hybrid** [6] - 373:3,
373:15, 384:6,
384:8, 384:23,
384:24

## I

**Ian** [1] - 312:7
**ICS-209** [2] - 319:3,
344:15
**idea** [4] - 321:6, 336:4,
378:14, 384:23
**identical** [1] - 368:24
**identified** [3] - 358:5,
380:15, 380:18
**identify** [3] - 330:3,
350:3, 390:12
**imaged** [1] - 396:6
**images** [2] - 349:25,
350:12
**immediately** [2] -
303:13, 315:14
**important** [17] -
300:25, 305:10,
308:4, 322:4,
322:10, 329:9,
342:1, 346:23,
349:13, 361:14,
369:21, 370:2,
370:3, 371:16,
373:6, 374:4, 374:24
**imprecise** [3] - 318:7,
346:22, 385:12
**inaccurate** [6] -
369:12, 369:14,
373:10, 375:6,
377:7, 397:17
**incident** [6] - 311:11,
312:19, 312:23,
313:2, 315:8, 322:19
**Incident** [4] - 295:15,
311:14, 372:17,
372:21
**include** [2] - 390:6,
403:6
**included** [7] - 331:8,
333:4, 354:12,
354:15, 354:16,
377:13, 389:24
**including** [9] - 295:22,
297:6, 306:13,
311:11, 319:19,
330:14, 365:12,
412:8, 412:12

**inconsistency** [4] -
391:8, 391:10,
391:17, 391:21
**incorporated** [1] -
298:4
**incorrect** [10] -
368:11, 368:12,
372:6, 375:24,
376:11, 376:20,
383:16, 383:17,
383:18, 383:23
**incorrectly** [2] - 362:6,
369:3
**increased** [2] - 329:4,
339:5
**independence** [2] -
308:18, 341:10
**independent** [4] -
304:4, 304:10,
309:12, 341:6
**independently** [1] -
341:18
**indicated** [1] - 339:4
**indicates** [1] - 384:3
**indictment** [13] -
294:11, 294:14,
294:16, 294:21,
298:1, 298:20,
298:23, 299:1,
299:5, 299:9,
299:10, 310:25,
340:14
**individual** [2] -
350:11, 404:8
**indulgence** [3] -
350:9, 395:22, 397:4
**inference** [1] - 299:12
**info** [1] - 333:11
**inform** [1] - 299:10
**information** [26] -
297:1, 317:3, 318:5,
319:22, 320:10,
330:21, 334:3,
339:23, 341:4,
341:7, 343:2,
344:16, 364:24,
372:7, 375:6, 396:3,
397:11, 400:1,
400:10, 400:11,
403:12, 403:13,
405:3, 412:3, 412:9,
412:10
**initial** [7] - 310:10,
316:23, 319:25,
321:7, 329:5,
333:11, 342:25
**input** [3] - 295:25,
347:23, 377:23
**inputs** [11] - 319:8,
319:10, 319:15,

330:20, 341:3,
344:6, 344:9,
344:13, 344:16,
344:25, 347:21
**instead** [1] - 366:5
**instructed** [1] - 343:13
**instruction** [3] -
300:13, 300:16,
412:6
**insufficient** [1] -
329:16
**integrity** [1] - 311:8
**intellectual** [1] -
399:24
**intense** [1] - 315:25
**intent** [3] - 311:24,
314:14, 325:3
**intentionally** [1] -
300:3
**interest** [3] - 348:10,
404:22, 404:25
**interested** [2] -
341:17, 391:24
**interesting** [1] - 370:6
**internal** [4] - 340:13,
391:10, 399:23,
402:12
**Internet** [12] - 297:1,
297:4, 307:14,
307:17, 310:9,
319:24, 320:7,
330:15, 366:11,
379:11, 403:25,
404:9
**interpreted** [3] -
380:21, 388:18,
388:19
**interview** [76] -
298:11, 304:7,
305:7, 310:5,
312:22, 313:4,
313:7, 313:10,
313:11, 313:13,
313:15, 313:19,
314:12, 315:5,
318:15, 322:17,
322:19, 322:21,
322:25, 323:4,
323:7, 323:13,
323:24, 324:3,
329:19, 330:9,
339:13, 339:16,
339:21, 340:2,
340:23, 342:2,
342:4, 342:7,
342:15, 342:16,
342:21, 344:2,
347:10, 347:13,
349:14, 349:15,
349:17, 350:5,

355:4, 355:18,
356:16, 356:19,
356:22, 356:25,
357:11, 357:13,
357:17, 357:19,
358:10, 359:5,
359:25, 360:10,
361:17, 362:21,
371:5, 371:12,
373:9, 373:22,
374:21, 375:7,
382:6, 382:14,
384:20, 386:25,
388:22, 389:22,
392:20, 395:17
**interviewed** [12] -
303:25, 308:16,
311:21, 318:16,
322:18, 323:17,
339:18, 353:22,
354:20, 355:3,
370:23, 392:22
**interviewer** [3] -
365:19, 375:21,
376:25
**interviews** [1] - 347:2
**introduce** [3] - 304:19,
309:17, 326:16
**introducing** [1] -
325:14
**introductory** [1] -
362:21
**intrusion** [1] - 399:22
**invented** [1] - 307:25
**investigated** [1] -
327:5
**investigating** [3] -
327:23, 349:4, 408:6
**investigation** [16] -
298:12, 303:19,
303:20, 303:24,
308:7, 308:8,
308:10, 308:24,
328:10, 328:11,
329:9, 329:18,
330:24, 339:3,
339:4, 339:12
**investigations** [5] -
328:12, 399:17,
399:23, 408:7, 408:9
**investigative** [1] -
304:23
**Investigative** [1] -
303:25
**investigators** [1] -
411:21
**invited** [1] - 358:17
**involved** [8] - 318:10,
329:6, 339:10,
349:21, 357:4,

409:10, 411:4,
411:22
**involvement** [3] -
383:1, 409:8, 411:15
**involves** [1] - 312:21
**Ireland** [1] - 312:5
**irrelevant** [1] - 364:15
**issue** [17] - 315:4,
316:9, 316:12,
316:13, 316:19,
322:4, 322:10,
322:11, 329:2,
344:19, 346:4,
347:14, 347:22,
349:13, 349:15,
353:18, 373:18
**issued** [2] - 295:25,
305:20
**issues** [11] - 299:4,
316:4, 318:1, 340:1,
340:9, 347:9,
352:12, 353:15,
361:3, 361:10,
361:11
**itself** [8] - 299:1,
300:21, 367:25,
384:13, 386:8,
386:9, 387:4, 411:15

# J

**James** [1] - 332:15
**Janet** [1] - 312:6
**Jeff** [1] - 350:16
**JEFFREY** [3] - 292:11,
399:1, 399:9
**Jeffrey** [2] - 398:17,
399:9
**JESSICA** [1] - 290:24
**job** [4] - 312:15,
315:16, 354:4,
407:21
**JOHNSON** [1] -
290:21
**joined** [1] - 342:14
**JONES** [1] - 290:18
**judge** [2] - 305:5,
356:8
**JUDGE** [1] - 290:10
**judgment** [1] - 379:21
**judgments** [1] -
379:25
**judicial** [1] - 299:19
**July** [3] - 352:14,
411:4, 411:15
**June** [3] - 303:18,
360:8, 353:20
**JUNE** [2] - 290:6,
293:2

**jurisdiction** [3] -
298:7, 299:18, 300:1
**juror** [1] - 324:25
**Jury** [1] - 294:20
**JURY** [1] - 290:9
**jury** [36] - 293:8,
298:20, 299:4,
299:5, 302:4, 303:9,
304:13, 326:17,
328:17, 331:21,
331:24, 332:3,
332:23, 333:8,
335:23, 336:16,
337:1, 351:1, 351:5,
351:8, 351:16,
394:3, 396:3,
397:23, 398:9,
399:13, 400:3,
401:14, 401:24,
403:3, 403:9, 404:3,
404:20, 405:12,
412:21, 413:6
**Justice** [14] - 304:18,
304:21, 305:1,
326:20, 327:18,
327:22, 353:7,
353:19, 354:10,
354:23, 357:1,
357:7, 359:4, 361:17
**JUSTICE** [1] - 290:14
**justification** [1] -
385:16
**justifications** [1] -
310:16
**Justin** [2] - 355:15,
360:7

# K

**Katie** [3] - 304:24,
342:14, 360:9
**keep** [3] - 300:25,
373:25, 382:5
**Keith** [3] - 306:16,
352:9, 372:22
**key** [3] - 323:23,
330:16, 339:4
**kind** [6] - 318:6, 345:1,
367:2, 387:16,
399:19
**kinds** [3] - 344:22,
403:5, 404:24
**Kirstie** [1] - 312:7
**knowing** [3] - 297:11,
300:3, 345:6
**knowingly** [2] - 298:9,
299:17
**knowledge** [1] -
370:15

**known** [7] - 296:8,
297:3, 317:13,
318:7, 319:3,
319:19, 319:20
**knows** [2] - 344:22,
373:25
**KURT** [1] - 290:10

# L

**L.1** [1] - 352:6
**L.2** [1] - 352:6
**LA** [1] - 291:5
**labeled** [4] - 297:18,
352:16, 384:7
**laboratory** [1] -
400:23
**ladies** [6] - 303:8,
304:12, 311:6,
324:24, 331:21,
351:1
**laid** [4] - 380:1,
384:19, 384:21
**landed** [1] - 307:24
**Landry** [7] - 315:22,
316:22, 317:4,
317:19, 332:14,
332:20, 332:24
**lane** [1] - 381:3
**laptop** [1] - 343:21
**last** [20] - 293:17,
324:7, 376:5, 376:6,
376:11, 376:20,
377:14, 377:18,
378:6, 378:7, 378:8,
387:24, 394:4,
394:25, 395:2,
397:7, 397:16,
411:5, 411:6
**lasted** [1] - 313:11
**latest** [1] - 293:23
**launched** [1] - 303:19
**law** [13] - 298:11,
299:25, 300:8,
326:24, 327:1,
327:3, 327:7,
327:13, 408:21,
408:23, 410:25,
411:9
**lawyer** [1] - 326:20
**lawyers** [5] - 327:22,
342:13, 343:23,
410:4, 411:21
**lay** [1] - 340:11
**lead** [1] - 304:22
**Leader** [1] - 363:3
**leading** [2] - 300:20,
351:17
**leak** [1] - 295:21

**leaking** [5] - 295:19,
295:24, 328:19,
328:24, 334:15
**leaning** [1] - 320:18
**leanings** [1] - 321:7
**learn** [22] - 303:18,
303:23, 305:22,
306:4, 306:9,
306:11, 306:12,
306:14, 306:19,
307:16, 307:19,
308:3, 308:15,
309:6, 309:11,
340:1, 345:13,
376:12, 395:6,
395:8, 395:9, 395:10
**learned** [13] - 308:10,
309:3, 320:10,
341:3, 344:6, 345:7,
346:10, 349:9,
367:2, 387:16,
393:15, 393:17,
395:17
**learning** [3] - 296:23,
307:2, 347:3
**leased** [1] - 295:4
**least** [4] - 293:23,
341:24, 350:11,
359:3
**leave** [1] - 332:1
**leaves** [2] - 351:5,
413:6
**led** [5] - 295:13, 297:4,
305:10, 315:20,
315:22
**left** [7] - 293:17, 294:6,
334:8, 335:9,
335:24, 397:6,
397:12
**left-hand** [4] - 334:8,
335:9, 397:6, 397:12
**legislative** [1] - 299:19
**legitimate** [2] -
314:19, 318:11
**Lehr** [32] - 314:1,
314:2, 320:23,
320:25, 321:2,
321:5, 323:3, 368:2,
368:6, 368:22,
368:23, 369:5,
369:9, 369:10,
369:12, 369:13,
369:14, 369:18,
371:11, 371:14,
371:15, 372:1,
373:3, 378:7,
386:13, 387:1,
387:25, 388:1,
388:3, 388:6,
389:16, 389:18

**Lehr's** [4] - 367:23, 389:2, 392:8, 392:11
**length** [1] - 293:21
**LEO** [1] - 290:14
**Leo** [1] - 304:17
**less** [1] - 307:22
**letter** [3] - 337:19, 390:13, 390:14
**letting** [1] - 307:23
**level** [1] - 306:7
**liar** [1] - 325:4
**liberal** [2] - 407:2, 407:6
**lie** [13] - 305:11, 309:6, 309:14, 311:22, 313:8, 314:12, 314:25, 315:6, 315:7, 324:19, 392:15
**lied** [8] - 304:7, 304:8, 304:10, 308:23, 314:8, 322:22, 324:8, 324:10
**life** [2] - 315:11, 324:21
**light** [2] - 380:6, 397:17
**likely** [1] - 341:24
**Limited** [1] - 295:14
**limited** [1] - 395:13
**limiting** [2] - 300:12, 300:16
**line** [1] - 322:14
**listen** [1] - 293:14
**listening** [1] - 361:1
**litigation** [2] - 295:22, 327:2
**LIU** [1] - 290:23
**lived** [1] - 312:11
**located** [2] - 312:10, 330:15
**London** [1] - 295:1
**look** [21] - 307:5, 333:2, 338:6, 359:23, 362:9, 362:10, 362:25, 364:18, 364:21, 366:12, 366:24, 369:16, 374:1, 374:8, 375:20, 379:20, 386:21, 389:6, 398:9, 404:6, 404:12
**looked** [6] - 337:25, 338:9, 380:22, 382:15, 403:5, 403:11
**looking** [15] - 328:13, 329:1, 329:4, 331:5, 339:7, 341:21,

343:6, 349:24, 350:1, 374:13, 378:19, 404:9, 404:21, 404:22
**looks** [2] - 380:4, 396:5
**Loughnane** [3] - 304:24, 342:14, 360:9
**Louisiana** [9] - 294:16, 295:9, 298:6, 315:24, 321:17, 414:5, 414:6
**LOUISIANA** [4] - 290:1, 290:5, 290:16, 290:19
**low** [21] - 329:5, 329:8, 329:17, 334:11, 335:24, 336:18, 337:3, 339:9, 339:11, 349:3, 349:5, 382:2, 382:4, 385:17, 385:20, 389:10, 390:1, 390:4, 390:6, 390:18, 390:22
**lunch** [4] - 293:18, 412:15, 412:18, 413:13
**luncheon** [1] - 413:20
**LUNCHEON** [1] - 292:15
**lying** [2] - 304:13, 305:7

# M

**Macondo** [10] - 295:5, 295:7, 295:20, 295:24, 296:2, 298:14, 298:18, 305:16, 327:24, 328:19
**Magistrate** [1] - 294:18
**Magner** [5] - 312:1, 406:4, 406:8, 410:17, 412:4
**MAGNER** [4] - 290:18, 406:9, 406:11, 410:14
**MAGNER.................**
[1] - 292:13
**magnitude** [1] - 296:14
**mail** [9] - 321:5, 332:12, 332:23, 333:2, 333:4, 333:7, 333:10, 333:16, 337:6

**mailing** [1] - 405:4
**mails** [3] - 310:9, 349:23, 397:21
**maintained** [1] - 354:4
**majority** [1] - 410:23
**man** [7] - 311:7, 311:8, 319:6, 325:4, 325:7, 376:2
**man's** [1] - 350:16
**managed** [1] - 408:22
**management** [3] - 321:17, 327:10, 399:16
**managers** [1] - 408:20
**Manhattan** [1] - 402:22
**manipulate** [1] - 324:16
**manipulated** [1] - 297:20
**manner** [2] - 297:22, 299:18
**map** [1] - 318:22
**maps** [3] - 380:14, 380:15, 380:20
**March** [1] - 353:14
**mark** [2] - 302:22, 376:15
**marked** [4] - 331:14, 352:5, 352:17, 395:20
**Mary** [2] - 315:22, 316:22
**Mass** [2] - 352:16, 364:23
**mass** [7] - 296:8, 296:10, 297:3, 297:6, 297:11, 354:15, 354:23
**Massachusetts** [2] - 406:17, 406:18
**Master's** [2] - 401:16, 407:9
**match** [2] - 318:12, 405:1
**matched** [2] - 308:2, 349:5
**mate** [1] - 359:22
**material** [4] - 300:4, 300:6, 354:16, 402:2
**materially** [1] - 298:9
**materials** [4] - 339:2, 349:18, 349:19, 349:20
**Materials** [1] - 297:7
**matter** [21] - 294:10, 298:7, 299:25, 302:5, 305:2, 312:3, 317:11, 341:10, 341:20, 349:20,

353:24, 358:12, 358:18, 359:7, 367:10, 400:3, 404:19, 405:7, 409:19, 409:21, 414:9
**matters** [1] - 409:9
**Matthew** [1] - 360:4
**mean** [10] - 327:4, 327:9, 328:5, 363:15, 363:16, 363:22, 370:20, 388:18, 388:19, 402:16
**meaning** [1] - 362:2
**means** [3] - 298:24, 327:5, 327:10
**meant** [3] - 306:2, 373:24, 373:25
**meantime** [1] - 412:24
**measure** [1] - 316:17
**measured** [1] - 328:22
**measurement** [2] - 328:23, 334:15
**MECHANICAL** [1] - 291:7
**media** [1] - 403:1
**medium** [3] - 385:24, 390:22, 400:12
**meet** [1] - 311:15
**meeting** [4] - 333:12, 333:13, 370:23, 382:23
**member** [3] - 326:19, 330:16, 332:18
**members** [18] - 326:16, 328:16, 331:8, 332:13, 332:22, 333:8, 333:19, 335:23, 336:16, 337:1, 339:22, 360:15, 370:11, 375:11, 394:3, 396:2, 397:23, 403:22
**memo** [6] - 313:14, 313:15, 375:15, 387:1, 389:2, 397:1
**memorialized** [1] - 382:20
**memory** [5] - 323:11, 323:18, 324:4, 373:18, 391:12
**memos** [1] - 349:24
**men** [1] - 311:11
**mental** [1] - 346:25
**mentioned** [3] - 360:6, 375:21, 376:25
**MERIT** [1] - 291:4
**Merit** [2] - 414:4,

414:14
**message** [13] - 306:16, 307:23, 309:20, 323:14, 323:16, 323:18, 352:9, 386:7, 396:17, 396:21, 397:12, 397:18, 403:13
**messages** [19] - 306:20, 306:23, 306:25, 307:2, 309:2, 309:21, 350:2, 350:3, 350:5, 350:7, 350:14, 352:11, 396:5, 396:7, 396:8, 396:9, 397:25, 403:8, 403:14
**met** [1] - 312:6
**Metcalf** [11] - 379:11, 380:7, 380:9, 381:16, 381:18, 381:22, 381:24, 382:1, 382:2, 383:1, 383:3
**meter** [1] - 316:17
**method** [4] - 297:7, 297:8, 307:24, 388:11
**methodologies** [3] - 296:8, 296:10, 297:6
**methodology** [7] - 296:15, 318:20, 321:3, 377:2, 377:9, 379:8, 385:16
**methods** [8] - 297:14, 307:20, 367:13, 367:20, 368:5, 368:15, 368:22
**Mexico** [16] - 294:24, 295:6, 295:7, 296:2, 296:12, 300:23, 303:10, 312:14, 312:17, 313:25, 315:11, 316:1, 318:2, 318:19, 327:25, 363:19
**MFA** [1] - 407:8
**MICHAEL** [1] - 290:18
**Michael** [1] - 312:1
**middle** [7] - 311:13, 311:17, 334:23, 335:25, 342:14, 411:5, 411:6
**might** [8] - 316:25, 362:4, 388:17, 400:11, 400:12, 404:8, 412:15, 413:4
**miles** [1] - 379:22

**mind** [3] - 301:1, 309:9, 349:8
**minor** [2] - 316:9, 361:11
**minute** [5] - 302:23, 311:25, 312:19, 318:17, 320:24
**minutes** [11] - 302:18, 302:20, 322:21, 325:16, 350:21, 373:17, 395:16, 412:16, 412:19, 412:21, 413:9
**misdescribed** [1] - 369:4
**mislead** [1] - 311:18
**misleading** [1] - 300:8
**missed** [1] - 374:5
**missing** [2] - 324:12, 361:3
**misspoke** [3] - 373:9, 373:16, 373:24
**mistake** [1] - 362:5
**mistakes** [1] - 362:1
**mobile** [1] - 403:7
**models** [1] - 403:12
**modification** [1] - 405:3
**moment** [1] - 364:7
**monitor** [1] - 393:25
**month** [1] - 328:21
**months** [4] - 295:6, 315:15, 353:25, 402:3
**morning** [8] - 293:10, 304:17, 311:6, 318:25, 319:7, 322:6, 391:8, 399:12
**MORNING** [1] - 290:9
**most** [7] - 322:3, 322:21, 332:25, 342:24, 363:4, 363:13, 364:5
**mostly** [1] - 328:15
**mouth** [1] - 382:8
**move** [8] - 301:5, 335:13, 335:20, 356:10, 357:23, 382:1, 384:16, 386:22
**moved** [10] - 322:2, 356:5, 363:1, 363:2, 373:21, 382:1, 383:3, 383:4, 383:5, 384:17
**MR** [95] - 292:5, 292:6, 292:8, 292:9, 292:10, 292:12, 292:13, 292:14, 301:4, 301:8,

301:15, 301:21, 303:3, 303:6, 303:8, 311:4, 311:6, 325:19, 326:12, 326:15, 330:8, 331:11, 331:13, 331:17, 332:5, 338:25, 340:6, 340:8, 340:18, 340:20, 345:19, 345:20, 345:23, 346:1, 346:3, 346:6, 350:9, 350:10, 350:18, 352:25, 353:2, 356:5, 356:8, 356:10, 356:15, 357:23, 357:25, 358:6, 358:8, 359:20, 370:13, 371:7, 377:10, 382:5, 382:11, 382:17, 382:24, 383:12, 392:12, 393:1, 393:3, 393:5, 393:24, 394:2, 395:11, 395:14, 395:16, 395:20, 396:1, 397:4, 397:9, 397:14, 397:19, 397:20, 397:22, 397:24, 398:2, 398:4, 398:7, 398:10, 398:16, 399:11, 401:2, 401:4, 401:6, 401:9, 401:10, 405:9, 406:9, 406:11, 410:14, 410:18, 410:20, 411:24, 412:17
**MTG** [1] - 333:13
**mud** [1] - 295:3
**multinational** [1] - 294:25
**must** [3] - 299:22, 300:11, 347:13

# N

**N.W** [1] - 290:24
**nailed** [1] - 319:15
**name** [13] - 304:17, 326:9, 326:10, 326:18, 326:24, 348:7, 350:16, 361:25, 362:5, 376:3, 399:4, 399:8
**named** [6] - 306:15, 319:6, 320:23, 355:11, 376:2,

399:14
**namely** [1] - 298:10
**narrative** [1] - 347:5
**narrow** [2] - 312:21, 391:21
**narrower** [1] - 346:23
**National** [3] - 296:5, 305:23, 341:14
**natural** [2] - 295:3, 295:25
**near** [2] - 297:20, 316:9
**necessarily** [3] - 372:9, 392:16, 411:19
**need** [9] - 294:11, 302:14, 314:13, 318:20, 319:2, 340:16, 365:14, 379:24, 410:24
**needed** [5] - 318:22, 319:8, 385:12, 386:9, 386:10
**Neffenger** [1] - 332:15
**neighborhood** [1] - 389:10
**network** [1] - 399:25
**networks** [1] - 399:22
**neutral** [1] - 409:3
**never** [3] - 307:12, 311:23, 392:20
**New** [12] - 298:5, 308:17, 313:11, 326:20, 326:24, 339:19, 400:23, 402:20, 402:22, 407:13, 407:19, 408:9
**NEW** [4] - 290:5, 290:16, 290:19, 291:5
**new** [2] - 317:4, 357:6
**news** [2] - 293:21, 306:17
**next** [8] - 293:23, 295:6, 315:15, 316:3, 332:20, 335:13, 382:25, 398:15
**nice** [1] - 342:17
**night** [1] - 293:17
**nine** [2] - 320:24, 400:18
**nine-minute** [1] - 320:24
**NO** [1] - 290:5
**NOAA** [74] - 296:5, 296:9, 296:16, 296:20, 305:24, 306:2, 306:9,

306:13, 306:15, 310:10, 313:21, 314:1, 314:10, 314:12, 314:16, 314:25, 320:22, 322:22, 323:2, 323:7, 323:15, 323:24, 341:15, 341:19, 341:23, 342:1, 344:22, 345:2, 345:5, 345:7, 345:9, 345:11, 345:13, 345:15, 345:16, 346:10, 346:11, 346:15, 347:18, 347:19, 347:21, 347:25, 348:2, 348:5, 348:6, 348:12, 348:14, 348:16, 348:19, 348:20, 348:25, 350:6, 366:3, 367:2, 367:3, 367:24, 368:15, 368:16, 373:14, 373:20, 385:25, 386:2, 387:16, 387:17, 388:6, 388:9, 388:11, 388:13, 388:15, 391:18
**NOAA's** [29] - 296:23, 297:23, 298:15, 298:16, 306:4, 306:17, 307:2, 307:23, 308:2, 308:21, 308:25, 309:3, 309:12, 310:1, 310:10, 319:5, 319:12, 349:3, 349:9, 391:4, 391:14, 393:16, 393:17, 394:6, 394:7, 395:4, 397:11, 397:17, 398:5
**nobody** [1] - 364:13
**noon** [2] - 396:19, 412:14
**north** [1] - 363:2
**northeast** [1] - 407:3
**Northern** [1] - 312:4
**note** [9] - 346:25, 367:3, 367:4, 367:23, 367:25, 368:2, 369:17, 387:17, 387:18
**notebooks** [1] - 352:5
**notes** [11] - 313:14, 343:15, 343:18, 343:20, 343:22,

343:24, 351:24, 352:5, 360:17, 360:18, 360:22
**nothing** [12] - 311:23, 313:8, 318:15, 324:21, 326:2, 356:24, 370:6, 379:1, 382:6, 393:1, 398:10, 398:23
**notice** [1] - 298:25
**noticed** [1] - 364:7
**nowhere** [1] - 316:9, 392:6, 392:9
**number** [80] - 298:15, 298:17, 304:5, 305:20, 305:21, 307:3, 307:5, 307:24, 308:2, 308:4, 308:20, 308:21, 308:24, 308:25, 309:4, 309:8, 309:11, 309:12, 310:2, 312:14, 314:13, 314:25, 318:13, 323:9, 323:15, 323:25, 327:23, 329:3, 329:10, 329:22, 334:12, 340:4, 341:1, 342:1, 347:9, 348:6, 348:7, 348:13, 348:14, 348:16, 348:20, 348:25, 349:4, 349:6, 349:10, 361:24, 366:4, 380:4, 385:18, 385:19, 385:22, 385:24, 386:1, 386:17, 389:19, 390:4, 391:4, 391:14, 391:25, 392:4, 392:8, 392:12, 393:16, 393:17, 394:6, 394:7, 395:4, 396:5, 396:14, 397:11, 397:17, 402:3, 403:18, 410:2
**number-two** [1] - 312:14
**numbered** [2] - 301:7, 414:9
**numbers** [34] - 301:9, 301:10, 301:11, 301:16, 302:7, 302:9, 302:13, 320:16, 320:24, 321:11, 321:23, 365:8, 365:21,

366:6, 366:14, 366:16, 377:3, 381:7, 381:14, 381:18, 381:22, 382:2, 383:9, 383:12, 383:13, 385:1, 385:5, 385:12, 385:20, 389:24, 396:11, 396:15, 396:18

# O

**o'clock** [2] - 371:17, 372:1
**oath** [6] - 325:24, 326:7, 351:13, 398:20, 399:3, 413:9
**object** [3] - 340:6, 357:25, 410:15
**objection** [11] - 301:20, 345:19, 346:2, 356:8, 358:3, 370:13, 395:11, 397:14, 398:2, 398:7
**objective** [1] - 409:4
**obligation** [2] - 293:14, 325:12
**observation** [4] - 367:14, 367:20, 368:19, 368:22
**observations** [2] - 297:2, 365:20
**obvious** [6] - 363:9, 363:23, 364:9, 364:10, 373:5, 374:4
**obviously** [4] - 342:12, 352:19, 353:3, 355:22
**occasion** [1] - 329:19
**occurred** [2] - 295:3, 328:14
**Oceanic** [3] - 296:5, 305:23, 341:14
**OF** [4] - 290:1, 290:4, 290:9, 290:14
**offer** [1] - 406:25
**office** [1] - 315:15
**Office** [2] - 408:1, 408:10
**officer** [1] - 332:18
**officers** [1] - 408:23
**offices** [1] - 339:19
**Official** [2] - 414:5, 414:14
**OFFICIAL** [1] - 291:3
**official** [8] - 298:12, 305:19, 326:18, 357:19, 388:21,

394:17, 394:20, 394:22
**often** [1] - 403:22
**oil** [86] - 295:3, 295:6, 295:14, 295:19, 295:24, 296:1, 296:3, 296:7, 296:8, 296:12, 296:21, 297:2, 300:19, 300:22, 303:11, 303:14, 303:17, 303:19, 303:22, 305:14, 305:16, 305:17, 305:19, 306:1, 306:3, 306:6, 308:7, 311:16, 312:16, 313:1, 313:7, 313:23, 313:24, 315:17, 315:25, 317:10, 317:11, 318:18, 319:17, 321:18, 327:24, 328:15, 328:19, 328:24, 328:25, 329:12, 334:16, 334:20, 335:2, 335:25, 336:1, 336:2, 336:18, 336:19, 336:20, 337:3, 337:4, 337:5, 347:23, 367:14, 367:20, 367:21, 368:8, 368:19, 368:22, 368:23, 378:25, 379:16, 379:23, 379:25, 380:1, 380:4, 380:5, 380:6, 380:22, 380:23, 386:10, 386:11, 386:23, 394:6
**Oil** [1] - 295:12
**old** [1] - 406:12
**onboard** [1] - 295:3
**once** [5] - 304:17, 342:25, 347:9, 402:20, 405:22
**one** [67] - 294:10, 302:11, 302:23, 303:19, 305:24, 307:7, 307:24, 308:2, 315:23, 316:3, 318:22, 319:1, 319:23, 323:2, 323:4, 323:7, 324:4, 328:3, 329:23, 335:16, 342:19, 343:5, 345:8, 345:11,

345:15, 346:10, 346:11, 347:2, 348:5, 348:12, 351:23, 352:4, 352:8, 352:15, 352:16, 360:22, 362:18, 366:16, 366:19, 366:22, 366:24, 367:3, 368:2, 368:23, 374:11, 375:14, 376:6, 377:25, 379:2, 380:7, 381:16, 385:8, 386:7, 386:8, 386:16, 387:12, 387:17, 388:12, 388:15, 394:11, 395:18, 396:6, 396:11, 396:15, 397:22, 398:5, 412:22
**one-page** [11] - 305:24, 323:2, 323:4, 323:7, 324:4, 345:8, 345:11, 348:5, 367:3, 368:2, 387:17
**one-pager** [5] - 345:15, 346:11, 348:12, 386:7, 398:5
**ongoing** [1] - 402:6
**opening** [5] - 294:8, 302:18, 303:3, 340:9, 383:12
**OPENING** [4] - 292:5, 292:6, 303:5, 311:3
**openly** [2] - 321:9, 321:23
**operate** [1] - 405:19
**operated** [1] - 379:3
**operating** [1] - 332:18
**operations** [5] - 328:4, 328:5, 328:7, 328:8, 349:21
**operative** [1] - 368:18
**opportunity** [3] - 310:21, 325:13, 333:22
**opposing** [2] - 405:17, 405:19
**options** [1] - 374:10
**ORDER** [1] - 293:14
**order** [6] - 296:14, 301:23, 403:12, 405:1, 409:10, 411:22
**Order** [1] - 293:16
**ordered** [2] - 358:7, 398:12

**orders** [1] - 413:11
**organization** [1] - 315:20
**original** [2] - 351:23, 352:4
**originally** [1] - 353:11
**Orleans** [5] - 298:5, 308:17, 313:11, 339:19, 402:20
**ORLEANS** [4] - 290:5, 290:16, 290:19, 291:5
**outset** [3] - 293:12, 325:13, 411:14
**outside** [1] - 370:13
**overall** [1] - 407:5
**overrule** [5] - 346:5, 358:3, 371:2, 397:15
**overruled** [1] - 395:19
**own** [22] - 297:13, 304:2, 307:3, 309:4, 310:12, 310:16, 313:21, 314:2, 314:9, 314:15, 322:23, 324:5, 324:18, 344:23, 344:25, 345:6, 349:5, 367:4, 384:6, 384:24, 385:16, 387:18
**owner** [1] - 327:11

# P

**p.m** [4] - 306:23, 319:9, 333:12, 333:13
**packaged** [1] - 377:25
**page** [46] - 305:24, 319:25, 323:2, 323:4, 323:7, 324:4, 334:2, 335:14, 335:15, 335:17, 336:3, 336:21, 336:23, 337:15, 338:7, 338:11, 338:14, 338:18, 345:8, 345:11, 346:10, 348:5, 362:14, 362:19, 362:25, 363:1, 364:20, 364:21, 366:24, 367:3, 368:2, 369:16, 372:11, 373:2, 375:20, 383:13, 387:5, 387:17, 387:24, 388:12, 388:15, 397:7, 397:8
**Page** [1] - 378:6
**PAGE** [1] - 292:3
**pager** [5] - 345:15, 346:11, 348:12, 386:7, 398:5
**pages** [6] - 313:16, 356:2, 391:13, 392:2, 392:21, 404:10
**panel** [4] - 293:8, 351:5, 351:8, 413:6
**panic** [1] - 306:8
**paper** [1] - 369:10
**paragraph** [15] - 359:23, 360:1, 362:16, 362:17, 364:21, 365:7, 366:25, 372:13, 375:21, 378:7, 387:24, 393:25, 394:4, 395:2, 397:7
**paragraphs** [1] - 298:2
**paralegal** [3] - 342:14, 408:8, 408:10
**paralegals** [1] - 304:25
**Parkin** [9] - 376:2, 376:3, 376:4, 376:6, 377:3, 377:16, 377:19, 377:25, 378:2
**part** [34] - 294:7, 296:11, 298:1, 303:23, 308:10, 315:18, 317:17, 327:10, 327:11, 327:18, 328:11, 332:13, 332:19, 337:9, 339:4, 342:2, 350:13, 352:2, 353:16, 360:9, 362:21, 362:23, 369:21, 370:2, 370:3, 377:12, 378:19, 387:3, 405:14, 405:17, 407:21, 412:11
**part-time** [1] - 407:21
**participated** [2] - 321:19, 374:20
**particular** [8] - 334:22, 347:22, 349:13, 349:15, 396:7, 401:22, 403:9, 404:22
**particularly** [1] - 321:4
**parties** [3] - 295:12, 351:19, 411:19
**partisan** [2] - 409:5,

409:6
**partner** [1] - 327:8
**parts** [4] - 329:10,
374:7, 380:16,
386:14
**party** [3] - 319:4,
409:13, 411:16
**pass** [3] - 302:9,
350:18, 361:7
**passage** [1] - 320:7
**passing** [1] - 324:1
**pay** [1] - 306:24
**paying** [1] - 411:8
**penalized** [1] - 302:24
**penalties** [1] - 295:22
**pendency** [1] - 398:13
**pending** [1] - 413:13
**people** [25] - 304:19,
306:5, 306:13,
329:6, 339:10,
340:17, 347:5,
360:17, 360:21,
360:24, 361:1,
365:9, 365:10,
365:12, 366:3,
370:20, 374:20,
375:9, 380:19,
381:10, 392:14,
401:11, 408:17,
408:18
**people's** [1] - 396:5
**Pepper** [3] - 414:3,
414:12, 414:13
**PEPPER** [1] - 291:3
**per** [39] - 296:3, 296:7,
296:21, 305:19,
306:1, 306:4, 306:6,
306:12, 306:17,
307:3, 307:4, 308:1,
308:20, 309:5,
309:8, 310:11,
316:23, 328:24,
328:25, 334:14,
334:16, 334:20,
335:2, 335:25,
336:1, 336:2,
336:18, 336:19,
336:20, 337:3,
337:4, 337:5,
365:13, 365:15,
385:22, 386:2,
386:11, 386:23,
394:6
**percent** [2] - 354:6,
394:23
**perfect** [1] - 318:4
**perform** [4] - 295:5,
399:25, 403:10,
411:2
**performed** [3] -

297:13, 405:5
**performing** [4] -
297:10, 367:1,
378:1, 387:13
**perhaps** [1] - 387:11
**period** [5] - 322:8,
324:6, 327:15,
328:21, 339:6
**periodically** [1] -
300:25
**permission** [1] -
331:17
**permitted** [1] - 324:25
**person** [2] - 314:6,
332:19
**personal** [2] - 311:8,
370:14
**personally** [3] - 344:3,
402:24, 403:21
**personnel** [1] - 321:16
**pertains** [1] - 302:10
**pertinent** [1] - 302:10
**Ph.D** [2] - 312:5,
317:23
**phone** [9] - 306:16,
309:21, 315:10,
321:20, 323:17,
350:14, 352:10,
396:14, 396:15
**phones** [10] - 349:25,
350:1, 396:5, 396:6,
400:2, 400:11,
403:8, 403:11,
403:13, 403:16
**phony** [2] - 318:11,
324:9
**photos** [1] - 380:19
**physical** [1] - 403:9
**physically** [1] - 358:13
**pick** [2] - 294:6,
412:22
**picture** [1] - 324:13
**piece** [2] - 321:14,
323:21
**pique** [1] - 348:10
**pit** [1] - 350:20
**place** [8] - 313:10,
316:10, 321:14,
322:17, 328:14,
328:20, 339:16,
342:16
**places** [1] - 380:23
**plane** [2] - 333:11,
381:10
**played** [2] - 310:15,
316:23
**plc** [1] - 294:25
**pled** [1] - 299:3
**plugged** [1] - 365:8
**plugging** [3] - 365:15,

377:3, 381:13
**plume** [2] - 296:9,
368:23
**Plume** [1] - 296:15
**pocket** [2] - 357:8,
357:9
**podium** [3] - 303:2,
311:2, 351:14
**point** [2] - 301:20,
302:4, 302:13,
317:15, 333:14,
340:14, 347:7,
347:18, 357:10,
370:25, 374:13,
388:12, 388:14,
388:17, 388:18,
388:19, 391:22,
405:9, 406:4, 411:5
**policy** [8] - 357:1,
358:12, 358:18,
358:23, 359:7,
359:13, 359:16,
360:20
**politicians** [2] - 317:2,
322:11
**Polk** [3] - 326:24,
327:7, 327:12
**popular** [1] - 407:5
**portion** [5] - 328:10,
332:9, 391:11,
395:24, 395:25
**portrayed** [1] - 400:8
**posed** [2] - 322:24,
323:5
**position** [3] - 312:13,
327:7, 328:1
**positions** [1] - 400:19
**possibility** [2] -
373:13, 373:19
**possible** [7] - 295:22,
316:16, 338:22,
347:6, 373:16,
375:17, 404:7
**possibly** [1] - 413:4
**post** [2] - 328:12,
349:21
**potential** [4] - 295:21,
302:5, 327:23,
328:13
**POYDRAS** [2] -
290:15, 291:4
**practical** [1] - 402:1
**practice** [3] - 327:2,
347:4, 400:25
**precise** [1] - 316:15
**precisely** [1] - 385:15
**preliminary** [4] -
296:1, 296:11,
296:23, 297:24
**prenumbered** [2] -

302:6, 302:12
**prepare** [3] - 296:10,
316:14, 390:15
**prepared** [10] -
300:15, 305:24,
309:23, 313:20,
313:23, 314:2,
314:22, 323:2,
323:10, 380:20
**preparing** [2] -
339:25, 390:14
**prerequisites** [1] -
402:4
**present** [6] - 330:1,
355:6, 356:6,
359:25, 360:2, 360:9
**presentation** [2] -
294:3, 377:12
**presented** [1] - 377:25
**presently** [1] - 327:1
**preserved** [1] - 358:10
**President** [2] - 294:23,
312:13
**press** [3] - 317:2,
322:11, 332:1
**pressed** [1] - 344:19
**pressure** [1] - 317:4
**presuming** [1] - 366:5
**pretty** [3] - 361:14,
371:22, 374:24
**previous** [1] - 338:10
**previously** [2] -
402:14, 402:20
**primarily** [2] - 309:16,
408:3
**principally** [2] - 331:8,
340:4
**principles** [3] - 400:6,
400:10, 407:7
**printed** [2] - 335:6,
336:9
**private** [3] - 408:16,
410:24, 410:25
**privilege** [1] - 312:2
**probe** [1] - 324:2
**problem** [3] - 303:16,
307:7, 317:10
**proceed** [2] - 311:4,
315:1, 326:12
**PROCEEDINGS** [3] -
290:9, 291:7, 293:1
**proceedings** [2] -
413:19, 414:9
**process** [2] - 325:15,
405:17
**PRODUCED** [1] -
291:8
**produced** [1] - 320:15
**producing** [1] -
354:10

**production** [2] -
354:12, 354:15
**professional** [1] -
401:20
**proffer** [1] - 382:7
**proffers** [1] - 405:10
**proficiency** [1] - 402:2
**profited** [1] - 324:22
**profoundly** [1] -
317:23
**prohibiting** [1] -
356:24
**project** [1] - 322:6
**projects** [4] - 363:14,
363:20, 363:21,
364:3
**promised** [1] - 350:20
**promptly** [1] - 413:10
**proof** [2] - 299:13,
351:21
**property** [1] - 399:24
**prosecuting** [1] -
408:7
**prosecution** [2] -
340:13, 408:19
**prosecution's** [2] -
324:8, 325:1
**prosecutor** [9] -
304:18, 304:20,
310:4, 319:21,
353:6, 353:17,
355:14, 357:5, 357:6
**prosecutors** [10] -
314:8, 316:6,
317:21, 322:3,
323:22, 355:7,
359:22, 408:4,
408:18, 408:22
**Protection** [3] -
304:24, 342:11,
360:8
**protocol** [8] - 379:11,
379:14, 379:15,
380:3, 380:7,
381:16, 384:11,
384:13
**protocols** [8] - 319:17,
319:18, 320:2,
320:14, 379:15,
380:2, 381:14, 383:8
**prove** [7] - 300:11,
304:15, 309:15,
311:23, 314:13,
314:21, 325:2
**proven** [1] - 299:22
**provide** [8] - 313:6,
344:12, 399:20,
403:13, 404:25,
405:2, 410:22,
411:22

**provided** [11] - 308:12, 314:5, 343:2, 352:6, 352:10, 352:15, 359:5, 377:24, 412:3, 412:9
**provides** [1] - 402:13
**providing** [2] - 303:3, 381:7
**PST** [1] - 396:19
**public** [8] - 296:1, 296:20, 308:13, 314:6, 316:19, 317:4, 330:14, 331:5
**publish** [1] - 331:17
**published** [1] - 396:18
**pull** [15] - 331:22, 331:25, 333:6, 334:9, 334:17, 334:25, 335:3, 335:9, 335:21, 336:25, 337:14, 338:7, 389:5, 393:24, 397:5
**purportedly** [2] - 297:14, 370:23
**purports** [1] - 384:3
**purpose** [3] - 299:9, 300:8, 340:12
**purposes** [2] - 295:12, 359:5
**pursue** [1] - 370:18
**push** [1] - 331:24
**pushed** [4] - 317:4, 321:23, 322:11, 323:3
**put** [11] - 301:3, 301:10, 319:23, 331:20, 348:22, 357:15, 361:4, 366:14, 397:22, 409:11, 409:17
**puts** [1] - 298:24
**putting** [2] - 317:9, 365:13

## Q

**qualification** [1] - 405:17
**qualified** [3] - 296:24, 297:24, 317:22
**qualify** [1] - 405:14
**quarter** [1] - 412:14
**questioning** [4] - 323:1, 342:25, 343:3, 343:9
**questions** [36] - 313:17, 322:24,

323:5, 323:19, 331:16, 339:23, 340:8, 340:22, 341:11, 342:21, 342:24, 343:10, 344:8, 358:25, 360:23, 360:25, 370:14, 374:12, 390:15, 390:23, 392:18, 393:6, 393:7, 393:9, 393:12, 394:8, 405:20, 406:5, 409:10, 410:14, 411:17, 411:24, 412:4, 412:11
**quibble** [2] - 410:5, 410:6
**quickly** [3] - 335:13, 335:20, 373:22
**quite** [4] - 340:12, 340:15, 344:23, 366:9

## R

**Rainey** [179] - 294:17, 294:23, 295:15, 295:16, 296:24, 297:13, 297:22, 298:7, 298:12, 298:16, 300:17, 304:1, 304:5, 305:5, 306:14, 306:16, 306:18, 306:22, 307:2, 307:7, 307:8, 307:25, 310:6, 310:13, 311:7, 311:11, 311:13, 312:2, 319:4, 321:19, 325:4, 329:24, 330:1, 330:9, 330:12, 330:16, 333:10, 333:17, 334:6, 336:5, 339:13, 339:18, 340:15, 341:2, 341:12, 341:18, 342:12, 343:2, 343:23, 344:2, 344:25, 345:3, 347:8, 347:16, 347:17, 348:1, 348:7, 348:11, 348:14, 348:17, 348:22, 349:9, 349:17, 350:4, 350:6, 352:6, 352:9, 352:10, 352:13, 352:15,

353:21, 354:13, 354:21, 355:3, 356:17, 357:11, 357:15, 357:20, 358:20, 358:24, 361:18, 362:17, 363:2, 363:4, 363:11, 364:4, 364:22, 364:23, 365:4, 365:19, 366:2, 366:25, 367:3, 369:2, 369:4, 369:13, 369:17, 370:1, 370:8, 370:23, 371:10, 371:13, 372:1, 372:2, 372:8, 372:10, 372:19, 372:24, 373:9, 373:13, 373:18, 373:19, 374:21, 375:22, 376:6, 376:10, 376:11, 376:19, 376:20, 377:1, 377:3, 377:6, 377:9, 377:15, 377:17, 377:23, 377:24, 378:2, 379:7, 380:9, 380:20, 380:24, 381:13, 382:1, 382:9, 382:22, 382:25, 383:11, 383:20, 383:21, 383:24, 384:3, 384:5, 384:18, 386:6, 386:17, 387:1, 387:17, 387:25, 388:12, 388:24, 388:25, 389:23, 390:1, 390:2, 390:3, 390:5, 390:13, 390:14, 391:11, 392:24, 393:15, 394:5, 394:15, 394:16, 396:11, 396:17, 396:21, 396:25, 397:10, 398:5, 405:7, 409:22, 410:3
**RAINEY** [2] - 290:7, 290:18
**rainey** [1] - 387:12
**Rainey's** [28] - 296:22, 297:4, 297:15, 297:18, 297:19, 309:21, 310:5, 310:8, 310:12, 330:25, 331:6, 334:11, 335:16, 341:16, 341:21,

343:5, 360:3, 369:9, 372:25, 373:2, 373:8, 377:22, 384:7, 389:9, 389:23, 396:16, 396:24, 398:1
**raise** [3] - 306:7, 325:25, 398:21
**raised** [2] - 296:20, 312:4
**raises** [1] - 299:4
**raising** [1] - 373:19
**ran** [2] - 320:6, 328:10
**range** [12] - 321:24, 323:10, 336:17, 336:25, 385:5, 385:8, 385:11, 385:13, 389:18, 389:24, 391:20, 391:21
**ranking** [1] - 295:17
**ranks** [1] - 312:9
**Rate** [2] - 295:18, 296:22
**rate** [99] - 296:2, 296:6, 298:13, 298:15, 298:17, 303:15, 304:3, 304:4, 304:9, 304:11, 305:17, 305:19, 305:25, 306:3, 306:10, 307:4, 307:5, 307:12, 307:18, 307:21, 307:24, 308:4, 308:9, 308:11, 308:15, 308:19, 309:22, 311:19, 313:20, 313:21, 313:24, 314:2, 314:3, 314:9, 314:22, 315:3, 316:7, 316:8, 316:11, 316:15, 316:19, 316:22, 316:25, 317:3, 317:4, 317:13, 317:16, 318:8, 318:10, 318:18, 319:9, 319:11, 321:22, 322:3, 322:10, 322:23, 324:10, 328:15, 328:17, 328:18, 328:22, 329:2, 329:3, 329:7, 329:9, 329:11, 329:16, 330:17, 330:18, 330:20, 330:25, 331:6, 332:25,

333:17, 333:24, 334:5, 335:16, 341:2, 341:5, 341:8, 341:13, 341:19, 341:25, 343:1, 343:8, 344:4, 344:18, 345:14, 346:18, 349:23, 353:15, 375:21, 376:5, 377:1, 377:13, 388:24, 392:15
**rates** [10] - 300:19, 303:22, 304:2, 307:16, 324:16, 329:5, 329:13, 330:22, 336:25, 339:5
**rather** [2] - 306:4, 412:15
**reach** [4] - 296:12, 304:6, 304:12, 309:4
**reached** [1] - 351:16
**read** [24] - 293:14, 294:11, 298:3, 299:1, 300:12, 300:13, 300:24, 332:22, 333:8, 335:23, 336:16, 337:1, 351:18, 351:24, 352:1, 352:21, 360:2, 362:16, 375:11, 376:17, 376:18, 377:6, 391:11, 394:3
**reading** [1] - 294:13
**ready** [1] - 350:21
**real** [2] - 322:12, 322:14
**reality** [3] - 316:8, 322:5, 323:25
**realize** [3] - 293:12, 348:2, 374:1
**realleged** [1] - 298:3
**really** [4] - 307:7, 316:2, 374:15, 400:12
**realtime** [1] - 362:2
**REALTIME** [1] - 291:3
**Realtime** [2] - 414:3, 414:13
**reason** [6] - 311:22, 314:13, 314:24, 315:7, 323:16, 342:18
**reasonable** [7] - 293:23, 299:14, 299:23, 300:11, 304:15, 321:13, 385:18

**REBECCA** [1] - 290:23
**recalled** [1] - 323:9
**receive** [4] - 346:9, 352:2, 396:17, 398:5
**received** [2] - 307:2, 307:22, 312:5, 313:20, 314:25, 315:10, 323:12, 330:13, 337:6, 337:8, 341:4, 345:8, 345:12, 345:15, 345:17, 346:11, 346:15, 348:5, 348:25, 350:4, 355:1, 367:3, 367:4, 387:17, 387:18, 387:21, 388:12, 388:15, 396:21, 397:18, 407:6, 407:8
**receiving** [1] - 323:9
**recent** [1] - 332:25
**recess** [1] - 413:20
**RECESS.................
.................** [1] -
292:15
**recognize** [1] - 337:16
**recollection** [5] -
323:6, 349:16, 393:12, 394:23, 411:14
**reconstruct** [1] -
313:13
**record** [23] - 322:25, 326:9, 330:14, 344:15, 355:17, 356:19, 357:13, 357:16, 357:19, 358:1, 358:2, 358:3, 358:16, 361:16, 372:8, 375:7, 388:21, 394:20, 394:22, 399:5, 399:8, 413:18, 414:8
**recorded** [2] - 358:15, 373:10
**RECORDED** [1] -
291:7
**recorder** [1] - 357:16
**recording** [3] -
313:12, 356:24, 357:2
**records** [2] - 309:20, 309:21
**recover** [1] - 405:2
**recovered** [1] - 306:20
**recreate** [1] - 323:22
**REDIRECT** [2] -
292:10, 393:4
**redirect** [1] - 393:2,

405:21
**reduce** [1] - 294:5
**refer** [6] - 301:14, 302:6, 328:12, 328:18, 400:15
**reference** [3] - 330:3, 367:23, 367:24
**referred** [4] - 345:15, 348:12, 354:17, 394:18
**referring** [6] - 363:10, 366:17, 366:19, 367:25, 368:16, 374:14
**reflect** [2] - 385:13
**reflected** [1] - 366:7
**reflects** [1] - 365:1
**regard** [2] - 300:11, 301:2
**regarding** [3] -
299:25, 401:22, 412:10
**regards** [1] - 409:22
**Registered** [1] - 414:3
**REGISTERED** [1] -
291:4
**registered** [1] - 414:14
**regular** [1] - 315:15
**Reid** [1] - 312:1
**REID** [1] - 290:22
**reinforce** [1] - 349:4
**relate** [5] - 300:17, 313:19, 382:14, 382:18, 399:18
**related** [6] - 308:9, 312:24, 313:1, 328:15, 405:6, 410:3
**relates** [3] - 312:21, 313:3, 382:13
**relating** [3] - 349:22, 365:2, 409:9
**relation** [4] - 313:21, 345:11, 349:9, 409:21
**relatively** [2] - 382:4, 407:2
**released** [1] - 306:15
**relevance** [1] - 340:6
**relevant** [6] - 294:20, 295:20, 295:21, 313:6, 374:4, 375:6
**relied** [1] - 296:15
**reluctance** [1] -
365:22
**relying** [2] - 380:24, 381:1
**remain** [2] - 325:23, 398:19
**remaining** [1] - 302:23
**remember** [16] -

320:8, 342:6, 342:16, 343:23, 346:21, 346:22, 348:14, 361:23, 362:13, 362:17, 379:12, 381:21, 383:6, 385:15, 388:16, 394:16
**remind** [1] - 293:18
**reminding** [1] - 293:13
**remotely** [2] - 316:13, 379:3
**reoriented** [1] -
372:14
**rephrase** [1] - 346:1
**replied** [1] - 306:18
**report** [2] - 361:12, 368:3
**reported** [6] - 370:8, 371:17, 372:19, 372:24, 391:13, 391:18
**Reporter** [7] - 414:3, 414:4, 414:5, 414:13, 414:14, 414:14, 414:14
**REPORTER** [3] -
291:3, 291:3, 291:4
**reporter** [1] - 358:17
**REPORTER'S** [1] -
414:1
**represent** [1] - 305:1, 327:5, 409:19
**representation** [2] -
371:25, 410:13
**representations** [1] -
298:10, 330:13, 331:4
**representative** [2] -
295:17, 315:23
**representatives** [2] -
295:10, 315:21
**represented** [1] -
409:20
**representing** [1] -
312:2
**request** [8] - 317:5, 317:19, 330:9, 339:13, 349:18, 404:23, 411:12, 411:18
**requested** [1] - 404:5
**require** [2] - 318:23, 351:21
**requires** [1] - 402:1
**research** [8] - 293:15, 307:17, 319:16, 320:4, 320:11, 321:10, 344:18, 379:11

**researching** [1] -
319:16
**resolutions** [1] - 378:9
**resource** [1] - 317:9
**respect** [10] - 309:19, 310:3, 324:2, 329:2, 403:8, 404:4, 404:20, 405:6, 410:21, 411:25
**respectively** [1] -
352:18
**respond** [1] - 358:24
**responding** [4] -
295:12, 311:16, 313:1, 315:16
**response** [21] -
295:14, 306:7, 307:9, 313:6, 313:8, 313:23, 315:18, 329:10, 329:15, 344:12, 349:8, 368:13, 375:9, 390:15, 391:22, 396:23, 396:24, 396:25, 397:2, 412:4
**responsibilities** [7] -
311:19, 315:16, 322:5, 374:21, 374:23, 375:2
**responsibility** [6] -
300:20, 318:1, 375:4, 375:10, 375:14
**responsible** [3] -
295:11, 363:3, 375:16
**rest** [1] - 319:23
**result** [4] - 296:19, 304:12, 309:9, 385:19
**resulted** [4] - 297:15, 348:15, 348:19, 393:18
**resulting** [1] - 296:13
**results** [8] - 297:23, 314:10, 320:17, 321:8, 321:10, 321:11, 321:12, 388:1
**resume** [3] - 350:24, 351:3, 413:9
**retained** [5] - 350:11, 411:1, 411:3, 411:6, 411:7
**retracts** [1] - 332:2
**retrieve** [1] - 403:12
**return** [2] - 310:22, 372:11
**returned** [1] - 299:5
**reverse** [7] - 297:23,

314:15, 314:20, 318:12, 391:25, 392:4, 392:12
**reverse-engineer** [3] -
297:23, 318:12, 392:4
**reverse-engineered**
[3] - 314:15, 391:25, 392:12
**review** [7] - 330:12, 330:14, 333:15, 333:22, 337:6, 337:23, 361:7
**reviewed** [10] - 343:5, 355:22, 361:20, 361:24, 362:7, 362:12, 374:3, 374:17, 375:17
**reviews** [1] - 404:24
**Rick** [1] - 397:1
**rig** [10] - 295:4, 303:10, 305:14, 315:12, 363:17, 364:1, 364:2, 378:24, 378:25
**right-hand** [2] -
334:18, 397:7
**rise** [2] - 293:7, 351:7
**risk** [1] - 399:16
**RMR** [2] - 291:3, 414:13
**ROBERT** [1] - 290:15
**Robert** [5] - 295:8, 304:20, 315:24, 321:17, 321:19
**role** [4] - 312:18, 316:23, 328:6, 339:1
**roles** [2] - 328:6, 363:6
**roll** [1] - 366:23
**rolled** [1] - 366:18
**ROOM** [1] - 291:4
**room** [15] - 321:2, 342:16, 342:18, 343:22, 359:21, 360:14, 360:21, 366:3, 366:4, 366:11, 366:20, 373:24, 373:25, 388:17, 412:21
**rooms** [1] - 342:20
**rose** [1] - 312:9
**rough** [1] - 410:1
**roughly** [5] - 308:2, 314:3, 389:17, 396:19, 410:11
**ROVs** [4] - 378:9, 378:12, 378:18
**run** [3] - 319:2, 328:11, 333:11

# S

**s/Cathy** [1] - 414:12
**sake** [1] - 356:7
**salary** [1] - 409:16
**sank** [1] - 303:11
**satisfactory** [3] - 345:18, 346:3, 346:7
**satisfied** [1] - 383:3
**save** [1] - 301:13
**saved** [1] - 323:17
**saw** [10] - 308:21, 308:24, 309:11, 310:1, 348:16, 348:19, 361:9, 374:6, 375:18, 394:6
**scheduled** [1] - 371:21
**scheme** [1] - 324:16
**school** [6] - 312:6, 407:6, 407:11, 407:15, 407:21, 407:23
**science** [10] - 318:1, 318:7, 366:3, 366:4, 366:11, 366:20, 401:15, 406:20, 407:5, 407:7
**scientific** [1] - 400:6
**scientist** [13] - 296:4, 296:9, 296:16, 305:22, 314:1, 314:4, 317:24, 319:5, 319:13, 320:22, 323:3, 388:6, 388:9
**scientists** [6] - 317:8, 322:12, 366:4, 366:12, 366:20, 373:14
**scope** [1] - 370:13
**Scotland** [1] - 312:6
**SCOTT** [1] - 290:17
**screen** [6] - 331:18, 332:4, 332:6, 397:6, 397:13
**screens** [1] - 331:22
**seabed** [1] - 316:17
**search** [5] - 297:4, 319:25, 320:7, 405:1
**searched** [1] - 297:1
**searches** [1] - 319:24
**seated** [5] - 293:10, 325:24, 351:10, 398:20, 399:7
**Seattle** [1] - 323:3
**second** [19] - 294:16, 295:16, 300:2, 332:20, 332:21,

333:3, 348:11, 352:8, 362:17, 362:18, 364:21, 370:7, 373:12, 378:6, 378:8, 387:24, 394:1, 397:7, 413:17
**section** [2] - 299:16, 353:16
**Section** [1] - 294:18
**see** [63] - 301:12, 302:15, 306:1, 306:2, 306:22, 307:7, 307:8, 307:13, 307:19, 309:19, 309:21, 309:22, 309:24, 315:6, 319:23, 325:1, 329:5, 330:7, 331:23, 332:6, 335:11, 339:7, 343:25, 348:20, 352:14, 359:22, 359:23, 363:7, 365:17, 365:23, 366:5, 366:6, 367:6, 367:16, 368:20, 369:19, 370:7, 373:3, 378:10, 378:20, 378:22, 387:19, 388:1, 388:25, 391:4, 391:5, 391:14, 394:7, 395:4, 397:16, 403:25, 404:11, 413:2
**seeing** [5] - 323:9, 365:16, 374:9, 374:14, 374:16
**Seilhan** [5] - 306:16, 306:23, 307:23, 352:9, 372:22
**send** [1] - 325:7
**senior** [11] - 307:9, 314:4, 314:5, 315:22, 319:5, 321:17, 321:19, 329:19, 329:23, 332:18, 332:19
**sense** [11] - 314:14, 316:2, 316:25, 318:3, 320:18, 321:8, 321:12, 324:24, 325:2, 343:8, 346:23
**sent** [5] - 306:16, 332:12, 337:19, 350:3, 388:1
**sentence** [13] - 363:1, 363:9, 368:14,

368:18, 371:9, 376:10, 376:19, 377:5, 377:6, 378:8, 394:25, 395:2, 397:16
**sentences** [1] - 394:4
**separate** [2] - 310:13, 411:16
**September** [1] - 298:22
**serious** [6] - 305:21, 306:3, 306:9, 307:5, 314:3, 314:7
**serve** [1] - 299:9
**served** [1] - 295:15
**servers** [2] - 400:2, 400:12
**serves** [2] - 299:10, 411:14
**service** [1] - 411:22
**services** [2] - 399:19, 410:22
**SESSION** [1] - 290:9
**set** [3] - 298:4, 331:7, 344:23
**settled** [1] - 312:10
**several** [4] - 296:16, 300:14, 393:6, 394:8
**shall** [1] - 299:2
**shared** [9] - 330:18, 330:25, 331:6, 331:9, 337:9, 339:7, 339:8, 390:2, 390:3
**sharing** [1] - 330:22
**sheen** [2] - 380:6, 380:17
**short** [2] - 312:21, 392:17
**shortly** [3] - 305:20, 354:9, 361:21
**show** [13] - 304:6, 304:14, 305:18, 306:20, 307:4, 307:6, 308:22, 308:25, 309:13, 313:8, 356:12, 356:13, 395:18
**showed** [1] - 345:16
**showing** [3] - 331:14, 395:20, 396:6
**shows** [1] - 400:8
**shut** [1] - 412:16
**sic** [1] - 406:16
**side** [9] - 302:17, 334:8, 334:18, 342:19, 343:15, 347:6, 397:6, 397:7, 397:12
**sides** [1] - 300:15
**sign** [1] - 319:10,

358:20
**signed** [1] - 298:20
**significance** [1] - 316:9
**significantly** [2] - 296:17, 297:16
**signify** [1] - 302:23
**similar** [2] - 385:25, 386:16
**simple** [2] - 353:17, 386:24
**simply** [4] - 309:1, 340:18, 351:19, 377:3
**single** [6] - 313:15, 324:13, 324:14, 356:2, 357:20, 375:11
**single-spaced** [3] - 313:15, 356:2, 357:20
**sinking** [1] - 305:14
**sit** [1] - 376:14
**site** [2] - 320:1, 380:13
**sites** [2] - 307:15, 404:10
**sitting** [8] - 304:19, 304:21, 330:4, 330:5, 355:10, 371:23, 374:11, 378:17
**situation** [3] - 311:13, 320:18, 413:3
**six** [4] - 360:15, 360:17, 360:21, 374:20
**sixth** [1] - 366:25
**size** [1] - 381:8
**skilled** [1] - 317:24
**sleeves** [2] - 366:18, 366:23
**slick** [3] - 367:14, 367:20, 368:19
**slid** [1] - 387:1
**slope** [1] - 363:2
**small** [2] - 407:2, 407:5
**smaller** [1] - 342:20
**smartphones** [1] - 403:7
**so-called** [1] - 324:23
**Society** [2] - 297:7, 407:19
**sole** [1] - 361:6
**solemnly** [2] - 326:1, 398:22
**solving** [1] - 317:9
**someone** [5] - 318:13, 367:3, 373:24, 387:17

**sometime** [10] - 323:8, 323:13, 342:14, 346:12, 367:5, 367:7, 367:8, 387:19, 387:22, 411:5
**somewhere** [2] - 345:17, 403:18
**Sonja** [3] - 342:10, 355:11, 360:13
**soon** [1] - 295:23
**sorry** [13] - 306:12, 336:9, 338:21, 345:23, 356:9, 360:1, 372:21, 376:22, 395:7, 395:22, 395:25, 397:8
**sort** [3] - 339:6, 371:20, 380:20
**sorts** [5] - 400:6, 401:24, 403:3, 403:9, 404:20
**sought** [2] - 320:19, 339:24
**sound** [1] - 301:11
**sounds** [1] - 372:5
**source** [1] - 396:18
**space** [1] - 328:9
**spaced** [3] - 313:15, 356:2, 357:20
**spacious** [1] - 342:17
**speaking** [2] - 400:5, 409:22
**Special** [2] - 304:21, 360:8
**specific** [1] - 304:12
**specifically** [8] - 305:6, 308:19, 309:25, 329:1, 353:9, 394:13, 400:9, 409:22
**spell** [2] - 326:8, 399:4, 399:8
**spelled** [2] - 361:25, 362:6
**spelling** [3] - 361:10, 362:1, 362:5
**spend** [2] - 374:7, 378:15
**spent** [7] - 319:16, 339:25, 341:21, 343:6, 344:5, 395:16, 410:2
**Spill** [1] - 295:12
**spill** [27] - 295:14, 296:25, 297:2, 300:19, 300:22, 303:19, 305:18, 308:7, 311:16,

**OFFICIAL TRANSCRIPT**

313:1, 313:7,
313:23, 315:17,
321:6, 327:24,
328:12, 328:14,
329:10, 331:8,
344:16, 349:21,
365:2, 379:20,
379:21, 379:22,
379:23, 380:16
**spilling** [1] - 313:25
**split** [1] - 397:5
**spot** [2] - 412:15,
413:10
**spotters** [2] - 380:12,
380:14
**spread** [1] - 379:21
**spreadsheets** [3] -
309:23, 309:25,
349:24
**square** [1] - 379:22
**ST** [1] - 290:19
**standard** [2] - 319:19,
319:20
**standards** [3] -
297:19, 321:24,
383:7
**standing** [4] - 325:23,
330:6, 330:7, 398:19
**stands** [2] - 383:6,
401:21
**start** [4] - 305:11,
348:23, 353:12,
399:12
**started** [14] - 296:12,
307:3, 307:14,
309:9, 318:25,
325:17, 346:17,
354:9, 367:4,
378:25, 387:18,
400:20, 412:16
**starting** [1] - 307:17
**State** [1] - 414:4
**state** [5] - 315:21,
326:8, 399:4, 399:8,
402:23
**statement** [19] -
294:16, 298:2,
299:18, 299:24,
300:2, 300:4, 300:5,
300:8, 300:14,
300:16, 303:4,
305:6, 308:25,
376:16, 376:21,
378:20, 391:3,
395:10, 398:1
**STATEMENTS** [4] -
292:5, 292:6, 303:5,
311:3
**statements** [16] -
294:8, 298:10,

302:18, 303:22,
308:9, 312:22,
313:18, 322:20,
324:1, 340:9,
351:22, 382:13,
382:14, 382:18
**STATES** [4] - 290:1,
290:4, 290:10,
290:14
**States** [21] - 294:15,
294:17, 294:18,
295:10, 295:13,
298:8, 298:19,
299:16, 299:20,
304:18, 305:2,
312:12, 325:19,
339:2, 357:7, 359:4,
361:16, 361:17,
375:14, 414:5,
414:15
**stay** [1] - 398:14
**STENOGRAPHY** [1] -
291:7
**step** [3] - 345:23,
398:11, 413:16
**STEPTOE** [1] - 290:21
**Steptoe** [1] - 342:13
**stick** [1] - 390:25
**still** [4] - 306:8, 347:3,
351:13, 382:15
**stipulation** [2] -
351:19, 401:5
**stipulations** [3] -
351:16, 352:19,
352:21
**stolen** [1] - 399:24
**Stone** [6] - 342:10,
343:19, 355:11,
355:25, 360:13,
360:18
**stop** [3] - 295:20,
321:8, 350:20
**stopped** [1] - 317:14
**stopping** [2] - 317:10,
321:18
**storage** [1] - 400:12
**store** [1] - 400:10
**stored** [3] - 352:12,
400:1, 400:13
**story** [3] - 322:13,
347:5, 347:9
**stranger** [1] - 377:17
**streamline** [1] - 294:2
**STREET** [2] - 290:15,
291:4
**street** [1] - 339:19
**Stroz** [16] - 399:14,
399:15, 399:16,
399:19, 400:14,
400:15, 400:17,

400:19, 401:12,
403:15, 408:13,
408:15, 408:17,
410:21, 411:1,
411:12
**struck** [1] - 346:21
**structure** [6] - 327:10,
331:7, 332:14,
332:20, 333:20,
372:23
**struggling** [3] -
344:24, 376:22,
380:18
**Subcommittee** [1] -
337:20
**subject** [4] - 301:21,
367:10, 391:14,
398:13
**subjects** [1] - 408:7
**submitted** [3] - 308:5,
390:5, 390:18
**Subsection** [1] -
294:19
**subsequently** [6] -
344:9, 350:11,
350:13, 376:12,
395:18, 407:8
**subsidiary** [1] -
294:24
**substance** [5] -
309:20, 343:1,
361:11, 361:13,
373:11
**substantive** [1] -
343:10
**suggest** [1] - 323:23
**suggestion** [1] - 320:4
**suggestions** [1] -
361:2
**SUITE** [2] - 290:15,
290:19
**summarized** [1] -
313:14
**summary** [2] - 310:17,
383:14
**summer** [3] - 354:8,
354:23, 355:2
**sunk** [1] - 378:24
**superior** [1] - 373:1
**superseding** [1] -
294:16
**supervise** [1] - 403:22
**supervised** [1] -
403:20
**supplied** [1] - 302:2
**support** [1] - 325:14
**supported** [1] -
310:24
**supporting** [1] - 408:8
**supports** [1] - 378:20

**supposed** [1] - 354:5
**supposedly** [1] -
324:20
**surface** [16] - 296:8,
296:12, 297:3,
318:19, 318:22,
318:23, 319:18,
365:20, 366:6,
366:13, 368:6,
379:16, 380:12,
386:2, 386:16, 388:9
**surprisingly** [1] -
346:22
**surrounding** [1] -
303:12
**sustain** [2] - 398:3,
398:8
**Suttles** [15] - 315:23,
317:19, 318:3,
321:9, 321:10,
321:18, 322:12,
332:16, 332:17,
333:10, 333:18,
372:14, 373:2
**swear** [2] - 326:1,
398:22
**sworn** [3] - 310:13,
326:6, 399:2

---

# T

**table** [8] - 304:19,
304:21, 304:24,
323:4, 330:5,
355:11, 383:14,
387:2
**tables** [5] - 333:24,
335:14, 337:25,
384:12, 384:13
**talks** [1] - 368:5
**tape** [4] - 356:24,
357:13, 357:15,
358:15
**taped** [1] - 356:22
**task** [11] - 317:7,
317:22, 318:3,
328:6, 328:8,
339:20, 342:9,
342:17, 350:12,
361:6, 404:15
**Task** [13] - 327:19,
327:21, 328:2,
353:10, 353:12,
353:13, 353:15,
355:15, 360:5,
360:7, 360:15,
375:11, 378:15
**tasked** [2] - 361:4,
377:23

**Team** [1] - 363:3
**team** [12] - 329:1,
339:22, 339:23,
340:13, 340:17,
349:18, 360:15,
364:13, 370:11,
378:23, 408:6, 409:5
**technical** [5] - 323:15,
352:12, 363:5,
402:7, 408:8
**techniques** [1] - 359:4
**technologies** [1] -
402:8
**technology** [1] - 328:9
**telephone** [3] -
320:25, 373:3,
373:15
**television** [1] - 393:25
**ten** [1] - 353:25
**tendering** [1] - 401:1
**term** [1] - 328:18
**terms** [5] - 359:11,
361:11, 373:10,
373:11, 405:1
**terribly** [1] - 386:11
**testified** [19] - 326:7,
355:6, 364:4,
367:10, 371:16,
372:10, 373:17,
374:18, 377:12,
379:7, 384:1,
392:10, 393:12,
399:3, 402:16,
402:18, 402:20,
402:21, 402:22
**testify** [6] - 310:5,
310:8, 310:10,
324:13, 324:15,
406:7
**testifying** [1] - 362:7
**testimony** [27] -
302:15, 310:13,
310:14, 314:2,
325:14, 326:1,
350:24, 350:25,
353:21, 355:23,
364:16, 370:20,
371:1, 373:8,
391:23, 398:12,
398:14, 398:22,
405:24, 406:1,
408:25, 409:1,
412:3, 412:7,
412:23, 413:12,
413:13
**Testing** [1] - 297:7
**Texas** [2] - 363:3,
402:23
**text** [30] - 306:16,
306:20, 306:23,

306:25, 307:2, 307:23, 309:1, 309:19, 309:20, 323:14, 323:18, 350:1, 350:3, 350:5, 350:7, 350:14, 352:9, 352:11, 386:7, 396:4, 396:7, 396:8, 396:21, 397:12, 397:18, 397:25, 403:8, 403:13, 403:14

**THE** [75] - 290:10, 290:14, 293:7, 293:10, 301:6, 301:10, 301:19, 301:23, 303:7, 311:1, 311:5, 325:10, 325:21, 325:25, 326:4, 326:8, 326:10, 326:13, 330:6, 330:7, 331:12, 331:19, 338:23, 338:24, 340:11, 345:25, 346:2, 346:5, 350:19, 351:7, 351:10, 356:9, 356:12, 357:24, 358:1, 358:7, 359:12, 359:15, 359:18, 359:19, 370:18, 371:3, 376:13, 382:13, 382:18, 390:11, 390:13, 390:25, 393:2, 395:12, 395:19, 397:5, 397:15, 397:16, 398:3, 398:8, 398:11, 398:18, 398:21, 398:25, 399:4, 399:6, 399:7, 399:9, 401:1, 401:3, 401:5, 401:8, 405:12, 410:16, 412:1, 412:18, 413:8, 413:15, 413:16

**themselves** [1] - 343:25
**theoretically** [3] - 359:7, 359:9, 359:13
**theory** [4] - 324:8, 324:17, 325:1, 329:14
**thereafter** [1] - 361:21
**therefore** [1] - 299:4
**thick** [4] - 379:25, 380:4, 380:5, 380:6

**thickness** [1] - 347:23
**thicknesses** [2] - 347:25, 384:4
**thin** [1] - 380:1
**thinking** [2] - 346:22, 389:25
**third** [7] - 300:4, 307:24, 319:4, 359:22, 362:16, 375:20, 378:8
**third-party** [1] - 319:4
**thousand** [2] - 385:20, 389:10
**thread** [1] - 333:6
**three** [20] - 295:6, 319:18, 328:21, 335:13, 347:13, 351:16, 366:25, 375:21, 376:5, 376:6, 376:11, 376:20, 376:25, 377:2, 377:7, 377:8, 377:14, 377:18, 378:16, 389:24
**three-month** [1] - 328:21
**throwing** [1] - 324:20
**thrust** [1] - 323:1
**thumbs** [1] - 360:22
**timeframe** [1] - 346:24
**timer** [1] - 302:21
**timing** [9] - 306:25, 309:20, 313:20, 323:24, 346:14, 348:24, 353:3, 371:15, 405:3
**tirelessly** [1] - 311:12
**Title** [1] - 298:19
**TO** [1] - 293:4
**today** [12] - 293:19, 315:1, 324:7, 330:1, 351:17, 359:6, 362:8, 364:14, 374:11, 374:18, 376:14, 378:17
**together** [5] - 305:1, 312:1, 312:7, 324:16, 361:4
**Tony** [1] - 376:3
**took** [23] - 313:10, 319:25, 320:1, 320:8, 321:14, 322:17, 324:19, 328:14, 328:20, 342:16, 343:18, 343:20, 343:22, 346:16, 354:6, 360:17, 360:18, 360:24, 362:9, 362:10, 364:11,

373:22, 373:23
**tool** [2] - 401:22, 402:3
**top** [7] - 319:13, 332:9, 337:15, 363:1, 365:16, 395:24, 397:22
**topic** [1] - 347:16
**total** [3] - 327:12, 377:16, 386:17
**tough** [1] - 318:1
**toward** [1] - 293:25
**tracks** [1] - 324:11
**tragedy** [1] - 311:10
**trained** [1] - 297:12
**training** [5] - 307:11, 401:24, 402:6, 402:10, 402:12
**transcribed** [3] - 369:2, 369:3
**transcribing** [1] - 343:25
**transcript** [3] - 313:12, 374:1, 414:7
**TRANSCRIPT** [2] - 290:9, 291:7
**transcription** [3] - 373:11, 375:13, 375:17
**Transocean** [2] - 295:11, 364:2
**transparent** [1] - 322:1
**traverse** [1] - 401:7
**TRAVERSE** [2] - 292:13, 406:10
**TRIAL** [1] - 290:9
**trial** [36] - 292:13, 293:15, 293:22, 293:24, 294:5, 294:7, 299:9, 300:14, 300:25, 302:8, 302:16, 306:1, 310:19, 312:20, 314:11, 314:24, 315:4, 316:10, 316:12, 324:13, 324:15, 324:22, 325:5, 351:17, 351:25, 352:2, 352:21, 398:13, 405:13, 405:19, 412:7, 413:2, 413:3, 413:4
**tried** [3] - 299:4, 307:20, 322:14
**trigger** [1] - 366:10
**true** [21] - 309:1, 319:24, 320:1, 324:17, 351:20,

351:22, 366:2, 366:10, 368:12, 368:25, 369:11, 370:8, 372:6, 377:16, 381:14, 382:3, 383:12, 397:13, 398:1, 409:7, 414:7
**truly** [1] - 317:5
**Trust** [1] - 295:12
**trusty** [1] - 302:21
**truth** [10] - 298:15, 318:16, 323:12, 324:6, 326:2, 326:3, 398:23, 398:24
**try** [10] - 294:2, 311:12, 313:13, 316:6, 319:1, 319:21, 323:22, 325:15, 347:4, 404:7
**trying** [16] - 303:19, 332:2, 343:7, 344:19, 346:8, 346:14, 346:20, 347:8, 348:12, 348:25, 349:4, 356:10, 376:24, 379:16, 381:15, 385:18
**Tsao** [9] - 303:3, 304:17, 311:1, 325:18, 401:8, 406:2, 410:16, 412:4, 412:14
**TSAO** [14] - 290:14, 303:6, 303:8, 398:16, 399:11, 401:2, 401:4, 401:9, 401:10, 405:9, 410:18, 410:20, 411:24, 412:17
**TSAO...........** [1] - 292:14
**TSAO..................** [1] - 292:12
**TSAO........................** [1] - 292:5
**TUESDAY** [2] - 290:6, 293:2
**tug** [1] - 331:25
**turn** [9] - 318:3, 362:14, 364:20, 366:24, 372:13, 375:20, 378:6, 387:5, 387:24
**turned** [4] - 307:14, 317:20, 354:22, 361:15
**turns** [1] - 370:6
**TV** [1] - 400:8

**twiddling** [1] - 360:22
**two** [42] - 296:7, 303:11, 307:20, 312:7, 312:14, 312:21, 313:18, 315:15, 322:20, 324:3, 328:3, 328:6, 328:21, 331:19, 333:5, 341:15, 341:17, 342:13, 347:13, 352:5, 352:15, 355:7, 355:10, 359:22, 366:24, 367:13, 367:20, 368:5, 368:14, 368:22, 368:23, 371:17, 371:20, 372:1, 374:10, 384:11, 384:13, 386:13, 394:4, 405:14
**two-part** [1] - 405:14
**type** [2] - 318:20, 327:1, 413:2
**types** [1] - 307:11
**typewritten** [1] - 356:2
**typical** [1] - 316:3
**typing** [1] - 343:21

# U

**U.S** [4] - 290:14, 298:21, 408:1, 408:10
**ultimate** [1] - 392:15
**uncertain** [2] - 317:16, 321:3
**uncertainties** [2] - 316:18, 318:9
**uncertainty** [1] - 365:22
**uncomfortable** [2] - 366:16, 384:25
**under** [4] - 321:13, 321:24, 351:13, 413:9
**underestimated** [1] - 329:13
**undergraduate** [1] - 312:5
**undersigned** [1] - 360:1
**understated** [1] - 329:14
**understood** [2] - 347:22, 409:12
**Unified** [34] - 295:8, 295:13, 295:16, 295:17, 295:25,

296:20, 311:15, 314:6, 315:19, 316:2, 316:5, 316:8, 316:13, 316:19, 316:25, 317:8, 317:17, 317:25, 319:6, 319:13, 321:16, 322:4, 331:7, 332:14, 332:19, 332:21, 333:20, 337:9, 339:8, 366:20, 372:22, 372:23, 372:25, 390:3
**unit** [2] - 328:23, 334:15
**UNITED** [4] - 290:1, 290:4, 290:10, 290:14
**United** [21] - 294:15, 294:17, 294:18, 295:10, 295:13, 298:8, 298:19, 299:16, 299:20, 304:18, 305:2, 312:12, 325:19, 339:2, 357:7, 359:4, 361:16, 361:17, 375:14, 414:5, 414:15
**University** [1] - 401:17
**unknown** [2] - 317:6, 318:22
**unless** [2] - 340:15, 382:22
**unlikely** [1] - 373:21
**unreliable** [1] - 296:13
**up** [53] - 294:6, 297:17, 300:20, 302:2, 304:9, 304:11, 305:10, 309:7, 309:8, 311:25, 312:9, 315:14, 316:15, 318:11, 319:4, 320:6, 324:1, 324:9, 324:16, 331:7, 331:20, 331:22, 331:25, 332:2, 332:4, 333:6, 334:9, 334:17, 334:25, 335:3, 335:9, 335:21, 336:25, 337:14, 338:7, 344:17, 344:24, 345:21, 347:10, 349:5, 351:17, 354:6, 366:18, 366:23, 377:25, 379:3, 389:5,

391:20, 393:24, 397:5, 411:1, 412:22, 413:17
**URBAN** [1] - 290:24
**urgency** [2] - 306:7, 316:2
**US** [1] - 332:13
**user** [1] - 404:8
**uses** [6] - 299:6, 381:18, 381:19, 381:22, 385:8
**utilized** [1] - 350:12

## V

**values** [1] - 365:1
**variety** [2] - 316:4, 363:5
**various** [17] - 295:20, 301:8, 320:14, 331:1, 332:13, 360:14, 363:20, 380:1, 380:2, 380:16, 399:25, 400:6, 400:8, 403:11, 404:9, 405:4, 408:21
**vehicles** [1] - 379:3
**velocity** [2] - 296:9, 300:22
**Velocity** [1] - 296:15
**vendor** [1] - 396:4
**verdict** [6] - 310:22, 310:23, 310:24, 325:6, 325:7
**verse** [1] - 320:9
**versus** [2] - 346:15, 371:5
**VERSUS** [1] - 290:5
**Vice** [2] - 294:23, 312:13
**video** [1] - 368:10
**videotaped** [2] - 358:14, 358:15
**view** [10] - 293:14, 302:7, 330:16, 331:3, 331:5, 332:3, 341:24, 369:9, 375:12, 385:3
**violation** [2] - 294:18, 298:19
**visited** [1] - 307:15
**visual** [1] - 380:19
**voir** [1] - 411:25
**VOIR** [4] - 292:12, 292:14, 399:10, 410:19
**volume** [5] - 296:8, 297:2, 300:22,

318:18, 319:17

## W

**walk** [2] - 305:11, 315:2
**walked** [1] - 321:9
**WALKER** [1] - 290:18
**wants** [1] - 356:12
**Washington** [1] - 354:5
**WASHINGTON** [1] - 290:25
**wastewater** [1] - 381:24
**water** [11] - 297:3, 338:21, 363:14, 363:19, 367:15, 367:21, 368:20, 368:23, 386:17, 386:19, 396:18
**waterfront** [1] - 313:16
**waters** [1] - 303:12
**Watson** [1] - 332:15
**ways** [9] - 320:20, 329:15, 358:9, 358:13, 358:14, 358:16, 359:12, 359:17, 380:5
**wearing** [1] - 330:4
**web** [2] - 404:9, 404:10
**website** [1] - 297:5
**Wed** [1] - 333:12
**Wednesday** [1] - 333:12
**week** [2] - 293:23, 293:24
**weeks** [1] - 351:17
**weight** [3] - 412:8, 412:12, 412:13
**Weingarten** [8] - 312:1, 351:12, 351:14, 352:23, 356:10, 394:8, 394:17, 395:16
**WEINGARTEN** [27] - 290:22, 301:8, 340:6, 345:19, 346:3, 352:25, 353:2, 356:5, 356:15, 357:23, 358:6, 358:8, 359:20, 371:7, 377:10, 382:11, 382:17, 382:24, 390:16, 391:2, 393:1, 395:11,

395:14, 397:14, 398:2, 398:7, 401:6
**WEINGARTEN...........** ...... [1] - 292:9
**western** [1] - 363:3
**whack** [1] - 385:2
**whatsoever** [4] - 299:10, 314:25, 316:24, 325:2
**WHEREUPON** [5] - 293:8, 351:5, 351:8, 413:6, 413:19
**white** [1] - 327:2
**whole** [9] - 316:4, 321:3, 321:19, 326:2, 347:9, 374:19, 375:3, 378:23, 398:23
**wife** [1] - 312:6
**Wikipedia** [7] - 297:5, 307:15, 319:22, 320:1, 320:5, 320:9, 320:12
**willfully** [2] - 298:9, 299:17
**Williams** [3] - 401:16, 406:16, 406:22
**Williamsport** [1] - 406:16
**Williamstown** [1] - 406:18
**willing** [2] - 366:17, 366:22
**Wilmer** [1] - 411:10
**window** [3] - 346:8, 346:13, 346:19
**wish** [2] - 301:2, 374:2
**withdraw** [1] - 413:3
**witness** [23] - 324:13, 324:14, 325:11, 325:17, 326:6, 350:18, 351:11, 356:6, 356:12, 356:13, 370:22, 382:21, 399:2, 402:19, 405:13, 405:15, 405:16, 405:23, 406:2, 406:6, 410:17, 412:12
**WITNESS** [13] - 326:4, 326:10, 330:7, 338:24, 359:15, 359:19, 371:3, 390:13, 397:16, 398:25, 399:6, 399:9, 413:15
**witness'** [2] - 405:24, 412:23
**witnesses** [6] -

309:16, 309:18, 310:3, 325:13, 392:23, 412:7
**witnesses'** [2] - 371:1, 412:7
**women** [1] - 311:11
**word** [6] - 311:8, 333:13, 359:14, 364:11, 375:11, 380:18
**words** [7] - 302:11, 310:12, 310:16, 382:8, 408:25, 409:1, 409:8
**worldwide** [1] - 401:13
**writing** [3] - 343:23, 343:24, 344:1
**written** [4] - 337:19, 358:24, 370:21, 374:17

## Y

**year** [9] - 311:21, 312:23, 313:4, 315:5, 322:16, 323:17, 411:1, 411:5, 411:6
**years** [11] - 307:10, 327:14, 349:7, 361:18, 378:16, 400:18, 403:6, 403:19, 409:25, 410:3, 410:8
**yesterday** [4] - 293:20, 294:7, 298:23, 325:12
**York** [7] - 326:20, 326:24, 400:23, 402:22, 407:13, 407:19, 408:9
**yourself** [4] - 314:11, 326:16, 351:2, 402:10
**yourselves** [1] - 412:25

## Z

**ZINK** [43] - 290:15, 301:4, 301:15, 303:3, 325:19, 326:12, 326:15, 330:8, 331:11, 331:13, 331:17, 332:5, 338:25, 340:8, 340:18, 340:20, 345:20,

345:23, 346:1,
346:6, 350:9,
350:10, 350:18,
356:8, 356:10,
357:25, 370:13,
382:5, 393:3, 393:5,
393:24, 394:2,
395:16, 395:20,
396:1, 397:4, 397:9,
397:19, 397:20,
397:22, 397:24,
398:4, 398:10
**Zink** [6] - 301:24,
302:20, 303:1,
304:20, 310:20,
325:18
**ZINK**.................... [1] -
292:10
**ZINK**..................... [1]
- 292:8
**zones** [1] - 371:20

§

**§** [4] - 294:19, 298:19,
299:16, 300:11